**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____    Chapter    **11**

☐ Check if this an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | **Debtor's name** | **Charge Enterprises, Inc.** | |
| 2. | **All other names debtor used in the last 8 years** <br> Include any assumed names, trade names and *doing business as* names | **FDBA  GoIP Global, Inc.** <br> **FDBA  Transworld Holdings, Inc.** | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **90-0471969** | |

| | | | |
|---|---|---|---|
| 4. | **Debtor's address** | **Principal place of business** | **Mailing address, if different from principal place of business** |
| | | **125 Park Avenue, 25th Floor** <br> **New York, NY 10017** <br> Number, Street, City, State & ZIP Code | <br> <br> P.O. Box, Number, Street, City, State & ZIP Code |
| | | **New York** <br> County | **Location of principal assets, if different from principal place of business** <br> <br> Number, Street, City, State & ZIP Code |

| | | | |
|---|---|---|---|
| 5. | **Debtor's website** (URL) | **www.charge.enterprises** | |
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) <br><br> ☐ Partnership (excluding LLP) <br><br> ☐ Other. Specify: _____ | |

| Debtor | **Charge Enterprises, Inc.** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**7.  Describe debtor's business**

   A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

   B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

   C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

       5259

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply*:

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ■ A plan is being filed with this petition.

    ■ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ■ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| District | | When | | Case number | |
|---|---|---|---|---|---|
| District | | When | | Case number | |

Debtor   **Charge Enterprises, Inc.**                                   Case number (*if known*)
_____
Name

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No
☐ Yes.

List all cases. If more than 1, attach a separate list

| | | |
|---|---|---|
| Debtor _____ | | Relationship _____ |
| District _____ | When _____ | Case number, if known _____ |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes.    Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.    Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ■ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ■ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |

Debtor    **Charge Enterprises, Inc.**                                    Case number (*if known*) _____
          Name

☐ $50,001 - $100,000          ☐ $10,000,001 - $50  million      ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000         ☒ $50,000,001 - $100 million      ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million       ☐ $100,000,001 - $500 million     ☐ More than $50 billion

| Debtor | **Charge Enterprises, Inc.** | Case number (*if known*) | |
|--------|------------------------------|--------------------------|--|
| | Name | | |

| | **Request for Relief, Declaration, and Signatures** |
|--|------------------------------------------------------|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| 17. Declaration and signature of authorized representative of debtor | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|--|--|

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on      **March  7, 2024**
                 MM / DD / YYYY

**X** **/s/ Craig Harper-Denson**                      **Craig Harper-Denson**
Signature of authorized representative of debtor        Printed name

Title    **Authorized Officer**

---

**18. Signature of attorney**

**X** **/s/ Ian J. Bambrick**                      Date  **March  7, 2024**
Signature of attorney for debtor                         MM / DD / YYYY

**Ian J. Bambrick**
Printed name

**Faegre Drinker Biddle & Reath LLP**
Firm name

**222 Delaware Avenue**
**Suite 1410**
**Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone   **302-467-4200**        Email address   **ian.bambrick@faegredrinker.com**

**5455 DE**
Bar number and State

**Official Form 201A (12/15)**

*[If debtor is required to file periodic reports (e.g. forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11 of the Bankruptcy Code, this Exhibit "A" shall be completed and attached to the petition.]*

# United States Bankruptcy Court
## District of Delaware

In re  **Charge Enterprises, Inc.**

Debtor(s)

Case No.

Chapter  **11**

## Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11

1. If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is   **333-253073** .

2. The following financial data is the latest available information and refers to the debtor's condition on   **1/31/2024** .

   a. Total assets                                           $                **114,368,349.00**

   b. Total debts (including debts listed in 2.c., below)    $                **48,718,180.71**

   c. Debt securities held by more than 500 holders:

| | | | | | | Approximate number of holders: |
|---|---|---|---|---|---|---|
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | 0.00 | | 0 |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | 0.00 | | 0 |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | 0.00 | | 0 |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | 0.00 | | 0 |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | 0.00 | | 0 |
| d. Number of shares of preferred stock | | | | 10,603,393 | | 0 |
| e. Number of shares common stock | | | | 215,039,868 | | 0 |

   Comments, if any:

3. Brief description of Debtor's business:
   **Electrical, broadband & electric vehicle charging infrastructure co. that provides clients w/ end-to-end project mgmt services: advising, designing, engineering, acquiring & installing equipment to monitoring, servicing & maintenance**

4. List the name of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:
   **Andrew Fox**
   **Gabriel 613 Trust**
   **Arena Investors, LP**
   **Kenneth Orr**

## CERTIFICATE

I, Jim Biehl, Chief Legal Officer, Chief Compliance Officer and Secretary of Charge Enterprises, Inc., a Delaware corporation, (the "Company"), DO HEREBY CERTIFY that Exhibit A is a true and correct copy of resolutions duly adopted at a meeting of the Board of Directors of the Company duly held and convened on March 4, 2024, at which meeting a duly constituted quorum of the Board of Directors was present and acting throughout and that such resolutions have not been modified, rescinded or revoked and are at present in full force and effect.

IN WITNESS WHEREOF, the undersigned has executed this Certificate this __6th__ day of March, 2024.

/s/ Jim Biehl
By: Jim Biehl
Title: Chief Legal Officer, Chief Compliance Officer and Secretary

Charge Enterprises, Inc.

US.362425855.01

**Exhibit A**

**Resolutions of the Board of Directors**

**WHEREAS,** the Board of Directors (the "Board") of Charge Enterprises, Inc., a Delaware corporation (the "Company") has reviewed and considered the financial and operational condition of the Company and the Company's business on the date hereof, including the historical performance of the Company, the assets of the Company, the current and long-term liabilities of the Company, the market for the Company's assets, and credit market conditions;

**WHEREAS**, the Board previously resolved to explore strategic alternatives for the Company and, in particular, (i) approved the appointment of Piper Sandler & Co.("Piper Sandler") to assist the Company in addressing its debt and liquidity positions and to consider all strategic alternatives including restructuring or refinancing our debt, seeking additional debt or equity capital, reducing or delaying our business activities and strategic initiatives, or selling assets, other strategic transactions and/or other measures (any such transaction, a "Potential Transaction") and (ii) granted the Special Committee of the Board the authority to act as the transaction committee for any such Potential Transaction;

**WHEREAS**, the Board has surveyed potential restructuring options for the Company, including any Potential Transactions, and has considered presentations by management as well as financial and legal advisors to the Company (such advisors in such applicable capacities, collectively, the "Advisors") regarding the assets, liabilities and liquidity situation of the Company, the strategic alternatives available to the Company and the impact of the foregoing on the Company's business, prospects and enterprise value; and

**WHEREAS**, the Board has reviewed, had the opportunity to consult with, and ask questions of, the management and Advisors, and fully considered each of the strategic alternatives available to the Company, including the relative risks and benefits of pursuing a bankruptcy proceeding under the provisions of chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code");

**WHEREAS**, the Board previously approved the Company's entry into a Restructuring and Plan Support Agreement, including the attached bankruptcy plan term sheet, dated as of February 27, 2024, by and among certain affiliates of Arena Investors, L.P. ("Arena") and the Company (the "RSA") .

**NOW, THEREFORE, BE IT:**

**Commencement and Prosecution of Chapter 11 Cases**

**RESOLVED**, that, in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, stockholders, and other interested parties, that a voluntary petition (the "Petition") be filed by the Company in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") commencing a case (the "Chapter 11 Case") under the provisions of chapter 11 of the Bankruptcy Code in accordance with the RSA; and it is further

US.362624277.02

**RESOLVED**, that the Authorized Officers (as defined below) of the Company, be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, in the name of and on behalf of the Company, to execute, acknowledge, deliver, and verify the Petition and to cause the same to be filed with the Bankruptcy Court at such time as such Authorized Officer may determine; and it is further

**RESOLVED**, that the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered in the name of and on behalf of the Company, to execute, acknowledge, deliver, and verify and file any and all schedules, statements of affairs, lists, and other papers and to take any and all related actions that such Authorized Officers may deem necessary or proper in connection with the filing of the Petition and commencement of the Chapter 11 Case; and it is further

**RESOLVED**, that the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, from time to time in the name and on behalf of the Company, to perform the obligations of the Company under the Bankruptcy Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices, and documents to be executed and delivered in such form, as any Authorized Officer performing or executing the same shall approve, and the performance or execution thereof by such Authorized Officer shall be conclusive evidence of the approval thereof by such Authorized Officer and by the Company; and it is further

**RESOLVED**, that the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered from time to time in the name and on behalf of the Company, to cause the Company to enter into, execute, deliver, certify, file, record, and perform such agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, certificates or other documents, to pay all expenses, including filing fees, and to take such other actions, as in the judgment of such Authorized Officers, shall be necessary, proper, and desirable to prosecute to a successful completion the Chapter 11 Case and to effectuate the restructuring or liquidation of the Company's debt, other obligations, organizational form and structure, and ownership of the Company, all consistent with the foregoing resolutions and to carry out and put into effect the purposes of these resolutions, and the transactions contemplated by these resolutions, their authority thereunto to be evidenced by the taking of such actions; and it is further

## Retention of Professionals

**RESOLVED**, that the law firm of Faegre Drinker Biddle & Reath LLP ("<u>Faegre Drinker</u>") be, and hereby is, authorized, directed, and empowered to represent the Company as corporate, finance, restructuring, and bankruptcy counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Chapter 11 Case; and in connection therewith, the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to the filing of the

US.362624277.02

Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of Faegre Drinker; and it is further

**RESOLVED**, that Berkeley Research Group, LLC ("BRG") be, and hereby is, authorized, directed, and empowered to represent the Company as financial restructuring adviser to represent and assist the Company in carrying out its duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights and obligations in connection with the Chapter 11 Case; and in connection therewith, the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company, to execute appropriate retention agreements, pay appropriate retainers, if required, prior to the filing of the Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of BRG; and it is further

**RESOLVED**, that Piper Sandler be, and hereby is, authorized, directed, and empowered to represent the Company as investment banker and financial adviser to represent and assist the Company in connection with the potential restructuring, reorganization, or other strategic alternatives relating to the Company's business or assets and in carrying out its duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights and obligations in connection with the Chapter 11 Case; and in connection therewith, the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company, to execute appropriate retention agreements, pay appropriate retainers, if required, prior to the filing of the Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of Piper Sandler; and it is further

**RESOLVED**, that Squire Patton Boggs (US) LLP ("Squire") be, and hereby is, authorized, directed, and empowered to represent the Company as special litigation counsel to represent and assist the Company in connection with certain corporate litigation matters in connection with the Chapter 11 Case; and in connection therewith, the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company, to execute appropriate retention agreements, pay appropriate retainers, if required, prior to the filing of the Chapter 11 Case, and to cause to be filed an appropriate motion or application for authority to retain the services of Squire; and it is further

**RESOLVED**, that Epiq Corporate Restructuring, LLC ("Epiq") be, and hereby is, authorized, directed, and empowered to serve as the notice, claims, solicitation, balloting, and administrative agent in connection with the Chapter 11 Case; and in connection therewith, the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers, if required, prior to the filing of the Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of Epiq; and it is further

**RESOLVED**, that the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the

Company to employ any other individual and/or firm as professionals, consultants, financial advisors, or investment bankers to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and in connection therewith, the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to the filing of the Chapter 11 Case, and to cause to be filed an appropriate application for authority to retain the services of such firms.

## Post-Petition Financing/ "DIP' Financing Term Sheet

**WHEREAS**, the Company, as debtor and debtor in possession under the Chapter 11 Case, intends to obtain senior secured, superpriority, postpetition financing and the use of cash collateral (the "DIP Financing") on the terms and conditions of the proposed debtor-in-possession financing term sheet, substantially in the form attached hereto as Exhibit A (together with any ancillary documents, the "DIP Term Sheet") between the Company as borrower and one or more affiliates of Arena as postpetition lender (the "DIP Lender") and other agents and entities from time to time party thereto, and to grant to and for the benefit of the DIP Lender security interests in and liens with priority under section 364(c) of the Bankruptcy Code upon some, any, or all of the Company's assets; and

**WHEREAS**, the Company will obtain benefits from the incurrence of the loans, issuance of any letters of credit and guaranties, and any and all related transactions contemplated under a DIP financing agreement consistent with the terms set forth in the DIP Term Sheet (collectively, the "DIP Financing Transactions"), which are necessary and appropriate to the conduct, promotion and attainment of the business of the Company.

**RESOLVED**, that the Company is authorized to obtain DIP Financing and to grant to and for the benefit of the DIP Lender security interests in and liens with priority under section 364(c) of the Bankruptcy Code upon some, any, or all of the Company's assets on terms and conditions set forth in the DIP Term Sheet, with such changes, additions, and modifications thereto as an Authorized Officer executing the same shall approve, such approval to be conclusively evidenced by a Authorized Officer's execution and delivery thereof; and it is further

**RESOLVED**, that the Special Committee is hereby authorized to negotiate and approve a definitive agreement for the DIP Financing and DIP Financing Transactions; and it is further

**RESOLVED**, that the Authorized Officers be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company, to secure the payment and performance of any post-petition financing by (i)(a) pledging or granting liens or mortgages on, or security interests in, all or any portion of the Company's assets, whether now owned or hereafter acquired, and (b) causing any subsidiary of the Company, if any, to pledge or grant liens or mortgages on, or security interests in, all or any portion of such subsidiary's assets, whether now owned or hereafter acquired, and (ii) entering into or causing to be entered into, including, without limitation, causing any subsidiaries of the Company to enter into, such credit agreements, guaranties, other debt instruments, security agreements, pledge agreements, control agreements, inter-creditor agreements, mortgages, deeds of trust, and other

agreements as are necessary, appropriate, or desirable to effectuate the intent of, or matters reasonably contemplated or implied by, this resolution in such form, covering such collateral and having such other terms and conditions as are approved or deemed necessary, appropriate, or desirable by the Authorized Officer executing the same, the execution thereof by such Authorized Officer to be conclusive evidence of such approval or determination.

## General Resolutions

**RESOLVED**, that the Board hereby adopts any resolution required under the applicable securities laws of any jurisdiction to be adopted in connection with any of the transactions contemplated hereby, if (i) in the opinion of any Authorized Officer, the adoption of such resolution is necessary or advisable, and (ii) the corporate secretary of the Company evidences such adoption by inserting into the minute book of the Company a copy of such resolution, which will thereupon be deemed to have been adopted by the Board with the same force and effect as if specifically presented to a duly called meeting of the Board; and it is further

**RESOLVED**, that the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer and Chief Legal Officer (the "Authorized Officers") are hereby each severally authorized in the name of and on behalf of the Company to perform any and all acts as may be necessary or desirable to execute, file and deliver all instruments and other documents contemplated by the foregoing resolutions and to take any and all further action that such person or persons may deem necessary or desirable to effectuate any action authorized by these resolutions and otherwise to carry out the purposes and intentions of the foregoing resolutions; and the execution by any such person or persons of any such documents or the performance by any such person or persons of any such act in connection with the foregoing matters shall conclusively establish his or her authority therefor from the Company and the approval and ratification by the Company of the documents so executed and the actions so taken; and it is further

**RESOLVED**, that any and all actions heretofore taken by any Authorized Officer in connection with the transactions and other matters contemplated by the foregoing resolutions are hereby ratified, approved, confirmed and accepted in all respects.

US.362624277.02

**Exhibit A**

<table>
<tr><td colspan="2" align="center">**DIP Facility**<br>**Summary of Terms and Conditions**</td></tr>
<tr><td colspan="2">This summary of terms and conditions (the "<u>DIP Term Sheet</u>") of a proposed debtor-in-possession credit facility (the "<u>DIP Facility</u>") which shall be binding on the undersigned Parties (as defined below) from and after, and subject to, the entry of the Interim DIP Order (as defined below) by the Bankruptcy Court (as defined below). In the event of any conflict between this DIP Term Sheet and the terms of the DIP Orders (as defined below), the terms of the DIP Orders shall govern</td></tr>
<tr><td><u>Borrower</u>:</td><td>Charge Enterprises, Inc. (the "<u>Borrower</u>" or "<u>Debtor</u>")</td></tr>
<tr><td><u>DIP Agent</u>:</td><td>AI Amped I, LLC (the "<u>DIP Agent</u>")</td></tr>
<tr><td><u>DIP Lenders</u>:</td><td>AI Amped I, LLC (the "<u>DIP Lenders</u>" and collectively with the Borrower and DIP Agent, the "<u>Parties</u>")</td></tr>
<tr><td><u>DIP Facility</u>:</td><td>A multiple-draw senior secured priming term loan facility (the "<u>DIP Facility</u>," and all loans under such DIP Facility, collectively, the "<u>DIP Loans</u>," and each, a "<u>DIP Loan</u>") in the aggregate principal amount of up to $10,000,000 (the "<u>Total Commitment Amount</u>"), in each case subject to and in accordance with the DIP Budget (as defined below).<br><br>All DIP Loans outstanding under the DIP Facility (together with all accrued and unpaid interest, fees, expenses and other amounts payable under or in respect of the DIP Facility, collectively, the "<u>DIP Facility Obligations</u>") shall become due and payable on the Maturity Date (as defined below).</td></tr>
<tr><td><u>DIP Loan Documents</u>:</td><td>The DIP Facility shall be governed by the DIP Orders (as defined below), this DIP Term Sheet , the DIP Budget, the DIP Credit Agreement (as defined below), and all instruments and documents executed at any time in connection therewith, each as may be amended, restated, supplemented or otherwise modified from time to time in accordance with their terms shall be referred to collectively as the "<u>DIP Loan Documents</u>."<br><br>If the DIP Agent and the DIP Lenders determine there is a need for a debtor in possession credit agreement in respect of the DIP Facility (the "<u>DIP Credit Agreement</u>"), the Parties shall work together in good faith to negotiate and document the DIP Credit Agreement within a reasonable (consistent with the term of this DIP Term Sheet) time period, and in any event prior to the deadline for entry of the Final DIP Order. The DIP Credit Agreement will be based on a customary form for debtor-in-possession financing transactions of this type as selected by the DIP Lenders, will include the terms and conditions of this DIP Term Sheet, such representations and warranties, mandatory prepayment provisions, affirmative and negative covenants and events of default and such other terms and conditions, in each case as are customary for debtor-in-possession financing transactions of this type as selected by the DIP Lenders and be</td></tr>
</table>

A-6

| | |
|---|---|
| | otherwise in form and substance acceptable to the DIP Lenders in their sole discretion. |
| Bankruptcy Case: | The bankruptcy case (the "Bankruptcy Case") of the Borrower to be filed under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on or before the milestone set forth in the RSA. |

A-7

| Terms & Conditions – DIP Facility | |
|---|---|
| <u>Availability</u>: | Subject to the entry by the Bankruptcy Court of an interim order approving the DIP Facility on an interim basis, in form and substance acceptable to the DIP Lenders (the "<u>Interim DIP Order</u>"), and satisfaction by the Borrower of the conditions precedent set forth in the "Conditions Precedent to the Initial DIP Loans" section of this DIP Term Sheet, the Borrower shall be permitted to borrow an amount up to $4,000,000 (or such greater amount, as approved in writing by the DIP Lenders in their sole discretion) (the "<u>Initial DIP Loan</u>") for the purposes set forth below and in accordance with the DIP Budget (as defined below).<br><br>Subject to the entry by the Bankruptcy Court of an order approving the DIP Facility on a final basis, in substantially the same form as the Interim DIP Order and otherwise in form and substance acceptable to the DIP Lenders in their sole discretion, the "<u>Final DIP Order</u>" and, together with the Interim DIP Order, the "<u>DIP Orders</u>", and each a "<u>DIP Order</u>"), and satisfaction by the Borrower of the conditions precedent set forth in the "Conditions Precedent to Each Subsequent Borrowing" section of this DIP Term Sheet, the Borrower shall be permitted to borrow an additional aggregate amount up to (x) the Total Commitment Amount *minus* (y) the principal amount of the Initial DIP Loan in one or more subsequent borrowings (each a "<u>Subsequent DIP Loan</u>") for the purposes set forth below and in accordance with the DIP Budget; *provided* that the Borrower may not borrow less than $500,000 in any individual subsequent borrowing, and no Subsequent DIP Loan shall be requested or made within three (3) business days of a prior Subsequent DIP Loan. |
| <u>Term</u>: | Unless otherwise extended in writing by the DIP Lenders in their sole discretion, the period from the Funding Date (as defined below) to the earliest of: (i) the Scheduled Maturity Date (as defined below); (ii) the occurrence of an Event of Default (as defined below); (iii) the effective date of a plan of reorganization of the Borrower approved by the Bankruptcy Court (the "<u>Confirmed Plan</u>") pursuant to section 1129 of the Bankruptcy Code; (iv) the consummation of a sale of all or substantially all of the assets of the Borrower or its subsidiaries; or (v) the date of the entry of an order converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code (such date with respect to (i) through (v), the "<u>Maturity Date</u>").<br><br>"<u>Scheduled Maturity Date</u>" shall mean May 31, 2024. |

US.362624277.02

| Funding Date: | The date on which each of the conditions precedent set forth in the "Conditions Precedent to the Initial DIP Loans" section of this DIP Term Sheet below shall have been met (the "<u>Funding Date</u>"). |
|---|---|
| Use of Proceeds: | Subject to the provisions of the DIP Order, and in accordance with the DIP Budget, proceeds of the DIP Loans may be used by the Borrower to: (a) finance their working capital needs and for other general corporate purposes, (b) pay related transaction costs, fees, liabilities and expenses (including professional fees and expenses), adequate protection payments, and other administration costs incurred in connection with and for the benefit of the Bankruptcy Case, in each case in accordance with the DIP Budget; and (c) fees, liabilities and expenses (including professional fees and expenses incurred by the DIP Agent and the DIP Lenders) under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility.  Nothing in the DIP Order shall authorize the disposition of any assets of the Borrower outside the ordinary course of business, or Borrower's use of any proceeds resulting therefrom, except in accordance with the DIP Budget. |
| | No proceeds of the DIP Loans, any Cash Collateral, any DIP Collateral or Prepetition Collateral, or the Carve-Out, shall be used, among other things, whether directly or indirectly: |
| | (i)     to finance or reimburse for expenses incurred or to be incurred, in both instances, in any way: (a) any investigation, adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of DIP Lenders, the DIP Agent or the Prepetition Secured Parties (as defined below), or their respective rights and remedies under the DIP Facility, the DIP Orders, the DIP Loan Documents, or the Notes and other documents and instruments in respect of the Prepetition Secured Obligations (as defined below); or (b) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility; |
| | (ii)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders or that is not in accordance with the DIP Budget; |
| | (iii)    to make any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments) that is not in accordance with the express terms of the DIP Budget; |
| | (iv)    to make any payment to any board member, in such capacity as such, or shareholder of the Debtor or any of its affiliates or subsidiaries; or |

US.362624277.02

| | |
|---|---|
| | (v)    to make any payment in settlement of any claim, action or proceeding without Bankruptcy Court approval and the prior written consent of the DIP Lenders, which consent will not be unreasonably withheld or delayed. |
| DIP Proceeds Account: | The DIP Proceeds shall be funded into a controlled, segregated bank account (the "DIP Proceeds Account"), which DIP Proceeds Account (and the funds therein) shall be subject to first-priority senior security interests in favor of the DIP Agent, including a control agreement in favor of the DIP Agent. |
| Interest: | DIP Loans under the DIP Facility shall bear interest at a rate per annum equal to Secured Overnight Financing Rate ("SOFR") for a one month interest period (floor of 5.00%) plus 10.00% paid in cash at the end of each applicable interest rate period.  Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.<br><br>All accrued and unpaid interest shall be paid on the Maturity Date.  In the event any amounts remain outstanding after the Maturity Date, interest on such amounts shall be payable at the default rate in cash, upon demand by the DIP Agent.  During the continuance of an Event of Default (as defined below), any amounts outstanding under the DIP Facility will bear interest at an additional 5.00% per annum above the then applicable interest rate. |
| OID/Upfront Fee: | The Borrower shall pay 1.00% of the principal amount of the aggregate commitments under the DIP Facility in cash on the Funding Date, which amount may be netted from the Initial DIP Loan. |
| Exit Fee: | The Borrower shall pay 3.00% of the principal amount of the aggregate commitments under the DIP Facility in cash upon any termination or repayment or prepayment of principal amount of the DIP Facility or any commitment thereunder, whether through optional prepayments, mandatory prepayments, at maturity, upon acceleration or otherwise to any DIP Lender; provided, however, such fee shall be deemed waived upon consummation of the Plan (as defined below). |
| Mandatory Prepayments: | Mandatory prepayments of the DIP Loans shall be required in an amount equal to (i) 100% of the proceeds from asset sales or series of related asset sales by the Borrower, net only of actual costs necessary to close such sale or sales, so long as such costs are approved by the Bankruptcy Court; (ii) 100% of insurance and condemnation proceeds (including the return of unearned premiums), in each case received by the Borrower; and (iii) 100% of the proceeds of any extraordinary amounts received by or on behalf of the Borrower, including without limitation, the proceeds of the incurrence of any indebtedness (including any indebtedness incurred under section 363 or 364 of the Bankruptcy Code from anyone other than the DIP Lenders) or any equity |

US.362624277.02

| | |
|---|---|
| | contributions. Mandatory Prepayments shall be subject to the Make Whole Amount (as defined below). |
| <u>Voluntary Prepayments</u> | The DIP Loans shall not be voluntarily prepaid under any circumstance. A Make Whole Amount (as defined below) shall be payable upon acceleration, termination, prepayment, or repayment. "Make Whole Amount" means, as of any date of determination, an amount equal to the aggregate amount of interest which would have otherwise been payable on the principal amount of the DIP Loans repaid or prepaid (or deemed repaid or prepaid in the case of acceleration or termination) on such date from the date of repayment or prepayment until the Scheduled Maturity Date discounted at the Treasury Rate (as defined below) plus 0.50%. <br><br> "Treasury Rate" means, with respect to any repayment or prepayment of DIP Loans, a rate per annum (computed on the basis of actual days elapsed over a year of 360 days) equal to the rate determined by the DIP Agent on the date falling three Business Days prior to the date of such repayment or prepayment, to be the yield expressed as a rate listed in the Wall Street Journal for United States Treasury securities most nearly equal to the period from the date of such prepayment or repayment to and including the Scheduled Maturity Date. |
| <u>DIP Superpriority Claims; Priority:</u> | Subject only to the Carve-Out (as defined below), all amounts owing by the Borrower under the DIP Facility at all times will constitute allowed superpriority administrative expense claims in the Bankruptcy Case, having priority over all claims and administrative expense claims against the Borrower, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, and shall at all times be senior to the rights of the Borrower and any successor trustee or creditor in the Bankruptcy Case or any successor case thereto. <br><br> All liens authorized and granted pursuant to the DIP Order entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date (as defined below), without necessity of the execution, filing or recording of security agreements, pledge agreements, control agreements, financing statements or other agreements and no further filing, notice or act will be required to effect such perfection. <br><br> However, the DIP Agent shall be permitted (and is hereby authorized by the Debtor), but not required, to (or to require the Debtors to) make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under federal or state |

A-11

| | |
|---|---|
| | law in order to reflect the security, perfection or priority of the DIP Lenders' claims described herein, including prior to the Petition Date. |
| DIP Liens; DIP Collateral: | All obligations of the Borrower under the DIP Facility shall be secured by the following: |

     (i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected first-priority liens on and security interests in all DIP Collateral that is not subject to any liens or encumbrances immediately prior to the Petition Date, subject only to the Carve Out; and

     (ii)   pursuant to section 363(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected first priority, priming liens on and security interests in all other DIP Collateral, which liens and security interests shall be subject only to (x) any valid, enforceable, perfected, and non-avoidable lien or security interest in favor of any person other than the Prepetition Secured Parties that was in existence immediately prior to the Petition Date or that is perfected as permitted by Section 546(b) of the Bankruptcy Code (a "Permitted Encumbrance") and (y) the Carve-Out, and senior to all other liens and encumbrances in respect of the DIP Collateral ((i) – (ii), collectively, the "DIP Liens").

"DIP Collateral" shall include all assets (whether tangible, intangible, personal or mixed) of the Borrower, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, contracts, patents, copyrights, trademarks and other general intangibles, commercial litigation claims, the proceeds of all claims or causes of action, and all rents, products, offspring, profits and proceeds thereof (including, without limitation, all Prepetition Collateral and, subject to the entry of the Final DIP Order, all claims or causes of action of the Borrower arising under section 502(d), 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law avoidance actions under chapter 5 of the Bankruptcy Code).

The DIP Liens shall be enforceable against and binding upon the Borrower, its estate and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Borrower's Bankruptcy Case, or any Successor Case (as defined below).

The Borrower shall use a cash management system that is the same as or substantially similar to its prepetition cash management system, or as otherwise agreed by the DIP Lenders and authorized by DIP Lenders (in

US.362624277.02

| | |
|---|---|
| | their sole discretion) and the Bankruptcy Court. The DIP Order shall provide the DIP Lenders with a valid, binding, perfected and enforceable first priority security interest in and lien on the cash held in the Borrower' bank accounts, subject only to Permitted Encumbrances, *provided that* nothing herein or in the DIP Order shall constitute an admission, or a finding or ruling by the Bankruptcy Court, that any alleged Permitted Encumbrance is valid, senior, enforceable, prior, perfected or non-avoidable. |
| Carve-Out: | The DIP Liens, Prepetition Secured Obligations, the Prepetition Liens, the Adequate Protection Superiority Claims (as defined below), and the Adequate Protection Liens (as defined below) shall, in all instances, be subject and subordinate to prior payment of the Carve-Out.  The "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) up to the amounts set forth in the respective DIP Budget line items and, to the extent allowed by the Bankruptcy Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official committee (the "Committee"), if any, appointed in the Bankruptcy Case (the "Committee Professionals," and together with the Debtor Professionals, the "Professionals") at any time on or before one business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iii) Allowed Professional Fees of Professionals in an aggregate amount not to exceed $325,000 incurred after delivery by the DIP Agent of the Carve-Out Trigger Notice (the amount set forth in this clause (iii) being the "Post Carve-Out Trigger Notice Cap"); provided that under no circumstances shall any success, completion, transaction or similar fees be payable from the Carve Out.. For purposes of this DIP Term Sheet, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to counsel to the Borrower, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post Carve-Out Trigger Notice Cap has been invoked. <br><br> Prior to the delivery of a Carve-Out Trigger Notice, the Borrower shall wire transfer funds, on a weekly basis, to an escrow account held by a qualified escrow agent to be agreed upon by the Parties ("Escrow Holder") (such account, to the extent of such funds actually deposited, the "Professional Fee Reserve Account") in an amount equal to, but not |

| | |
|---|---|
| | to exceed, the professional fees and costs set forth in the DIP Budget for Debtor Professionals for each such week. From such funds held in the Professional Fee Reserve Account, Escrow Holder shall release to the Debtor Professionals solely such amounts as are payable from time to time pursuant to the DIP Budget and an applicable order of the Bankruptcy Court, including an order approving interim compensation procedures in the Chapter 11 Case and any order granting interim or final fee applications for Professionals (each, a "<u>Fee Order</u>"). For the avoidance of doubt, (a) in making payments from the Professional Fee Reserve Account, Escrow Holder shall be entitled to rely upon written certifications of each Debtor Professional as to the amount such Debtor Professional is authorized pursuant to the DIP Budget and an applicable order of the Bankruptcy Court to be paid at such time from the Professional Fee Reserve Account; and (b) in no circumstances shall Escrow Holder be obligated to pay any Debtor Professional other than from the funds held, from time to time, in the Professional Fee Reserve Account in accordance with the DIP Budget and an applicable order of the Bankruptcy Court. Funds held in the Professional Fee Reserve Account shall be applied to Allowed Professional Fees that have been incurred following the Petition Date in accordance with the procedures established in the Bankruptcy Case (the "<u>Interim Fee Procedures</u>"). Payments and reimbursements made to a Professional prior to delivery of the Carve-Out Trigger Notice shall reduce the amounts available to such Professional under section (ii) of the Carve-Out, and neither the Professional Fee Reserve Account nor payments therefrom shall in any way increase the Carve-Out. All Allowed Professional Fees payable to Debtor Professionals shall be paid first from funds in the Professional Fee Reserve Account, if any, and, upon exhaustion thereof, from the Carve-Out (less any amounts previously funded into the Professional Fee Reserve Account). For the avoidance of doubt the DIP Liens, Prepetition Liens, and Adequate Protection Liens shall attach to, and shall have a residual right to and lien on, any excess funds in the Professional Fee Reserve Account after satisfaction of the Carve-Out in respect of Allowed Professional Fees, which excess funds shall then be used to satisfy amounts due under the DIP Facility, the Prepetition Secured Obligations, and the Adequate Protection Amount, as applicable, in each case, until paid in full in cash. |
| <u>Conditions Precedent to the Initial DIP Loans</u>: | The obligation of the DIP Lenders to provide Initial DIP Loan shall be subject to the satisfaction of the following conditions precedent and any other conditions precedent (the "<u>Initial Borrowing Conditions</u>"):<br><br>(i) The delivery of the Initial DIP Budget (as defined below) in form and substance satisfactory to the DIP Agent and DIP Lenders in their sole discretion;<br><br>(ii) Within three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form |

and substance satisfactory to the DIP Agent and DIP Lenders in their sole discretion authorizing and approving the DIP Facility and granting continued use of cash collateral and the transactions contemplated thereby, including, without limitation, authorizing customary stipulations and releases by the Debtor as set forth in the Interim DIP Order and the granting of valid, enforceable, non-avoidable and fully perfected superpriority priming security interests and liens on all DIP Collateral and superpriority claims in favor of the DIP Agent on behalf of itself and the DIP Lenders and adequate protection to the Prepetition Secured Parties as set forth herein, and such Interim DIP Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge and the Debtor shall be in compliance with the Interim DIP Order;

(iii)   All orders entered by the Bankruptcy Court pertaining to cash management, adequate protection, and all other "first day" relief, and all motions and other documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent and DIP Lenders in their sole discretion;

(iv)   No Event of Default (as defined below) and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist or result from the borrowing of the Initial DIP Loan;

(v)   Receipt of a borrowing notice at least three (3) business days prior to proposed date of borrowing from the Borrower in form and substance satisfactory to the DIP Agent;

(vi)   All fees, costs, and expenses (including reasonable and documented legal and advisory fees and expenses) of the DIP Agent and DIP Lenders and other compensation required by the DIP Loan Documents and this DIP Term Sheet shall have been paid or reimbursed on or prior to the Funding Date;

(vii)   The DIP Lenders shall be satisfied that the Debtor has complied with the following customary closing conditions: (a) the delivery of corporate records and documents from public officials, secretary's certificates, and officer's certificates; and (b) evidence of authority. The Debtor and the transactions contemplated by this DIP Term Sheet and the DIP Orders shall be in compliance in all material respects with all applicable laws and regulations; and

(viii)   The DIP Agent and DIP Lenders shall have received all documentation and other information that the DIP Agent and/or the DIP Lenders reasonably request in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

A-15

| | |
|---|---|
| <u>Conditions Precedent to Each Subsequent DIP Loan</u>: | Unless otherwise indicated, the obligation to provide each DIP Loan after the Initial DIP Loan shall be subject to the satisfaction of the Initial Borrowing Conditions and the following additional conditions precedent: |

(i)    All Initial Borrowing Conditions have been satisfied and the Borrower remains in compliance with the terms of all such conditions immediately prior to and after giving effect to any Subsequent DIP Loans;

(ii)    The Borrower, the DIP Agent, the DIP Lenders, and each other party thereto shall have entered into the final DIP Loan Agreements, including the DIP Credit Agreement to the extent requested by the DIP Lenders as provided herein, and such DIP Loan Documents shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated;

(iii)    The Bankruptcy Court shall have entered the Final DIP Order, in form and substance satisfactory to the DIP Agent and DIP Lenders in their sole discretion authorizing and approving the DIP Facility and granting continued use of cash collateral and the transactions contemplated thereby, including, without limitation, authorizing customary stipulations and releases by the Debtor, granting waivers with respect to sections 506(c) and 552(b) of the Bankruptcy Code and marshaling as provided herein, and the granting of valid, enforceable, non-avoidable and fully perfected superpriority security interests and liens on all DIP Collateral and the granting superpriority claims, in each case in favor of the DIP Agent on behalf of itself and the DIP Lenders on a final basis and such Final DIP Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge;

(iv)    The Borrower shall be in compliance with all terms of the Interim DIP Order, the Final DIP Order, and the DIP Loan Documents;

(v)    The Borrower shall be in compliance with the DIP Budget;

(vi)    The representations and warranties contained in the DIP Loan Documents shall be true and correct as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date);

(vii)    No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist or result from the borrowing of the Subsequent DIP Loan;

A-16

|  | (viii) | All final orders entered by the Bankruptcy Court pertaining to cash management, adequate protection, and all other "second day" relief, and all motions and other documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent and DIP Lenders in their sole discretion; |
|  | (ix) | Receipt of a borrowing notice at least three (3) business days prior to proposed date of borrowing from the Borrower in form and substance satisfactory to the DIP Agent; |
|  | (x) | The Debtor and the transactions contemplated by the DIP Loan Document shall be in compliance in all material with all applicable laws and regulations; and |
|  | (xi) | All fees, costs, expenses (including reasonable and documented legal and advisory fees and expenses) of the DIP Agent and DIP Lenders and other compensation required by the DIP Loan Documents shall have been paid or reimbursed on or prior to the funding of any Subsequent DIP Loan in accordance with the Budget. |
| <u>Financial Reporting Requirements</u>: | The Borrower and its operating subsidiaries shall provide the DIP Agent with financial reporting customary and appropriate for similar loan agreements for similar debtor-in-possession financings or deemed by the DIP Agent appropriate or otherwise required by them in relation to this specific transaction, including without limitation the reporting obligations set forth in the DIP Order.<br><br>After delivery of the Initial DIP Budget (as defined below), the Borrower will subsequently provide the DIP Agent with an updated DIP Budget through the Outside Effective Date (as defined herein) every fourth Friday.<br><br>All DIP Budgets shall be subject to the approval of the DIP Lenders in their sole discretion. | |
| <u>DIP Budget and Budget Variance Covenant</u>: | The Borrower and the DIP Agent shall agree to an initial budget, including a cash-flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (the "<u>Initial DIP Budget</u>"). The "<u>DIP Budget Period</u>" shall refer to period commencing on the date that the Interim DIP Order is entered and the Outside Effective Date.<br><br>The Borrower will subsequently provide the DIP Agent with an updated budget every fourth Friday prior to the end of the DIP Budget Period for the remaining weeks left under the Initial DIP Budget. Each updated budget shall be subject to the approval of the DIP Lenders in their sole discretion (each such approved budget, a "<u>Supplemental Approved DIP Budget</u>" and together with the Initial DIP Budget, the "<u>DIP Budget</u>"); | |

A-17

<table>
<tr>
<td></td>
<td><u>provided</u> that until such time as the DIP Agent approves any updated budget, the Borrower shall be subject to and be governed by the terms of the Initial DIP Budget or such Supplemental Approved DIP Budget, as applicable, then in effect in accordance with the DIP Order.<br><br>The Borrower shall provide to the DIP Agent a budget variance report (the "<u>Budget Variance Report</u>") on the Friday of every other week during the DIP Budget Period, and the DIP Budget Variance Report shall set forth in reasonable detail actual receipts and disbursements of Borrower, together with a statement certifying compliance with the DIP Budget Covenant (as defined below) set forth below.  The Borrower shall not permit or suffer to exist, a negative variance of 15% or more of total aggregate Operating Disbursements and Non-Operating Disbursements (as reflected in the DIP Budget) in the aggregate from the amounts set forth in the DIP Budget (each, a "<u>Permitted Variance</u>"), tested on a cumulative rolling two (2) week basis (the "<u>DIP Budget Covenant</u>").<br><br>The DIP Agent shall have no obligation to permit the use of proceeds of DIP Loans or cash collateral, and the Borrower shall have no authority to use proceeds of DIP Loans or cash collateral, other than in accordance with the DIP Budget, subject to the DIP Budget Covenant and as set forth in the DIP Order.</td>
</tr>
<tr>
<td><u>Affirmative Covenants</u>:</td>
<td>The DIP Loan Documents will contain customary and appropriate affirmative covenants for debtor in possession financings of this type, and as otherwise determined by the DIP Lenders to be necessary and appropriate for this particular transaction, including, without limitation, the following which apply pursuant to this DIP Term Sheet:<br><br>The Borrower shall and shall cause each of its subsidiaries to, at all times, (a) comply with the DIP Order and each other order entered by the Bankruptcy Court in the Bankruptcy Case and all applicable laws, rules and regulations, (b) comply with the DIP Budget Covenant, (c) provide access to the DIP Agent and DIP Lenders to the Borrower's financial advisors, management team and books and records and other information (including historical information), in all cases, including with respect to strategic planning, cash, and liquidity management, and operational and restructuring activities (subject to customary exceptions), (d) operate in the ordinary course of business, and (e) absent emergent circumstances, deliver all pleadings, motions and other documents filed with the Bankruptcy Court on behalf of the Borrower to the DIP Agent at least two (2) days prior to filing such pleadings, motions or other documents with the Bankruptcy Court.</td>
</tr>
<tr>
<td><u>Negative Covenants</u>:</td>
<td>The DIP Loan Documents will contain customary and appropriate negative covenants for debtor in possession financings of this type, and</td>
</tr>
</table>

A-18

as otherwise determined by the DIP Lenders to be necessary and appropriate for this particular transaction, including, without limitation, the following which apply pursuant to this DIP Term Sheet:

The Borrower shall at all times not do, not cause to be done, and agree not to do or cause to be done any of the following: (a) create, incur, assume or permit to exist any indebtedness, other than the DIP Facility and the Prepetition Secured Obligations; (b) purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Borrower as of the Petition Date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of the Borrower or any subsidiary of the Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lenders in their sole discretion or is otherwise in accordance with the DIP Budget, (ii) any disposition which would indefeasibly satisfy the DIP Facility Obligations in full in cash, (iii) asset sales in the ordinary course of business and (iv) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business; (d) incur or make any Restricted Payment (as defined below), investment, loan or other payment without the prior written consent of the DIP Lenders, other than as expressly contemplated under the DIP Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization consistent with the Restructuring Support Agreement and otherwise acceptable to the DIP Lenders, or in a manner that is not materially adverse to the interests of the DIP Lenders without the prior written consent of the DIP Lenders; (f) absent prior written consent of the DIP Lenders assume or reject any executory contract or unexpired lease; (g) file or propose any plan of reorganization that is inconsistent with the Restructuring Support Agreement; (h) engage in any activities that would result in the Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (i) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of the Borrower without the prior written

A-19

|  | approval of the DIP Lenders (other than as expressly contemplated under the DIP Budget. |
|--|--|
|  | The Borrower shall and, shall cause each of its subsidiaries to, at all times not do, not cause to be done, and agree not to do or cause to be done any of the following: (1) other than liens securing the DIP Facility and the Prepetition Secured Obligations or liens existing prior to the Petition Date, create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except the Carve-Out; or (2) sell or transfer any property or assets, or purchase or acquire any property or assets, other than in the ordinary course of business or with the written consent of the DIP Agent. |
|  | As used in this DIP Term Sheet, "Restricted Payment" means, with respect to any person, (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or (b) any other distribution (by reduction of capital or otherwise), in each case directly or indirectly, whether in cash, property, securities or a combination thereof, with respect to any of its equity interests or directly or indirectly redeem, purchase, retire or otherwise acquire for value any of its equity interests or set aside any amount for any such purpose. |
| <u>Events of Default:</u> | Each of the following shall be an event of default (each an "<u>Event of Default</u>") under the DIP Loan Documents, including under this DIP Term Sheet: |
|  | (i)    there is a material breach under the Restructuring Support Agreement dated February 25, 2024 among Charge and Arena (each as defined therein) (the "<u>Restructuring Support Agreement</u>") or the Restructuring Support Agreement terminates; |
|  | (ii)    the Borrower's failure to timely meet any Milestone (as defined below) unless extended in writing by the DIP Lenders; |
|  | (iii)    the Borrower's noncompliance with the DIP Budget or the DIP Budget Covenant which is not curable or, solely if curable, not cured within two (2) business days; |
|  | (iv)    the entry of an order: (a) appointing a trustee, receiver or examiner with expanded powers, including to manage the Borrower's business, (b) dismissing the Borrower's Bankruptcy Case, (c) converting the Borrowers' Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (d) terminating or reducing the Borrower's exclusivity period under section 1121 of the Bankruptcy Code for any reason whatsoever, or the expiration of such period without extension; |

US.362624277.02

(v)    the granting of relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any assets of the Borrower in excess of $100,000, in the aggregate;

(vi)   the filing of a motion by the Borrower, without written consent of the DIP Lenders, to incur debt secured by a lien with priority equal to, or superior to, the DIP Liens, the Prepetition Liens or the Adequate Protection Liens, or any of them, or which is given superpriority administrative expense status under section 364(c) of the Bankruptcy Code, unless such motion provides for the proceeds of such debt to be used for the indefeasible payment in full in cash of the DIP Loans, the Prepetition Secured Obligations, the Adequate Protection Amount, and any and all other amounts due to the DIP Lenders and the Prepetition Secured Parties;

(vii)  entry of an order granting any lien or superpriority claim with the priority set forth immediately above;

(viii) the filing of a motion by the Borrower to use cash collateral of the DIP Lenders or the Prepetition Secured Parties under section 363(c) of the Bankruptcy Code or any equivalent provision of relevant applicable law without prior written consent of the DIP Lenders and the Prepetition Secured Parties;

(ix)   the Borrower shall (a) challenge or contest the validity or enforceability of the DIP Orders or deny that it has further liability thereunder, (b) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the obligations under the DIP Facility, the DIP Liens, the DIP superpriority claims, the Adequate Protection Liens, Adequate Protection Amount, the Adequate Protection Superpriority Claims, the Prepetition Secured Obligations, or the Prepetition Liens, (c) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the obligations under the DIP Facility, the DIP Liens, the DIP superpriority claims, the Adequate Protection Liens, Adequate Protection Amount, the Adequate Protection Superpriority Claims, the Prepetition Secured Obligations, or the Prepetition Liens, (d) investigate, join or file any motion, application or other pleading in support of, or publicly support any other entity that has asserted any of the claims, challenges or other requested relief contemplated in clauses –a) - (c) above.

(x)    entry of an order staying, reversing, vacating, or otherwise modifying the DIP Facility or the DIP Orders in any manner not consented to in writing by the DIP Lenders;

(xi)   the filing by the Borrower of any motion or a pleading seeking to stay, reverse, amend, vacate, or modify any of the provisions of the

A-21

|  | Interim DIP Order other than in connection with a Final DIP Order consented to by the DIP Lenders; |
|---|---|
|  | (xii) the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against or in relation to any DIP Lender or the DIP Collateral; |
|  | (xiii) cessation of liens or superpriority claims granted in the DIP Orders to be valid, perfected and enforceable in all respects with the priority described herein; and |
|  | (xiv) the filing of any motion or other pleading by the Borrower seeking, supporting, or otherwise consenting to, entry of any of the orders described above, or the Borrower's failure to timely contest any such motion or pleading filed by another party, including but not limited to the filing by the Borrower of, or any motion or other pleading in support of, a plan of reorganization other than the Plan of Reorganization (as defined in the RSA). |
| Representations and Warranties: | All representations and warranties contained in the Notes (as defined below) and made by, or applicable to, the Debtor and its subsidiaries, are hereby incorporated herein by reference, *mutatis mutandis*, as of the date of this DIP Term Sheet, except to the extent such representations and warranties and negative covenants are violated as a result of the Debtor filing the Bankruptcy Case or existed prior to the Petition Date. In addition, on each Funding Date, the Borrower represents and warrants that it is in valid existence, has the requisite power, is due authorized, there is no conflict with the Interim DIP Order or the Final DIP Order (as applicable) or applicable law, governmental consent, enforceability of DIP Loan Documents, accuracy of financial statements, and all other non-forward looking information provided, compliance with law, absence of "Material Adverse Change" (other than arising from specified known events), no default under the DIP Loan Documents, taxes, subsidiaries, ERISA, pension and benefit plans, ownership of properties and necessary rights to intellectual property, insurance, inapplicability of Investment Company Act, compliance with OFAC, money laundering, PATRIOT Act and other anti-terrorism laws and anti-corruption laws, continued accuracy of representations and continued effectiveness of the applicable DIP Order and each other order of the Bankruptcy Court with respect to the DIP Facility. |
| Remedies: | In addition to other customary terms and remedies, and to such other rights and remedies as are available to the DIP Agent and DIP Lenders at law or at equity, subject to the Carve-Out, upon the occurrence and during the continuance of an Event of Default, the DIP Agent, in its sole and absolute discretion may immediately (w) deliver a notice of an Event of Default; (x) terminate any pending DIP Loans and use of Cash Collateral; (y) sweep all cash in any controlled accounts, and (z) terminate the DIP Facility. |

A-22

<table>
<tr>
<td></td>
<td>In the case of the enforcement of liens and other remedies with respect to the DIP Collateral and subject to the Carve-Out, the terms and conditions set forth in the DIP Orders will be customary and otherwise acceptable to the DIP Lenders in their sole discretion, and shall provide for the automatic stay to be modified to permit the DIP Agent and the DIP Lenders (in the case of any exercise of remedies upon the occurrence of an Event of Default, upon five (5) calendar days' written notice to counsel to the Debtors (the "Termination Notice") by the DIP Agent of the occurrence of an Event of Default (such 5-calendar day period, the "Default Notice Period")), to exercise all remedies under the DIP Orders, the other DIP Loan Documents and applicable law, including, without limitation, to (x) set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, (y) to otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (z) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided that during the Default Notice Period, the Debtor shall be permitted solely to continue to use drawn proceeds of the DIP Facility and any cash collateral subject to the consent of the DIP Lenders for any critical business-related expenses necessary to operate the Debtors' business and preserve the DIP Collateral as determined by the Debtor in its reasonable discretion and in good faith; and provided, further, that the only basis on which the Debtor, a committee (if any) or any other party-in-interest shall have the right to contest a Termination Notice shall be with respect to the validity of the Event of Default giving rise to such Termination Notice (i.e., whether or not such Event of Default has occurred or not).

Upon payment in full of the DIP Obligations, the foregoing enforcement rights may be exercised by the Prepetition Secured Parties.</td>
</tr>
<tr>
<td>Milestones:</td>
<td>The DIP Orders shall require the Borrowers to comply with the following milestones (collectively, the "Milestones"):

(i)    On or before the date that is three (3) business days after the Petition Date, the Interim DIP Order authorizing and approving on an interim basis the DIP Facility and the transactions contemplated thereby, in form and substance consistent with this DIP Term Sheet, shall have been entered by the Bankruptcy Court;

(ii)    The Debtor shall have filed its Plan of Reorganization which shall be in form and substance consistent with the RSA and otherwise</td>
</tr>
</table>

A-23

|  |  |  |
|---|---|---|
|  |  | acceptable to the DIP Lenders (the "Plan") and the related disclosure statement (the "Disclosure Statement") on the Petition Date; |
|  | (iii) | On or before the date that is thirty (30) days after the Petition Date, the Final DIP Order authorizing and approving the DIP Facility and the transactions contemplated thereby, in form and substance consistent with this DIP Term Sheet and approved by the DIP Lenders in their sole discretion, shall have been entered by the Bankruptcy Court; |
|  | (iv) | The Bankruptcy Court shall have entered an order scheduling a combined Disclosure Statement and Plan confirmation hearing within three (3) business days of the Petition Date; |
|  | (v) | The Bankruptcy Court shall have entered an order confirming the Plan (the "Confirmation Order") on or before forty-eight (48) days of the Petition Date; and |
|  | (vi) | The Plan shall be consummated and have gone effective on or before May 5, 2015 (the "Outside Effective Date"). |
| Costs and Expenses: | | As provided in the DIP Orders, the Borrower shall pay in cash in full (x) on the Funding Date and (y) thereafter, from time to time, all reasonable and documented out of pocket fees, costs and expenses of the DIP Agent and the DIP Lenders (including, without limitation, fees and disbursements of counsel, including White & Case LLP and local counsel, and financial and accounting advisors) in connection with the Bankruptcy Case, including, without limitation (i) the negotiation, preparation, execution and entry, as applicable, of the Restructuring Support Agreement, Plan Term Sheet and this DIP Term Sheet, (ii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by DIP Agent, the Borrower or any other person) in any way relating to the Restructuring Support Agreement, Plan Term Sheet, or this DIP Term Sheet, and (iii) the enforcement of any rights and remedies under the DIP Loan Documents, including, without limitation, any accrued and unpaid fees, costs and expenses of the DIP Agent and the DIP Lenders (including, without limitation, any fees and disbursements of counsel and any other advisors to the DIP Agent and to the DIP Lenders) prior to the Petition Date. |
| Indemnification; Expenses: | | The Borrower shall be obligated to indemnify and hold harmless the DIP Agent, the DIP Lenders and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives (collectively, the "Related Parties") from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsels) in connection with any investigation, litigation, or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated in |

US.362624277.02

| | |
|---|---|
| | this DIP Term Sheet; provided that, notwithstanding the foregoing, such indemnity shall not, as to any indemnitee, be available to the extent that such losses, damages, claims, liabilities and expenses resulted solely from the gross negligence or willful misconduct of such indemnitee as determined by the final non-appealable judgment of a court of competent jurisdiction. The Borrower Loan Parties shall be obligated to pay or reimburse the DIP Agent, the  DIP Lenders and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives incurred in connection with (i) the preparation, negotiation and execution of this DIP Term Sheet and the other DIP Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including out-of-pocket fees and disbursements of counsels) and (ii) the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this DIP Term Sheet or the other DIP Loan Documents (including out-of-pocket fees and disbursements of counsels). <br><br> To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against the DIP Agent, the DIP Lenders and their Related Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this DIP Term Sheet, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby. <br><br> The provisions of this section entitled "Indemnity; Expenses" shall survive the resignation or replacement of the DIP Agent, the termination of the DIP Loan Documents, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document. |
| Credit Bidding | For the avoidance of doubt, the Prepetition Secured Parties will have the rights to credit bid up to the full amount of the Prepetition Lender Claims (as defined herein). The DIP Agent, upon the instruction of the DIP Lenders, shall have the right and authority to credit bid up to the full amount of the DIP Obligations. |
| Assignments and Participations: | The Borrower shall not sell, assign or transfer any interest in the DIP Facility, or any of the obligations thereunder, or any portion thereof, including the Borrower' rights, title, interests, remedies, powers, and duties hereunder or thereunder, without the DIP Agent's prior written consent. |

A-25

| | The DIP Lenders shall be free to sell, assign or transfer any interest in the DIP Facility or any of the obligations thereunder, or any portion thereof, and to syndicate the DIP Loans (or any portion thereof), to any person or persons selected by DIP Lenders in their sole discretion. Subject to the foregoing, the DIP Order shall be binding upon and inure to the benefit of the successors and permitted assigns of the Borrower and the DIP Agent and DIP Lenders. |
|---|---|
| Prepetition Secured Parties: | AI Amped I, LLC ("AI Amped I") and AI Amped II, LLC ("AI Amped II," together with AI Amped I, the "Prepetition Secured Parties"), which hold claims against the Debtor under certain Securities Purchase Agreements, certain Convertible and Non-Convertible Promissory Notes (collectively, with the Securities Purchase Agreements, the "Notes"), and that certain Exchange Agreement collectively referred to herein as the "Prepetition Lender Claims." |
| Prepetition Secured Obligations: | The Debtor stipulates that the Prepetition Lender Claims are not less than $51M[1] in aggregate principal amount and are secured by a security interest in and first priority liens (the "Prepetition Liens") on substantially all assets of Borrower (the "Prepetition Collateral") pursuant to that certain Security Agreement dated as of December 17, 2021 (as amended, modified, and supplemented from time to time, the "Security Agreement") to secure the prompt payment, performance, and discharge in full of all of the Borrower's obligations under the Notes (the "Prepetition Secured Obligations"). |
| Cash Collateral of the Prepetition Secured Parties: | All of the Borrower's cash and cash equivalents as of the Petition Date, wherever located, including cash held in deposit accounts, whether as original collateral or proceeds of other Prepetition Collateral or DIP Collateral, constitutes Cash Collateral (as defined below) and is Prepetition Collateral of the Prepetition Secured Parties. "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363(a) of the Bankruptcy Code, in or on which the Prepetition Secured Parties have a lien, security interest or other interest. |
| Use of Cash Collateral: | Subject to the terms and conditions of the DIP Orders and this DIP Term Sheet, the Borrower will be authorized to use Cash Collateral in accordance with the DIP Budget for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of (a) the expiration of the Default Notice Period (subject to the terms and conditions set forth herein and in the DIP Orders) and (b) the date that is thirty (30) days after the Petition Date if the Bankruptcy Court has not |

[1] The Prepetition Lender Claims set forth herein do not include any liquidated damages, which the Borrower understands may be approximately $163,350,000.00 and with respect to which the Prepetition Secured Parties have reserved all rights.

US.362624277.02

entered the Final DIP Order on or before such date (unless such date is extended with the written consent of the Prepetition Secured Parties).

Subject to the provisions of the DIP Orders, and in accordance with the DIP Budget, Cash Collateral may be used during the Specified Period by the Borrower to: (a) finance their working capital needs and for any other general corporate purposes; and (b) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of the Bankruptcy Case.

No portion of the Cash Collateral, the proceeds of the DIP Facility, the Collateral, or the Carve-Out may be used:

(i)     for any purpose that is prohibited under the Bankruptcy Code or the DIP Order;

(ii)    unless expressly provided for in the DIP Budget, to make any payment or distribution, directly or indirectly, to any insider of the Debtor;

(iii)   to make any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments (including to and in foreign subsidiaries)) that is not in accordance with the express terms of the DIP Budget; and

(iv)    to finance or reimburse for expenses incurred or to be incurred, in both instances, directly or directly and in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Agents/Trustees, the Prepetition Secured Parties, or their respective rights and remedies under the DIP Facility, the Interim DIP Order, or the DIP Order or (ii) any other action, which with the giving of notice or passing of time, would result in an event of default under the DIP Facility.

| | |
|---|---|
| <u>Adequate Protection:</u> | Pursuant to sections 361, 362, 363(c)(2), 363(e), 364(d) and 507 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, as a result of the use of Prepetition Collateral, including Cash Collateral, the priming of their interests in Prepetition Collateral by the DIP Facility, and the imposition of the automatic stay (such diminution in value, the "<u>Adequate Protection Amount</u>").   As adequate protection for the Adequate Protection |

A-27

Amount, and solely to the extent of same, the Prepetition Secured Parties will be granted in the DIP Orders the following:

(i) *Adequate Protection Liens.* Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, effective as of the Petition Date and perfected without the need for execution by the Borrower or the recordation or other filing by the Prepetition Secured Parties of security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the Prepetition Secured Parties of any DIP Collateral, the Prepetition Secured Parties, solely to the extent of the Adequate Protection Amount, shall be granted valid, binding, continuing, enforceable, fully perfected, first priority senior replacement liens on and security interests in (collectively, the "Adequate Protection Liens") all DIP Collateral.

(ii) The Adequate Protection Liens shall be junior only to the DIP Liens, the Carve-Out and any Permitted Encumbrance. The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral. The Adequate Protection Liens shall be nonavoidable and shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code. The Adequate Protection Liens shall be enforceable against and binding upon the Borrower, its estate and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Borrower's Bankruptcy Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Borrower's Bankruptcy Case, or in any other proceedings superseding or related to any of the foregoing (each, a "Successor Case").

(iii) *Adequate Protection Superpriority Claims.* The Adequate Protection Amount due to the Prepetition Secured Parties shall constitute allowed superpriority administrative expense claims against the Borrower and its estate, as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all claims and administrative expense claims (except amounts due under the DIP Facility and the Carve-Out) against the Borrower, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, and shall at all times be senior to the rights of the Borrower and any successor trustee or creditor in the Bankruptcy Case or any Successor Case (the "Adequate Protection Superpriority Claims").

(iv) *Adequate Protection Payments.* The Borrower shall pay to the Prepetition Secured Parties all postpetition interest at the default rate, fees, and costs due, or that become due, under the Prepetition

US.362624277.02

<table>
<tr>
<td></td>
<td></td>
<td>Documents, as and when such amounts become due under the terms of the Prepetition Documents.</td>
</tr>
<tr>
<td></td>
<td>(v)</td>
<td>*Prepetition Secured Parties' Fees and Expenses.* The Borrowers shall pay the reasonable and documented prepetition and postpetition fees and disbursements of legal counsel and advisors to the Prepetition Secured Parties.</td>
</tr>
<tr>
<td></td>
<td>(vi)</td>
<td>*Reporting and Information.* To include, at a minimum, the reporting described above in "Financial Reporting Requirements" and "Other Reporting Requirements".</td>
</tr>
<tr>
<td><u>Stipulations; Waivers:</u></td>
<td colspan="2">The DIP Orders shall:</td>
</tr>
<tr>
<td></td>
<td>(i)</td>
<td>include customary stipulations with respect to the Prepetition Obligations and Prepetition Liens;</td>
</tr>
<tr>
<td></td>
<td>(ii)</td>
<td>include customary releases in favor of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, and their related parties;</td>
</tr>
<tr>
<td></td>
<td>(iii)</td>
<td>provide that nothing in the DIP Order or in the Plan shall prejudice, waive, or affect in any way Arena's claims as against the PTGi Guarantors;</td>
</tr>
<tr>
<td></td>
<td>(iv)</td>
<td>subject to the entry of the Final DIP Order, provide that in no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral, and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary; and</td>
</tr>
<tr>
<td></td>
<td>(v)</td>
<td>subject to the entry of the Final DIP Order, the Debtor (on behalf of itself and its estate) shall waive, and shall not assert in the Bankruptcy Case or any Successor Case, (a) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, upon the DIP Collateral or the Prepetition Collateral, and (b) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.</td>
</tr>
</table>

A-29

| Governing Law and Submission to Jurisdiction: | New York law except as governed by the Bankruptcy Code. Non-exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of remedies by the DIP Agent and DIP Lenders and preservation of the DIP Collateral's value. |
|---|---|

**CHARGE ENTERPRISES, INC.**

By: _____
Name: _____
Title: _____


**AI AMPED I, LLC**

By: _____
Name: _____
Title: _____

A-30

| Fill in this information to Identify the case: |
| --- |
| Debtor Name:   Charge Enterprises, Inc. |
| United States Bankruptcy Court for the:      District of Delaware |
| Case Number (If known):      24-_____ |

☐ Check if this is an
amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | ERNST & YOUNG U.S. LLP 100 NORTH TYRON STREET SUITE 3800 CHARLOTTE, NC  28202 | CONTACT: JEFFREY LEDFORD PHONE: 704-331-1824 JEFFREY.LEDFORD@EY.COM | TRADE DEBT | D | | | $300,999.93 |
| 2 | ISLAND CAPITAL GROUP ADVISOR LLC 717 5TH AVE 18 NEW YORK, NY  10022 | CONTACT: JEFFREY COHEN PHONE: (212) 705-5000 JCOHEN@ISLECAP.COM | TRADE DEBT | | | | $120,000.00 |
| 3 | ASSURED PARTNERS 445 HAMILTON AVE 10TH FLOOR WHILE PLAINS, NY  10601 | CONTACT: ALEX CANTER PHONE: (914) 761-9000 MARIA.GALATAS@ASSUREDPARTNERS.COM | TRADE DEBT | | | | $75,256.00 |
| 4 | SEDELCO, LLC (PATRICK MANEY) 12 ELMWOOD ROAD ALBANY, NY  12204 | CONTACT: PATRICK MANEY PMANEY@NEXTRIDGEINC.COM | TRADE DEBT | | | | $40,000.00 |
| 5 | FARKOUH, FURMAN & FACCIO 460 PARK AVE 12TH FLOOR NEW YORK, NY  10022 | CONTACT: ALEX FUONG PHONE: (212) 245.5900 AFUONG@FFFCPAS.COM | TRADE DEBT | | | | $37,949.50 |
| 6 | TRADIGITAL MARKETING GROUP, INC. 12 E 49TH ST FLOOR 11 NEW YORK, NY  10017 | CONTACT: SARAH WARE PHONE: 212-389-9782 SWARE@TRADIGITALIR.COM | TRADE DEBT | | | | $10,000.00 |
| 7 | ISSUER DIRECT ONE GLENWOOD AVE SUITE 1001 RALEIGH, NC  27603 | CONTACT: LYN GERSALIA PHONE: (919) 705-0232 ACCOUNTING@ISSUERDIRECT.COM | TRADE DEBT | D | | | $5,100.00 |

Debtor: Charge Enterprises, Inc.  

Case Number (if known): 24-_____

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8   AP BENEFIT ADVISORS, LLC GENERAL  PREMIUM TRUST PO BOX 42507 PHILADELPHIA, PA  19101-2506 | CONTACT: ALEX CANTER ASSUREDANSWERS@ASSUREDPARTNERS.COM | TRADE DEBT | | | | $1,873.55 |
| 9   YOUR EQUITY SOLUTIONS 342 HIGHWAY 13 CUNNINGHAM, TN  37052 | CONTACT: CHRIS COX CHRIS.COX@YESEQUITYPLANS.COM | TRADE DEBT | | | | $1,450.00 |
| 10   THOMSON REUTERS ENTERPRISE CENTRE GMBH 610 OPPERMAN DRIVE EAGAN, MN  55123-1396 | CONTACT: SHANE HACHEY PHONE: 651-687-7000 TREBILLDELIVERY@THOMSONREUTERS.COM | TRADE DEBT | | | | $1,105.45 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Charge Enterprises, Inc., | Case No. 24-_____ (____) |
| Debtor.[1] | |

## <u>CORPORATE OWNERSHIP STATEMENT</u>

    1.      Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the above-captioned debtor (the "<u>Debtor</u>") hereby certifies as follows.

    2.      Based on the books and records of the Debtor, no corporation owns 10% or more of the stock of the Debtor.

---

[1]      The last four digits of the Debtor's federal tax identification number are 1969.  The Debtor's mailing address for purposes of the Chapter 11 Case is 125 Park Avenue, 25th Floor, New York, New York 10017.

US.362652044.01

**Fill in this information to identify the case:**

Debtor name    **Charge Enterprises, Inc.**

United States Bankruptcy Court for the:   DISTRICT OF DELAWARE

Case number (if known)   _____

☐ Check if this is an
   amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐   *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐   *Schedule H: Codebtors* (Official Form 206H)
☐   *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐   Amended *Schedule* _____
■   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■   Other document that requires a declaration    **Corporate Ownership Statement**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **March 7, 2024**     X **/s/ Craig Harper-Denson**
                                            Signature of individual signing on behalf of debtor

                                           **Craig Harper-Denson**
                                           Printed name

                                           **Authorized Officer**
                                           Position or relationship to debtor