## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CHARGE ENTERPRISES, INC.,[1] | Case No. 24-10349 (TMH) |
| Reorganized Debtor. | **Re: ECF No. 325** |

## REORGANIZED DEBTOR'S SUPPLEMENT TO OBJECTION TO THE SECOND OMNIBUS CLAIMS OBJECTION SEEKING TO DISALLOW AND EXPUNGE ANDREW FOX'S CLAIM NO. 10003 ON NO LIABILITY GROUNDS

Charge Enterprises, Inc. (the "**Reorganized Debtor**" or "**Charge**") hereby supplements the *Reorganized Debtor's Second Omnibus (Substantive) Objection Seeking to (I) Disallow and Expunge Certain Claims on No Liability Grounds and (II) Reduce and Allow Certain Claims In the Modified Amounts* [ECF No. 325] filed on August 27, 2024, (the "**Second Omnibus Objection**")[2] based on new information discovered since the filing of such objection and in accordance with the reservation of rights thereunder.[3] By the Second Omnibus Objection, as supplemented herein, the Reorganized Debtor seeks entry of an order, substantially in the form attached as Exhibit A to the Second Omnibus Objection, pursuant to sections 105(a) and 502 of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 3007-

---

[1]    The last four digits of the Reorganized Debtor's federal tax identification number are 1969. The Reorganized Debtor's mailing address for purposes of the Chapter 11 Case is 125 Park Avenue, 25th Floor, New York, New York 10017.

[2]    Capitalized terms used but not otherwise defined herein have the same meaning as those ascribed to such terms in the Second Omnibus Objection.

[3]    The Reorganized Debtor reserved "the right to object in the future to any of the No Liability Claims . . . listed on Schedule 1 . . . attached to the Proposed Order on any additional ground, including, without limitation, additional objections as to the liability, amount, or priority of any claims listed, and to amend, modify, and/or supplement this Objection." *See* Second Omnibus Obj. ¶ 30. The Reorganized Debtor is committed to working cooperatively with the Claimant to accommodate any response time to this supplement.

1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), disallowing proof of claim no. 10003 filed by Andrew Fox ("**Mr. Fox**" or the "**Claimant**") in the above-captioned chapter 11 case for amounts that Charge allegedly owes for services the Claimant purportedly performed under the Separation and Consulting Agreement dated August 28, 2023, between the Claimant and Charge (the "**S&C Agreement**"). *See* Proof of Claim No. 10003.

The Reorganized Debtor also submits the *Declaration of Laura Garr in Support of the Reorganized Debtor's Supplement to the Second Omnibus Claims Objection Seeking to Disallow and Expunge Andrew Fox's Claim No. 10003 on No Liability Grounds* (the "**Garr Declaration**"), attached hereto as __Exhibit A__, in support of this supplement to the Second Omnibus Objection.  As a supplement to the Second Omnibus Objection and the *Declaration of Scott Haeger in Support of the Reorganized Debtor's Second Omnibus (Substantive) Objection Seeking to (I) Disallow and Expunge Certain Claims on No Liability Grounds and (II) Reduce and Allow Certain Claims in the Modified Amounts* [ECF No. 325-2], which are incorporated fully herein by reference, the Reorganized Debtor states as follows:

## BACKGROUND

1.      The Claimant served as chief executive officer ("**CEO**") and chairman of the board of directors ("**Chairman**") of Charge from October 2020 through August 31, 2023. During that time, he acted as a signatory on behalf of Charge in loan agreements with certain entities affiliated with Arena Investors, L.P. ("**Arena**") representing and warranting that, among other things, Charge was not and would not be invested in a limited partnership and that its funds were and would only be invested in cash and cash equivalents.[4]  During that time, he also approved Kenneth Orr ("**Mr. Orr**"), the former CEO and Chairman, serving as Charge's

---

[4]      *See* Garr Declaration, Exs. 1A, 1B, and 1C.

investment advisor and investing Charge's funds.[5]  More specifically, on June 7, 2022, Mr. Fox, along with other Board members, unanimously approved a special advisor agreement with KORR Acquisitions Group, Inc., an entity that Mr. Orr controlled, that effectively gave Mr. Orr unfettered control over Charge's investments.[6]  Mr. Fox received regular updates, including statements, regarding the investments, and was in regular communication with Mr. Orr about the status of the investments.[7]

2.    Mr. Fox resigned from his position as CEO and Chairman on August 31, 2023, and stayed on as a director and consultant to the Board under the S&C Agreement, which went effective the same date.  *See* Proof of Claim No. 10003, S&C Agreement § 6(b).  Under the S&C Agreement, the Claimant was to serve as "Strategic Advisor reporting to the Board, performing special assignment and initiatives…as requested by the Board." *Id.* § 6(a).  In exchange for such services, Charge was to compensate Mr. Fox at a rate of $45,000 per month during the initial one-year period, subject to Charge's right to terminate the agreement at any time. *See id.* §§ 2, 6.

3.    Among other things, the S&C Agreement set forth certain provisions regarding company property and related obligations.

4.    Section 3 of the S&C Agreement lays out post-separation obligations.  Section 3(a)(i) of the S&C Agreement contains a covenant that the Claimant "will not disclose or use at any time any Confidential Information [], whether or not such information was developed by him…" S&C Agreement, § 3(a)(i).

5.    Section 3(c) of the S&C Agreement concerns return of company property and contains the following provision:

---

[5]    *See* Garr Declaration, Ex. 2, at 23-25, 27-28.

[6]    *See id.*

[7]    *Id.* at 33-35.

All materials, equipment, documents, data compilations (*in whatever form*), software programs, and electronically created or stored materials that Mr. Fox *previously received or made, or receives or makes during the Consulting Term, are and shall remain the property of the Company*. *Mr. Fox shall immediately return such property*, including without limitation all credit cards, keys, unused tickets for airline or other travel, equipment, files, records, notes, passwords, documents, memoranda, computers, computer programs, computer equipment, videos, photos, software license keys, electronic storage devices (thumb drives, etc.), smartphones and other communication devices, *back-ups of any electronic files and emails, including online or cloud storage (e.g., Dropbox) in Mr. Fox's control, to the Company upon the Company's request and/or upon the termination of the Consulting Term, whichever occurs first*. Mr. Fox shall not remove from the Company's offices any such property except as authorized in writing by the Board. *The obligation to return such property extends to anything received or made as a result of performing services for the Company*, regardless of whether it was received from the Company or a third party and *regardless of whether it contains Confidential Information*.

S&C Agreement, § 3(c) (emphasis added).

6.      Section 11 of the S&C Agreement contains the following breach provision:

Upon Mr. Fox's breach of this Agreement in any material respect, *including Sections 3* and 6 hereof, in addition to such other remedies as may be available at law or in equity, *the Company shall be entitled to cease immediately, without further obligation, providing the Consulting Payments, and (b) Mr. Fox shall repay the Company the full amount of any Consulting Payments already provided to him, less $5,000*. Additionally, for clarity, as set forth above, upon a breach of this Agreement in any material respect, the Company shall have the right to terminate the Consulting Term for Cause, which event shall cause the Options to cease to be exercisable as provided in Section 2(a)(iii) above.

S&C Agreement, § 11 (emphasis added).

7.      As a publicly traded company, Charge was obligated to make accurate disclosures both prior to and after the entry into the S&C Agreement. Although the Company, as approved by the Board, had reported it was solvent on November 8, 2023,[8] including because

---

[8]      *See* Garr Declaration, Ex. 3, at 5-6.

of its entry into a securities purchase agreement with KORR Value, L.P. in August 2023,[9] on November 21, 2023, Charge disclosed for the first time publicly that it could not liquidate its investments with Mr. Orr because they were invested in a limited partnership (KORR Value, L.P.) controlled by Orr and "not immediately able to be liquidated or readily accessible."[10] This is despite the fact that the funds should have only been invested in "cash, cash equivalents, marketable securities or similar readily liquid assets."[11]

8.      As a board member, Mr. Fox knew or should have known prior to and after entry into the S&C Agreement that Charge was no longer solvent due to Mr. Orr's improper use of millions of dollars of Charge funds.  Absent access to those funds Charge was unable to repay Arena's secured debt by the maturity date and that event of default and the related cross-defaults resulted in Charge no longer being able to continue as a going concern.

9.      On March 7, 2024 (the "**Petition Date**"), Charge filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code that commenced this chapter 11 case and resulted in the confirmation of the *Debtor's Combined Disclosure Statement and Prepackaged Chapter 11 Plan of Reorganization* [ECF No. 12] (as may be amended, modified, and supplemented from time to time, the "**Plan**").

10.     As the Board—including Mr. Fox—well knew, Charge and Arena expressly reserved their rights to sue the directors and officers of Charge for their misconduct, violations of securities law, breaches of fiduciary duty, and all other conduct that caused significant harm to Charge's business and reputation to the extent of available proceeds under the applicable insurance policies.  *See* Plan § 5.1.

11.     While Charge does not concede that the Claimant performed any services for

---

[9]     *Id.* at 24.

[10]    *Id.*

[11]    *Id.*

Charge for the period from September 1, 2023, through the lead up to the Petition Date, once Charge commenced this chapter 11 case, the Claimant voluntarily stopped performing any services for Charge under the S&C Agreement, presumably in anticipation of his termination and upcoming litigation against him.

12.     Mr. Fox was paid pursuant to the terms of the S&C Agreement for the six months he worked under the S&C Agreement before the commencement of this chapter 11 case. This included $45,000 per month as well as a one-time payment of $ 53,046.48 for legal fees as reimbursement for drafting the S&C Agreement.

13.     The Plan was confirmed on April 24, 2024, and went effective on May 3, 2024. *See Findings of Fact, Conclusions of Law, and Order Approving Disclosure Statement and Confirming the Debtor's Chapter 11 Plan* [ECF No. 255]; *Notice of (A) Entry of Confirmation Order Approving and Confirming the Debtor's Combined Disclosure Statement and Prepackaged Chapter 11 Plan of Reorganization, (B) the Effective Date of the Debtor's Plan of Reorganization, and (C) Deadlines for Filing Proofs of Claims and Requests for Payment* [ECF No. 275].

14.     The Reorganized Debtor rejected the S&C Agreement, and the S&C Agreement was terminated as of the Effective Date. *See Notice of Filing Plan Supplement to the Debtor's Combined Disclosure Statement and Prepackaged Chapter 11 Plan of Reorganization* [ECF No. 89]

15.     The Reorganized Debtor also timely objected to proof of claim no. 10003. *See Second Omnibus Objection.*

16.     Under Section 5.6 of the Plan, the Reorganized Debtor was entitled to the exclusive turnover of all assets of Charge.

17.     On January 9, 2025—ten months after the Petition Date and eight months after the Effective Date—Mr. Fox contacted Charge, asking for additional Charge files in

6

anticipation of litigation.

18.     Charge immediately contacted its counsel.   Although the Claimant's employment at Charge ceased in August 2023, at which time his access to company property (as defined in the Section 3(c) of the S&C Agreement) was relinquished, and his consultant role had ceased at least ten months prior, it became clear that the Claimant apparently still had in his possession a large amount of company property, including confidential information (as defined in Section 3(a)(i) of the S&C Agreement).

19.     Counsel for Charge contacted the Claimant's counsel on January 10, 2025, requesting that Mr. Fox immediately return company property, including confidential information, in his possession, and destroy any copies in his possession, in accordance with section 3(c) of the S&C Agreement.  On or around January 13, 2025, Charge and its counsel further discovered that on April 4, 2024, Mr. Fox, with his counsel, had emailed Craig Denson and Jim Biehl, asking for immediate access to Mr. Fox's Charge emails "to prepare for litigation," that Mr. Denson and Mr. Biehl approved the request, and that Mr. Fox was granted access and has retained that access ever since.[12]

20.     Mr. Denson and Mr. Biehl gave Mr. Fox access to company property one month after the Petition Date and when the then-proposed Plan had already been filed, which called for the termination of all directors and officers, evidencing clear intention of future litigation against them.

21.     Counsel for Charge contacted the Claimant's counsel with this information and made no fewer than three separate requests for (1) the return of company property and (2) confirmation that Mr. Fox (a) does not currently have in his possession, custody, or control any company property, including confidential information, and (b) since April 4, 2024, (i) has

---

[12]     *See* Garr Declaration, Ex. 5.

not downloaded, saved, or copied any company property and (ii) has not distributed any company property to any third party.  All requests were denied or ignored.[13]

22.     An investigation into Mr. Fox's improper access to Charge's property revealed that he accessed or attempted to access Charge's property at least nine times between August 29, 2024, and January 25, 2025, notwithstanding Mr. Fox being made aware that such access was improper weeks prior to his last attempt.[14]  Charge suspects that Mr. Fox likely also accessed or attempted to access Charge property between May 4, 2024, and August 28, 2024.

## ADDITIONAL BASIS FOR RELIEF

23.     In addition to the reasons set forth in the Second Omnibus Objection, Claimant's claim no. 10003 for $270,000 should be disallowed and expunged for three additional reasons.

24.     <u>First</u>, the Claimant is not entitled to payment because he breached, among other provisions, Section 3(c) of the S&C Agreement.  Section 3(c) provides that all materials "in whatever form" that "Mr. Fox previously received or made, or receives or makes during his [c]onsulting [t]erm, are and shall remain the property of the Company.  Mr. Fox shall immediately return such property … to the Company upon the Company's request and/or upon the termination of the Consulting Term, whichever occurs first.  Mr. Fox shall not remove from the Company's offices any such property except as authorized in writing by the Board."  Charge had already requested the return of all company property (and turned off access to such property) prior to Mr. Fox's demand from Mr. Denson and Mr. Biehl for access on April 4, 2024.  The Claimant then took company property from Charge's offices, without the written consent of Charge's board of directors as required under Section 3(c) of the S&C Agreement.  Nor did he return the company property as required at the time of the official termination of

---

[13]     *See* Garr Declaration, Exs. 6A, 6B, 6C, 6D, and 6E.

[14]     *See* Garr Declaration, Ex. 7.

the S&C Agreement.  He has further failed to comply with repeated requests from the Company

to return the company property and to disclose with whom he has shared such company

property in violation of the S&C Agreement.  He is therefore in breach of, among other laws

and provisions, Section 3(c) of the S&C Agreement.  Pursuant to section 11 of the S&C

Agreement, breach of Section 3, in addition to other remedies under law or equity, requires Mr.

Fox to repay the full amount of any consulting payments provided to him pursuant to the S&C

Agreement, less $5,000.  Therefore, not only is the Claimant not entitled to any value in

connection with claim no. 10003 or the obligations underlying the same, he instead owes

money to the estate for his post-effective date conduct.[15]

25.    Second, the Claim should be disallowed because the Claimant breached his

fiduciary duty to Charge and induced Mr. Denson and Mr. Biehl to breach their fiduciary duties

to Charge.  Specifically, on April 4, 2024, at a time when Mr. Fox no longer had, or had any

legitimate need for, access to company property he demanded that his soon-to-be co-defendants

grant him access.  His request was unequivocally clear: he demanded access to company

property for litigation purposes, not to perform any services on behalf of Charge.  Mr. Biehl

and Mr. Denson were still acting directors and officers of Charge at the time but knew they

were to be terminated and sued along with the Claimant for their roles in Charge's financial

ruin.  Granting the Claimant's request for access to company property "to prepare for litigation"

by Arena and/or Charge was not for the benefit of Charge; it was adverse to Charge's interests

and a breach of the fiduciary duties they owed to Charge.

26.    Third, the Claimant already received payment in full for all consulting payments

that accrued prior to his voluntary termination of service under the S&C Agreement at the time

of the Petition Date.  There is no balance owing with respect to claim no. 10003.  Under Section

---

[15]    Charge is assessing its rights and remedies and reserves it rights to pursue an action against the Claimant for
his post-effective date misconduct.  *See* Plan, § 5.13.

6(c)(iv) of the S&C Agreement, the Claimant is not entitled to further payment.  Because the obligation underlying the Claim was paid, it must be disallowed.  As set forth in the Garr Declaration, the Reorganized Debtor has reviewed the S&C Agreement and determined that claim no. 10003 was satisfied prior to the Petition Date and does not give rise to liability against the Reorganized Debtor.  Failure to disallow and expunge claim no. 10003 would result in the Claimant receiving an unwarranted recovery against the Reorganized Debtor's estate to the detriment of other creditors in this chapter 11 case.

27.    For the above reasons, as well as those argued in the Second Omnibus Objection, the Reorganized Debtor contends that Mr. Fox's claim no. 10003 should be fully disallowed and expunged.

*Remainder of This Page Is Intentionally Left Blank*

WHEREFORE, for the reasons set forth herein, as well as those set forth in the Second
Omnibus Objection, the Reorganized Debtor respectfully requests that the Court enter the
Proposed Order, granting the relief requested and such other relief as is just and proper.

Respectfully submitted,

February 10, 2025
Wilmington, Delaware

/s/ Kenneth A. Listwak

Douglas D. Herrmann (No. 4872)
Kenneth A. Listwak (No. 6300)
TROUTMAN PEPPER LOCKE LLP
Hercules Plaza, Suite 1000
1313 North Market Street, P.O. Box 1709
Wilmington, DE 19801
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
Email: douglas.herrmann@troutman.com
        ken.listwak@troutman.com

-and-

Harrison Denman (admitted *pro hac vice*)
Laura Garr (admitted *pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: harrison.denman@whitecase.com
        laura.garr@whitecase.com

-and-

Trudy Smith (admitted *pro hac vice*)
WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Telephone: (302) 371-2700
Facsimile: (205) 358-5744
Email: trudy.smith@whitecase.com

*Counsel to the Reorganized Debtor*

11

## **Exhibit A**

**Declaration of Laura Garr**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHARGE ENTERPRISES, INC.,[1] | ) | Case No. 24-10349 (TMH) |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

**DECLARATION OF LAURA GARR IN SUPPORT OF
THE REORGANIZED DEBTOR'S SUPPLEMENT TO THE
SECOND OMNIBUS CLAIMS OBJECTION SEEKING TO DISALLOW AND
EXPUNGE ANDREW FOX'S CLAIM NO. 10003 ON NO LIABILITY GROUNDS**

I, Laura Garr, declare under penalty of perjury as follows:

1.      I am a partner in the New York office of White & Case LLP, counsel for Charge Enterprises, Inc., the reorganized debtor in the above-captioned chapter 11 case (the "**Reorganized Debtor**" or "**Charge**").  I submit this declaration in support of the *Reorganized Debtor's Supplement to the Second Omnibus Claims Objection Seeking to Disallow and Expunge Andrew Fox's Claim No. 10003 on No Liability Grounds* (the "**Supplement**"), filed contemporaneously herewith.

2.      The following documents are attached hereto:

a)   **Exhibit 1A** is a true and correct copy of a securities purchase agreement dated May 19, 2021, by and among Charge and Arena;[2]

b)   **Exhibit 1B** is a true and correct copy of an original issue discount senior secured non-convertible promissory note due November 19, 2022, original issue date May 19, 2021, between Charge and Arena;

c)   **Exhibit 1C** is a true and correct copy of an amended and restated security agreement, dated May 19, 2021, between Charge and Arena;

d)   **Exhibit 2** is a true and correct copy of a complaint filed on June 26, 2024, by Arena in the Supreme Court of New York, Index No. 653261/2024, against Amy Hanson, Craig Denson, Andrew Fox, and Leah Schweller,

---

[1]      The last four digits of the Debtor's federal tax identification number are 1969.  The Debtor's mailing address for purposes of the Chapter 11 Case is 125 Park Avenue, 25th Floor, New York, New York 10017.

[2]      Capitalized terms used herein but not otherwise defined have the same meaning ascribed to such term in the Supplement.

alleging fraudulent inducement or misrepresentation, negligent misrepresentation, and breach of fiduciary duties;

e) **Exhibit 3** is a true and correct copy of Form 10-Q for Charge dated November 8, 2023;

f) **Exhibit 4** is a true and correct copy of Form 8-K for Charge dated November 15, 2023;

g) **Exhibit 5** is a true and correct copy of the correspondence dated April 4, 2024, between Andrew Fox, Craig Denson, Jim Biehl, and Roger Marion regarding Andrew Fox's request for access to company emails;

h) **Exhibit 6A** is a true and correct copy of the correspondence dated January 10, 2025, through January 22, 2025, between counsel for Charge and counsel for Andrew Fox;

i) **Exhibit 6B** is a true and correct copy of the letter dated January 13, 2025, to counsel for Charge from counsel for Andrew Fox;

j) **Exhibit 6C** is a true and correct copy of the letter dated January 14, 2025, to counsel for Andrew Fox from counsel for Charge;

k) **Exhibit 6D** is a true and correct copy of the letter dated January 21, 2025, to counsel for Charge from counsel for Andrew Fox;

l) **Exhibit 6E** is a true and correct copy of the letter dated January 22, 2025, to counsel for Andrew Fox by counsel for Charge; and

m) **Exhibit 7** is a true and correct copy of a report that Charge prepared showing Andrew Fox's access to company property.

3.    Charge informed me that Andrew Fox was paid pursuant to the S&C Agreement between September 2023 and February 2024.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

February 10, 2025
New York, New York

By: _/s/ Laura Garr_____
    Laura Garr

## **Exhibit 1A**

**Securities Purchase Agreement dated May 19, 2021**

## SECURITIES PURCHASE AGREEMENT

THIS SECURITIES PURCHASE AGREEMENT (the "Agreement") is made as of May 19, 2021, by and among Charge Enterprises Inc., a Delaware corporation (which was formerly known as Transworld Holdings, Inc., and prior to that as GoIP Global, Inc., a Colorado corporation) (and together with all of its current and future, direct and/or indirect, wholly owned and/or partially owned Subsidiaries, collectively, the "Company"), and the Purchaser identified on the signature pages hereto (including its successors and assigns, the "Purchaser").

RECITALS

A.      The Company and the Purchaser are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act (as defined below), and/or Rule 506(b) of Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission under the Securities Act.

B.      The Purchaser, wishes to purchase, and the Company wishes to sell at closing, upon the terms and conditions stated in this Agreement, the Securities (as defined herein), all in the amounts and for the price set forth on Schedule 1 hereto.

C.      The Company wishes to borrow from the Purchaser cash, all upon the terms and subject to the conditions hereinafter set forth.

D.      The Company has agreed to secure performance of its obligations under this Agreement and by pledging to the Purchaser (a) 100% of the shares in NextRidge (as defined below) and a first ranking pledge over all of NextRidge's existing and future assets; and (b) 100% of the shares in PTGI (as defined below) and a first-lien on PTGI.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Purchaser hereby agrees as follows:

ARTICLE 1
DEFINITIONS

1.1     Defined Terms.  In addition to terms defined elsewhere in this Agreement or in any supplement, amendment or exhibit hereto, when used herein, the following terms shall have the following meanings:

(a)      "Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 of the Securities Act, including, among others, executive officers, directors, large stockholders, subsidiaries, parent entities and sister companies.

(b)      "Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking

institutions in the State of New York are authorized or required by law or other governmental action to close.

(c)        "Closing Date" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to the parties' obligations hereunder have been satisfied or waived, including (i) the Purchaser's obligations to pay the Purchase Price, and (ii) the Company's obligations to deliver the Securities.

(d)        "Collateral" shall have the meaning ascribed to such term as set forth in the Security Agreement.

(e)        "Common Stock" means (i) the Company's common stock, par value $0.0001 per share, and (ii) any capital stock into which such common stock shall have been changed or any share capital resulting from a reclassification of such common stock.

(f)        "Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

(g)        "Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(h)        "Conversion Date" has the meaning set forth in the Convertible Note.

(i)        "Conversion Shares" means all shares of Common Stock issuable upon conversion of any portion of the Convertible Note (including, at the Purchaser's election pursuant to the conditions set forth in the Convertible Note, accrued and unpaid interest thereon), but solely to the extent and subject to any conditions set forth in the Convertible Note.

(j)        "Convertible Note" means all of the Original Issue Discount Senior Secured Convertible Promissory Notes due on the third anniversary of the Closing Date that are owned by the Purchaser, which, subject to the terms and conditions set forth in this Agreement, shall be purchased from the Company pursuant to this Agreement, and any and all Convertible Note(s) issued in exchange, transfer or replacement of the Convertible Note(s); the form of the Convertible Note is annexed hereto as Exhibit A.

(k)        "COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or any other epidemics, pandemics or disease outbreaks.

(l)  "COVID-19 Action" means an inaction or action by the Company, including the establishment of any policy, procedure or protocol, in response to COVID-19 or any COVID-19 Measures (i) that is consistent with the past practice of the Company in response to COVID-19 prior to the date of this Agreement (but only to the extent in compliance with applicable Law), or (ii) that would, given the totality of the circumstances under which the Company acted or did not act, be unreasonable for Purchaser to withhold, condition or delay consent with respect to such action or inaction (whether or not Purchaser has a consent right with respect thereto).

(m)  "COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Governmental Order, Action, directive, guidelines or recommendations by any Governmental Authority in connection with or in response to COVID-19, including, but not limited to, the Coronavirus Aid, Relief, and Economic Security (CARES) Act.

(n)  "Dollar(s)" and "$" means lawful money of the United States.

(o)  "Effective Date" means the date that the initial Registration Statement filed by the Company pursuant to the Registration Rights Agreement is first declared effective by the Commission.

(p)  "Event of Default" shall have the meaning set forth in the Notes and the Warrant.

(q)  "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(r)  "Exempt Issuance" means the issuance of (a) shares of Common Stock or options to employees, officers, consultants, advisors or directors of the Company in consideration of services to the Company pursuant to any stock or option plan duly adopted for such purpose by a majority of the members of the Board of Directors or a majority of the members of a committee of directors established for such purpose, (b) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date of this Agreement, provided that such securities have not been amended since the date of this Agreement to increase the number of such securities or to decrease the exercise, exchange or conversion price of such securities, (c) Permitted Indebtedness incurred in accordance with Section 1.1(ee) hereunder or (d) any securities issued to shareholders of NextRidge in accordance with the terms of the NextRidge Acquisition Agreement.

(s)  "GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

(t)  "Indebtedness" means, with respect to any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (but excluding trade payables incurred in the ordinary course of business), (c) all obligations of such Person

evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or the Purchaser under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, surety bond or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person, (h) all obligations for any earn-out consideration, (i) the liquidation value of preferred capital stock of such Person, (j) all guarantee obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (i) above, (k) all obligations of the kind referred to in clauses (a) through (i) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any lien on property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and all obligations of such Person in respect of hedge agreements; and (l) all Contingent Obligations in respect to indebtedness or obligations of any Person of the kind referred to in clauses (a)-(k) above. The Indebtedness of any Person shall include, without duplication, the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

(u)    "Investment" means any investment (including, without limitation, any loan or advance) in or to any Person, whether payment therefor is made in cash or capital stock or other equity interests or otherwise, and whether such Investment is by acquisition of capital stock or other equity interests or Indebtedness, or by loan, advance, transfer of property out of the ordinary course of business, capital contribution, equity or profit sharing interest, extension of credit on terms other than those normal in the ordinary course of business or otherwise.

(v)    "Liens" or "liens" means a lien, mortgage, charge pledge, security interest, encumbrance, right of first refusal, preemptive right or other restriction, or other clouds on title.

(w)    "Liabilities" means all direct or indirect liabilities, Indebtedness and obligations of any kind of Company to the Purchaser, howsoever created, arising or evidenced, whether now existing or hereafter arising (including those acquired by assignment), absolute or contingent, due or to become due, primary or secondary, joint or several, whether existing or arising through discount, overdraft, purchase, direct loan, participation, operation of law, or otherwise, including, but not limited to, pursuant to the Notes, this Agreement and/or any of the other Transaction Documents, all accrued but unpaid interest on the Notes, the principal, any letter of credit, any standby letter of credit, and/or outside attorneys' and paralegals' fees or charges relating to the preparation of the Transaction Documents and the enforcement of the Purchaser's rights, remedies and powers under this Agreement, the Notes and/or the other Transaction Documents.

(x)     "<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, property, operations, or condition (financial or otherwise) of the Company, (b) the validity or enforceability of this Agreement or any of the other Transaction Documents, (c) the rights or remedies of the Purchaser hereunder or thereunder, or (d) the ability of the Company to perform its obligations under any Transaction Document. Notwithstanding anything to the contrary contained in this Agreement, nothing herein shall prevent the Company from taking or failing to take any COVID-19 Actions and (x) no such COVID-19 Actions shall be deemed to violate or breach this Agreement in any way or be deemed a Material Adverse Effect, (y) all such COVID-19 Actions shall be deemed to constitute an action taken in the ordinary course of business and (z) no such COVID-19 Actions shall serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to the applicable Closing contained herein have not been satisfied.

(y)     "<u>May 2020 Financing</u>" means the Company's financing which closed on May 8, 2020 involving the sale and issuance of senior secured notes in an aggregate principal amount of $3,000,000, warrants for the purchase of an aggregate of 7,600,000 shares of Common Stock and 7.5 shares of series G convertible preferred stock to Affiliates of the Purchaser for an aggregate purchase price of $2,700,000.

(z)     "<u>NextRidge</u>" means NextRidge Inc., a New York corporation.

(aa)     "<u>NextRidge Acquisition Agreement</u>" means that certain Stock Acquisition Agreement, dated May 7, 2021, by and among the Company, NextRidge and the shareholders of NextRidge.

(bb)     "<u>Non-convertible Note</u>" means all of the Original Issue Discount Senior Secured Non-convertible Promissory Notes due on the eighteenth month anniversary of the Closing Date that are owned by the Purchaser, which, subject to the terms and conditions set forth in this Agreement, shall be purchased from the Company pursuant to this Agreement, and any and all Non-convertible Note(s) issued in exchange, transfer or replacement of the Non-convertible Note(s); the form of the Non-convertible Note is annexed hereto as <u>Exhibit B</u>.

(cc)     "<u>Notes</u>" means all of the Convertible Notes and Non-convertible Notes together.

(dd)     "<u>November 2020 Financing</u>" means the Company's financing which closed on November 3, 2020 involving the sale and issuance of senior secured notes in an aggregate principal amount of $3,888,889, for an aggregate purchase price of $3,500,000.

(ee)     "<u>Permitted Indebtedness</u>" means (a) the indebtedness evidenced by the Notes, (b) any indebtedness of the Company outstanding as of the date of this Agreement, (c) lease obligations and purchase money indebtedness incurred in connection with the acquisition of capital assets and lease obligations with respect to newly acquired or leased assets in the ordinary course of business, (d) any indebtedness issued by the Company to any  SBA-approved lender or SBA-approved financial institution and (e) any indebtedness

issued by NextRidge or its subsidiaries either (i) upon consummation of the transactions contemplated by the NextRidge Acquisition Agreement, on or after the date hereof, provided such indebtedness is non-recourse to the Company and its Subsidiaries (other than NextRidge) or (ii) as existing lines of credit with Pioneer Bank for factoring arrangements that do not exceed $4,000,000 for any given month.

(ff)   "Permitted Lien" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP; (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien; (c) Liens incurred in connection with Permitted Indebtedness thereunder; (d) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (e) Deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;  (f) any Liens in favor of the Purchaser; and (g) Liens securing Indebtedness of the type described in clause (e) of the definition of Permitted Indebtedness, provided such Liens do not extend to any Collateral.

(gg)   "Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, county, city, municipal or otherwise including, without limitation, any instrumentality, division, agency, body or department thereof).

(hh)   "Principal Market" means the principal Trading Market on which the Common Stock is listed or quoted for trading on the date in question.

(ii)   "Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

(jj)   "PTGI" means PTGI International Carrier Services Inc., a Delaware corporation.

(kk)   "Purchase Price" shall have the meaning as set forth on Schedule 1 next to the heading "Purchase Price," in United States Dollars.

(ll)    "Registration Rights Agreement" means the Registration Rights Agreement, dated as of the Closing Date, by and between the Company and the Purchaser as hereinafter amended and/or supplemented altogether with all exhibits, schedules and annexes to such Registration Rights Agreement, which Registration Rights Agreement is annexed hereto as Exhibit E.

(mm)    "Registration Statement" means a registration statement meeting the requirements set forth in the Registration Rights Agreement and covering the resale of the Conversion Shares issuable upon conversion of the Convertible Note and the Warrant Shares issuable upon exercise of the Warrant as provided for in the Registration Rights Agreement.

(nn)    "SEC" or "Commission" means the United States Securities and Exchange Commission.

(oo)    "Securities" means the Convertible Note and the Warrants purchased pursuant to this Agreement and all Underlying Shares and any securities of the Company issued to the Purchaser in replacement, substitution and/or in connection with any exchange, conversion, exercise and/or any other transaction involving all or any of such securities of the Company.

(pp)    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(qq)    "Security Agreement" means the Amended and Restated Security Agreement, dated on or about the date hereof, by and among the Company, the Subsidiaries of the Company, and the Purchaser as hereinafter amended and/or supplemented altogether with all exhibits, schedules and annexes to such Security Agreement, pursuant to which the Notes are secured by the Collateral, which security interest in the Collateral shall be perfected by the Purchaser's UCC-1, filed with the Secretary of State of the State of Delaware, to the extent perfectable by the filing of a UCC-1 Financing Statement and such other documents and instruments related thereto, which Security Agreement is annexed hereto as Exhibit D.

(rr)    "Senior Secured Loan" means a loan with a face value of $11,032,609 from the Purchaser to the Company with an original issue discount of 8%, a fee of $150,000 payable to the Purchaser, and a tenor of 18 months from the Closing Date, as set forth on Schedule 2 hereto.

(ss)    "Short Sales" means all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall not be deemed to include the location and/or reservation of borrowable shares of Common Stock).

(tt)    "SMRH" means Sheppard, Mullin, Richter & Hampton LLP, with offices located at 30 Rockefeller Plaza, 39th Floor, New York, New York 10112. "Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by

reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  All of the Company's Subsidiaries are set forth on <u>Schedule 3.1(a)</u> hereto.

(uu)    "<u>Subsidiary Guaranty Agreement</u>" means each Guaranty Agreement, substantially in the form of annexed hereto as <u>Exhibit F</u>, between a Subsidiary and the Purchaser, as amended, restated, supplemented or otherwise modified from time to time.

(vv)    "<u>Trading Day</u>" means a day on which the principal Trading Market is open for trading.

(ww)    "<u>Trading Market</u>" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE MKT, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, any market or quotation service of the OTC Markets Group or the OTC Bulletin Board (or any successors to any of the foregoing).

(xx)    "<u>Transaction Documents</u>" means, collectively, this Agreement, the Notes, the Warrants, the Registration Rights Agreement, the Security Agreement, each Subsidiary Guaranty Agreement, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or other comparable or similar laws, rules or regulations) in favor of the Purchaser as secured parties perfecting all Liens the Purchaser have on the Collateral (which security interests and Liens of the Purchaser shall be senior to all Indebtedness of the Company), any control agreement or similar agreement, and such other documents, instruments, certificates, supplements, amendments, exhibits and schedules required and/or attached pursuant to this Agreement and/or any of the above documents, and/or any other document and/or instrument related to the above agreements, documents and/or instruments, and the transactions hereunder and/or thereunder and/or any other agreement, documents or instruments required or contemplated hereunder or thereunder, whether now existing or at any time hereafter arising.

(yy)    "<u>Transfer Agent</u>" means Manhattan Transfer Registrar Co. the current transfer agent of the Company, with a mailing address of 38B Sheep Pasture Road, Port Jefferson, NY 11777 and a phone number of 631-928-7655, and any successor transfer agent of the Company.

(zz)    "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u>, <u>however,</u> that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to the Purchaser's Liens on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "<u>UCC</u>" shall mean the Uniform Commercial code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

(aaa)   "Underlying Shares" means all Conversion Shares and Warrant Shares.

(bbb)   "VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b)  if OTCQB or OTCQX is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on OTCQB or OTCQX as applicable, (c) if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported in the "Pink Sheets" published by OTC Markets, Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Purchaser of a majority in interest of the Securities then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

(ccc)   "Warrants" means, the Common Stock purchase warrants delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof, which Warrants shall be exercisable immediately at an exercise price of $4.00 per share of Common Stock and have a term of exercise equal to three (3) years from the issuance date in the form of Exhibit C attached hereto.

(ddd)   "Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

1.2   Other Definitional Provisions.

(a)   Use of Defined Terms.  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Transaction Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)   Accounting Terms.  As used herein and in the other Transaction Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Company not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP (provided that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Company at "fair value", as defined therein, and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any

other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof).

(c)     Construction.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     UCC Terms.  Terms used in this Agreement that are defined in the UCC shall, unless the context indicates otherwise or are otherwise defined in this Agreement, have the meanings provided for by the UCC.

ARTICLE 2
PURCHASE AND SALE

2.1   Closing.

(a)     On the Closing Date, time being of the essence, subject to the occurrence of other conditions set forth in Section 2.3 and upon the terms and subject to the conditions set forth herein, the Company agrees to sell, and the Purchaser agrees to purchase, the Securities in such amounts as indicated on Schedule 1 hereto. The Purchaser shall deliver to the Company, via wire transfer, immediately available funds equal to the Purchase Price, and the Company shall deliver to the Purchaser the Convertible Note and the Warrant on the Closing Date, and the Company and the Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing. Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of SMRH or such other location as the parties shall mutually agree.

(b)     On the Closing Date, time being of the essence, subject to the occurrence of the other conditions set forth in Section 2.3 and upon the terms and subject to the conditions set forth herein, the Purchaser shall provide to the Company the Senior Secured Loan in consideration for the Non-convertible Note in such amount as indicated on Schedule 2 hereto. The Purchaser shall deliver to the Company, via wire transfer, immediately available funds equal to the Senior Secured Loan on the Closing Date, and the Company shall deliver to the Purchaser the Non-convertible Note on the Closing Date, and the Company and the Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of SMRH or such other location as the parties shall mutually agree.

2.2   Deliveries.

(a)    On or prior to the Closing Date, the Company shall deliver or cause to be delivered to the Purchaser the following:

(i)    this Agreement duly executed by the Company;

(ii)    a Security Agreement providing the Purchaser with a lien on all of the assets of the Company, duly executed by the Company;

(iii)    a Convertible Note registered in the name of the Purchaser with such principal amount as set forth on Schedule 1;

(iv)    a Non-convertible Note registered in the name of the Purchaser with such principal amount as set forth on Schedule 2;

(v)    a Warrant registered in the name of the Purchaser to purchase up to 1,870,000 shares of Common Stock, equal to 100% of the face value of the Convertible Note, with an exercise price equal to $4.00 per share of Common Stock, subject to adjustment therein;

(vi)    the Registration Rights Agreement duly executed by the Company;

(vii)    a certificate, in the form acceptable to the Purchaser and its counsel, executed by the secretary of the Company dated as of the Closing Date, as to (i) the resolutions as adopted by the Company's board of directors relating to the transactions contemplated by this Agreement in a form acceptable to the Purchaser, (ii) Certificate of Incorporation or other similar organizational document of the Company, and (iii) the Bylaws or other similar organizational document of the Company, each as in effect at the Closing;

(viii)    a certificate for each Subsidiary of the Company, in the form acceptable to the Purchaser and its counsel, executed by the secretary of such Subsidiary dated as of the Closing Date, as to (i) the resolutions as adopted by the Subsidiary's board of directors or other governing body relating to the transactions contemplated by this Agreement in a form acceptable to the Purchaser, (ii) Certificate of Incorporation or other similar organizational document of such Subsidiary, and (iii) the Bylaws or other similar organizational document of such Subsidiary, each as in effect at the Closing;

(ix)    a certificate, duly executed by the Chief Executive Officer of the Company, dated as of the Closing Date, confirming compliance with Section 2.3(a)(i) and (ii) below and as to such other matters as may be reasonably requested by the Purchaser and its counsel in the form acceptable to the Purchaser;

(x)    certificates evidencing the good standing of the Company and each Company Subsidiary in such entity's jurisdiction of incorporation issued by the Secretary of State (or comparable office) of such jurisdiction of formation as of a date within five (5) days of the Closing Date;

(xi)     an opinion of counsel to the Company, in such form as reasonably acceptable to the Purchaser;

(xii)    a Subsidiary Guaranty Agreement for each Subsidiary of the Company; and

(xiii)   such other documents, instruments, opinions or certificates relating to the transactions contemplated by this Agreement as the Purchaser or its counsel may reasonably request.

(b)     On or prior to the Closing, the Purchaser shall deliver or cause to be delivered to the Company the following:

(i)      this Agreement duly executed by the Purchaser;

(ii)     the Purchase Price subject to the closing by wire transfer;

(iii)    the Security Agreement duly executed by the Purchaser; and

(iv)     the Registration Rights Agreement duly executed by the Purchaser.

2.3     <u>Conditions to Purchase the Securities</u>.  Subject to the terms and conditions of this Agreement, the Purchaser will at the Closing purchase from the Company the Securities in the amounts and for the Purchase Price as set forth on <u>Schedule 1</u>, <u>provided</u> the following:

(a)     The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

(i)      the accuracy in all material respects (or, to the extent representations or warranties are qualified by materiality or Material Adverse Effect, in all respects) when made and on the date of the Closing of the representations and warranties of the Purchaser contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

(ii)     all obligations, covenants and agreements of the Purchaser required to be performed at or prior to the date of the Closing shall have been performed;

(iii)    the delivery by the Purchaser of the items set forth in Section 2.2(b) of this Agreement;

(iv)     there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)      no statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or other federal, state, local or other governmental authority of competent jurisdiction that prohibits the consummation of any of the transactions contemplated by the Transaction Documents.

(b)     The obligations of the Purchaser hereunder in connection with the Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects (or, to the extent representations or warranties are qualified by materiality or Material Adverse Effect, in all respects) when made and on the date of the Closing of the representations and warranties of the Company contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

(ii)     all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing shall have been performed in all material respects;

(iii)     the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)     there shall have been no Material Adverse Effect with respect to the Company since the date hereof;

(v)     the Company shall have obtained all governmental, regulatory and third party consents and approvals, if any, necessary for the entry into the Transaction Documents and the sale of the Securities; and

(vi)     no statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or other federal, state, local or other governmental authority of competent jurisdiction that prohibits the consummation of any of the transactions contemplated by the Transaction Documents.

2.4     <u>Purchase Price and Payment of the Purchase Price for the Securities</u>.  The Purchase Price for the Securities to be purchased by the Purchaser at the Closing shall be as set forth on <u>Schedule 1</u> and shall be paid at the Closing (less all of the Purchaser's Expenses (as defined below)) by the Purchaser by wire transfer of immediately available funds to the Company in accordance with the Company's written wiring instructions, against delivery of the Securities.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES; OTHER ITEMS

3.1     <u>Representation and Warranties of the Company</u>.  Except as set forth in the Disclosure Schedules, which Disclosure Schedules shall be deemed a part hereof and shall qualify any representation or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Disclosure Schedules (but in no event shall qualify any indemnity obligation of the Company hereunder), the Company (which for purposes of this <u>Section 3.1</u> means the Company and all of its Subsidiaries) represents and warrants to the Purchaser that on the Closing Date (unless as of a specific date set forth below):

(a)     <u>Subsidiaries</u>.  All of the direct and indirect subsidiaries of the Company and the locations thereof are set forth on <u>Schedule 3.1(a)</u>.  The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear

of any Liens, and all of the issued and outstanding shares of capital stock or other interests of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities. Schedule 3.1(a) sets forth, as of the Closing Date, the jurisdiction of organization and the location of the Company's and its subsidiaries' executive offices and other places of business.

(b)    Organization, Etc.   The Company and each of the Subsidiaries is duly organized, validly existing and in good standing under the laws of the state of their respective organization and are duly qualified and in good standing or has applied for qualification as a foreign corporation authorized to do business in each jurisdiction where, because of the nature of its activities or properties, such qualification is required except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

(c)    Authorization: No Conflict.   The execution, delivery and performance of the Transaction Documents and the transactions contemplated thereby by the Company, including, but not limited to, the sale and issuance of the Securities for the Purchase Price, the reservation for issuance of the Underlying Shares required to be reserved pursuant to the terms of the Convertible Note and the Warrant, and the issuance of the Underlying Shares from which the Convertible Note is convertible and the Warrant is exercisable (i) are within the Company's corporate powers, (ii) have been duly authorized by all necessary action by or on behalf of the Company (and/or its stockholders to the extent required by law), (iii) have received all necessary and/or required governmental, regulatory and other approvals and consents (if any shall be required), (iv) do not and shall not contravene or conflict in any material respect with any provision of, or require any consents under (1) any law, rule, regulation or ordinance, (2) the Company's organizational documents; and/or (3) any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, and (v) other than the Liens granted to the Purchaser pursuant to the Transaction Documents, do not result in, or require, the creation or imposition of any Lien and/or encumbrance on any of the Company's properties or revenues pursuant to any law, rule, regulation or ordinance or otherwise.

(d)    Validity and Binding Nature.   The Transaction Documents to which the Company is a party are the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization and other similar laws of general application affecting the rights and remedies of creditors and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

(e)    Title to Assets.   The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for (i) Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries, (ii)

Liens for the payment of federal, state or other taxes, for which appropriate reserves have been made therefor in accordance with GAAP and the payment of which is not delinquent, and (iii) Permitted Liens.  Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

(f)    Compliance. Neither the Company nor any Subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree or order of any court, arbitrator or other governmental authority or (iii) is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to securities, corporate law, taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters, except in each case as could not have or reasonably be expected to result in a Material Adverse Effect.

(g)    Taxes.  Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and its Subsidiaries each (i) has made or filed all United States federal, state and local income and all foreign income and franchise tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations and (iii) has set aside on its books provision reasonably adequate for the payment of all material taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company or of any Subsidiary know of no basis for any such claim.

(h)    Licenses and Permits.  The Company possesses all certificates, authorizations, consents, approvals, orders, licenses and permits issued by the appropriate federal, state or foreign regulatory authorities (collectively, the "Permits"), necessary to conduct its business as now conducted. All of such Permits are valid and in full force and effect.  There is no pending or, to the Company's knowledge, threatened action, suit, proceeding or investigation that individually or in the aggregate would reasonably be expected to lead to the revocation, modification, termination, suspension or any other impairment of the rights of the holder of any such Permit.

(i)    Investment Company.  The Company is not (i) an "investment company" or a company "controlled", whether directly or indirectly, by an "investment company", within the meaning of the Investment Company Act of 1940, as amended; or (ii) engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

(j)    Absence of Defaults and Conflicts. The Company is not (i) in violation of its charter, by-laws or similar incorporation or organizational documents or (ii) in violation or default in the performance or observance of any material obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, deed of trust, loan or credit agreement, note, lease or other agreement or instrument to which the Company is a party or by which it may be bound, or to which any of the property or assets of the Company is subject (collectively, "Agreements and Instruments"). The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated in this Agreement and the other Transaction Documents, and compliance by the Company with its obligations under this Agreement and the other Transaction Documents, do not and will not, whether with or without the giving of notice or passage of time or both, (w) conflict with or result in a breach of any of the terms and provisions of, or constitute a default or Repayment Event (as defined below) under, (x) result in the creation or imposition of any lien, charge or encumbrance (other than Permitted Liens) upon any property or assets of the Company pursuant to, the Agreements and Instruments, (y) result in any violation of the provisions of the charter, by-laws or similar organizational documents of the Company, or (z) result in any applicable law, statute, rule, regulation, judgment, order, writ or decree of any government, government instrumentality or court, domestic or foreign, having jurisdiction over the Company or any of its assets, properties or operations, except in the case of this clause (z) for such conflicts, violations, breaches or defaults which would not reasonably be expected to result in a Material Adverse Effect on the Company. As used herein, a "Repayment Event" means any event or condition which gives the holder of any note, debenture or other evidence of indebtedness that is material to the operations or financial results of the Company (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company.

(k)    Foreign Corrupt Practices Act. Neither the Company nor, to the Company's knowledge, any of its affiliates, directors, officers, employees, agents or other person acting on behalf of the Company is aware of or has taken any action, directly or indirectly, that would result in a material violation by such person of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA"), including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA and the Company and, to the Company's knowledge, its affiliates have conducted their businesses in material compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

(l)    Rule 506(d) Bad Actor Disqualification Representations and Covenants.

(i)    No Disqualification Events. Neither the Company, nor any of its predecessors, affiliates, any manager, executive officer, other officer of the Company participating in the offering, any beneficial owner (as that term is defined

in Rule 13d-3 under the Exchange Act) of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the Securities Act) connected with the Company in any capacity as of the date of this Agreement and on the Closing Date (each, a "Company Covered Person" and, together, "Company Covered Persons") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3).   The Company has exercised reasonable care to determine (A) the identity of each person that is a Company Covered Person; and (B) whether any Company Covered Person is subject to a Disqualification Event.  The Company has complied with its disclosure obligations under Rule 506(e) as set forth on Schedule 3.1(l).

(ii)  Other Covered Persons.  The Company is not aware of any person (other than any Company Covered Person) who has been or will be paid (directly or indirectly) remuneration in connection with the purchase and sale of the Notes and the Warrant who is subject to a Disqualification Event (each, an "Other Covered Person").

(iii)  Reasonable Notification Procedures.  With respect to each Company Covered Person, the Company has established procedures reasonably designed to ensure that the Company receives notice from each such Company Covered Person of (A) any Disqualification Event relating to that Company Covered Person, and (B) any event that would, with the passage of time, become a Disqualification Event relating to that Company Covered Person; in each case occurring up to and including the Closing Date.

(iv)  Notice of Disqualification Events.  The Company will notify the Purchaser immediately in writing upon becoming aware of (A) any Disqualification Event relating to any Company Covered Person and (B) any event that would, with the passage of time, become a Disqualification Event relating to any Company Covered Person and/or Other Covered Person.

(m)  Accuracy of Information, etc.  No statement or information contained in this Agreement, any other Transaction Document or any other document, certificate or statement furnished to the Purchaser by or on behalf of the Company in writing for use in connection with the transactions contemplated by this Agreement and/or the other Transaction Documents contained, as of the date such statement, information, document or certificate was made or furnished, as the case may be, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein, taken as a whole, not materially misleading.  There is no fact known to the Company that would reasonably be expected to materially affect the Company that has not been expressly disclosed herein, in the other Transaction Documents, or in any other documents, certificates and written statements furnished to the Purchaser for use in connection with the transactions contemplated hereby and by the other Transaction Documents.

(n)     Solvency. Based on the consolidated financial condition of the Company as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder: (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, (ii) the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, consolidated and projected capital requirements and capital availability thereof, and (iii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid. The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt). The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date. Schedule 3.1(n) sets forth as of the date hereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(o)     Transactions With Affiliates and Employees. Except as set forth on the financial statements included in Schedule 3.1(x), none of the officers or directors of the Company or any Subsidiary and, to the knowledge of the Company, none of the employees of the Company or any Subsidiary is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from providing for the borrowing of money from or lending of money to, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee, stockholder, member or partner, in each case in excess of $120,000 other than for: (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock option agreements under any stock option plan of the Company.

(p)     Intellectual Property.  The Company has, or has rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights as described on Schedule 3.1(p) that are material to the conduct of its business (collectively, the "Intellectual Property Rights").  The Company has not received a notice (written or otherwise) that any material Intellectual Property Right has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned.  The Company has not received, since the Balance Sheet Date, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person, except as would not have or reasonably be expected to have a Material Adverse

Effect.  To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights.  The Company has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all of its intellectual property.

(q)     USA Patriot Act.  The Company is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the USA Patriot Act (Title III of Pub. L. 107-56, signed into law on October 26, 2001) (the "Act").  No part of the proceeds of the Notes or Warrant will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(r)     Office of Foreign Assets Control. Neither the Company nor any Subsidiary nor, to the Company's knowledge, any director, officer, agent, joint venture employee or affiliate of the Company or any Subsidiary is currently, or in the past 5 years, has been subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(s)     Filings, Consents and Approvals. The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than: (i) the filings required pursuant to the Registration Rights Agreement and the declaration of effectiveness by the SEC of the Registration Statement, (ii) the notice and/or application(s) to each applicable Trading Market for the issuance and sale of the Securities and the listing of the Conversion Shares and Warrant Shares for trading thereon in the time and manner required thereby, and (iii) the filing of Form D with the Commission and such filings as are required to be made under applicable state securities laws (collectively, the "Required Approvals").

(t)     Authorization; Enforcement.   All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of the Transaction Documents and the performance of all obligations of the Company under the Transaction Documents and have been taken on or prior to the date hereof.  Each of the Transaction Documents has been duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except: (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by general equitable principles regardless of whether such enforcement is considered in a proceeding in equity or at law, (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable

remedies and (iv) insofar as indemnification and contribution provisions may be limited by applicable law.

(u)    Valid Issuance of Securities.  The Convertible Note and Warrant have been duly authorized and, when issued and paid for in accordance with this Agreement, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens and all restrictions on transfer other than those expressly imposed by the federal securities laws and vest in the Purchaser full and sole title and power to the Convertible Note and Warrant purchased hereby by the Purchaser, free and clear of all Liens, and restrictions on transfer other than those imposed by the federal securities laws.  All Conversion Shares, when issued pursuant to conversion of the Convertible Note, and all Warrant Shares, when issued pursuant to exercise of the Warrants, when issued pursuant to this Agreement, will be duly and validly issued, fully paid and nonassessable, will be free and clear of all Liens and vest in the holder full and sole title and power to such securities.  The Company has reserved from its duly authorized unissued Common Stock, the Required Minimum (as defined in the Convertible Note), which Required Minimum shall be continuously determined by the Company to ensure that the Required Minimum is in reserve with the Transfer Agent at all times.

(v)    Offering.  The offer and sale of the Convertible Note and the Warrant, when issued pursuant to this Agreement, as contemplated by this Agreement, are exempt from the registration requirements of the Securities Act, and the qualification or registration requirements of state securities laws or other applicable blue sky laws.  Neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemptions.

(w)    Capitalization and Voting Rights.  The capitalization of the Company is as set forth on Schedule 3.1(w), which Schedule 3.1(w) shall also include the number of shares of Common Stock owned beneficially, and of record, by Affiliates of the Company as of the date hereof. The authorized capital stock of the Company and all securities of the Company issued and outstanding are set forth on Schedule 3.1(w) as of the dates reflected therein.  All of the outstanding shares of Common Stock and other securities of the Company have been duly authorized and validly issued, and are fully paid and nonassessable. Except as set forth on Schedule 3.1(w), no Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents. Except as set forth on Schedule 3.1(w), there are no agreements or arrangements under which the Company is obligated to register the sale of any of the Company's securities under the Securities Act.  Except as set forth on Schedule 3.1(w), no shares of Common Stock and/or other securities of the Company are entitled to preemptive rights and there are no outstanding debt securities and no contracts, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of the capital stock and/or other securities of the Company or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, any shares of capital stock of the Company other than those issued or granted in the ordinary course of business pursuant to the Company's equity incentive and/or compensatory plans or arrangements.  Except for customary transfer restrictions

contained in agreements entered into by the Company to sell restricted securities and/or as set forth on Schedule 3.1(w), the Company is not a party to, and it has no knowledge of, any agreement restricting the voting or transfer of any shares of the capital stock and/or other securities of the Company.  Except as set forth on Schedule 3.1(w), the offer and sale of all capital stock, convertible or exchangeable securities, rights, warrants, options and/or any other securities of the Company, when any such securities of the Company were issued, complied in all material respects with all applicable federal and state securities laws, and no current and/or prior holder of any securities of the Company has any right of rescission or damages or any "put" or similar right with respect thereto.  Except as set forth on Schedule 3.1(w), there are no securities or instruments of the Company containing anti-dilution or similar provisions that will be triggered by the issuance and/or sale of the Securities and/or the consummation of the transactions described herein or in any of the other Transaction Documents.

(x)     Shell Company Status; Financial Statements.  The Company has been an issuer subject to Rule 144(i) under the Securities Act. The unaudited financial statements of the Company as of June 30, 2020 is included in Schedule 3.1(x) hereto.  The financial statements of the Company included on Schedule 3.1(x) have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject to normal, immaterial, year-end audit adjustments. For purposes of this Section 3.1, June 30, 2020 is referred to as the "Balance Sheet Date".

(y)     Material Changes; Undisclosed Events, Liabilities or Developments.  Since the Balance Sheet Date: (i) there has been no event, occurrence or development that has had or that could reasonably be expected to be materially adverse to the Company, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission (if the Company is an issuer required to file periodic reports under the Exchange Act), (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. Except for the issuance of the Securities contemplated by this Agreement or as set forth on Schedule 3.1(y), no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries or their respective businesses, properties, operations, assets or financial condition, that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

(z)     Litigation. Except as set forth on Schedule 3.1(z), there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(aa)     Disclosure. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any Purchaser or its respective agents or counsel with any information that constitutes material, non-public information.  The Company understands that the Purchaser may rely on the Transaction Documents, the information included therein, including, but not limited to, the foregoing representation in purchasing the Securities.  All of the disclosure furnished by or on behalf of the Company to the Purchaser in the Transaction Documents regarding, among other matters relating to the Company, its business and the transactions contemplated in the Transaction Documents, is true and correct in all material respects as of the date made and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  The Company acknowledges and agrees that the Purchaser does not make nor has made any representations or warranties with respect to the transactions contemplated in the Transaction Documents other than those specifically set forth in Section 3.2 hereof.

(bb)     No Integrated Offering. Assuming the accuracy of the representations and warranties set forth in Section 3.2, neither the Company, nor any of its affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause the issuance and/or sale of the Securities to be integrated with prior offerings of securities by the Company for purposes of (i) the Securities Act that would require the registration of any such Securities and/or any other securities of the Company under the Securities Act, or that would invalidate the exemptions from registration relied upon by the Company, or (ii) any stockholder-approval provisions of any Trading Market on which any of the securities of the Company are listed, eligible for quotation and/or designated.

(cc)     Insurance. The Company is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and

customary in the business in which it is engaged; the Company has not been refused any coverage sought or applied for; and the Company does not have any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business.

(dd)    <u>Regulation M Compliance</u>.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company.

(ee)    <u>Registration Rights</u>. Except as set forth on <u>Schedule 3.1(ee)</u>, no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company or any Subsidiaries. The Company shall not effectuate any

(ff)    <u>Labor Relations</u>. No labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company, which could reasonably be expected to result in a Material Adverse Effect. None of the Company's or its Subsidiaries' employees is a member of a union that relates to such employee's relationship with the Company or such Subsidiary, and neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are good. To the knowledge of the Company, no executive officer of the Company or any Subsidiary, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(gg)    <u>Dilutive Effect</u>.  The Company understands and acknowledges that the number of Underlying Shares issuable upon conversion of the Convertible Note and exercise of the Warrant, pursuant to the terms thereof, will increase in certain circumstances.  The Company further acknowledges that its obligations to issue Underlying Shares pursuant to the terms of the Convertible Note and Warrant in accordance with this Agreement, the Convertible Note and Warrant is absolute and unconditional regardless of the dilutive effect that any such issuances may have on the percentage ownership interests of other stockholders of the Company.

(hh)  <u>Application of Takeover Protections; Rights Agreement</u>.  The Company and its board of directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provisions under the Company's certificate of incorporation, as amended, or the laws of the jurisdiction of its formation that are or could become applicable to the Purchaser as a result of the transactions contemplated by this Agreement and/or the other Transaction Documents, including, without limitation, the Company's issuance of the Securities and the Purchaser's ownership of the Securities.  The Company has not adopted a stockholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company.

(ii)  <u>Manipulation of Price</u>.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result, or that could reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

(jj)  <u>DTC Eligible</u>.  The Common Stock is DTC eligible and DTC has not placed a "freeze" or a "chill" on the Common Stock and the Company has no reason to believe that DTC has any intention to make the Common Stock not DTC eligible, or place a "freeze" or "chill" on the Common Stock.  No federal or state regulatory authority has indicated that it will prohibit the listing of the Company's securities based upon its prior business in the cannabis or cannabis-related markets nor will the Purchaser be prohibited from depositing, clearing or settling the Securities, including through the DTC or otherwise, on account of the Company's prior business in the cannabis or cannabis-related markets.

(kk)  <u>Listing and Maintenance Requirements</u>.  The Company has not, in the 12 months preceding the date hereof, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that the Company is not in compliance with the listing or maintenance requirements of such Trading Market.  The Common Stock is eligible for quotation on the Principal Market and the Company has no reason to believe that the Principal Market has any intention of delisting or no longer quoting the Common Stock from the Principal Market.  The issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.  All Underlying Shares have been approved, if so required, for listing or quotation on the Trading Market, subject only to notice of issuance.

(ll)  <u>No General Solicitation</u>.  Neither the Company, nor any of its affiliates, nor, to the knowledge of the Company, any Person acting on its behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities.

(mm)   <u>Acknowledgment Regarding the Purchaser's Purchase of Securities</u>.  The Company acknowledges and agrees that the Purchaser is acting solely in the capacity of an arm's length purchaser with respect to the other Transaction Documents and the transactions contemplated hereby and thereby and that the Purchaser is not (i) an officer or director of the Company, (ii) an Affiliate of the Company or (iii) to the knowledge of the Company, a "beneficial owner" of more than 10% of the shares of Common Stock (as defined for purposes of Rule 13d-3 of the Exchange Act).  The Company further acknowledges that the Purchaser is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby, and any advice given by the Purchaser or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to the Purchaser's purchase of the Securities.  The Company further represents to the Purchaser that the Company's decision to enter into the Transaction Documents has been based solely on the independent evaluation by the Company and its representatives.

(nn)   <u>Off-Balance Sheet Arrangements</u>.  There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off-balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed.

(oo)   <u>Certain Fees</u>. No brokerage or finder's fees or commissions are or will be payable by the Company or any Subsidiaries to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents. The Purchaser shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(pp)   <u>Anti-Money Laundering, Anti-Bribery and Anti-Corruption; Sanctions</u>.

(i)   Neither the Company nor, any of its Subsidiaries or Affiliates or any director or officer of any of them is an individual or entity currently, or has not in the past 5 years been, subject to any Sanctions or is on any Sanctions List.

(ii)   Each of the Company, any of its Subsidiaries and Affiliates and their respective directors, officers, employees and, to the knowledge of the Company, agents and any other person or entity acting on behalf of the Company, has complied with the Money Laundering, Anti-Corruption and Anti-Bribery Laws, in each case as applicable to them, and no action, suit or proceeding by or before any court or any arbitrator or any governmental agency, authority or body involving the Company and any of its Subsidiaries or their respective directors or officers and, to the knowledge of the Company, the employees, agents, or representatives of each of them, is pending or threatened with respect to Money Laundering, Anti-Corruption and Anti-Bribery Laws.

(iii)    Neither the Company nor any of its Subsidiaries nor their respective directors or officers, nor, to the knowledge of the Company, the employees or agents of any of them has:

    A.  used any corporate funds (nor will it use any proceeds from the Notes and Warrants) for any unlawful contribution, gift, entertainment or unlawful expense relating to political activity;

    B.  taken any action in furtherance of an unlawful offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or (anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for public office) or made any other bribe, rebate, payoff, influence payment or kickback intended to improperly influence official action or secure an improper advantage;

    C.  nor will it use any proceeds from the Notes and Warrants in furtherance of any such unlawful payment or violation of Sanctions or Money Laundering, Anti-Corruption and Anti-Bribery Laws.

(iv)    The Company and each Subsidiary will promote and ensure compliance with Money Laundering, Anti-Corruption and Anti-Bribery Laws in all jurisdictions where they operate and with the representations and warranties contained herein.

(v)    As used in this Section 3.1(pp):

    A.  "<u>Money Laundering, Anti-Corruption and Anti-Bribery Laws</u>" means money laundering and anti- corruption statutes of all jurisdictions (including, the Foreign Corrupt Practices Act of 1977, the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions, and any similar national or local law or regulation in the United Kingdom or elsewhere where the Company and each other Subsidiary conducts business), the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency or any such jurisdiction.

    B.  "<u>Sanctions</u>" means any laws or regulations or restrictive measures relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by a Sanctions Authority.

C.  "<u>Sanctions Authority</u>" means (i) the United Nations Security Council; (ii) the United States government; (iii) the European Union; (iv) the United Kingdom government; (v) the respective governmental institutions and agencies of any of the foregoing, including without limitation, OFAC, the United States Department of State and Department of Commerce, and Her Majesty's Treasury; and (vi) any other governmental institution or agency with responsibility for imposing, administering or enforcing Sanctions with jurisdiction over the Company or any of its subsidiaries (together, "<u>Sanctions Authorities</u>").

D.  "<u>Sanctions List</u>" means the Specially Designated Nationals and Blocked Persons List maintained by OFAC, the Denied Persons List maintained by the U.S. Department of Commerce, the Consolidated List of Financial Sanctions Targets maintained by Her Majesty's Treasury, or any other list issued or maintained by any Sanctions Authority of persons subject to Sanctions (including investment or related restrictions), each as amended, supplemented or substituted from time to time.

(qq)  <u>Environmental Laws</u>. The Company and its Subsidiaries, to the best of the Company's knowledge, (i) are in compliance with all federal, state, local and foreign laws relating to pollution or protection of human health or the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), including laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "<u>Hazardous Materials</u>") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands, or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations, issued, entered, promulgated or approved thereunder ("<u>Environmental Laws</u>"); (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses; and (iii) are in compliance with all terms and conditions of any such permit, license or approval where in each clause (i), (ii) and (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(rr)  <u>Seniority</u>.  As of the Closing Date, (i) all Indebtedness, other than the Notes and the indebtedness issued to Affiliates of the Purchaser in the May 2020 Financing and November 2020 Financing, are subordinated to the Notes and the indebtedness issued to Affiliates of the Purchaser in the May 2020 Financing and the November 2020 Financing, and (ii) no Indebtedness or other claim against the Company is senior to or pari passu with the Notes or indebtedness issued to Affiliates of the Purchaser in the May 2020 Financing and November 2020 Financing in right of payment (except that the Notes and the indebtedness issued to Affiliates of the Purchaser in the May 2020 Financing and November 2020 Financing are pari passu with each other), whether with respect to interest or upon liquidation or dissolution, or otherwise, other than indebtedness secured by

purchase money security interests (which is senior only as to underlying assets covered thereby) and capital lease obligations (which is senior only as to the property covered thereby).

3.2    Representation and Warranties of the Purchaser. The Purchaser, severally and not jointly, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows:

(a)    Organization; Authority. The Purchaser is either an individual or an entity duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation with full right, corporate, partnership, limited liability company or similar power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of the Transaction Documents and performance by the Purchaser of the transactions contemplated by the Transaction Documents have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of the Purchaser. Each Transaction Document to which it is a party has been duly executed by the Purchaser, and when delivered by the Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of the Purchaser, enforceable against it in accordance with its terms, except: (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b)    Own Account. The Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting the Purchaser's right to sell the Securities pursuant to an effective registration statement or otherwise in compliance with applicable federal and state securities laws). The Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)    Purchaser Status. At the time the Purchaser was offered the Securities, it was, and as of the date hereof it is an "accredited investor" as defined in Rule 501(a) under the Securities Act.

(d)    Experience of Purchaser. The Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment.

The Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e)     General Solicitation. The Purchaser is not, to the Purchaser's knowledge, purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(f)     Access to Information. The Purchaser acknowledges that it has had the opportunity to review the Transaction Documents (including all exhibits and schedules thereto) and has been afforded (i) the opportunity to ask such questions as it has deemed necessary of, and to receive answers from, representatives of the Company concerning the terms and conditions of the offering of the Securities and the merits and risks of investing in the Securities; (ii) access to information about the Company and its financial condition, results of operations, business, properties, management and prospects sufficient to enable it to evaluate its investment; and (iii) the opportunity to obtain such additional information that the Company possesses or can acquire without unreasonable effort or expense that is necessary to make an informed investment decision with respect to the investment.

(g)     Certain Transactions and Confidentiality.  The Purchaser has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with the Purchaser, executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing as of the time that the Purchaser first received a term sheet (written or oral) from the Company or any other Person representing the Company setting forth the material terms of the transactions contemplated hereunder and ending immediately prior to the execution hereof.  Notwithstanding the foregoing, if the Purchaser is a multi-managed investment vehicle, whereby separate portfolio managers manage separate portions of the Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of the Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.  Other than to other Persons party to this Agreement or to the Purchaser's representatives, including, without limitation, its officers, directors, partners, legal and other advisors, employees, agents and Affiliates, the Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction).

The Company acknowledges and agrees that the representations contained in this Section 3.2 shall not modify, amend or affect such Purchaser's right to rely on the Company's representations and warranties contained in this Agreement or any representations and warranties contained in any other Transaction Document or any other document or instrument executed and/or delivered in connection with this Agreement or the consummation of the transaction contemplated hereby.

ARTICLE 4
OTHER AGREEMENTS OF THE PARTIES

4.1    <u>Transfer Restrictions</u>.

(a)    The Securities may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Company or to an Affiliate of the Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and shall have the rights and obligations of the Purchaser under this Agreement.

(b)    The Purchaser agrees to the imprinting, so long as is required by this Section 4.1, of a legend on any of the Securities in the following form:

NEITHER THIS SECURITY NOR THE SECURITIES INTO WHICH THIS SECURITY IS CONVERTIBLE HAS BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY AND THE SECURITIES ISSUABLE UPON CONVERSION/EXERCISE OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Company acknowledges and agrees that the Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and who agrees to be bound by the provisions of this Agreement and, if required under the terms of such arrangement, the Purchaser may transfer pledged or secured Securities to the pledgees or secured parties. Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith. Further, no notice shall be required of such pledge. At the Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities, including, if the Securities are then registered for resale on a registration statement, the preparation and filing of any required

prospectus supplement under Rule 424(b)(3) under the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of selling stockholders thereunder.

(c)      Certificates evidencing the Underlying Shares shall not contain any legend (including the legend set forth in Section 4.1(b) hereof): (i) when they have been sold while a registration statement (including the Registration Statement) covering the resale of such security is effective under the Securities Act, (ii) following any sale of such Underlying Shares pursuant to Rule 144, (iii) if such Underlying Shares are eligible for sale under Rule 144 and a sale or transfer will be taking place prior to the Company's next periodic report becomes due under the Exchange Act or (iv) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission). The Company shall cause its counsel to issue a legal opinion to the Transfer Agent promptly after the Effective Date or at such time as such legend is no longer required under this Section 4.1(c) if required by the Transfer Agent to effect the removal of the legend hereunder, or if requested by the Purchaser. If any portion of the Convertible Note is converted at a time when there is an effective registration statement to cover any sale of the Underlying Shares, or if such Underlying Shares have been sold under Rule 144 and the Company is then in compliance with the current public information required under Rule 144, or if the Underlying Shares may be sold under Rule 144 without the requirement for the Company to be in compliance with the current public information required under Rule 144 as to such Underlying Shares and without volume or manner-of-sale restrictions provided the conditions of Rule 144(i)(2) have been satisfied and a sale of such shares will be taking place prior to the Company's next annual or quarterly report becoming due under its reporting obligations under the Exchange Act  or if such legend is not otherwise required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission) then such Underlying Shares shall be issued free of all legends. The Company agrees that following the Effective Date or at such time as such legend is no longer required under this Section 4.1(c), it will, no later than the earlier of (i) three (3) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period (as defined below) following the delivery by the Purchaser to the Company or the Transfer Agent of certificate(s) representing the Underlying Shares, as applicable, issued with a restrictive legend (such date, the "Legend Removal Date"), deliver or cause to be delivered to the Purchaser a certificate representing such shares that is free from all restrictive and other legends. The Company may not make any notation on its records or give instructions to the Transfer Agent that enlarge the restrictions on transfer set forth in this Section 4. Certificates for Underlying Shares subject to legend removal hereunder shall be transmitted by the Transfer Agent to the Purchaser by crediting the account of the Purchaser's prime broker with the Depository Trust Company System as directed by the Purchaser. As used herein, "Standard Settlement Period" means the standard settlement period, expressed in a number of Trading Days, on the Company's primary Trading Market with respect to the Common Stock as in effect on the date of delivery of a certificate representing the Underlying Shares, as applicable, issued with a restrictive legend.

(d)    In addition to the Purchaser's other available remedies, the Company shall pay to the Purchaser, in cash, the greater of (i) as partial liquidated damages and not as a penalty, for each $1,000 of Underlying Shares (based on the VWAP of the Common Stock on the date such Securities are submitted to the Transfer Agent) delivered for removal of the restrictive legend and subject to Section 4.1(c), $5 per Trading Day (increasing to $10 per Trading Day five (5) Trading Days after such damages have begun to accrue) for each Trading Day after the Legend Removal Date until such certificate is delivered without a legend and (ii) if the Company fails to (x) issue and deliver (or cause to be delivered) to the Purchaser by the Legend Removal Date a certificate representing the Securities so delivered to the Company by the Purchaser that is free from all restrictive and other legends or (y) if after the Legend Removal Date the Purchaser purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Purchaser of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock equal to all or any portion of the number of shares of Common Stock that the Purchaser anticipated receiving from the Company without any restrictive legend, then, an amount equal to the excess of the Purchaser's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including brokerage commissions and other out-of-pocket expenses, if any) (the "Buy-In Price") over the product of (A) such number of Conversion Shares, as applicable, that the Company was required to deliver to the Purchaser by the Legend Removal Date multiplied by (B) the lowest closing sale price of the Common Stock on any Trading Day during the period commencing on the date of the delivery by the Purchaser to the Company of the applicable Underlying Shares and ending on the date of such delivery and payment under this clause (ii).

4.2    Furnishing of Information. Beginning on the Closing Date, the Company shall use commercially reasonable efforts to comply with the Pink Basic Disclosure Guidelines which set forth the disclosure obligations that make up the "Alternative Reporting Standard" for OTC Pink companies as such obligations are published by the OTC Markets Group, Inc.  In addition, the Company shall file a Registration Statement on Form 8-A as soon as practicable, but in no event no later than five (5) Trading Days, after the effective date of first registration statement filed by the Company that is declared effective by the SEC which registers securities held by the Purchaser or any of its Affiliates.  If after the date hereof the Company becomes subject to the rules and regulations of the Exchange Act and as long as the Purchaser owns Securities, the Company covenants to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act.   As long as the Purchaser owns Securities, if the Company is not required to file reports pursuant to the Exchange Act, it will prepare and furnish to the Purchaser and make publicly available in accordance with Rule 144(c) such information as is required for the Purchaser to sell the Securities, including without limitation, under Rule 144.  In addition, the Company shall file with Commission current "Form 10 information", as defined in Rule 144(i)(3), as soon as practicable after the date the Company becomes subject to the rules and regulations of the Exchange Act, reflecting its status as an entity that is no longer an issuer described in Rule 144(i)(1)(i).  The Company further covenants that it will take such further action as any holder of Securities may reasonably request, to the extent required from time to time to enable such Person to sell such Securities without registration under the Securities Act, including without limitation, within the requirements of the exemption provided by Rule 144.

4.3    Integration. The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities or that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

4.4    Securities Laws Disclosure; Publicity. The Company shall by 9:00am on the 2nd Trading Day after the date of this Agreement, issue a press release disclosing the material terms of the transactions contemplated hereby, which press release shall have been approved by the Purchaser prior to its release (which approval shall not unreasonably be withheld or delayed). From and after the issuance of such press release, the Company represents to the Purchaser that it shall have publicly disclosed all material, non-public information delivered to the Purchaser by the Company or any of its Subsidiaries, or any of their respective officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents. In addition, effective upon the issuance of such press release, the Company acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between the Company, any of its Subsidiaries or any of their respective officers, directors, agents, employees or Affiliates on the one hand, and the Purchaser or any of its Affiliates on the other hand, shall terminate. The Company and the Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor the Purchaser shall issue any such press release nor otherwise make any such public statement without the prior consent of the Company, with respect to any press release of the Purchaser, or without the prior consent of the Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. Notwithstanding the foregoing, the Company shall not, without the prior written consent of the Purchaser, (a) use the name of the Purchaser, "Arena Investors LP," "Arena Management Company LLC," "Arena Finance Company LLC," "Arena" or any other derivative thereof (each, a "Trade Name") in any press releases or other public disclosures (including in any filing with the Commission or any regulatory agency or Trading Market), offering documents, sales materials, brochures or similar publicity or promotional materials, or for promotional purposes, whether orally or in writing, except (x) as required by federal securities law and the rules and regulations promulgated thereunder in connection with the filing of final Transaction Documents, any disclosure required pursuant to any reports required to be filed by the Company pursuant to the Exchange Act after the date hereof or the Registration Statement with the Commission, (y) to the extent such disclosure is required by law or Trading Market regulations, including the "Alternative Reporting Standard" required by OTC Markets, in which case the Company shall provide the Purchaser with prior notice of such disclosure permitted under this clause (y), or (z) as required under Delaware General Corporation Law or (b) represent that an investment in the Company or any product or any service provided by the Company has been approved or endorsed by the Purchaser. Following any such written consent, which shall not be unreasonably withheld or delayed, the Company shall provide the Purchaser with a copy of such written or other materials using the Trade Name if requested by the Purchaser. The Purchaser shall be deemed to have provided prior written consent of the disclosure of the

Purchaser's name to other stockholders and investors in the Company, and to potential investors in the Company (that to the extent such information has not already been publicly disclosed, have been informed of the confidential nature thereof) that in the course of their due diligence require disclosure of the identity of the existing investors in the Company.

4.5    Shareholder Rights Plan. No claim will be made or enforced by the Company or, with the consent of the Company, any other Person, that the Purchaser is an "Acquiring Person" under any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or similar anti-takeover plan or arrangement in effect or hereafter adopted by the Company, or that the Purchaser could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Securities under the Transaction Documents.

4.6    Non-Public Information.    Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, which shall be disclosed pursuant to Section 4.4, the Company covenants and agrees that neither it, nor any other Person acting on its behalf will provide the Purchaser or its agents or counsel with any information that constitutes, or the Company reasonably believes constitutes, material non-public information, unless prior thereto the Purchaser shall have consented to the receipt of such information and agreed with the Company to keep such information confidential. The Company understands and confirms that the Purchaser shall be relying on the foregoing covenant in effecting transactions in securities of the Company. To the extent that the Company delivers any material, non-public information to the Purchaser without the Purchaser's consent, the Company hereby covenants and agrees that the Purchaser shall not have any duty of confidentiality to the Company, any of its Subsidiaries, or any of their respective officers, directors, agents, employees or Affiliates, or a duty to the Company, any of its Subsidiaries or any of their respective officers, directors, agents, employees or Affiliates not to trade on the basis of, such material, non-public information, provided that the Purchaser shall remain subject to applicable law. To the extent that any notice provided pursuant to any Transaction Document constitutes, or contains, material, non-public information regarding the Company or any Subsidiaries, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K or if not subject to the reporting requirements under the Commission, file a press release. The Company understands and confirms that the Purchaser shall be relying on the foregoing covenant in effecting transactions in securities of the Company.

4.7    Use of Proceeds. Subject to the terms and conditions set forth on Schedule 4.7 attached hereto, the Company shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and shall not use such proceeds: (a) for the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), (b) for the redemption of any Common Stock or Common Stock Equivalents, (c) for the settlement of any outstanding litigation or (d) in violation of FCPA, OFAC regulations or Money Laundering, Anti-Corruption and Anti-Bribery Laws. Notwithstanding anything to the contrary in the Transaction Documents or otherwise, neither the Company nor its Subsidiaries may use any portion of the Purchase Price or any other proceeds from the Purchaser or any of its Affiliates (including the proceeds from the sale of the senior secured notes issued to Affiliates of the Purchaser in the May 2020 Financing and November 2020 Financing) to pay any liquidated damages, penalties, fees or other amounts due and payable to the Purchaser or its Affiliates under the Transaction Documents, the transaction documents

relating to the May 2020 Financing, November 2020 Financing or otherwise without the express advance written consent of the Purchaser.

4.8   <u>Indemnification of Purchaser</u>.   Subject to the provisions of this Section 4.8, the Company will indemnify and hold the Purchaser and its respective directors, officers, shareholders, members, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls the Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "<u>Purchaser Party</u>") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, as incurred, arising out of or relating to (i) any untrue or alleged untrue statement of a material fact contained in any registration statement filed by the Company, any prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that such untrue statements or omissions are based solely upon information regarding such Purchaser Party furnished in writing to the Company by such Purchaser Party expressly for use therein, or (ii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act or any state securities law, or any rule or regulation thereunder in connection therewith. If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party. Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (x) the employment thereof has been specifically authorized by the Company in writing, (y) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (z) in such action there is, in the reasonable opinion of counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The Company will not be liable to any Purchaser Party under this Agreement (1) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (2) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents. The indemnification required by this Section 4.8 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or are incurred. The indemnity agreements contained herein shall be in addition to any cause of action or similar right of any Purchaser Party against the Company or others and any liabilities the Company may be subject to pursuant to law.

4.9    Reservation of Common Stock. As of the date hereof, the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, a sufficient number of shares of Common Stock equal to the Required Minimum (as defined in the Convertible Note) for the purpose of enabling the Company to issue the Underlying Shares and any other shares that may be issuable pursuant to the Convertible Note and Warrant.  If, on any date, the number of authorized but unissued (and otherwise unreserved) shares of Common Stock is less than the Required Minimum on such date, then the Board of Directors shall use commercially reasonable efforts to amend the Company's certificate or articles of incorporation to increase the number of authorized but unissued shares of Common Stock to at least the Required Minimum at such time, as soon as possible and in any event not later than the 75th day after such date

4.10    Listing of Common Stock. The Company hereby agrees to use reasonable best efforts to maintain the listing or quotation of the Common Stock on the Trading Market on which it is currently listed, and concurrently with the Closing, the Company shall apply to list or quote all of the Underlying Shares on such Trading Market and promptly secure the listing of all of the Underlying Shares on such Trading Market. The Company further agrees, if the Company applies to have the Common Stock traded on any other Trading Market (including in accordance with Section 4.23), it will then include in such application all of the Underlying Shares, and will take such other action as is necessary to cause all of the Underlying Shares to be listed or quoted on such other Trading Market as promptly as possible. The Company will then take all action reasonably necessary to continue the listing and trading of its Common Stock on such Trading Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market. The Company agrees to maintain the eligibility of the Common Stock for electronic transfer through the Depository Trust Company or another established clearing corporation, including, without limitation, by timely payment of fees to the Depository Trust Company or such other established clearing corporation in connection with such electronic transfer.

4.11    Certain Transactions and Confidentiality. The Purchaser covenants that neither it nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including Short Sales of any of the Company's securities during the period commencing with the execution of this Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.4.  The Purchaser covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the initial press release as described in Section 4.4, such Purchaser will maintain the confidentiality of the existence and terms of this transaction and the information included in the Disclosure Schedules. Notwithstanding the foregoing and notwithstanding anything contained in this Agreement to the contrary, the Company expressly acknowledges and agrees that (i) no Purchaser makes any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced, (ii) no Purchaser shall be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.4, (iii) the Purchaser has not been asked by the Company to agree, nor has the

Purchaser agreed, to desist from purchasing or selling Securities which have been issued under the terms of this Agreement, the Convertible Note or any other Transaction Document, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term, (iv) the Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction, (v) the Purchaser may engage in hedging activities, other than Short Sales at various times during the period that the Securities are outstanding, and (vi) no Purchaser shall have any duty of confidentiality or duty not to trade in the securities of the Company to the Company or its Subsidiaries after the issuance of the initial press release. Except as contemplated above, Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

4.12  Conversion Procedures. The form of Notice of Conversion in the Convertible Note sets forth the totality of the procedures required of the Purchaser in order to convert the Convertible Note. No additional legal opinion, other information or instructions shall be required of the Purchaser to convert the Convertible Note. Without limiting the preceding sentences, no ink-original Notice of Conversion shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Notice of Conversion form be required in order to covert the Convertible Note. The Company shall honor conversions of the Convertible Note and shall deliver the Underlying Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents.

4.13  Form D; Blue Sky Filings. The Company agrees to timely file a Form D with respect to the Securities with the Commission as required under Regulation D, and with the applicable securities regulators in the states in which the Securities were sold, and to provide copies thereof, promptly upon request of the Purchaser. The Company shall take such further action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Purchaser at the Closing under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of such actions promptly upon request of the Purchaser.

4.14  Maintenance of Property. So long as the Notes and Warrant remain outstanding, the Company shall use its commercially reasonable efforts to keep all of its property, which is necessary or useful to the conduct of its business, in good working order and condition, ordinary wear and tear excepted.

4.15  Preservation of Corporate Existence. So long as the Notes and Warrant remain outstanding, the Company shall preserve and maintain its corporate existence, rights, privileges and franchises in the jurisdiction of its incorporation, and qualify and remain qualified, as a foreign corporation in each jurisdiction in which such qualification is necessary in view of its business or operations and where the failure to qualify or remain qualified would reasonably be expected to have a Material Adverse Effect.

4.16  DTC Program. At all times that the Securities are outstanding, the Company will employ as the transfer agent for the Common Stock and Conversion Shares a participant in the Depository Trust Company Automated Securities Transfer Program and cause the Common Stock to be transferable pursuant to such program.

4.17 <u>Subsequent Equity Sales</u>. From the date hereof until such time as the Purchaser no longer holds the Convertible Note and the Warrant, the Company shall be prohibited from effecting or entering into an agreement to effect any issuance by the Company or any of its Subsidiaries of Common Stock or Common Stock Equivalents (or a combination of units thereof) involving a Variable Rate Transaction. "<u>Variable Rate Transaction</u>" means a transaction which is not Permitted Indebtedness and in which the Company (i) issues or sells any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional shares of Common Stock either (A) at a conversion price, exercise price or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into, or effects a transaction under, any agreement, including, but not limited to, an equity line of credit, whereby the Company may issue securities at a future determined price.   The foregoing restrictions shall not include any agreement for an at-the-market offering.   The Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages. From the date hereof until ninety (90) days after the effectiveness of the Registration Statement, the Company shall be prohibited from effecting any registration statement, or amendment or supplement thereto, with the Commission, other than a prospectus filed with the Commission pursuant to Rule 424(b) in connection with the Registration Statement.

4.18 <u>Transfer Agent Instructions</u>. The Company shall issue irrevocable instructions to the Transfer Agent in a form acceptable to the Purchaser (the "<u>Irrevocable Transfer Agent Instructions</u>") to issue certificates or credit shares via DWAC or otherwise to the applicable balance accounts at The Depository Trust Company ("<u>DTC</u>"), registered in the name of the Purchaser or its respective nominee(s), for the Underlying Shares in such amounts as specified from time to time by the Purchaser to the Company upon conversion of the Convertible Note or exercise of the Warrant. The Company represents and warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section will be given by the Company to its Transfer Agent with respect to the Securities, and that the Securities shall otherwise be freely transferable on the books and records of the Company, as applicable, to the extent provided in this Agreement and the other Transaction Documents. In the event that such sale, assignment or transfer involves Conversion Shares sold, assigned or transferred pursuant to an effective registration statement or in compliance with Rule 144, the transfer agent shall issue such shares to such Buyer, assignee or transferee (as the case may be) without any restrictive legend in accordance with Section 4.1. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to Purchaser. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that Purchaser shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required. The Company shall cause its counsel to issue the legal opinion referred to in the Irrevocable Transfer Agent Instructions to the Company's transfer agent from and after the Applicable Date.

Any fees (with respect to the transfer agent, counsel to the Company or otherwise) associated with the issuance of such opinion or the removal of any legends on any of the Securities shall be borne by the Company. "Applicable Date" means the first date on which all of the Underlying Shares are eligible to be resold by the Purchaser pursuant to Rule 144 or an effective registration statement is in effect.

4.19 <u>Public Information</u>.  At any time during the period commencing from the six (6) month anniversary of the Closing Date and ending at such time that all of the Securities, may be sold without the requirement for the Company to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144, if the Company shall fail for any reason to satisfy the current public information requirement under Rule 144(c) (a "<u>Public Information Failure</u>") then, in addition to the Purchaser's other available remedies, the Company shall pay to the Purchaser, in cash, as partial liquidated damages and not as a penalty, by reason of any such delay in or reduction of its ability to sell the Securities, an amount in cash equal to two percent (2.0%) of the aggregate Purchase Price of the Purchaser's Securities on the day of a Public Information Failure and on every thirtieth (30th) day (pro rated for periods totaling less than thirty days) thereafter until the earlier of (a) the date such Public Information Failure is cured and (b) such time that such public information is no longer required  for the Purchaser to transfer the Underlying Shares pursuant to Rule 144.  The payments to which the Purchaser shall be entitled pursuant to this Section 4.19 are referred to herein as "<u>Public Information Failure Payments</u>."  Public Information Failure Payments shall be paid on the earlier of (i) the last day of the calendar month during which such Public Information Failure Payments are incurred and (ii) the third (3rd) Business Day after the event or failure giving rise to the Public Information Failure Payments is cured. If an Event (as defined in the Registration Rights Agreement) is occurring at the time of a Public Information Failure, and the Company is (x) then obligated to pay, and (y) timely pays the Purchaser partial liquidated damages under Section 2(d) of the Registration Rights Agreement for the period occurring simultaneous with the applicable Public Information Failure (such payments, the "<u>Simultaneous Registration Rights Partial Liquidated Damages</u>") and (z) has timely paid the Purchaser all previously accrued partial liquidated damages under Section 2(d) of the Registration Rights Agreement, the Company may deduct the amounts paid in connection with such Simultaneous Registration Rights Partial Liquidated Damages from such Public Information Failure Payments due for such simultaneous Public Information Failure. In the event the Company fails to make Public Information Failure Payments in a timely manner, such Public Information Failure Payments shall bear interest at the rate of 1.5% per month (prorated for partial months) until paid in full. Nothing herein shall limit such Purchaser's right to pursue actual damages for the Public Information Failure, and the Purchaser shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.

4.20 <u>Exercise Procedures</u>. The form of Notice of Exercise included in the Warrants sets forth the totality of the procedures required of the Purchaser in order to exercise the Warrants. No additional legal opinion, other information or instructions shall be required of the Purchasers to exercise their Warrants. Without limiting the preceding sentences, no ink-original Notice of Exercise shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Notice of Exercise form be required in order to exercise the Warrants. The Company shall honor exercises of the Warrants and shall deliver Warrant Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents.

4.21 <u>Litigation</u>. For as long as the Notes and Warrants are outstanding, the Company shall promptly, to the extent not prohibited by law, give the Purchaser notice in writing of any Action before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) affecting the Company, any Subsidiary, any director and/or officer including but not limited to, any Action involving a claim of violation of or liability under federal or state securities laws, a claim of breach of fiduciary duty or any investigation by a governmental or administrative agency or regulatory authority (federal, state county, local or foreign). Any such information provided to the Purchaser shall comply with the requirements of Section 4.6 above.

4.22 <u>Access to Records</u>. The Company shall provide the Purchaser and/or any of its duly authorized representatives, attorneys or accountants access to any and all bank records at the premises of the Company where such records are kept, such access being afforded without charge, but only during normal business hours. Any such information provided to the Purchaser shall comply with the requirements of Section 4.6 above.

4.23 <u>OTC Markets; National Securities Exchange</u>.

(a) As soon as reasonably practicable after the Closing, the Company shall use its reasonable best efforts to meet the eligibility requirements for listing its shares of Common Stock on the OTCQB or OTCQX and upon meeting such requirements, the Company shall promptly take all necessary and appropriate actions to quote its shares of Common Stock on such over-the-counter market.

(b) As soon as reasonably practicable after the Company meets the qualitative and quantitative listing standards for listing on a national securities exchange, the Company shall use reasonable best efforts to take all necessary and appropriate actions to list its shares of Common Stock for trading on such national securities exchange.

4.24 <u>Post-Closing Actions</u>. The Company shall and shall cause each of its relevant Subsidiaries to execute and deliver the documents and complete the tasks set forth in this Section as soon as reasonably practicable and in each case no later than the time limit specified in this Section or such longer time as the Purchaser may agree in its sole discretion:

(a) Any Person acquired by the Company, or that otherwise becomes a Subsidiary of the Company, on or after the date of this Agreement shall enter into a Subsidiary Guaranty Agreement and be joined to the Security Agreement as a debtor not later than one (1) calendar day after the consummation of such acquisition by the Company or the date the Person otherwise becomes a Subsidiary of the Company; and

(b) The Company shall consummate the acquisition of NextRidge contemplated by the NextRidge Acquisition Agreement within fourteen (14) calendar days following the Closing Date. If the acquisition of NextRidge is not consummated within the time limit specified herein, it will constitute an Event of Default.

4.25 <u>Future Financings</u>. Except for Permitted Indebtedness and for so long as Liabilities are outstanding, neither the Company, nor any of its Subsidiaries, shall enter into, create, incur, assume, guarantee or suffer to exist any Indebtedness. Despite the foregoing prohibition and for

so long as Liabilities are outstanding, if at any time the Company or any of its Subsidiaries issues or incurs any Indebtedness other than Permitted Indebtedness, in addition to the Purchaser's other available remedies, the Company shall pay to the Purchaser, in cash, as partial liquidated damages and not as a penalty, on each date of any such issuance or incurrence of Indebtedness, $30,000.  Any such Indebtedness shall be expressly subordinated to the Notes and the convertible promissory notes issued to Affiliates of the Purchaser in the May 2020 Financing, and the holders of such Indebtedness shall not be granted any registration rights, nor shall the Company register, or cause to be registered, with the SEC or any state securities commission the notes or other debt instruments representing such Indebtedness or any equity securities issuable in connection with such Indebtedness. In addition, all entry into future Permitted Indebtedness shall be subject to a subordination and intercreditor agreements in form satisfactory to the Purchaser, with the exception of the existing lines of credit with Pioneer Bank for factoring arrangements that do not exceed $4,000,000 for any given month.

## ARTICLE 5
## MISCELLANEOUS

5.1    <u>Fees and Expenses</u>.  Except as expressly set forth below and in the Transaction Documents to the contrary, each party shall pay the reasonable, documented fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. The Company shall pay all Transfer Agent fees (including, without limitation, any fees required for same-day processing of any instruction letter delivered by the Company and any exercise notice delivered by the Purchaser), stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchaser. Notwithstanding the foregoing, the Company agrees to pay all direct and indirect costs and expenses of the Purchaser related to the negotiation, due diligence, preparation, closing, and all other items regarding or related to this Agreement and the other Transaction Documents and all of the transactions contemplated herein and/or therein, including, but not limited to, the legal fees and expenses of the Purchaser's legal counsel (collectively, the "<u>Purchaser's Expenses</u>"), all of which will be deducted and paid on Closing Date.

5.2    <u>Entire Agreement</u>. The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.3    <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of: (a) the date of transmission, if such notice or communication is delivered via facsimile or email attachment at the facsimile number or email address as set forth on the signature pages attached hereto at or prior to 5:30 p.m. (New York City time) on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via facsimile or email attachment at the facsimile number or email address as set forth on the signature pages attached hereto on a day that is not a Business Day or later than 5:30 p.m. (New York City time) on any Business Day, (c) the second (2nd) Business Day following the

date of mailing, if sent by U.S. nationally recognized overnight courier service or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

5.4    <u>Amendments; Waivers</u>. No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Company and the Purchaser or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right. Any amendment effected in accordance with accordance with this Section 5.4 shall be binding upon the Purchaser and holder of Securities and the Company.

5.5    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Purchaser then holding the outstanding Notes and Warrant (other than by merger). Purchaser may assign any or all of its rights under this Agreement to any Person to whom Purchaser assigns or transfers any Securities in compliance with the Transaction Documents, provided that such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of the Transaction Documents that apply to the "Purchaser," and provided further that (i) such transferee is an "accredited investor" within the meaning of Rule 501 under the Securities Act and (ii) such transferee is not a direct competitor of the Company or any Subsidiary.

5.6    <u>No Third-Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

5.7    <u>Governing Law; Exclusive Jurisdiction</u>. All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any Action or Proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such Action or Proceeding is improper or is an inconvenient venue for such Proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such Action or Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with

evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.   If any party shall commence an Action or Proceeding to enforce any provisions of the Transaction Documents, then, in addition to the obligations of the Company elsewhere in this Agreement, the prevailing party in such Action or Proceeding shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Action or Proceeding.

5.8   Survival. The representations and warranties contained herein shall survive the Closing and the delivery of the Securities at Closing.

5.9   Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party, it being understood that the parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

5.10   Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated, as long as the essential terms and conditions of the Notes and Warrant for each party remain valid, binding, and enforceable. The parties shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.

5.11   Rescission and Withdrawal Right. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, whenever the Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then the Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights; provided, however, that, in the case of a rescission of a conversion of the Convertible Note or of an exercise of the Warrant, the Purchaser shall be required to return any shares of Common Stock subject to any such rescinded conversion or exercise notice concurrently with the return to the Purchaser of the aggregate exercise price paid to the Company for such shares.

5.12   Replacement of Securities. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of

evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

5.13    <u>Remedies</u>. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchaser and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any Action for specific performance of any such obligation the defense that a remedy at law would be adequate.

5.14    <u>Payment Set Aside</u>. To the extent that the Company makes a payment or payments to the Purchaser pursuant to any Transaction Document or the Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

5.15    <u>Usury</u>. To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any Action or Proceeding that may be brought by the Purchaser in order to enforce any right or remedy under any Transaction Document. Notwithstanding any provision to the contrary contained in any Transaction Document, it is expressly agreed and provided that the total liability of the Company under the Transaction Documents for payments in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "<u>Maximum Rate</u>"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums in the nature of interest that the Company may be obligated to pay under the Transaction Documents exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by law and applicable to the Transaction Documents is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to the Transaction Documents from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Purchaser with respect to indebtedness evidenced by the Transaction Documents, such excess shall be applied by the Purchaser to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Purchaser's election.

5.16 <u>Liquidated Damages</u>. The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

5.17 <u>Saturdays, Sundays, Holidays, etc</u>. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

5.18 <u>Construction</u>. The parties agree that each of them and/or their respective counsel have reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments thereto.

5.19 **WAIVER OF JURY TRIAL. IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY**.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**CHARGE ENTERPRISES, INC.**

By: _____
    Name: Andrew Fox
    Title: Chief Executive Officer

Address for Notice:

125 Park Avenue, 25th Floor
New York, NY  10017

Email: a@charge.us

With a copy to (which shall not constitute notice):

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza, 39th Floor
New York, NY  10112
Attn: Richard A. Friedman and Stephen A. Cohen
Email: rafriedman@sheppardmullin.com,
scohen@sheppardmullin.com

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

SIGNATURE PAGE FOR PURCHASER FOLLOWS]

PURCHASER SIGNATURE PAGES TO CHARGE SECURITIES PURCHASE AGREEMENT

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: _____

*Signature of Authorized Signatory of Purchaser*: _____

DocuSigned by:

*lawrence Cutler*

D6D05B3BF2A04FD...

Name of Authorized Signatory: _____Lawrence Cutler_____

Title of Authorized Signatory: _____Authorized Signatory_____

Email Address of Authorized Signatory: _____

Facsimile Number of Authorized Signatory: _____

Address for Notice to Purchaser:



Address for Delivery of Securities to Purchaser (if not same as address for notice):



FEIN Number: _____

**PURCHASER SIGNATURE PAGES TO CHARGE SECURITIES PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: _____

*Signature of Authorized Signatory of Purchaser*: _____

DocuSigned by:

*Lawrence Cutler*

D6D05B3BF2A04FD...

Name of Authorized Signatory: ___Lawrence Cutler_____

Title of Authorized Signatory: _____Authorized Signatory_____

Email Address of Authorized Signatory: _____

Facsimile Number of Authorized Signatory: _____

Address for Notice to Purchaser:

Address for Delivery of Securities to Purchaser (if not same as address for notice):

FEIN Number: _____

## EXHIBIT A

## Form of Convertible Note

# EXHIBIT B

## Form of Non-convertible Note

## EXHIBIT C

## Form of Warrant

## **EXHIBIT D**

## **Form of Amended and Restated Security Agreement**

# EXHIBIT E

## Form of Registration Rights Agreement

## EXHIBIT F

## Form of Subsidiary Guaranty Agreement

**Schedule 1**

**Purchase Price; Securities Purchased**

Tranche 1

| Name of Purchaser | Purchase Price | Aggregate Principal Amount of Convertible Notes being Purchased | Number of Warrants to be Issued |
|---|---|---|---|
| Arena Special Opportunities Fund, LP | $594,168.38 | $666,656.92 | 222,219 |
| Arena Special Opportunities Partners I, LP | $4,405,831.62 | $4,943,343.08 | 1,647,781 |
| **TOTAL** | **$5,000,000.00** | **$5,610,000.00** | **1,870,000** |

**Schedule 2**

**Senior Secured Loan**

Tranche 2

| Name of <br> Purchaser | Purchase Price | Aggregate Principal Amount of Non-convertible Notes being Purchased |
|---|---|---|
| Arena Special Opportunities Fund, LP | $1,188,336.75 | $1,311,045.47 |
| Arena Special Opportunities Partners I, LP | $8,811,663.25 | $9,721,563.53 |
| **TOTAL** | **$10,000,000.00** | **$11,032,609.00** |

# CHARGE ENTERPRISES, INC.
## DISCLOSURE SCHEDULES

This disclosure schedule (this "Disclosure Schedule") delivered by Charge Enterprises, Inc., a Delaware corporation (the "Company," "we," "us," or "our,") has been prepared in connection with the Securities Purchase Agreement (the "Agreement") dated as of May 19, 2021 by and among the Company and the purchasers signatory thereto. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

This Disclosure Schedule sets forth items, the disclosure of which are necessary or appropriate either in response to an express disclosure requirement contained in a provision of the Agreement or as an exception to one or more of the Company's representations or warranties contained in the Agreement. Any information set forth in one section of this Disclosure Schedule will be deemed to apply to all other sections or subsections of the Agreement to the extent that such disclosure is applicable to such other section(s) or subsection(s) on its face without additional investigation.

Headings inserted in the sections or subsections of this Disclosure Schedule are for convenience of reference only and shall not have the effect of amending or changing the express terms of the sections or subsections as set forth in the Agreement. Unless otherwise expressly specified, all references to "dollars" or "$" means United States Dollars.

The mere inclusion of any item in any section or subsection of this Disclosure Schedule as an exception to any representation or warranty or otherwise shall not be deemed to constitute an admission by the Company including that such item was required to be disclosed, or to otherwise imply (i) that any such item has had or would reasonably be expected to have a Material Adverse Effect or otherwise represent an exception or material fact, event or circumstance for the purposes of the Agreement, (ii) that such item is or was material under federal or state securities laws, (iii) that such item is or was outside the Company's course of business, or (iv) that such item meets or exceeds a monetary or other threshold specified for disclosure in the Agreement. Notwithstanding the foregoing, no disclosure included in any section of the this Disclosure Schedule will contravene or vary the text of the representations and warranties set forth in the Agreement. Nothing in the this Disclosure Schedule shall constitute an admission of any liability or obligation of the Company or any other party to any third party or shall confer or give to any third party any remedy, claim, liability, reimbursement, cause of action, or other right.

### Schedule 3.1(a)
### Subsidiaries

| Entity Name | State of Organization | Percent Owned |
|---|---|---|
| Transworld Enterprises, Inc. | Delaware | 100% |
| Charge Investments, Inc. | Nevada | 100% |
| Charge Infrastructure, Inc. | Delaware | 100% |
| Charge Communications, Inc. | Delaware | 100% |
| PTGI International Carrier Services, Inc. | Delaware | 100% by Charge Communications, Inc. |
| Go2Tel.com, Inc. | Florida | 100% by PTGI |
| GetCharged, Inc. | Delaware | 100% by Charge Infrastructure, Inc. |
| Charge Services, LLC | Delaware | 100% by GetCharged |
| GetCharged (France) SAS | France | 100% by GetCharged |

## Schedule 3.1(n)
## Outstanding Indebtedness

| Date of Note Issuance | Outstanding Balance ($) | Principal Amount at Issuance ($) | Maturity Date | Conversion Terms | Name of Noteholder |
|---|---|---|---|---|---|
| May 8, 2020 | $390,098 | $390,098 | May 8, 2022 | Converts at $0.25 per share | Arena Special Opportunities Partners I LP |
| May 8, 2020 | $166,092 | $166,092 | May 8, 2022 | Converts at $0.25 per share | Arena Originating Co LLC |
| May 8, 2020 | $1,807,872 | $1,807,872 | May 8, 2022 | Converts at $0.25 per share | Mt. Whitney Securities LLC |
| May 8, 2020 | $635,938 | $635,938 | May 8, 2022 | Converts at $0.25 per share | Arena Special Opportunities Fund LP |
| August 24, 2020 | $110,000 | $110,000 | August 24, 2021 | Converts at $0.25 per share | Iroquois Master Fund Ltd. |
| August 25, 2020 | $166,667 | $166,667 | August 25, 2021 | Converts at $0.25 per share | Trillium Partners LP |
| August 26, 2020 | $110,000 | $110,000 | August 26, 2021 | Converts at $0.25 per share | Iroquois Master Fund Ltd. |
| September 14, 2020 | $22,000 | $22,000 | September 14, 2021 | Converts at $0.25 per share | Patrick Maney |
| September 15, 2020 | $27,777 | $27,777 | September 15, 2021 | Converts at $0.25 per share | Jeffrey B. Scott |

GetCharged Indebtedness

1. Charge is indebted to the following companies for work performed under consulting contracts:

| Creditor | Nature of Relationship | Approximate Debt |
|---|---|---|
| Bhavia Communications | Communications services. | $12,000 |

-3-

| Kasirer, LLC | Lobbying (New York) *(Contract terminated by letter 23 Jan 2020)* | $16,000 |

Mr. Fox has independently indemnified the Company and its affiliates against any claims arising from the indebtedness listed above.

**Schedule 3.1(l)**
**No Disqualification Events**

Kenneth Orr, our Executive Chairman, was a registered principal and president of First Cambridge Securities Corporation ("First Cambridge") from March 1994 until May 23, 1997. First Cambridge was registered with the Securities and Exchange Commission (the "Commission") as a broker-dealer pursuant to Section 15(b) of the Securities Exchange Act of 1934, as amended, during the period of Mr. Orr's employment.

On May 9, 1997, the Alabama Securities Commission (the "ASC") issued an order of suspension against Mr. Orr and First Cambridge for failure to respond to a visitation letter from the commission directing the production of documents relevant to an investigation being conducted by the ASC.

On November 10, 1999, the Securities and Exchange Commission (the "Commission") filed a civil action in federal district court against Mr. Orr and sixteen other defendants. In connection therewith, a Final Judgment of Permanent Injunction and Other Relief was entered by the Court, on September 13, 2002, as to Mr. Orr, with respect to which Mr. Orr consented without admitting or denying the allegations in the Commission's Complaint, permanently enjoining him from future violations of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, ordering him to disgorge $55,000 in ill-gotten SMRH:4839-9458-1458.2 -13- gains, approximately $44,000 in prejudgment interest, and post-judgment interest, and ordering Orr to pay a civil penalty of $55,000. Mr. Orr consented to the entry of the final judgment without admitting or denying the allegations in the Commission's Complaint.

Regarding the same allegations in the SEC complaint, on January 3, 2002, in a settlement with the US Attorney, Mr. Orr pleaded guilty to one count of indirect conspiracy, and, on May 21, 2002, a judgment was entered against Mr. Orr by the Court pursuant to which Mr. Orr ordered to pay a $3,000 fine. In addition, and as part of the above, in December 2004, Mr. Orr consented to the entry of an Order Making Findings and Imposing Remedial Sanctions pursuant to Section 15(b) of the Securities Exchange Act of 1934.

In connection therewith, Mr. Orr was barred from association with any broker or dealer. Any reapplication for association by Mr. Orr will be subject to the applicable laws and regulations governing the reentry process. Mr. Orr has determined not to reapply or seek reentry.

While the events underlying such actions and/or settlements were over 20 years ago, and the final settlements of such matters were over 15 years ago, investors may wish to consider the above information prior to making an investment in the Company. For further details on the above, go to www.sec.gov, or contact the Company.

**Schedule 3.1(p)**
**Intellectual Property**

Charge Intellectual Property

| Matter | Application or Serial No. | Filing Date | Attorney Docket | Status |
|---|---|---|---|---|
| Provisional Patent Application CHARGING HUB FOR URBAN MICRO-MOBILITY VEHICLES | 17071071 | 10/15/20 | CHAR-0005-US-PV1 | Pending |
| Provisional Patent Application CHARGING STATION FOR URBAN MICRO-MOBILITY VEHICLES | 62932612 | 11/08/2019 | CHAR-0007-US-PV1 | Pending |
| US Trademark Application POWERED BY CHARGE | 88438346 | 9/3/2019 | CHAR-0004-US | Pending |
| Madrid Protocol Trademark Application CHARGE (Stylized w/lightning bolt) | 88363394 | 3/29/2019 | CHAR-0003-MP | Pending |

**Schedule 3.1(w)**
**Capitalization**

**(As of May 18, 2021)**

Common Stock

Authorized: 500,000,000
Issued/Outstanding: 152,212,063
Options: 32,600,000 issued, 4,325,000 to be issued upon Nextridge Acquisition and 750,000 to be issued to CFO that starts on June 1, 2021
Warrants: 9,959,555 shares of common stock issuable at $0.50/share and 10,000,000 shares of common stock issuable at $2.00/share
Convertible Debt: See Schedule 3.1(n)
Affiliates:

| Shareholder | Class of Shares | Number of Shares |
|---|---|---|
| KORR Acquisitions Group, Inc. | Series A Preferred Stock | 1,000,000 |
| KORR Acquisitions Group, Inc. | Common Stock | 42,474,540 |
| KORR Value, LP | Common Stock | 10,618,683 |
| Cori Orr | Common Stock | 2,123,711 |
| Lauren Orr | Common Stock | 1,061,887 |
| Benjamin Orr | Common Stock | 1,061,887 |
| Phil Scala | Common Stock | 1,061,887 |
| Justin Deutsch | Common Stock | 424,768 |
| Andrew Fox[1] | Common Stock | 14,741,855 |

KORR Value LP and Andrew Fox also hold convertible debt as set forth on Schedule 3.1(n).  In connection with issuance of the convertible debt, KORR Value LP and Andrew Fox received warrants to purchase an aggregate of 601,667 and 220,000 shares of common stock, respectively.  The convertible debt issued to KORR Value and Andrew Fox was converted into shares of common stock and is no longer outstanding.

Preferred Stock

Authorized: 10,000,000
Designated: 1,000,000 shares of Series A Preferred Stock
Issued/Outstanding: 1,000,000 shares of Series A Preferred Stock.
The series A preferred stock is convertible into 12.5% of the Company's issued and outstanding shares of common stock at any time at the option of the holder and votes on an as converted basis.

Rights of First Refusal, Preemptive Rights, Rights of Participation, Etc.

Not applicable.

---

[1] Mr. Fox has entered into a set off agreement with the Company pursuant to which the Company is withholding 1,000,000 shares of common stock to be issued to Mr. Fox as a potential set off against amount that may be owed by Charge.

Obligations to Register Securities

None other than to funds managed by Arena Investors LP pursuant to the terms of the May 2020 Financing and November 2020 Financing.  In addition, investors in the Company's December 2020 Equity Offering have piggyback registration rights on the securities they acquired in such offering.

Obligations to Issue Additional Securities

None.

Agreements Restricting Voting or Transfer of Securities

Not applicable.

Exceptions to Securities Compliance; Right of Rescission

Not applicable.

Anti-Dilution Provisions

None other than the provisions included in the notes issued to funds managed by Arena Investors LP pursuant to the terms of the May 2020 Financing and the November 2020 Financing as well as the subordinated debt financing which the Company consummated between May 2020 and September 2020 (the "Subordinated Note Financing") which are on the same terms as the convertible notes issued in the May 2020 Financing (except that the notes issued in the Subordinated Note Financing are subordinated to the convertible notes issued in the May 2020 Financing).  The transactions contemplated by this Agreement will not trigger an anti-dilution adjustment of the notes issued in the May 2020 Financing, the November 2020 Financing and the Subordinated Note Financing.

**Schedule 3.1(x)**
**Shell Company Status; Financial Statements**

The financial statements for the Company as of December 31 which were publicly filed with the SEC are set forth in the below link:

https://www.sec.gov/Archives/edgar/data/0001277250/000165495421005693/goig_s1a.htm

### Schedule 3.1(y)
### Material Changes; Undisclosed Events, Liabilities or Developments

We filed a Certificate of Amendment with the Delaware Secretary of State on January 26, 2021 to reflect we changed our name from Transworld Holdings, Inc. to Charge Enterprises, Inc.

Our wholly-owned subsidiary, Charge Infrastructure, Inc., entered into a securities purchase agreement, dated May 7, 2021, with the shareholders of Nextridge, Inc., a New York corporation ("Nextridge") pursuant to which we agreed to purchase all the issued and outstanding shares of Nextridge for an aggregate purchase price of $18,850,000 (the "Nextridge Acquisition"). $6,850,000.00 of the aggregate purchase price payable to the shareholders of Nextridge will be payable through the issuance of shares of our Series B preferred stock (the "Series B Preferred"). The closing of the Nextridge Acquisition is subject to certain closing conditions and is expected to close before the end of the quarter ended June 30, 2021. Nextridge operates its business through its wholly owned subsidiary, ANS Advanced Network Services LLC, a New York, limited liability company.

Founded in 1991, Nextridge's predecessor company, Telecommunications Analysis Group, Inc., began with a strategic focus on communications and telephone networks in the enterprise and higher education market, providing high-quality Engineering, Furnishing and Installation (EF&I) services for building and developing infrastructure. Over time, Nextridge has grown from servicing telephone networks to providing high-quality engineer, furnish and install (EF&I) services for wireless carriers, tower owners, enterprise facilities, and government offices. This includes in-building wireless (DAS), cell tower and network infrastructure services, as well as DC and UPS backup power services. Today, Nextridge's U.S. footprint extends from Chicago to the Northeast and down the East Coast, with as-needed support nationwide.

**Schedule 3.1(y)**
**Litigation**

The Company is subject to claims and legal proceedings that arise in the ordinary course of business. Such matters are inherently uncertain, and there can be no guarantee that the outcome of any such matter will be decided favorably to the Company or that the resolution of any such matter will not have a material adverse effect upon the Company's Consolidated Financial Statements. The Company does not believe that any of such pending claims and legal proceedings will have a material adverse effect on its Consolidated Financial Statements. The Company records a liability in its Consolidated Financial Statements for these matters when a loss is known or considered probable and the amount can be reasonably estimated. The Company reviews these estimates each accounting period as additional information is known and adjusts the loss provision when appropriate. If a matter is both probable to result in a liability and the amounts of loss can be reasonably estimated, the Company estimates and discloses the possible loss or range of loss to the extent necessary for its Consolidated Financial Statements not to be misleading. If the loss is not probable or cannot be reasonably estimated, a liability is not recorded in its Consolidated Financial Statements.

Set forth below is a description of the Company's Legal Proceedings.

On April 5, 2021, Go2tel.com, Inc. ("Go2tel"), a wholly owned subsidiary of PTGI, was named as one of the defendants in an adversary proceeding brought by the Chapter 7 Trustee in the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division (Case No. 2:21-ap-01044-BR) in connection with the Chapter 7 bankruptcy proceeding (the "Litigation") for VoIP Guardian Partners I, LLC (the "Debtor"). The Litigation alleges, among other things, that certain fraudulent payments were made to Go2tel in an amount of $11,784,945.64 over a period beginning April 20, 2016 and ending January 25, 2018 in order to defraud creditors of the Debtor. PTGI has sought defense costs and indemnification related to the Litigation under the terms of a Stock Purchase Agreement ("SPA") related to PTGI's acquisition of Go2tel from the sellers of such business (the "Sellers") which closed in November 2018. The Company denies these allegations and intends to defend the case vigorously. Consequently, the Company believe that any potential costs and awards which could result from these allegations are the responsibility of the Sellers. There is no guarantee that Sellers will pay any settlement amounts or judgments rendered against Go2tel. In addition, PTGI's ability to collect any amounts due pursuant to these indemnification obligations will depend upon the liquidity and solvency of the Sellers.

## **Schedule 3.1(ee)**
## **Registration Rights**

None other than the following:

- registration rights relating to the securities issued to funds managed by Arena Investors LP pursuant to the terms of the May 2020 Financing and November 2020 Financing.

- Investors in the Company's December 2020 private placement received demand registration rights pursuant to which after the securities issued in the May 2020 Financing and November 2020 Financing are included on a registration statement that is declared effective, upon a request from investors in the December 2020 financing (the "Dec 2020 Holders") holding at least 50% of the shares of common stock issued in the December 2020 private placement (the "Shares") then outstanding that the Company file a Form S-1 registration statement, then the Company shall (i) within ten (10) days after the date such request is given, give notice thereof (the "Demand Notice") to all Dec 2020 Holders; and (ii) as soon as practicable, and in any event within thirty (30) days after the date such request, file a Form S-1 registration statement under the Securities Act covering all Shares requested to be registered, as specified by notice given by each such Purchaser to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations set forth below. Notwithstanding the foregoing obligations, if the Company furnishes to Purchasers requesting a registration a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Company's Board of Directors it would be materially detrimental to the Company and its stockholders for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or Exchange Act, then the Company shall have the right to defer taking action with respect to such filing, and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly, for a period of not more than ninety (90) days after the request is given; provided, however, that the Company may not invoke this right more than once in any twelve (12) month period; and provided, further, that the Company shall not register any securities for its own account or that of any other stockholder during such ninety (90) day period.

**Schedule 4.7**
**Use of Proceeds**

All proceeds will be used for the acquisition by the Company of Nextridge.

## **Exhibit 1B**

**Promissory Note due November 19, 2022**

Original Issue Date: May 19, 2021

Original Principal Amount: $1,311,045.47

Purchase Price: $1,188,336.75

## ORIGINAL ISSUE DISCOUNT SENIOR SECURED

## NON-CONVERTIBLE PROMISSORY NOTE

## DUE NOVEMBER 19, 2022

THIS ORIGINAL ISSUE DISCOUNT SENIOR SECURED NON-CONVERTIBLE PROMISSORY NOTE is a duly authorized and validly issued debt obligation of Charge Enterprises, Inc., a Delaware corporation (which was formerly known as Transworld Holdings, Inc., and prior to that as GoIP Global, Inc., a Colorado corporation) (the "Company" or the "Borrower"), having its principal place of business at 125 Park Avenue, 25th Floor, New York, New York 10017, designated as its Original Issue Discount Senior Secured Non-convertible Promissory Note due November 19, 2022 (the "Note").

FOR VALUE RECEIVED, the Company promises to pay to Arena Special Opportunities Fund, LP or its registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, 107.5% of the principal sum (or $1,409,373.88 as of the Original Issue Date) and any other sums due hereunder on November 19, 2022 (the "Maturity Date"), or such earlier date as this Note is required or permitted to be repaid as provided hereunder, and to pay interest to the Holder on the then outstanding principal amount of this Note in accordance with the provisions hereof.  This Note is subject to the following additional provisions:

Section 1.    Definitions.  For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company, (b) there is commenced against the Company any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company makes a general assignment for the benefit of creditors, (f) the Company calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts or (g) the Company, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"<u>Business Day</u>" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which the New York Federal Reserve Bank is closed.

"<u>Buy-In</u>" shall have the meaning set forth in <u>Section 4(c)(v)</u>.

"<u>Change of Control Transaction</u>" means the occurrence after the date hereof of any of the following: (a) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of fifty percent (50%) of the voting securities of the Company, (b) the Company merges into or consolidates with any other Person, or any Person merges into or consolidates with the Company and, after giving effect to such transaction, the stockholders of the Company immediately prior to such transaction own less than fifty-one percent (51%) of the aggregate voting power of the Company or the successor entity of such transaction, (c) the Company sells or transfers all or substantially all of its assets to another Person and the stockholders of the Company immediately prior to such transaction own less than fifty-one percent (51%) of the aggregate voting power of the acquiring entity immediately after the transaction, (d) a replacement at one time or within a three year period of more than one-half of the members of the Board of Directors which is not approved by a majority of those individuals who are members of the Board of Directors on the Original Issue Date (or by those individuals who are serving as members of the Board of Directors on any date whose nomination to the Board of Directors was approved by a majority of the members of the Board of Directors who are members on the date hereof), or (e) the execution by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (a) through (d) above.

"<u>Distribution</u>" shall have the meaning set forth in <u>Section 5(c)</u>.

"<u>Event of Default</u>" shall have the meaning set forth in <u>Section 6(a)</u>.

"<u>Late Fees</u>" shall have the meaning set forth in <u>Section 2(d)</u>.

"<u>Mandatory Default Amount</u>" means the payment of 100% of the outstanding principal amount of this Note and accrued and unpaid interest hereon, in addition to the payment in cash of all other amounts, costs, expenses and liquidated damages due in respect of this Note.

"<u>New York Courts</u>" shall have the meaning set forth in <u>Section 8(d)</u>.

"<u>Note Register</u>" shall have the meaning set forth in <u>Section 2(c)</u>.

"<u>Original Issue Date</u>" means the date of the first issuance of the Note, as set forth on the first page hereof, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Note.

"Purchase Agreement" means the Securities Purchase Agreement, dated as of May 19, 2021 among the Company and the original Holder, as amended, modified or supplemented from time to time in accordance with its terms.

"Purchase Rights" shall have the meaning set forth in Section 5(c).

Section 2.    Interest, Prepayment, Redemption and Put Provisions.

a)    Payment of Interest in Cash. The Company shall pay interest to the Holder on the aggregate outstanding principal amount of this Note at the rate of seven and a half percent (7.5%) per annum, payable monthly, beginning on the first day of the first month after the Original Issue Date, on each Optional Redemption Date (as to that principal amount then being redeemed) and on the Maturity Date (each such date, an "Interest Payment Date") (if any Interest Payment Date is not a Business Day, then the applicable payment shall be due on the next succeeding Business Day), in cash. Upon the occurrence of an Event of Default, the Company shall pay interest to the Holder on the aggregate outstanding principal amount of this Note at the rate of twenty percent (20%) per annum.

b)    Interest Calculations. Interest shall be calculated on the basis of a 360-day year, consisting of twelve 30 calendar day periods, and shall accrue daily commencing on the Original Issue Date until payment in full of the outstanding principal, together with all accrued and unpaid interest, liquidated damages and other amounts which may become due hereunder, has been made.  Interest hereunder will be paid to the Person in whose name this Note is registered on the records of the Company regarding registration and transfers of this Note (the "Note Register").

c)    All overdue accrued and unpaid interest to be paid hereunder shall incur a late fee at an interest rate equal to the lesser of 20% per annum (the "Late Fees") which shall accrue daily from the date such interest is due hereunder through and including the date of actual payment in full.

Section 3.    Registration of Transfers and Exchanges.

a)    Different Denominations. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same.  No service charge will be payable for such registration of transfer or exchange.

b)    Investment Representations. This Note has been issued subject to certain investment representations of the original Holder set forth in the Purchase Agreement and may be transferred or exchanged only in compliance with the Purchase Agreement and applicable federal and state securities laws and regulations.

c)    Reliance on Note Register. Prior to due presentment for transfer to the Company of this Note, the Company and any agent of the Company may treat the Person in whose name this Note is duly registered on the Note Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Note is overdue, and neither the Company nor any such agent shall be affected by

notice to the contrary.  The Company shall update the Note Register to reflect permitted transferees and assignees of the Note.

Section 4.        Intentionally Omitted.

Section 5.        Intentionally Omitted.

Section 6.        Events of Default.

a) "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

i.        any default in the payment of (A) the principal amount of the Note or (B) interest, liquidated damages and other amounts owing to the Holder on the Note, as and when the same shall become due and payable (whether on a Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, is not cured within five (5) Trading days;

ii.        the Company shall fail to observe or perform any other covenant or agreement contained in the Note;

iii.        a breach, default, event of default or the failure observe or perform any covenant or agreement (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) any of the Transaction Documents or (B) any other material agreement, lease, document or instrument to which the Company or any Subsidiary is obligated (and not covered by clause (v) below);

iv.        the Company experiences a Material Adverse Effect;

v.        any Person shall breach any agreement delivered to the initial Holder pursuant to Section 2.2 of the Purchase Agreement;

vi.        any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect (or, to the extent such representation or warranty is qualified by materiality or Material Adverse Effect, in any respect) as of the date when made or deemed made;

vii.        the Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring

arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable;

viii.        the Company or any Significant Subsidiary (as such term is defined in Rule 1-02(w) of Regulation S-X) shall be subject to a Bankruptcy Event;

ix.        (A) the Common Stock shall not be eligible for listing or quotation for trading, or has been suspended from listing or quotation, on its Principal Market and shall not resume listing or quotation for trading thereon or on any other Trading Market (other than OTC Pink) within three (3) Trading Days, (B) the transfer of shares of Common Stock through the Depository Trust Company System is no longer available or "chilled", or (C) the Company's failure to comply with any rules or regulations of its Principal Market;

x.        the Company shall be a party to any Change of Control Transaction or shall agree to sell or dispose of all or in excess of fifty percent (50%) of its assets in one transaction or a series of related transactions (whether or not such sale would constitute a Change of Control Transaction);

xi.        intentionally omitted;

xii.        the Company fails to be in compliance with Rule 144(c)(1) (or Rule 144(i)(2), if applicable);

xiii.        the occurrence of any levy upon or seizure or attachment of, or any uninsured loss of or damage to, any property of the Borrower or any Subsidiary having an aggregate fair value or repair cost (as the case may be) in excess of $100,000 individually or in the aggregate, and any such levy, seizure or attachment shall not be set aside, bonded or discharged within forty-five (45) days after the date thereof;

xiv.        any monetary judgment, writ or similar final process shall be entered or filed against the Company, any Subsidiary or any of their respective property or other assets for more than $100,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of forty-five (45) calendar days;

xv.        prior to the payment in full and satisfaction of the owed under this Note, any security interest and Lien purported to be created by any Transaction Document shall cease to be in full force and effect, or shall cease to give the Holders, the Liens, rights, powers and privileges purported to be created and granted under such Transaction Documents (including a perfected first priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in such Transaction Document)) in favor of the Holders, or shall be asserted by the Company or any Affiliate(s) not to be a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or any such

DocuSign Envelope ID: E283372C-2393-4669-AFB2-BD4C216156CC

Transaction Document) security interest in or Lien on the Collateral covered thereby;

xvi.        the Company shall enter into any transaction or arrangement structured in accordance with, based upon, or related or pursuant to, in whole or in part, Section 3(a)(l0) of the Securities Act;

xvii.        the Company shall enter into a Variable Rate Transaction;

xviii.        any attempt by the Borrower or its officers, directors, and/or affiliates to transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's public disclosure of such information on that same date; or

xix.        the Initial Registration Statement (as defined in the Registration Rights Agreement) shall not have been declared effective by the Commission on or prior six months anniversary of the Original Issue Date (as defined in the Registration Rights Agreement);

b) <u>Remedies Upon Event of Default</u>. If any Event of Default occurs, at the Holder's election (i) the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become immediately due and payable in cash pursuant to clause (ii) of the definition of Mandatory Default Amount, or (ii) the outstanding principal amount of this Note, and, if elected by the Holder, all accrued and unpaid interest hereon, shall be paid to the Holder in cash. Commencing on the occurrence of any Event of Default and for as long an Event of Default is not cured, the interest rate on this Note as set forth in <u>Section 2</u> above shall accrue at a rate equal to 20% per annum. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to or as directed by the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this <u>Section 6(b)</u>. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. The Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

<u>Section 7</u>        <u>Negative Covenants.</u> As long as any portion of this Note remains outstanding, unless the Holder shall have otherwise given prior written consent, the Company shall

not, and shall not permit any of its subsidiaries (whether or not a Subsidiary on the Original Issue Date) to, directly or indirectly:

a)  except for Permitted Indebtedness, enter into, create, incur, assume, guarantee or suffer to exist any indebtedness for borrowed money of any kind, including, but not limited to, a guarantee, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

b)  except for Permitted Liens, enter into, create, incur, assume or suffer to exist any Liens of any kind, on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom;

c)  amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder;

d)  except for Permitted Indebtedness, repay, repurchase or offer to repay, repurchase or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to (i) the Conversion Shares as permitted or required under the Transaction Documents and (ii) repurchases of Common Stock or Common Stock Equivalents of departing officers and directors of the Company, provided that such repurchases shall not exceed an aggregate of $100,000 for all officers and directors during the term of this Note;

e)  repay, repurchase or offer to repay, repurchase or otherwise acquire any Indebtedness, other than the Liabilities, and other than regularly scheduled principal and interest payments of Permitted Indebtedness as such terms are in effect as of the Original Issue Date, provided that such payments shall not be permitted if, at such time, or after giving effect to such payment, any Event of Default exist or occur; provided that neither the Company nor any of its Subsidiaries shall make any cash payment in respect of the Indebtedness issued pursuant to the Additional Note Financing or the Subsequent Financing, until the full and final payment in cash of the Liabilities;

f)  pay cash dividends or distributions on any equity securities of the Company;

g)  enter into any transaction with any Affiliate of the Company which would be required to be disclosed in any public filing with the Commission, unless such transaction is made on an arm's-length basis and expressly approved by a majority of the disinterested directors of the Company (even if less than a quorum otherwise required for board approval);

h)  sell, lease or otherwise dispose of any significant portion of its assets or acquire any assets or business on or after the Original Issue Date other than as contemplated by the NextRidge Acquisition Agreement;

i)  make or suffer to exist any Investments using any proceeds from the Holder or any of its Affiliates (including without limitation, loans and advances to, and other Investments in, Subsidiaries), or commitments therefor, or to become or remain a partner in any partnership or joint venture, except for: (i) Investments in cash and cash equivalents; and (ii) Investments in

Subsidiaries that have guaranteed the Liabilities and joined the Security Agreement as a debtor pursuant to Section 4.24(b) of the Purchase Agreement;

j) pay any compensation that may be due and payable and/or accrued, whether in cash, in kind or any combination thereof, to its executive officers;

k) use any proceeds from the Holder or any of its Affiliates to pay any liquidated damages, penalties, fees or other amounts that may be due and payable under the Note;

l) file any registration statement with respect to any securities other than Registrable Securities (as defined in the Registration Rights Agreement) or any other securities which the Company has granted registration rights on or prior to the date hereof and disclosed in the Purchase Agreement after the date hereof, or otherwise cause such securities to become registered with the SEC or under any state securities laws; and

m) enter into any agreement with respect to any of the foregoing.

Section 8.    Miscellaneous.

a)    Notices.  Any and all notices or other communications or deliveries to be provided by the Holder hereunder shall be in writing and delivered personally, by facsimile, electronic mail or sent by a nationally recognized overnight courier service, addressed to the Company, at the facsimile number, email address or mailing address set forth on its signature page hereto, or such other facsimile number, electronic mail or address as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section 8(a).  Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by electronic mail, by facsimile, or sent by a nationally recognized overnight courier service addressed to the Holder at the email address, facsimile number or address of the Holder appearing on the books of the Company, or if no such email address or facsimile number or address appears on the books of the Company, at the principal place of business of such Holder, as set forth in the Purchase Agreement, or such other facsimile number, electronic mail or address as the Holder may specify for such purposes by notice to the Company delivered in accordance with this Section 8(a).  Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via electronic mail or facsimile prior to 5:30 p.m. (New York City time) on any Trading Day, (ii) the next Trading Day after the date of transmission, if such notice or communication is delivered via electronic mail or facsimile on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (iii) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b)    Absolute Obligation. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, liquidated damages and accrued interest, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein

prescribed.  This Note is a direct debt obligation of the Company.  This Note ranks <u>pari passu</u> with all other Notes now or hereafter issued under the terms set forth herein.

c)      <u>Lost or Mutilated Note</u>.  If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d)      <u>Governing Law</u>.  All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflict of laws thereof.  Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "<u>New York Courts</u>").  Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby. If any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

e)      <u>Waiver</u>.  Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note.  The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note on any other occasion.  Any waiver by the Company or the Holder must be in writing.

DocuSign Envelope ID: E283372C-2393-4069-AEB2-BD4C216156CC

f)      Severability.  If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

g)      Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief.  The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note.  The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions of this Note.

h)      Next Business Day.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i)      Headings.  The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

      j)    <u>Secured Obligation</u>.  The obligations of the Company under this Note are secured by all assets of the Company and each Subsidiary pursuant to the Security Agreement, dated as of May 19, 2021 between the Company, the Subsidiaries of the Company and the Secured Parties (as defined therein).

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**CHARGE ENTERPRISES, INC.**

By: _____
    Name:  Andrew Fox
    Title:   CEO

Mailing Address for Notices:

125 Park Avenue, 25th Floor
New York, NY 10017

Email Address for delivery of Notices: a@charge.us

Facsimile No. for delivery of Notices:

## **Exhibit 1C**

**Amended and Restated Security Agreement dated May 19, 2021**

## AMENDED AND RESTATED
## SECURITY AGREEMENT

This AMENDED AND RESTATED SECURITY AGREEMENT, dated as of May 19, 2021 (this "Agreement"), is among Charge Enterprises, Inc., a Delaware corporation (formerly known as Transworld Holdings, Inc. and GoIP Global, Inc., a Colorado corporation) (the "Company"), the Subsidiaries of the Company set forth on the signature pages hereto (such subsidiaries, the "Subsidiaries" and, together with the Company, the "Debtors") and the holders of the Notes (as defined herein) signatory hereto, their endorsees, transferees and assigns (collectively, the "Secured Parties").

## W I T N E S S E T H :

WHEREAS, the Company has issued to the Secured Parties the following promissory notes: (a) the Company's Original Issue Discount Senior Secured Convertible Promissory Notes issued on May 8, 2020 and due twenty-four (24) months following their issuance, in the aggregate principal amount of $3,000,000.00 (the "May 2020 Notes"), (b) the Company's Original Issue Discount Senior Secured Convertible Promissory Notes issued on November 3, 2020 and due thirty-six (36) months following their issuance, in the aggregate principal amount of $3,888,889.00 (the "November 2020 Notes") and (c) the Company's Original Issue Discount Senior Secured Convertible Promissory Notes and Original Issue Discount Senior Secured Non-convertible Promissory Notes issued as of the date hereof and due thirty-six (36) months and eighteen (18) months, respectively, following their issuance, in the aggregate principal amount of $5,610,000.00 and $11,032,609.00, respectively (the "May 2021 Notes" and, together with the May 2020 Notes and November 2020 Notes, the "Notes");

WHEREAS, pursuant to the Securities Purchase Agreement dated as of May 8, 2020 (as amended, modified or supplemented from time to time in accordance with its terms, the "May 2020 Purchase Agreement"), the Secured Parties have severally agreed to extend the loans to the Company evidenced by the May 2020 Notes;

WHEREAS, pursuant to the Securities Purchase Agreement dated as of November 3, 2020 (as amended, modified or supplemented from time to time in accordance with its terms, the "November 2020 Purchase Agreement"), the Secured Parties have severally agreed to extend the loans to the Company evidenced by the November 2020 Notes;

WHEREAS, pursuant to the Securities Purchase Agreement dated as of the date hereof (as amended, modified or supplemented from time to time in accordance with its terms, the "May 2021 Purchase Agreement" and together with the May 2020 Purchase Agreement and November 2020 Purchase Agreement, the "Purchase Agreements" and each individually a "Purchase Agreement"), the Secured Parties have severally agreed to extend the loans to the Company evidenced by the May 2021 Notes;

WHEREAS, in order to induce the Secured Parties to extend the loans evidenced by the May 2020 Notes and the November 2020 Notes, each Debtor agreed to execute and deliver to the Secured Parties that certain Security Agreement dated as of May 8, 2020, as amended and restated on November 3, 2020 (the "Existing Security Agreement");

WHEREAS, in order to induce the Secured Parties to extend the loans evidenced by the May 2021 Notes, the Secured Parties and each Debtor have agreed to amend and restate the Existing Security Agreement and each Debtor has agreed to grant the Secured Parties, pari passu with each other Secured Party and through the Agent (as defined in <u>Section 18</u> hereof), a security interest in certain property of such Debtor to secure the prompt payment, performance and discharge in full of all of the Company's obligations under the Notes;

WHEREAS, the Secured Parties have agreed to subordinate the first-lien on the shares of the Company's existing Subsidiary, PTGI International Carrier Services Inc. ("<u>PTGI</u>") which were pledged to the Secured Parties, subject to an intercreditor and subordination agreement in such form satisfactory to the Secured Parties; and

WHEREAS, each Debtor party to the Existing Security Agreement wishes to affirm its obligations under the terms of the Existing Security Agreement and wishes to amend and restate the terms of the Existing Security Agreement pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Certain Definitions**. As used in this Agreement, the following terms shall have the meanings set forth in this <u>Section 1</u>.  Terms used but not otherwise defined in this Agreement that are defined in Article 9 of the UCC (such as "account", "chattel paper", "commercial tort claim", "deposit account", "document", "equipment", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "proceeds" and "supporting obligations") shall have the respective meanings given such terms in Article 9 of the UCC.  In addition to the terms defined elsewhere in this Agreement, capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

(a)    "<u>Collateral</u>" means the collateral in which the Secured Parties are granted a security interest by this Agreement and which shall comprise all the assets of the Debtors, including, without limitation, the following personal property of the Debtors, whether presently owned or existing or hereafter acquired or coming into existence, wherever situated, and all additions and accessions thereto and all substitutions and replacements thereof, and all proceeds, products and accounts thereof, including, without limitation, all proceeds from the sale or transfer of the Collateral and of insurance covering the same and of any tort claims in connection therewith, and all dividends, interest, cash, notes, securities, equity interest or other property at any time and from time to time acquired, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Pledged Securities (as defined below):

(i)    All goods, including, without limitation, (A) all machinery, equipment, computers, motor vehicles, trucks, tanks, boats, ships, appliances, furniture, special and general tools, fixtures, test and quality control devices and other equipment of every kind and nature and wherever situated, together with all documents of title and documents representing the same, all additions and accessions thereto, replacements therefor, all parts therefor, and all substitutes for any of the foregoing and all other items used and useful in connection with any Debtor's businesses and all improvements thereto; and (B) all inventory;

(ii)    All contract rights and other general intangibles, including, without limitation, all partnership interests, membership interests, stock or other securities, rights under any of the Organizational Documents, agreements related to the Pledged Securities, licenses, distribution and other agreements, computer software (whether "off-the-shelf", licensed from any third party or developed by any Debtor), computer software development rights, leases, franchises, customer lists, quality control procedures, grants and rights, goodwill, Intellectual Property and income tax refunds;

(iii)    All accounts, together with all instruments, all documents of title representing any of the foregoing, all rights in any merchandising, goods, equipment, motor vehicles and trucks which any of the same may represent, and all right, title, security and guaranties with respect to each account, including any right of stoppage in transit;

(iv)    All documents, letter-of-credit rights, instruments and chattel paper;

(v)    All commercial tort claims;

(vi)    All deposit accounts and all cash (whether or not deposited in such deposit accounts);

(vii)    All investment property;

(viii)    All supporting obligations;

(ix)    All files, records, books of account, business papers, and computer programs; and

(x)    the products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(ix) above.

Without limiting the generality of the foregoing, the "Collateral" shall include all investment property and general intangibles respecting ownership and/or other equity interests in each Subsidiary, including, without limitation, the shares of capital stock and the other equity interests listed on Schedule G hereto (as the same may be modified from time to time pursuant to the terms hereof), and any other shares of capital stock and/or other equity interests of any other direct or indirect subsidiary of any Debtor obtained in the future, and, in each case, all certificates representing such shares and/or equity interests and, in each case, all rights, options, warrants, stock, other securities and/or equity interests that may hereafter be received, receivable or distributed in respect of, or exchanged for, any of the foregoing and all rights arising under or in connection with the Pledged Securities, including, but not limited to, all dividends, interest and cash.

Notwithstanding the foregoing, nothing herein shall be deemed to constitute an assignment of any asset which, in the event of an assignment, becomes void by operation of applicable law or the assignment of which is otherwise prohibited by applicable law (in each case to the extent that such applicable law is not overridden by Sections 9-406, 9-407 and/or 9-408 of the UCC or other similar applicable law); provided, however, that, to the extent permitted by applicable law, this

Agreement shall create a valid security interest in such asset and, to the extent permitted by applicable law, this Agreement shall create a valid security interest in the proceeds of such asset.

(b)    "Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office, (ii) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof, and all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, (iii) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade dress, service marks, logos, domain names and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common law rights related thereto, (iv) all trade secrets arising under the laws of the United States, any other country or any political subdivision thereof, (v) all rights to obtain any reissues, renewals or extensions of the foregoing, (vi) all licenses for any of the foregoing, and (vii) all causes of action for infringement of the foregoing.

(c)    "Necessary Endorsement" means undated stock powers endorsed in blank or other proper instruments of assignment duly executed and such other instruments or documents as the Agent (as that term is defined below) may reasonably request.

(d)    "Obligations" means all of the liabilities and obligations (primary, secondary, direct, contingent, sole, joint or several) due or to become due, or that are now or may be hereafter contracted or acquired, or owing to, of any Debtor to the Secured Parties under this Agreement, the Notes and any other instruments, agreements or other documents executed and/or delivered in connection herewith or therewith, in each case, whether now or hereafter existing, voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from any of the Secured Parties as a preference, fraudulent transfer or otherwise as such obligations may be amended, supplemented, converted, extended or modified from time to time.  Without limiting the generality of the foregoing, the term "Obligations" shall include, without limitation: (i) principal of, and interest on the Notes and the loans extended pursuant thereto; (ii) any and all other fees, indemnities, costs, obligations and liabilities of the Debtors from time to time under or in connection with this Agreement, the Notes and any other instruments, agreements or other documents executed and/or delivered in connection herewith or therewith; and (iii) all amounts (including but not limited to post-petition interest) in respect of the foregoing that would be payable but for the fact that the obligations to pay such amounts are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving any Debtor.

(f)  "<u>Organizational Documents</u>" means, with respect to any Debtor, the documents by which such Debtor was organized (such as articles of incorporation, certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Debtor (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(g)  "<u>Pledged Securities</u>" shall have the meaning ascribed to such term in <u>Section 4(g)</u>.

(h)  "<u>Purchase Agreement</u>" shall have the meaning given to such term in the preamble.

2.  **Reaffirmation and Grant of Security Interest in Collateral**.  Each Debtor party to the Existing Security Agreement reaffirms the security interest granted under the terms and conditions of the Existing Security Agreement and agrees that such security interest remains in full force and effect and is hereby ratified, reaffirmed and confirmed.  Each Debtor party to the Existing Security Agreement acknowledges and agrees with the Secured Parties that the Existing Security Agreement is amended, restated, and superseded in its entirety pursuant to the terms hereof.  Furthermore, as an inducement for the Secured Parties to extend the loans as evidenced by the Notes and to secure the complete and timely payment, performance and discharge in full, as the case may be, of all of the Obligations, each Debtor hereby unconditionally and irrevocably pledges, grants and hypothecates to the Secured Parties a perfected, first priority security interest in and to, a lien upon and a right of set-off against all of their respective right, title and interest of whatsoever kind and nature in and to, the Collateral (a "<u>Security Interest</u>" and, collectively, the "<u>Security Interests</u>").

3.  **Delivery of Certain Collateral**.  Contemporaneously or prior to the execution of this Agreement, each Debtor shall deliver or cause to be delivered to the Agent (a) any and all certificates and other instruments representing or evidencing the Pledged Securities (if any), and (b) any and all certificates and other instruments or documents representing any of the other Collateral, in each case, together with all Necessary Endorsements. The Debtors are, contemporaneously with the execution hereof, delivering to Agent, or have previously delivered to Agent, a true and correct copy of each Organizational Document governing any of the Pledged Securities. Notwithstanding anything contained herein, prior to any Event of Default, the Company shall have the right vote any Pledged Securities and receive dividends therefrom.

4.  **Representations, Warranties, Covenants and Agreements of the Debtors**. Except as set forth under the corresponding Section of the disclosure schedules delivered to the Secured Parties concurrently herewith (the "<u>Disclosure Schedules</u>"), which Disclosure Schedules shall be deemed a part hereof, each Debtor represents and warrants to, and covenants and agrees with, the Secured Parties as follows:

(a)  The Debtors have no place of business or offices where their respective books of account and records are kept (other than temporarily at the offices of its attorneys or accountants) or places where Collateral is stored or located, except as set forth on <u>Schedule A</u> attached hereto.  Except as specifically set forth on <u>Schedule A</u>, each Debtor is the record owner of the real property where such Collateral is located, and there exist no mortgages or other liens on any such real property except for Permitted Liens as set forth on <u>Schedule A</u>. Except as disclosed

DocuSign Envelope ID: E283373C-2393-4C60-A5B3-BB4C216156CC

on Schedule A, none of such Collateral is in the possession of any consignee, bailee, warehouseman, agent or processor.

(b)    Except for Permitted Liens and as set forth on Schedule B attached hereto, the Debtors are the sole owners of the Collateral, free and clear of any liens, security interests, encumbrances, rights or claims, and are fully authorized to grant the Security Interests. Except as set forth on Schedule C attached hereto, there is not on file in any governmental or regulatory authority, agency or recording office an effective financing statement, security agreement, license or transfer or any notice of any of the foregoing (other than those that will be filed in favor of the Secured Parties pursuant to this Agreement) covering or affecting any of the Collateral. Except as set forth on Schedule C attached hereto and except pursuant to this Agreement, as long as this Agreement shall be in effect, the Debtors shall not execute and shall not knowingly permit to be on file in any such office or agency any other financing statement or other document or instrument (except to the extent filed or recorded in favor of the Secured Parties pursuant to the terms of this Agreement).

(c)    No written claim has been received that any Collateral or any Debtor's use of any Collateral violates the rights of any third party.  There has been no adverse decision to any Debtor's claim of ownership rights in or exclusive rights to use the Collateral in any jurisdiction or to any Debtor's right to keep and maintain such Collateral in full force and effect, and there is no proceeding involving said rights pending or, to the best knowledge of any Debtor, threatened before any court, judicial body, administrative or regulatory agency, arbitrator or other governmental authority.

(d)    Each Debtor shall at all times maintain its books of account and records relating to the Collateral at its principal place of business and its Collateral at the locations set forth on Schedule A attached hereto and may not relocate such books of account and records or tangible Collateral unless it delivers to the Secured Parties at least thirty (30) days prior to such relocation (i) written notice of such relocation and the new location thereof (which must be within the United States) and (ii) evidence that appropriate financing statements under the UCC and other necessary documents have been filed and recorded and other steps have been taken to perfect the Security Interests to create in favor of the Secured Parties a valid, perfected and continuing perfected first priority lien in the Collateral (to the extent such Collateral can be perfected by the filing of a UCC financing statement).

(e)    This Agreement creates in favor of the Secured Parties a valid first priority security interest in the Collateral, subject only to Permitted Liens, securing the payment and performance of the Obligations.  Upon making the filings described in the immediately following paragraph, all security interests created hereunder in any Collateral which may be perfected by filing UCC financing statements shall have been duly perfected.  Except for (i) the recordation of the Intellectual Property Security Agreement (as defined in Section 4(dd) hereof) with respect to copyrights and copyright applications referred to in paragraph (z) in the United States Copyright Office, (ii) the recordation of the Intellectual Property Security Agreement (as defined in Section 4(dd) hereof) with respect to patents and trademarks of the Debtors referred to in paragraph (bb) in the United States Patent and Trademark Office, and (iii) the delivery of the certificates and other instruments provided in Section 3,  no action is necessary to create, perfect or protect the security interests created hereunder. Without limiting the generality of the foregoing, except for

the foregoing, no consent of any third parties and no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for (x) the execution, delivery and performance of this Agreement, (y) the creation or perfection of the Security Interests created hereunder in the Collateral (to the extent such Collateral can be perfected by the filing of a UCC financing statement) or (z) the enforcement of the rights of the Agent and the Secured Parties hereunder.

(f)    Each Debtor hereby authorizes the Agent to file one or more financing statements under the UCC, with respect to the Security Interests, with the proper filing and recording agencies in any jurisdiction deemed proper by it.

(g)    The capital stock and other equity interests listed on <u>Schedule G</u> hereto (including all uncertificated equity interests consisting of capital stock of any corporation as well as partnership or limited liability company interests of any other entity) (the "<u>Pledged Securities</u>") represent all of the capital stock and other equity interests of the Debtors, and represent all capital stock and other equity interests owned, directly or indirectly, by the Company.  All of the Pledged Securities are validly issued, fully paid and nonassessable, and the Company is the legal and beneficial owner of the Pledged Securities, free and clear of any lien, security interest or other encumbrance except for the security interests created by this Agreement and other Permitted Liens.

(h)    Except for Permitted Liens, each Debtor shall at all times maintain the liens and Security Interests provided for hereunder as valid and perfected, first priority (to the extent that such liens and Security Interests can be perfected by the filing of a UCC financing statement) liens and security interests in the Collateral in favor of the Secured Parties until this Agreement and the Security Interest hereunder shall be terminated pursuant to <u>Section 14</u> hereof.  Each Debtor hereby agrees to defend the same against the claims of any and all persons and entities.  Each Debtor shall safeguard and protect all Collateral for the account of the Secured Parties.  At the request of the Agent, each Debtor will deliver to the Agent on behalf of the Secured Parties at any time or from time to time one or more financing statements pursuant to the UCC in form reasonably satisfactory to the Agent and will pay the cost of filing the same in all public offices wherever filing is, or is deemed by the Agent to be, necessary or desirable to effect the rights and obligations provided for herein.  Without limiting the generality of the foregoing, each Debtor shall pay all fees, taxes and other amounts necessary to maintain the Collateral and the Security Interests hereunder, and each Debtor shall obtain and furnish to the Agent from time to time, upon demand, such releases and/or subordinations of claims and liens which may be required to maintain the priority of the Security Interests hereunder. In addition to the foregoing, each Debtor shall promptly execute and deliver to the Agent such further deeds, mortgages, assignments, security agreements, financing statements or other instruments, documents, certificates and assurances and take such further action as the Agent may from time to time request and may in its sole discretion deem necessary to perfect, protect or enforce the Secured Parties' security interest in the Collateral, including, without limitation, if applicable, the execution and delivery of a separate security agreement with respect to each Debtor's Intellectual Property ("<u>Intellectual Property Security Agreement</u>") in which the Secured Parties have been granted a security interest hereunder, substantially in a form reasonably acceptable to the Agent, which Intellectual Property Security Agreement, other than as stated therein, shall be subject to all of the terms and conditions hereof.

DocuSign Envelope ID: E283373C-2393-4C60-AEB3-BB4C216156CC

(i)    No Debtor will transfer, pledge, hypothecate, encumber, license, sell or otherwise dispose of any of the Collateral (except for Permitted Liens or non-exclusive licenses granted by a Debtor in its ordinary course of business, sales of inventory by a Debtor in its ordinary course of business and the replacement of worn-out or obsolete equipment by a Debtor in its ordinary course of business) without the prior written consent of the Secured Party.

(j)    Each Debtor shall keep and preserve its equipment, inventory and other tangible Collateral in good condition, repair and order (other than ordinary use wear and tear) and shall not operate or locate any such Collateral (or cause to be operated or located) in any area excluded from insurance coverage.

(k)    Each Debtor shall maintain with financially sound and reputable insurers, insurance with respect to the Collateral, including Collateral hereafter acquired, against loss or damage of the kinds and in the amounts customarily insured against by entities of established reputation having similar properties similarly situated and in such amounts as are customarily carried under similar circumstances by other such entities and otherwise as is prudent for entities engaged in similar businesses but in any event sufficient to cover the full replacement cost thereof. Each Debtor shall cause each insurance policy issued in connection herewith to provide, and the insurer issuing such policy to certify to the Agent, that (a) the Agent will be named as lender loss payee and additional insured under each such insurance policy; (b) if such insurance be proposed to be cancelled or materially changed for any reason whatsoever, such insurer will promptly notify the Agent and such cancellation or change shall not be effective as to the Agent for at least thirty (30) days after receipt by the Agent of such notice, unless the effect of such change is to extend or increase coverage under the policy; and (c) the Agent will have the right (but no obligation) at its election to remedy any default in the payment of premiums within thirty (30) days of notice from the insurer of such default.  If no Event of Default (as defined in the Notes) exists and if the proceeds arising out of any claim.  Loss payments received by any Debtor after an Event of Default occurs and is continuing or in excess of $100,000 for any occurrence or series of related occurrences, upon approval by Agent, which approval shall not be unreasonably withheld, delayed, denied or conditioned, loss payments in each instance will be applied by the applicable Debtor to the repair and/or replacement of property with respect to which the loss was incurred to the extent reasonably feasible, and any loss payments or the balance thereof remaining, to the extent not so applied, shall be paid to the Agent on behalf of the Secured Parties.

(l)    Each Debtor shall, within ten (10) days of obtaining knowledge thereof, advise the Secured Parties, in sufficient detail, of any material adverse change in the Collateral, and of the occurrence of any event that would have a material adverse effect on the value of the Collateral or on the Secured Parties' security interest, through the Agent, therein.

(m)    Upon reasonable prior notice (so long as no Event of Default has occurred or continuing, which in either such event, no prior notice is required), each Debtor shall permit the Agent and its representatives and agents to inspect the Collateral during normal business hours and to make copies of records pertaining to the Collateral as may be reasonably requested by the Agent from time to time.

(n)    Each Debtor shall promptly notify the Secured Parties in sufficient detail upon becoming aware of any attachment, garnishment, execution or other legal process levied against

any material portion of the Collateral and of any other information received by such Debtor that may materially affect the value of the Collateral, the Security Interest or the rights and remedies of the Secured Parties hereunder.

(o) All information heretofore, herein or hereafter supplied to the Secured Parties by or on behalf of any Debtor with respect to the Collateral is accurate and complete in all material respects as of the date furnished.

(p) The Debtors shall at all times preserve and keep in full force and effect their respective valid existence and good standing and any rights and franchises material to its business. No Debtor will change its name, type of organization, jurisdiction of organization, organizational identification number (if it has one), legal or corporate structure, or identity, or add any new fictitious name unless it provides at least thirty (30) days' prior written notice to the Secured Parties of such change and, at the time of such written notification, such Debtor provides any financing statements or fixture filings necessary to perfect and continue the perfection of the Security Interests granted and evidenced by this Agreement.

(q) Except in the ordinary course of business, no Debtor may consign any of its inventory or sell any of its inventory on bill-and-hold, sale-or-return, sale-on-approval, or other conditional terms of sale without the consent of the Agent, which shall not be unreasonably withheld, delayed, denied, or conditioned.

(r) No Debtor may relocate its chief executive office to a new location without providing thirty (30) days' prior written notification thereof to the Secured Parties and so long as, at the time of such written notification, such Debtor provides any financing statements or fixture filings necessary to perfect and continue the perfection of the Security Interests granted and evidenced by this Agreement.

(s) Each Debtor was organized and remains organized solely under the laws of the state set forth next to such Debtor's name in Schedule D attached hereto, which Schedule D sets forth each Debtor's organizational identification number or, if any Debtor does not have one, states that one does not exist.

(t) (i) The actual name of each Debtor is the name set forth in Schedule D attached hereto; (ii) no Debtor has any trade names except as set forth on Schedule E attached hereto; (iii) no Debtor has used any name other than that stated in the preamble hereto or as set forth on Schedule E for the preceding five (5) years; and (iv) no entity has merged into any Debtor or been acquired by any Debtor within the past five years except as set forth on Schedule E.

(u) Each Debtor, in its capacity as issuer, hereby agrees to comply with any and all orders and instructions of Agent regarding the Pledged Securities consistent with the terms of this Agreement without the further consent of any Debtor as contemplated by Section 8-106 (or any successor section) of the UCC. Further, each Debtor agrees that it shall not enter into a similar agreement (or one that would confer "control" within the meaning of Article 8 of the UCC) with any other person or entity.

(v) Each Debtor shall cause each subsidiary of such Debtor to immediately become a party hereto (an "Additional Debtor"), by executing and delivering an Additional Debtor Joinder

in substantially the form of <u>Annex A</u> attached hereto and comply with the provisions hereof applicable to the Debtors. Concurrently therewith, the Additional Debtor shall deliver replacement schedules for, or supplements to all other Disclosure Schedules to (or referred to in) this Agreement, as applicable, which replacement schedules shall supersede, or supplements shall modify, the Disclosure Schedules then in effect. The Additional Debtor shall also deliver such authorizing resolutions, good standing certificates, incumbency certificates, organizational documents, financing statements and other information and documentation as the Agent may reasonably request. Upon delivery of the foregoing to the Agent, the Additional Debtor shall be and become a party to this Agreement with the same rights and obligations as the Debtors, for all purposes hereof as fully and to the same extent as if it were an original signatory hereto and shall be deemed to have made the representations, warranties and covenants set forth herein as of the date of execution and delivery of such Additional Debtor Joinder, and all references herein to the "Debtors" shall be deemed to include each Additional Debtor.

(w)  Each Debtor shall vote the Pledged Securities to comply with the covenants and agreements set forth herein and in the Notes.

(x)  Each Debtor shall register the pledge of the applicable Pledged Securities on the books of such Debtor. Each Debtor shall notify each issuer of Pledged Securities to register the pledge of the applicable Pledged Securities in the name of the Secured Parties on the books of such issuer. Further, except with respect to certificated securities delivered to the Agent, the applicable Debtor shall deliver to Agent an acknowledgement of pledge (which, where appropriate, shall comply with the requirements of the relevant UCC with respect to perfection by registration) signed by the issuer of the applicable Pledged Securities, which acknowledgement shall confirm that: (a) it has registered the pledge on its books and records; and (b) at any time directed by Agent during the continuation of an Event of Default, such issuer will transfer the record ownership of such Pledged Securities into the name of any designee of Agent, will take such steps as may be necessary to effect the transfer, and will comply with all other instructions of Agent regarding such Pledged Securities without the further consent of the applicable Debtor.

(y)  In the event that, upon an occurrence of an Event of Default, Agent shall sell all or any of the Pledged Securities to another party or parties (herein called the "<u>Transferee</u>") or shall purchase or retain all or any of the Pledged Securities, each Debtor shall, to the extent applicable: (i) deliver to Agent or the Transferee, as the case may be, the articles of incorporation, bylaws, minute books, stock certificate books, corporate seals, deeds, leases, indentures, agreements, evidences of indebtedness, books of account, financial records and all other Organizational Documents and records of the Debtors and their direct and indirect subsidiaries (but not including any items subject to the attorney-client privilege related to this Agreement or any of the transactions hereunder); (ii) use its best efforts to obtain resignations of the persons then serving as officers and directors of the Debtors and their direct and indirect subsidiaries, if so requested; and (iii) use its best efforts to obtain any approvals that are required by any governmental or regulatory body in order to permit the sale of the Pledged Securities to the Transferee or the purchase or retention of the Pledged Securities by Agent and allow the Transferee or Agent to continue the business of the Debtors and their direct and indirect subsidiaries.

(z)  Without limiting the generality of the other obligations of the Debtors hereunder, each Debtor shall promptly (i) cause to be registered at the United States Copyright Office all of

its material copyrights, (ii) following an Event of Default, upon the written request of the Agent, cause the security interest contemplated hereby with respect to all Intellectual Property registered at the United States Copyright Office or United States Patent and Trademark Office to be duly recorded at the applicable office, and (iii) give the Agent notice whenever it acquires (whether absolutely or by license) or creates any additional material Intellectual Property.

(aa) Each Debtor will from time to time, at the joint and several expense of the Debtors, promptly execute and deliver all such further instruments and documents, and take all such further action as may be necessary or desirable, or as the Agent may reasonably request, in order to perfect (to the extent such security interest can be perfected by the filing of a UCC financing statement) and protect any security interest granted or purported to be granted hereby or to enable the Secured Parties to exercise and enforce their rights and remedies hereunder and with respect to any Collateral or to otherwise carry out the purposes of this Agreement.

(bb) Schedule F attached hereto lists all of the patents, patent applications, trademarks, trademark applications, registered copyrights, and domain names owned by any of the Debtors as of the date hereof.  Schedule F lists all material licenses in favor of any Debtor for the use of any patents, trademarks, copyrights and domain names as of the date hereof.  All material patents and trademarks of the Debtors have been duly recorded at the United States Patent and Trademark Office and all material copyrights of the Debtors have been duly recorded at the United States Copyright Office.

(cc) Each Debtor shall promptly execute and deliver to the Agent such further deeds, mortgages, assignments, security agreements, financing statements or other instruments, documents, certificates and assurances and take such further action as the Agent may from time to time request and may in its sole discretion deem necessary to perfect, protect or enforce the Secured Parties' security interest in the Collateral.

(dd) Each Debtor will not transfer, pledge, hypothecate, encumber, license, sell or otherwise dispose of any of the Collateral (except for non-exclusive licenses granted by a Debtor in its ordinary course of business and sales of inventory by a Debtor in its ordinary course of business) without the prior written consent of the Agent.

5.   **Effect of Pledge on Certain Rights**.  If any of the Collateral subject to this Agreement consists of nonvoting equity or ownership interests (regardless of class, designation, preference or rights) that may be converted into voting equity or ownership interests upon the occurrence of certain events (including, without limitation, upon the transfer of all or any of the other stock or assets of the issuer), it is agreed by Debtors that the pledge of such equity or ownership interests pursuant to this Agreement or the enforcement of any of Agent's rights hereunder shall not be deemed to be the type of event which would trigger such conversion rights notwithstanding any provisions in the Organizational Documents or agreements to which any Debtor is subject or to which any Debtor is party.

6.   **Defaults**.  The following events shall be "Events of Default":

(a)   The occurrence of an Event of Default (as defined in the Notes) under the Notes;

(b)   Any representation or warranty of any Debtor in this Agreement shall prove to have been incorrect in any material respect when made;

(c)   The failure by any Debtor to observe or perform any of its obligations hereunder for fifteen (15) days after delivery to such Debtor of notice of such failure by or on behalf of a Secured Party unless such default is capable of cure but cannot be cured within such time frame and such Debtor is using best efforts to cure same in a timely fashion; or

(d)   If any material provision of this Agreement shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Debtor, or a proceeding shall be commenced by any Debtor, or by any governmental authority having jurisdiction over any Debtor, seeking to establish the invalidity or unenforceability thereof, or any Debtor shall deny that any Debtor has any liability or obligation purported to be created under this Agreement.

7.   **Duty to Hold in Trust**.

(a)   Upon the occurrence and during the continuance of any Event of Default, each Debtor shall upon receipt of any revenue, income, dividend, interest or other sums subject to the Security Interests, whether payable pursuant to the Notes or otherwise, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the same in trust for the Secured Parties and shall forthwith endorse and transfer any such sums or instruments, or both, to the Agent, pro-rata in proportion to their respective then-currently outstanding principal amount of Notes for application to the satisfaction of the Obligations (and if any Notes is not outstanding, pro-rata in proportion to the initial purchases of the remaining Notes).

(b)   If any Debtor shall become entitled to receive or shall receive any material securities or other property (including, without limitation, shares of Pledged Securities or instruments representing Pledged Securities acquired after the date hereof, or any options, warrants, rights or other similar property or certificates representing a dividend, or any distribution in connection with any recapitalization, reclassification or increase or reduction of capital, or issued in connection with any reorganization of such Debtor or any of its direct or indirect subsidiaries) in respect of the Pledged Securities (whether as an addition to, in substitution of, or in exchange for, such Pledged Securities or otherwise), such Debtor agrees to (i) accept the same as the agent of the Secured Parties; (ii) hold the same in trust on behalf of and for the benefit of the Secured Parties; and (iii) to deliver any and all certificates or instruments evidencing the same to Agent on or before the close of business on the fifth (5th) business day following the receipt thereof by such Debtor, in the exact form received together with the Necessary Endorsements, to be held by Agent subject to the terms of this Agreement as Collateral.

8.   **Rights and Remedies Upon Default**.

(a)   Upon the occurrence and during the continuance of any Event of Default, the Secured Parties, acting through the Agent, shall have the right to exercise all of the remedies conferred hereunder and under the Notes, and the Secured Parties shall have all the rights and remedies of a secured party under the UCC.  Without limitation, the Agent, for the benefit of the Secured Parties, shall have the following rights and powers:

DocuSign Envelope ID: E283373C-2393-4C60-AEB3-BD4C216156CC

(i)    The Agent shall have the right to take possession of the Collateral and, for that purpose, enter, with the aid and assistance of any person, any premises where the Collateral, or any part thereof, is or may be placed and remove the same, and each Debtor shall assemble the Collateral and make it available to the Agent at places which the Agent shall reasonably select, whether at such Debtor's premises or elsewhere, and make available to the Agent, without rent, all of such Debtor's respective premises and facilities for the purpose of the Agent taking possession of, removing or putting the Collateral in saleable or disposable form.

(ii)    Upon written notice to the Debtors by Agent, all rights of each Debtor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and all rights of each Debtor to receive the dividends and interest which it would otherwise be authorized to receive and retain, shall cease.  Upon such written notice, Agent shall have the right to receive, for the benefit of the Secured Parties, any interest, cash dividends or other payments on the Collateral and, at the option of Agent, to exercise in such Agent's discretion all voting rights pertaining thereto.  Without limiting the generality of the foregoing, Agent shall have the right (but not the obligation) to exercise all rights with respect to the Collateral as it were the sole and absolute owner thereof, including, without limitation, to vote and/or to exchange, at its sole discretion, any or all of the Collateral in connection with a merger, reorganization, consolidation, recapitalization or other readjustment concerning or involving the Collateral or any Debtor or any of its direct or indirect subsidiaries.

(iii)    The Agent shall have the right to operate the business of each Debtor using the Collateral and shall have the right to assign, sell, lease or otherwise dispose of and deliver all or any part of the Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as the Agent may deem commercially reasonable, all without (except as shall be required by applicable statute and cannot be waived) advertisement or demand upon or notice to any Debtor or right of redemption of a Debtor, which are hereby expressly waived. Upon each such sale, lease, assignment or other transfer of Collateral, the Agent, for the benefit of the Secured Parties, may, unless prohibited by applicable law which cannot be waived, purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of any Debtor, which are hereby waived and released.

(iv)    The Agent shall have the right (but not the obligation) to notify any account debtors and any obligors under instruments or accounts to make payments directly to the Agent, on behalf of the Secured Parties, and to enforce the Debtors' rights against such account debtors and obligors.

(v)    The Agent, for the benefit of the Secured Parties, may (but is not obligated to) direct any financial intermediary or any other person or entity holding any investment property to transfer the same to the Agent, on behalf of the Secured Parties, or its designee.

(vi)    The Agent may (but is not obligated to) transfer any or all Intellectual Property registered in the name of any Debtor at the United States Patent and Trademark Office and/or Copyright Office into the name of the Secured Parties or any designee or any purchaser of any Collateral.

(b)   The Agent shall comply with any applicable law in connection with a disposition of Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.  The Agent may sell the Collateral without giving any warranties and may specifically disclaim such warranties.  If the Agent sells any of the Collateral on credit, the Debtors will only be credited with payments actually made by the purchaser.  In addition, each Debtor waives (except as shall be required by applicable statute and cannot be waived) any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Agent's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

(c)   For the purpose of enabling the Agent to further exercise rights and remedies under this Section 8 or elsewhere provided by agreement or applicable law, each Debtor hereby grants to the Agent, for the benefit of the Agent and the Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Debtor) to use, license or sublicense following an Event of Default, any Intellectual Property now owned or hereafter acquired by such Debtor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

9.   **Applications of Proceeds**.  Upon the occurrence and during the continuance of any Event of Default, the proceeds of any sale, lease or other disposition by the Agent of the Collateral hereunder or from payments made to the Agent on account of any insurance policy insuring any portion of the Collateral shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, to the reasonable attorneys' fees and expenses incurred by the Agent in enforcing the Secured Parties' rights hereunder and in connection with collecting, storing and disposing of the Collateral, and then to satisfaction of the Obligations pro rata among the Secured Parties (based on then-outstanding principal amounts of Notes at the time of any such determination), and to the payment of any other amounts required by applicable law, after which the Secured Parties shall pay to the applicable Debtor any surplus proceeds. If, upon the sale, license or other disposition of all of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Secured Parties are legally entitled, the Debtors will be liable for the deficiency, together with interest thereon, at the rate of 18% per annum or the lesser amount permitted by applicable law (the "Default Rate"), and the reasonable fees of any attorneys employed by the Secured Parties to collect such deficiency.  To the extent permitted by applicable law, each Debtor waives all claims, damages and demands against the Secured Parties arising out of the repossession, removal, retention or sale of the Collateral, unless due solely to the gross negligence or willful misconduct of the Secured Parties as determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction.

10. **Securities Law Provision**.  Each Debtor recognizes that Agent may be limited in its ability to effect a sale to the public of all or part of the Pledged Securities by reason of certain prohibitions in the Securities Act of 1933, as amended, or other federal or state securities laws (collectively, the "Securities Laws"), and may be compelled to resort to one or more sales to a restricted group of purchasers who may be required to agree to acquire the Pledged Securities for their own account, for investment and not with a view to the distribution or resale thereof.  Each

Debtor agrees that sales so made may be at prices and on terms less favorable than if the Pledged Securities were sold to the public, and that Agent has no obligation to delay the sale of any Pledged Securities for the period of time necessary to register the Pledged Securities for sale to the public under the Securities Laws. Each Debtor shall cooperate with Agent in its attempt to satisfy any requirements under the Securities Laws (including, without limitation, registration thereunder if requested by Agent) applicable to the sale of the Pledged Securities by Agent.

11. **Costs and Expenses**.  Each Debtor agrees to pay all reasonable out-of-pocket fees, costs and expenses incurred in connection with any filing required hereunder, including without limitation, any financing statements pursuant to the UCC, continuation statements, partial releases and/or termination statements related thereto or any expenses of any searches reasonably required by the Agent. The Debtors shall also pay all other claims and charges which in the reasonable opinion of the Agent is reasonably likely to prejudice, imperil or otherwise affect the Collateral or the Security Interests therein. The Debtors will also, upon demand, pay to the Agent the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Agent, for the benefit of the Secured Parties, may incur in connection with the creation, perfection, protection, satisfaction, foreclosure, collection or enforcement of the Security Interest and the preparation, administration, continuance, amendment or enforcement of this Agreement and pay to the Agent the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Agent, for the benefit of the Secured Parties, and the Secured Parties may incur in connection with (i) the enforcement of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, or (iii) the exercise or enforcement of any of the rights of the Secured Parties under the Notes.

12. **Responsibility for Collateral**.  The Debtors assume all liabilities and responsibility in connection with all Collateral, and the Obligations shall in no way be affected or diminished by reason of the loss, destruction, damage or theft of any of the Collateral or its unavailability for any reason.  Without limiting the generality of the foregoing and except as required by applicable law, (a) neither the Agent nor any Secured Party (i) has any duty (either before or after an Event of Default) to collect any amounts in respect of the Collateral or to preserve any rights relating to the Collateral, or (ii) has any obligation to clean-up or otherwise prepare the Collateral for sale, and (b) each Debtor shall remain obligated and liable under each contract or agreement included in the Collateral to be observed or performed by such Debtor thereunder.  Neither the Agent nor any Secured Party shall have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Agent or any Secured Party of any payment relating to any of the Collateral, nor shall the Agent or any Secured Party be obligated in any manner to perform any of the obligations of any Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Agent or any Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Agent or to which the Agent or any Secured Party may be entitled at any time or times.

13. **Security Interests Absolute**.  All rights of the Secured Parties and all obligations of each Debtor hereunder, shall be absolute and unconditional, irrespective of: (a) any lack of validity or enforceability of this Agreement, the Notes or any agreement entered into in connection with

the foregoing, or any portion hereof or thereof, against any other Debtor or Guarantor; (b) any change in the time, manner or place of payment or performance of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Notes or any other agreement entered into in connection with the foregoing; (c) any exchange, release or nonperfection of any of the Collateral, or any release or amendment or waiver of or consent to departure from any other collateral for, or any guarantee, or any other security, for all or any of the Obligations; (d) any action by the Secured Parties to obtain, adjust, settle and cancel in its sole discretion any insurance claims or matters made or arising in connection with the Collateral; or (e) any other circumstance which might otherwise constitute any legal or equitable defense available to a Debtor, or a discharge of all or any part of the Security Interests granted hereby. Until the Obligations shall have been paid and performed in full (other than contingent obligations for which no claim has been made), the rights of the Secured Parties shall continue even if the Obligations are barred for any reason, including, without limitation, the running of the statute of limitations. Each Debtor expressly waives presentment, protest, notice of protest, demand, notice of nonpayment and demand for performance. In the event that at any time any transfer of any Collateral or any payment received by the Secured Parties hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall be deemed to be otherwise due to any party other than the Secured Parties, then, in any such event, each Debtor's obligations hereunder shall survive cancellation of this Agreement, and shall not be discharged or satisfied by any prior payment thereof and/or cancellation of this Agreement, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof. Each Debtor waives all right to require the Secured Parties to proceed against any other person or entity or to apply any Collateral which the Secured Parties may hold at any time, or to marshal assets, or to pursue any other remedy. Each Debtor waives any defense arising by reason of the application of the statute of limitations to any obligation secured hereby.

14. **Term of Agreement**. This Agreement and the Security Interests shall terminate on the date on which all payments under the Notes have been indefeasibly paid in full and all other Obligations (other than contingent obligations for which no claim has been made) have been paid or discharged; provided, however, that all indemnities of the Debtors contained in this Agreement (including, without limitation, Annex B hereto) shall survive and remain operative and in full force and effect regardless of the termination of this Agreement.

15. **Power of Attorney; Further Assurances**.

(a) Each Debtor authorizes the Agent, and does hereby make, constitute and appoint the Agent and its officers, agents, successors or assigns with full power of substitution, as such Debtor's true and lawful attorney-in-fact, with power, in the name of the Agent or such Debtor, to, after the occurrence and during the continuance of an Event of Default, (i) endorse any note, checks, drafts, money orders or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Agent; (ii) to sign and endorse any financing statement pursuant to the UCC or any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts, and other documents relating to the Collateral; (iii) to pay or discharge taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (iv) to demand, collect, receipt

for, compromise, settle and sue for monies due in respect of the Collateral; (v) to transfer any Intellectual Property or provide licenses respecting any Intellectual Property; and (vi) generally, at the option of the Agent, and at the expense of the Debtors, at any time, or from time to time, to execute and deliver any and all documents and instruments and to do all acts and things which the Agent deems necessary to protect, preserve and realize upon the Collateral and the Security Interests granted therein in order to effect the intent of this Agreement and the Notes all as fully and effectually as the Debtors might or could do; and each Debtor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.  The designation set forth herein shall be deemed to amend and supersede any inconsistent provision in the Organizational Documents or other documents or agreements to which any Debtor is subject or to which any Debtor is a party. Without limiting the generality of the foregoing, after the occurrence and during the continuance of an Event of Default, each Secured Party is specifically authorized to execute and file any applications for or instruments of transfer and assignment of any patents, trademarks, copyrights or other Intellectual Property with the United States Patent and Trademark Office and the United States Copyright Office.

(b)   Each Debtor hereby irrevocably appoints the Agent as such Debtor's attorney-in-fact, with full authority in the place and instead of such Debtor and in the name of such Debtor, from time to time in the Agent's discretion, to take any action and to execute any instrument which the Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including the filing, in its sole discretion, of one or more financing or continuation statements and amendments thereto, relative to any of the Collateral without the signature of such Debtor where permitted by law, which financing statements may (but need not) describe the Collateral as "all assets" or "all personal property" or words of like import, and ratifies all such actions taken by the Agent.  This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.

16. **Notices**.  All notices, requests, demands and other communications hereunder shall be subject to the notice provision of the Purchase Agreement.

17. **Other Security**.  To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other person, firm, corporation or other entity, then the Agent shall have the right, in its sole discretion, to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Secured Parties' rights and remedies hereunder.

18. **Appointment of Agent**.  If and as applicable, the Secured Parties hereby appoint Arena Investors LP to act as their agent ("Agent") for purposes of exercising any and all rights and remedies of the Secured Parties hereunder.  Such appointment shall continue until revoked in writing by the Secured Parties, at which time the Secured Parties shall appoint a new Agent.  The Agent shall have the rights, responsibilities and immunities set forth in Annex B hereto.

19. **Miscellaneous**.

(a)    No course of dealing between the Debtors and the Secured Parties, nor any failure to exercise, nor any delay in exercising, on the part of the Secured Parties, any right, power or privilege hereunder or under the Notes shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(b)    All of the rights and remedies of the Secured Parties with respect to the Collateral, whether established hereby or by the Notes or by any other agreements, instruments or documents or by law shall be cumulative and may be exercised singly or concurrently.

(c)    This Agreement, together with the exhibits and schedules hereto, contains the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement and the exhibits and schedules hereto.  No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Debtors and the Secured Party, or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.

(d)    If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.  It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(e)    No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

(f)    This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  The Company and the Subsidiaries may not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Agent (other than by merger).  Any Secured Party may assign any or all of its rights under this Agreement to any Person (as defined in the Purchase Agreement) to whom such Secured Party assigns or transfers any Obligations, provided such transferee agrees in writing to be bound, with respect to the transferred Obligations, by the provisions of this Agreement that apply to the "Secured Parties."

(g)  Each party shall take such further action and execute and deliver such further documents as may be necessary or appropriate in order to carry out the provisions and purposes of this Agreement.

(h)  Except to the extent mandatorily governed by the jurisdiction or situs where the Collateral is located, all questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  Except to the extent mandatorily governed by the jurisdiction or situs where the Collateral is located, each Debtor agrees that all proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and the Notes (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, Borough of Manhattan.  Except to the extent mandatorily governed by the jurisdiction or situs where the Collateral is located, each Debtor hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such proceeding is improper.  Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(i)  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement.  In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

(j)  All Debtors shall jointly and severally be liable for the obligations of each Debtor to the Secured Parties hereunder.

(k)  Each Debtor agrees to indemnify, pay and hold harmless the Agent and the Secured Parties and their respective assignees and affiliates and their respective officers, directors, employees, agents, consultants, auditors, and attorneys of any of them (collectively, "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Purchaser Indemnitee shall be designated a party thereto) imposed on, incurred by or asserted against such Indemnitee in any way related to or arising from or alleged to arise from this Agreement or the Collateral, except any such losses, claims, liabilities, damages, penalties, suits, costs and expenses which result from the gross negligence or willful misconduct of the Indemnitee as determined by a final, nonappealable decision of a court of competent jurisdiction; provided that the Debtors shall not be obligated to indemnify the Indemnitees, or have

any liability, in excess of the aggregate Purchase Price (as defined in the Purchase Agreement). This indemnification provision is in addition to, and not in limitation of, any other indemnification provision in the Notes, the Purchase Agreement or any other agreement, instrument or other document executed or delivered in connection herewith or therewith.

(l)   Nothing in this Agreement shall be construed to subject Agent or any Secured Party to liability as a partner in any Debtor or any if its direct or indirect subsidiaries that is a partnership or as a member in any Debtor or any of its direct or indirect subsidiaries that is a limited liability company, nor shall Agent or any Secured Party be deemed to have assumed any obligations under any partnership agreement or limited liability company agreement, as applicable, of any such Debtor or any of its direct or indirect subsidiaries or otherwise, unless and until any such Secured Party exercises its right to be substituted for such Debtor as a partner or member, as applicable, pursuant hereto.

(m) To the extent that the grant of the security interest in the Collateral and the enforcement of the terms hereof require the consent, approval or action of any partner or member, as applicable, of any Debtor or any direct or indirect subsidiary of any Debtor or compliance with any provisions of any of the Organizational Documents, the Debtors hereby represent that all such consents and approvals have been obtained.

[SIGNATURE PAGE OF DEBTORS FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Security Agreement to be duly executed on the day and year first above written.

**CHARGE ENTERPRISES, INC.**

By: _____
    Name:  Andrew Fox
    Title:  CEO


**TRANSWORLD ENTERPRISES INC.**

By: _____
    Name:  Kenneth Orr
    Title:  President


**PTGI INTERNATIONAL CARRIER SERVICES, INC.**

By: _____
    Name:  Andrew Fox
    Title:  CEO


**GETCHARGED, INC.**

By: _____
    Name:  Andrew Fox
    Title:  CEO


**CHARGE SERVICES, LLC**

By: _____
    Name:  Andrew Fox
    Title:  Manager


[SIGNATURE PAGE OF HOLDERS FOLLOWS]


-21-

[SIGNATURE PAGE OF HOLDERS TO AMENDED AND RESTATED SECURITY AGREEMENT]

**MT. WHITNEY SECURITIES, LLC**

By: _____

Name: Lawrence Cutler

Title:  Authorized Signatory

**ARENA ORIGINATING CO., LLC**

By: _____

Name: Lawrence Cutler

Title:  Authorized Signatory

**ARENA SPECIAL OPPORTUNITIES FUND, LP**

By: _____

Name: Lawrence Cutler

Title:  Authorized Signatory

**ARENA SPECIAL OPPORTUNITIES PARTNERS I, LP**

By: _____

Name: Lawrence Cutler

Title:  Authorized Signatory

**ARENA STRUCTURED PRIVATE INVESTMENTS (CAYMAN), LLC**

By: _____

Name: Lawrence Cutler

Title:  Authorized Signatory

**ANNEX A**
to
**AMENDED AND RESTATED**

**SECURITY AGREEMENT**

**FORM OF ADDITIONAL DEBTOR JOINDER**

Amended and Restated Security Agreement dated as of May __, 2021 made by Charge Enterprises, Inc., a Delaware corporation (formerly known as Transworld Holdings, Inc. and GoIP Global, Inc., a Colorado corporation) and its subsidiaries party thereto from time to time, as Debtors to and in favor of the Secured Parties identified therein (the "Security Agreement").

Reference is made to the Security Agreement as defined above; capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in, or by reference in, the Security Agreement.

The undersigned hereby agrees that, upon delivery of this Additional Debtor Joinder to the Secured Parties referred to above, the undersigned shall (a) be an Additional Debtor under the Security Agreement, (b) have all the rights and obligations of the Debtors under the Security Agreement as fully and to the same extent as if the undersigned was an original signatory thereto and (c) be deemed to have made the representations and warranties set forth therein as of the date of execution and delivery of this Additional Debtor Joinder. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE UNDERSIGNED SPECIFICALLY GRANTS TO THE SECURED PARTIES A SECURITY INTEREST IN THE COLLATERAL AS MORE FULLY SET FORTH IN THE SECURITY AGREEMENT AND ACKNOWLEDGES AND AGREES TO THE WAIVER OF JURY TRIAL PROVISIONS SET FORTH THEREIN.

Attached hereto are supplemental and/or replacement Disclosure Schedules to the Security Agreement, as applicable.

An executed copy of this Joinder shall be delivered to the Secured Parties, and the Secured Parties may rely on the matters set forth herein on or after the date hereof.  This Joinder shall not be modified, amended or terminated without the prior written consent of the Secured Parties.

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed in the name and on behalf of the undersigned.


**[Name of Additional Debtor]**

By:_____
    Name:
    Title:
    Address:
Dated:

**ANNEX B**
**to**
**AMENDED AND RESTATED**

**SECURITY AGREEMENT**

**THE AGENT**

1.    **Appointment**. The Secured Parties (all capitalized terms used herein and not otherwise defined shall have the respective meanings provided in the Security Agreement to which this Annex B is attached (the "Agreement")), by their acceptance of the benefits of the Agreement, hereby designate Arena Investors LP ("Agent") as the Agent to act as specified herein and in the Agreement. Each Secured Party shall be deemed irrevocably to authorize the Agent to take such action on its behalf under the provisions of the Agreement and any other Transaction Document (as such term is defined in the Purchase Agreement) and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. The Agent may perform any of its duties hereunder by or through its agents or employees.

2.    **Nature of Duties**. The Agent shall have no duties or responsibilities except those expressly set forth in the Agreement. Neither the Agent nor any of its partners, members, shareholders, officers, directors, employees or agents shall be liable for any action taken or omitted by it as such under the Agreement or hereunder or in connection herewith or therewith, be responsible for the consequence of any oversight or error of judgment or answerable for any loss, unless caused solely by its or their gross negligence or willful misconduct as determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction. The duties of the Agent shall be mechanical and administrative in nature; the Agent shall not have by reason of the Agreement or any other Transaction Document a fiduciary relationship in respect of any Debtor or any Secured Party; and nothing in the Agreement or any other Transaction Document (as defined in the Purchase Agreement), expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of the Agreement or any other Transaction Document except as expressly set forth herein and therein.

3.    **Lack of Reliance on the Agent**. Independently and without reliance upon the Agent, each Secured Party, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Company and its subsidiaries in connection with such Secured Party's investment in the Debtors, the creation and continuance of the Obligations, the transactions contemplated by the Transaction Documents, and the taking or not taking of any action in connection therewith, and (ii) its own appraisal of the creditworthiness of the Company and its subsidiaries, and of the value of the Collateral from time to time, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Secured Party with any credit, market or other information with respect thereto, whether coming into its possession before any Obligations are incurred or at any time or times thereafter. The Agent shall not be responsible to the Debtors or any Secured Party for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith, or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of the Agreement or any

other Transaction Document, or for the financial condition of the Debtors or the value of any of the Collateral, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of the Agreement or any other Transaction Document, or the financial condition of the Debtors, or the value of any of the Collateral, or the existence or possible existence of any default or Event of Default under the Agreement, the Notes or any of the other Transaction Documents.

4.    **Certain Rights of the Agent**.  The Agent shall have the right to take any action with respect to the Collateral, on behalf of all of the Secured Parties.  To the extent practical, the Agent shall request instructions from the Secured Parties with respect to any material act or action (including failure to act) in connection with the Agreement or any other Transaction Document, and shall be entitled to act or refrain from acting in accordance with the instructions of the Secured Party; if such instructions are not provided despite the Agent's request therefor, the Agent shall be entitled to refrain from such act or taking such action, and if such action is taken, shall be entitled to appropriate indemnification from the Secured Parties in respect of actions to be taken by the Agent; and the Agent shall not incur liability to any person or entity by reason of so refraining. Without limiting the foregoing, (a) no Secured Party shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting hereunder in accordance with the terms of the Agreement or any other Transaction Document, and the Debtors shall have no right to question or challenge the authority of, or the instructions given to, the Agent pursuant to the foregoing and (b) the Agent shall not be required to take any action that the Agent believes (i) could reasonably be expected to expose it to personal liability or (ii) is contrary to this Agreement, the Transaction Documents or applicable law.

5.    **Reliance**.  The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, cablegram, radiogram, order or other document or telephone message signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to the Agreement and the other Transaction Documents and its duties thereunder, upon advice of counsel selected by it and upon all other matters pertaining to this Agreement and the other Transaction Documents and its duties thereunder, upon advice of other experts selected by it. Anything to the contrary notwithstanding, the Agent shall have no obligation whatsoever to any Secured Party to assure that the Collateral exists or is owned by the Debtors or is cared for, protected or insured or that the liens granted pursuant to the Agreement have been properly or sufficiently or lawfully created, perfected, or enforced or are entitled to any particular priority.

6.    **Indemnification**.  To the extent that the Agent is not reimbursed and indemnified by the Debtors, the Secured Parties will jointly and severally reimburse and indemnify the Agent, in proportion to their initially purchased respective principal amounts of Notes, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent in performing its duties hereunder or under the Agreement or any other Transaction Document, or in any way relating to or arising out of the Agreement or any other Transaction Document except for those determined by a final judgment (not subject to further appeal) of a court of competent jurisdiction to have resulted solely from the Agent's own gross negligence or willful misconduct.  Prior to taking any action hereunder as Agent, the Agent may

DocuSign Envelope ID: E283373C-2393-4C60-A5B3-BD4C216156CC

require each Secured Party to deposit with it sufficient sums as it determines in good faith is necessary to protect the Agent for costs and expenses associated with taking such action.

7.    **Resignation by the Agent.**

(a)    The Agent may resign from the performance of all its functions and duties under the Agreement and the other Transaction Documents at any time by giving 30 days' prior written notice (as provided in the Agreement) to the Debtors and the Secured Parties.  Such resignation shall take effect upon the appointment of a successor Agent pursuant to clauses (b) and (c) below.

(b)    Upon any such notice of resignation, the Secured Parties shall appoint a successor Agent hereunder.

(c)    If a successor Agent shall not have been so appointed within said thirty (30)-day period, the Agent shall then appoint a successor Agent who shall serve as Agent until such time, if any, as the Secured Parties appoint a successor Agent as provided above.  If a successor Agent has not been appointed within such thirty (30)-day period, the Agent may petition any court of competent jurisdiction or may interplead the Debtors and the Secured Parties in a proceeding for the appointment of a successor Agent, and all fees, including, but not limited to, extraordinary fees associated with the filing of interpleader and expenses associated therewith, shall be payable by the Debtors on demand.

8.    **Rights with respect to Collateral**.  Each Secured Party agrees with all other Secured Parties and the Agent (i) that it shall not, and shall not attempt to, exercise any rights with respect to its security interest in the Collateral, whether pursuant to any other agreement or otherwise (other than pursuant to this Agreement), or take or institute any action against the Agent or any of the other Secured Parties in respect of the Collateral or its rights hereunder (other than any such action arising from the breach of this Agreement) and (ii) that such Secured Party has no other rights with respect to the Collateral other than as set forth in this Agreement and the other Transaction Documents.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall be discharged from its duties and obligations under the Agreement.  After any retiring Agent's resignation or removal hereunder as Agent, the provisions of the Agreement including this Annex B shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent.

**Exhibit 2**

**Complaint Filed in New York Supreme Court (Index No. 653261/2024)**

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 127 of 270

**SUPREME COURT OF THE STATE OF**
**NEW YORK COUNTY OF NEW YORK**

| | |
|---|---|
| AI AMPED I, LLC, AI AMPED II, LLC, ARENA ORIGINATION CO., LLC, ARENA SPECIAL OPPORUNITIES FUND, LP, ARENA SPECIAL OPPORUNITIES PARTNERS I, LP, and MT. WHITNEY SECURITIES, LLC, <br><br> *Plaintiffs,* <br><br> -against- <br><br> AMY HANSON, CRAIG DENSON, ANDREW FOX, and LEAH SCHWELLER, <br><br> *Defendants.* | **VERIFIED COMPLAINT** |

Plaintiffs (i) AI Amped I LLC ("Amped I") and AI Amped II, LLC ("Amped II"), together with their predecessors and assignors, the largest and sole secured creditors of Charge Enterprises Inc. ("Company"), and (ii) Arena Origination Co., LLC, Arena Special Opportunities Fund, LP, Arena Special Opportunities Partners I, LP, and Mt. Whitney Securities, LLC, together with their predecessors and assignors, equity holders of the Company (the "Arena Shareholders," and together with Amped I and Amped II, "Plaintiffs") by and through their undersigned counsel allege the following based upon investigation of Plaintiffs' counsel, the Company's public statements and filings, and allegations from the Verified Complaint filed by the Company with this Court on January 8, 2024 captioned *Charge Enterprises, Inc. v. Kenneth Adam Orr et al.*, (the "Company Complaint") and accompanying documents:

## **NATURE OF THE ACTION**

1.    This is an action against senior officers and directors of the Company for fraud, negligent misrepresentation, and breach of fiduciary duty stemming from the Defendants' financial

1

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 128 of 270

mismanagement, lack of corporate governance and oversight, misrepresentations of financial covenants and warranties, and abdication of their duties as directors and officers of the Company, resulting in millions of dollars of financial harm to Plaintiffs.

2.      Specifically, in direct reliance on Defendants' repeated and express representations and assurances to Plaintiffs between December 2021 and November 2023 that the Company had not and would not invest Company funds (including Amped I and Amped II's cash collateral) in a limited partnership or invest in anything other than cash or cash equivalents, Plaintiffs entered into agreements to purchase Company shares, warrants, and Convertible and Non-Convertible Notes. But contrary to their express representations on which Plaintiffs relied, Defendants had granted their former Chairman and Chief Executive Officer ("CEO") unfettered authority and control over tens of millions of dollars of Company funds which he invested in his limited partnership and cross-collateralized with other personal accounts.

3.      Defendants' lack of proper governance and duty of care ultimately caused a default on the Company's debt to Amped I and Amped II and rendered the Company unable to sustain operations as a going concern to the detriment of the Arena Shareholders.  Plaintiffs seek damages in an amount to be determined at trial but believed to be not less than $33,199,846.

## THE PARTIES

4.      Plaintiff Amped I is a Delaware limited liability company with its principal place of business at 2500 Westchester Avenue, Suite 401, Purchase, New York 10577.  Amped I is the current holder of the Non-Convertible Notes (as defined below) and is the largest secured lender of the Company.  The Non-Convertible Notes were assigned from Arena Origination Co., LLC, Arena Special Opportunities Fund, LP, Arena Special Opportunities Partners I, LP, and Mt.

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 129 of 270

Whitney Securities, LLC to Amped I, LLC along with all claims, pursuant to an Assignment Agreement dated as of December 28, 2023.

5.        Plaintiff Amped II is a Delaware limited liability company with its principal place of business at 2500 Westchester Avenue, Suite 401, Purchase, New York 10577.  Amped II is the current holder of the Convertible Notes (as defined below).  The Convertible Notes were assigned from Arena Origination Co., LLC, Arena Special Opportunities Fund, LP, Arena Special Opportunities Partners I, LP, and Mt. Whitney Securities, LLC to Amped I, LLC along with all claims, pursuant to an Assignment Agreement dated as of December 28, 2023.

6.        Plaintiffs Arena Origination Co., LLC, Arena Special Opportunities Fund, LP, Arena Special Opportunities Partners I, LP, and Mt. Whitney Securities, LLC are each Delaware limited liability companies, with their principal place of business at 405 Lexington Avenue, New York, New York 10174.  The Arena Shareholders hold the Series C, Series E, Warrants, and Common shares of the Company.

7.        Defendant Amy Hanson ("Hanson") was the lead independent director of the Company Board ("Board") from June 2023 to the Company's restructuring (described in paragraph 92), has been a Director of the Company since January 2022 and, at relevant times, served as Chairman of the Audit Committee.  As Chairman of the Audit Committee she was tasked with, among other things, assisting the Board in overseeing material transactions, identifying and monitoring significant business risk, reviewing and managing the independent auditors, reviewing deficiencies or weaknesses of internal controls over financial reporting, overseeing press releases and regulatory reporting, and reviewing and approving related party transactions.  A copy of the Company's Charter of the Audit Committee of the Board of Directors is attached as Exhibit A. Defendant Hanson resides in Cincinnati, OH.

3

8.      Defendant Craig Denson ("Denson") has been a member of the Board since October 2020 and served as the Interim CEO of the Company from August 2023 to the restructuring.  Defendant Denson resides in Davenport, Florida.

9.      Defendant Andrew Fox ("Fox") served as CEO of the Company from October 2020 to August 2023.  Fox has been a Director of the Company since October 2020 and was Chairman of the Board from September 2021 until August 31, 2023. Defendant Fox resides in New York, New York.

10.      Defendant Leah Schweller ("Schweller") served as Chief Financial Officer ("CFO") of the Company from September 2021 until its restructuring.  Defendant Schweller resides in New York, New York.

11.      Each of the Defendants was directly involved in the management and oversight of the Company, a publicly held company with its principal place of business in New York, New York.  The Company's securities are registered with the SEC pursuant to the Securities and Exchange Act of 1934 ("Exchange Act") and, until its delisting on February 29, 2024, traded on Nasdaq.

## RELEVANT NON-PARTIES

12.      Nonparty Kenneth Orr ("Orr") was majority owner of the Company and served as Director, President, and CFO of the Company and its predecessors prior to September 2021.  He was also the Chairman of the Company's Board of Directors from May 2020 until September 2021.

13.      Nonparty KORR Acquisitions Group, Inc. ("KORR Acquisitions") is a registered investment advisor incorporated under the laws of the State of New York.  KORR Acquisitions is owned by Orr and his wife, Cori Orr.  Since in or around 2019, Orr was and remains the founder, Chairman, CEO, and Chief Investment Officer ("CIO") of KORR Acquisitions.  Upon information

and belief, Orr is the principal operating officer and has the sole voting and dispositive power over shares held by KORR Acquisitions. KORR Acquisitions is the general partner of KORR Value LP.

14.    Nonparty KORR Value LP ("KORR Value") is a Delaware limited partnership doing business in New York. Orr is CEO of KORR Value.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the parties under New York's Civil Practice Law and Rules ("CPLR") Sections 301 and 302 because the Defendants have conducted business within the State of New York on an ongoing and continuous basis in their capacities as officers and directors of the Company with its principal place of business in the State of New York. The underlying issues are directly related to Defendants' transaction of business in the State of New York, and the Notes, Securities Purchase Agreements, Exchange Agreement, and the Special Advisor Agreement at issue here are each governed by the laws of the State of New York and subject to the jurisdiction and venue of the State of New York and New York County.

16.    Venue is proper in this Court under CPLR §§ 503(a) and 509, and Plaintiffs designate New York County as the place of trial.

## FACTUAL ALLEGATIONS

A.    **Background of Charge Enterprises, Inc. and Kenneth Orr**

17.    The Company is an electric, broadband and EV charging infrastructure company. The Company was initially incorporated as E-Education Network, Inc. in Nevada on May 8, 2003 and changed its name to GoIP Global, Inc., on August 10, 2005. On April 30, 2020, GoIP Global, Inc. acquired 100% of the outstanding equity interests of Transworld Holdings, Inc. and in connection with that transaction, GoIP Global, Inc. changed its name to Transworld Holdings, Inc.

5

Case 24-10349-TMH    Doc 475    Filed 02/10/25    Page 132 of 270

and converted from a Colorado corporation to a Delaware corporation. On January 26, 2021, Transworld Holdings, Inc. changed its name to Charge Enterprises, Inc.

18.    Orr was majority owner of the Company and served as Director, President, and Chairman of the Board until September 2021.

19.    In or around mid-2021, the Company pursued an uplisting with the Nasdaq Stock Market. In connection with the uplisting, the SEC and Nasdaq raised concerns over Orr's ownership and role in the Company because of Orr's criminal and regulatory history.

20.    As a result of the concerns raised by the SEC and Nasdaq, Orr, then the majority owner of the Company, stepped down as Chairman of the Board and purportedly divested his interest in the Company to less than 10% of the beneficial ownership.

21.    On April 7, 2022, Charge Enterprises, Inc. was approved for uplisting to the Nasdaq Stock Market with the ticker symbol "CRGE" and began trading on April 12, 2022.

22.    As a public company, the Company was required to file with the SEC certain disclosure documents containing accurate and comprehensive information about its business operations and financial condition. Defendants were required to maintain effective disclosure controls and procedures to comply with their SEC reporting obligations.

**B.    Defendants Abdicate Their Responsibilities to Orr**

23.    Though Orr purportedly divested his interests in the Company and stepped down as an officer and director at the Company, Defendants kept in place an informal agreement ("Informal Agreement") with Orr from late 2020 which granted him unfettered authority and discretion over the Company's funds and investments without need for any Company consultation or approval. The Informal Agreement was described and reaffirmed by the Defendants in the Company's June 11, 2021 Amended Form S-1 Registration Statement filed with the SEC and in

6

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 133 of 270

Exhibit 10.23 to its 2021 Form 10-K for the fiscal year ended December 31, 2021.  According to the December 31, 2021 Form 10-K, the Informal Agreement provides that:

> KORR Acquisition Group, Inc., an entity controlled by Kenneth Orr, the Company's chairman of the board of director ("KORR") . . . shall be responsible for the investment and reinvestment of certain assets of the Company, as may be designated by the Company, from time to time, to be subject to KORR's management . . . [and] KORR shall be granted discretionary authority, without prior consultation with the Company, to buy, sell, trade, and allocate in and among, stocks, bonds and other securities and/or contracts relating to same, or otherwise...

24.     The 10-K for fiscal year ended December 31, 2021 was signed by Defendants Fox, Schweller, Denson, and Hanson, among other Board members and is attached as Exhibit B.

25.     The Company's Amendment No. 9 to Form S-1 Registration Statement filed on December 10, 2021 described the Informal Agreement as an "at-will" arrangement that allowed KORR Acquisitions to invest in "marketable securities" on the Company's behalf.  It further stated that the investments were to be limited to "20% of our assets, and of that, less than 5% in illiquid assets."  The filed Amended Form S-1 represented that "[w]e continuously monitor and review the value of our investments, including but not limited to conducting a mark-to-market valuation of our investments on a weekly basis, and, if ever we exceed 20%, we will liquidate marketable securities to stay within our intended maximum investment of 20% of our total assets."  A copy of the December 10, 2021 Amended Form S-1 is attached as Exhibit C.

26.     Defendants also repeatedly represented in their public disclosures that they had established effective internal disclosure controls and procedures for the Company.  Defendants Schweller, Fox, and Denson all at various times provided disclosure control certifications in the 2021 10-K, 1Q2022 10-Q, 2Q2022 10-Q, 3Q2022 10-Q, 2022 10-K, 1Q2023 10-Q, and 2Q2023 10-Q.

27.     On June 7, 2022, the Company and KORR Acquisitions entered into a formal, written investment agreement with Orr (the "Special Advisor Agreement"), whereby KORR

7

Acquisitions agreed to "manage the Company's investment account" in exchange for a $500,000 up-front payment and a monthly payment of $25,000. Under the Special Advisor Agreement, and notwithstanding the fact that the Company was a Nasdaq listed entity, Orr was again tasked with managing the Company investments with no Company oversight and no imposed restrictions or guardrails on the nature of the investments permitted. The Special Advisor Agreement was signed by Defendant Denson on behalf of the Company and approved through an Action by Unanimous Consent of the Board of Directors of the Company on June 7, 2022 signed by Defendants Fox and Denson, among other Board members. A copy of the Special Advisor Agreement is attached hereto as Exhibit D. A copy of the unanimous consent is attached as Exhibit E.

28.     Defendants gave Orr over $35 million to invest at his sole discretion without any oversight, consult, or approval by the Defendants or any officers or directors at the Company. Nearly $20 million was given to Orr between March 2022 and April 2023, alone.

29.     Defendants knew that the funds held invested by Orr via KORR Acquisitions were "critical" to the Company's liquidity and ability to operate as a going concern.

30.     KORR Acquisitions established accounts at Interactive Brokers (the "IB Accounts") and Defendants wired money from the Company to Orr's account at Wells Fargo from which Orr then transferred the funds to the IB Accounts.

31.     With a total lack of any corporate governance, Orr invested the funds in his limited partnership, KORR Value LP, wherein his company KORR Acquisitions purportedly has sole and absolute rights with respect to the funds of the partnership, including the alleged right to limit redemptions. The Company's funds were held in two accounts and then cross-collateralized with six other of Orr-controlled accounts in the name of the Limited Partnership at Interactive Brokers,

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 135 of 270

and KORR Acquisitions has maintained it has full discretion as to when and whether to return any funds to the Company.

32.     According to Company records, Orr and KORR Acquisitions also moved more than $6.275 million of Company funds into other accounts controlled by Orr, his children, and related companies, including "Optimus Health" a/k/a Optimus Healthcare Services, Inc, a publicly traded company with ties to certain of Charge's directors, before returning it.

**C.     The Defendants Are Regularly Apprised of Orr's Investment Actions**

33.     Though Defendants gave full discretion over the Company's investments, the Company's officers and directors, including the Defendants, knew or should have known that the Company's funds had been encumbered and invested in a limited partnership.

34.     Throughout the period that the Company gave tens of millions of dollars of its assets to Orr and KORR Acquisitions, Orr provided the Company with monthly IB Account statements.  Upon information and belief the IB Account Statements were shared with the Board.  Statements from December 2021 through December 2023 are attached here as Exhibit F.  The statements clearly show, among other glaring indicia, that the Company was investing in a limited partnership and the funds were leveraged:

- The IB Accounts are not in the Company's name, but held in the name of KORR Value LP, which would only be the case if the Company were invested in KORR Value LP.

- The "Customer Type" is identified as "Partnership".

- The value of the investments is reflected as "NAV," which is investment fund terminology.

- The Time-Weighted Rate of Return (TWR) are often very high, virtually an impossibility for a cash or cash equivalent type investment.

- The stock positions are long and short.

- The "Account Capabilities" indicate "Portfolio Margin," which allows the account holder to borrow on the securities—*i.e.*, create indebtedness or leverage.

9

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 136 of 270

35.     Communications between Defendants and Orr demonstrate that the IB Account statements were available to and known by the Defendants.  An example of a communication between Defendant Schweller and Orr from February 2022 is attached here as Exhibit G (CE_00106019).

**D.      Plaintiffs Relied on Defendants' Misstatements When Loaning the Company Money and Purchasing Company Stock**

36.     In parallel with the Defendants' abdication of their responsibilities to Orr, it sought funding from Plaintiffs for working capital and to run the Company's operations.

37.     On May 8, 2020, November 3, 2020, and May 19, 2021 respectively, with Board approval, the Company entered into three agreements, as amended thereafter, with Amped II for Original Issue Discount Senior Convertible Notes in the aggregate principal amounts of $3,000,000, $3,888,889.00, and $5,610,000.00 respectively (the "Convertible Notes").  In total, the Company issued and had outstanding approximately $12,498,889 in aggregate principal amount (cost basis of $11,200,000) of Senior Convertible Notes.  Copies of the Convertible Notes are attached hereto as Exhibit H.

38.     On December 17, 2021, with Board approval, the Company entered into Original Issue Discount Senior Secured Non-Convertible Promissory Notes due November 19, 2023, in the aggregate principal amount of $14,814,814.67 (cost basis of $13,333,180) (the "Non-Convertible Notes").  The Non-Convertible Notes have a 23-month term, with a 7.5% interest rate, subject to increase to 20% per annum upon and during the occurrence of an event of default.  A copy of the Non-Convertible Notes is attached hereto as Exhibit I.

39.     Amped I, the Company, and certain of the Company's subsidiaries also entered into an Amended and Restated Security Agreement dated as of December 17, 2021 (as amended,

10

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 137 of 270

modified, and supplemented from time to time, and including Additional Debtor Joinders dated as

of August 18, 2022 and November 3, 2022, collectively the "Amended Security Agreement").

40.     Pursuant to the Amended Security Agreement, the Company and certain of its

subsidiaries (the "Subsidiary Grantors") granted a security in all of their assets to serve as

Collateral (as defined in the Amended Security Agreement) for the outstanding obligations under

the Non-Convertible Notes.

41.     The Non-Convertible Notes contain several covenants for Amped I and Amped II's

protection of its Collateral including several negative covenants, with which Defendant Fox

represented the Company was in compliance when he signed the Non-Convertible Notes on behalf

of the Company.

42.     Among others, the negative covenant in Section 7(i) of the Non-Convertible Notes

provides that the Company will not:

> make or suffer to exist any Investments using any proceeds from [Amped I] or
> commitments therefor, or to become or remain a partner in any partnership or joint
> venture except for: (i) Investments in cash and cash equivalents…

43.     Section 1(x) of the December 2021 SPA (as defined below) defines Investments as

"any investment…in or to any Person, whether payment therefore is made in cash or capital stock

or other equity interests or otherwise, and whether such Investment is by acquisition of capital

stock or other equity interests or Indebtedness, or by loan, advance, transfer of property out of the

ordinary course of business, capital contribution, equity or profit sharing interest, extension of

credit on terms other than those normal in the ordinary course of business or otherwise."

44.     Section 6(a)(ii) of the Non-Convertible Notes provides that it is an Event of Default

if the Company fails "to observe or perform any other covenant or agreement contained in the

Note[s]."

Case 24-10349-TMH    Doc 475    Filed 02/10/25    Page 138 of 270

45.     Defendant Fox executed the Non-Convertible Notes knowing, or he should have known, that the Company was invested in a limited partnership that was not limited to cash or cash equivalents, and that the Company was already in breach of the negative covenant and would continue to be moving forward.

46.     On December 23, 2021, the Company filed an 8-K announcing the Non-Convertible Notes.  It was signed by Defendant Schweller.

47.     Amped I would not have entered into the Non-Convertible Notes had it known this material representation was false.

48.     Pursuant to the Non-Convertible Notes, in December 2021 Amped I loaned the Company approximately $13.3 million.  Three months later, in March 2022, the Defendants wired Orr $13.5 million.  At that time, the Defendants were already receiving account information, which demonstrated that their funds were invested in a limited partnership, in non-cash or cash equivalents, and the account was utilizing its margin capability.  The Defendants knew or should have known that the wiring of these funds was a breach of the terms of the Non-Convertible Notes.

49.     In connection with the Non-Convertible Notes, the Arena Shareholders and the Company, with the consent of the Board, also entered into a Securities Purchase Agreement dated December 17, 2021 (the "December 2021 SPA") pursuant to which the Arena Shareholders purchased 2,370,370 shares of Series C Convertible Preferred Stock, for a purchase price of $6,666,666.00 with a stated value of $7,407,407.56.

50.     In the December 2021 SPA, the Company represented that it was not "in default under or in violation of . . . any indenture, loan or credit agreement" and that it was not "in violation or default in the performance or observance of any material obligation, agreement, covenant or condition contained in any . . . note."

Case 24-10349-TMH    Doc 475    Filed 02/10/25    Page 139 of 270

51.     Defendant Fox executed the December 2021 SPA on behalf of the Company. Upon information and belief, Fox and all acting directors and officers, including Defendants Denson and Schweller, knew, or should have known, that the Company gave tens of millions of dollars of its assets to Orr and KORR Acquisitions, including because they were provided monthly IB Account statements by Orr. As a result, Fox and all acting directors and officers knew, or should have known, that the Company was in breach of the Non-Convertible Notes and therefore also knew, or should have known, that he made misrepresentations in the December 2021 SPA; namely, that the Company was already in default of the Non-Convertible Notes.

52.     Due to the nature and size of the Non-Convertible Notes and the December 2021 SPA, and because of the Defendants' obligation to be apprised of the Company's largest secured debt, the Company's directors and officers, including Defendants, had knowledge of and approved of, the Company's entrance into these agreements as well as the representations and warranties being made by Defendant Fox on the Company's behalf therein.

53.     But for the representation that the Company was not in default under any agreement or note, most pertinently its own Non-Convertible Notes, and Defendants' failure to disclose there was no oversight or review of Orr's unfettered discretion over Company funds and the nature of those investments, the Arena Shareholders would not have entered into the December 2021 SPA. Defendants' misrepresentations—which Defendants never corrected over the course of over two years—induced the Arena Shareholders into the purchase of securities totaling 2,370,370 Series C Convertible Preferred Stock at the price of $6,666,666.

54.     Further in connection with the December 2021 transactions, the Arena Shareholders received a warrant to purchase up to 2,370,000 shares of the Company's common stock with an exercise price of $4.00 per share.

13

55.    Furthermore, on March 14, 2023, without knowledge of the material defaults that had occurred and in reliance on the repeated prior representations to Amped I, Amped II, and the public disclosures affirming the cash position of the Company and assurances of effective oversight and internal controls, the Arena Shareholders elected to exercise a series of warrants into 4,400,000 shares of common stock and 3,200,000 shares of Series E Convertible Preferred Stock with a stated value of $1,600,000.

**E.     D&O Misstatements Induce Amped II to Convert Notes to Stock**

56.    On June 30, 2022, and based on the continued misrepresentations by the Defendants and failure by Defendants to advise Plaintiffs that the Company funds and Amped I and Amped II's cash collateral were invested in a limited partnership, the Company and Amped II entered into an agreement (the "Exchange Agreement") to convert a total of $12,498,889 of the Convertible Notes into Preferred D shares.  A copy of the Exchange Agreement is attached hereto as Exhibit J.

57.    Defendant Fox executed the Exchange Agreement on behalf of the Company.  On July 7, 2022, the Company filed an 8-K announcing the Exchange Agreement.  It was signed by Defendant Schweller.  The Company's officers and directors had knowledge of and approved of the Exchange Agreement and the representations and warranties therein.

58.    In Section 3.7 of the Exchange Agreement, Defendant Fox, on behalf of the Company, represented and warranted to Amped II that:

> Neither the Company nor any Subsidiary…is in default under or in violation of…any indenture, loan or credit agreement or any other agreement or instrument to which it is party or by which it or any of its properties is bound (whether or not such default or violation has been waived)

59.    In Section 3.11 of the Exchange Agreement, Defendant Fox, on behalf of the Company, represented and warranted to Amped II that:

> The Company is not…in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any

14

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 141 of 270

contract…loan or credit agreement, note, lease, or other agreement or instrument to which the Company is party or by which it may be bound, or to which any of the property or assets of the Company is subject…

60.     In Section 3.14 of the Exchange Agreement, Defendant Fox, on behalf of the

Company, represented and warranted to Amped II that:

No statement or information contained in this Agreement, any other Transaction Document[1] or any other document, certificate, or statement furnished to the Purchaser on behalf of the Company in writing or for use in connection with the transactions contemplated by this Agreement and/or the other Transaction Documents contained, as of the date such statement, information, document, or certificate was made or furnished, as the case may be, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein, taken as a whole, not materially misleading. There is no fact known to the Company that would reasonably be expected to materially affect the Company that has not been expressly disclosed herein, in the other Transaction Documents, or in any other documents, certificates and written statements furnished to the Purchaser for use in connection with the transactions contemplated hereby and by the other Transaction Documents.

61.     In Section 3.26 of the Exchange Agreement, Defendant Fox, on behalf of the

Company, represented and warranted to Amped II that:

The Company understands that the Investor[2] may rely on the Transaction Documents, the information included therein, including, but not limited to, the foregoing representation in purchasing the New Securities.[3] All of the disclosure furnished by or on behalf of the Company to the Investor in the Transaction Documents regarding, among other matters relating to the Company, its business and the transactions contemplated in the Transaction Documents, is true and correct in all material respects as of the date made and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading…

62.     At the time that he entered into the Exchange Agreement on behalf of the Company,

Defendant Fox knew, or should have known, that the Company was in default of the Non-

Convertible Notes.  The Defendants, who, upon information and belief were aware of and/or

---

[1] Transaction Documents is defined in the Exchange Agreement as the Exchange Agreement, the Registration Rights Agreement, the Certificate of Designation and other related agreements.

[2] Investor is defined as the parties that are signatories to the Exchange Agreement and is Arena (now Amped II).

[3] New Securities is defined in the recitals as the Series D Preferred stock.

approved the Exchange Agreement, did nothing to correct the misrepresentations made by Defendant Fox on behalf of the Company.

63.     But for the representations and warranties made by Defendant Fox on behalf of the Company and with the approval of the other Defendants, Amped II would never have converted its secured debt into equity and taken on more stock in a Company whose assets, including Amped II's cash collateral, was encumbered.

64.     Notably, Section 2.4 of the Exchange Agreement provides:

> *It shall be a condition* to the obligation of each [Arena Party] on the one hand and the Company on the other hand, *to consummate the Exchange contemplated hereunder*, *that the other party's representations and warranties contained herein are true and correct on the Closing Date*, with the same effect as though made on such date, unless waived in writing by the other party to whom such representations and warranties are made.

Exchange Agreement at § 2.4 (emphasis added).

65.     Because the truth of the representations and warranties was a necessary condition to the consummation of the Exchange and such representations were false, the conversion did not occur. The Convertible Notes therefore became due on May 8, 2023 and November 3, 2023, and May 19, 2024 respectively, while the Non-Convertible Notes became due in November 2023.

**F.     The Defendants' Mismanagement and Misstatements Result in Defaults and Company Insolvency**

66.     The Non-Convertible Notes were due on November 19, 2023. In anticipation of its repayment obligations to Amped I, the Defendants began demanding a return of the Company assets from Orr, but the Defendants quickly learned that Orr was unable to return the funds.

67.     Specifically, Defendants set a repayment schedule in May 2023 over numerous email conversations between Defendants Schweller and Denson asking Orr to return all the funds in the IB Accounts to the Company.

16

68.     As of July 2023, Orr had returned only $5 million of the $10 million the Company

had requested.  The failure to return the funds was a clear indication that the funds were illiquid,

contrary to the Company's repeated disclosures and reports in their SEC filings, including

announcing that it had more than $57 million in cash as of September 30, 2023 and claiming as

late as November 8, 2023 that the Company expected "to have sufficient resources to meet [its]

current operating liquidity and capital requirements for the next 12 months."

69.     By August 2023, Orr and KORR Acquisitions had failed to meet Defendants'

repeated demands to return the proceeds at the time requested.

70.     Because the Company needed to address its liquidity concerns, the Defendants

elected to enter into a Securities Purchase Agreement dated August 11, 2023 with Orr's KORR

Value LP (the "August 2023 SPA").  Under the August 2023 SPA, KORR Value LP agreed to

provide the Company with up to $5 million in liquidity by purchasing shares of the Company's

common stock.  Orr signed the August 2023 SPA on behalf of Orr and the Board unanimously

approved the transaction.  Upon information and belief, the Company delayed their 10-Q filing

specifically so they could represent to the market that they had sufficient liquidity to continue as a

going concern based on the August 2023 SPA.

71.     To demonstrate sufficient liquidity to purchase the Company shares, KORR Value

LP purportedly demonstrated a net value of $14.4 million by showing "screenshots" from an

unnamed account with a negative cash position of $34 million and net value of $14.46 million (due

to a positive equity position of nearly $49 million).  The information Orr used to demonstrate

KORR Value LP's net value was the same balances as the Company's own money from the IB

Accounts.

72.     The Company inaccurately reported in its August 14, 2023 10-Q additional liquidity based on this related-party transaction.  The 10-Q, which was signed by Defendants Fox and Schweller, omitted the fact that KORR Value LP was an entity in which the Company was invested.  There is also no mention that it is the same entity that was owner of the IB Accounts in which Orr held the Company's money—money that he failed to return upon request.  A copy of the 10-Q is attached as Exhibit K.

73.     As of August 14, 2023, when the Defendants issued the inaccurate cash and cash equivalent position of the Company, including the approximately $10 million held and unavailable in KORR Value LP and a $5 million "subscription line" from the August 2023 SPA, the Company's shares closed at $0.9.

74.     In September and October 2023, Defendants knew that Orr and KORR Acquisitions did not return the full amount of the requested funds or adhere to the schedule agreed to between Orr and the Defendants—the failure of which they knew would have a "cataclysmic" impact on the Company.

75.     By the end of October, despite agreeing to return $12 million of the Company funds before the end of October, Orr had returned only $4 million.

76.     With this knowledge the Defendants continued to disregard their obligations to the Company's stakeholders and did not adequately disclose this issue in an SEC public filing even after they realized Orr was not returning the Company's money and Plaintiffs' Collateral.

77.     In total, the Company had an outstanding principal balance of $27.8 million due under the Notes, exclusive of interests and fees.  In addition, the Company had several other debt obligations that contained cross-default provisions.

78.    By November 2023, Defendants Denson and Schweller sent increasingly urgent emails to Orr demanding the return of the money so that the Company could meet its obligations to Amped I.  Defendant Denson had a call with Orr on November 2, 2023 discussing Orr's failure to return the Company funds or to adhere to the schedule agreed to by the parties in August 2023.

79.    Then on November 3, 2023, Defendant Denson wrote that "Charge was experiencing financial harm by Orr's failure" which could "impact the Company's ability to sustain operations as a going concern."  Company Compl. ¶¶ 76-77.  The same day, Defendant Denson discussed a revised drawdown schedule for the return of the remaining $10.75 million in the IB Accounts.  On November 3 and November 6, the Company alleges it received wires in amounts of $800,000 and $200,000, respectively—far less than the $4 million agreed to.

80.    Notwithstanding actual knowledge that their funds were not being returned and the inherent financial risk to Plaintiffs and the Company overall, on November 2, 2023, Defendants were finalizing terms of a refinancing with Amped I and failed to notify Plaintiffs—their largest secured creditor and a shareholder—or the public, of the issue.  Indeed, the refinancing negotiations between the Company and Amped I, which had been ongoing since May 2023, ultimately resulted in the Company indicating it wanted to pay off Amped I's debt in full and its Series C preferred investment on or prior to November 19, 2023.  The payoff to Amped I was approved by the Company's officers, pending approval from the Board.

81.    Then on or around November 3, 2023, Plaintiffs were informed that the Board did not approve the recommended pay off.  Upon information and belief, this was because as of November 2 or 3, 2023, the Company knew that the Company did not have cash and cash equivalents it previously represented to all shareholders in its public filings, available to pay off the debt owed to Amped I and Amped II.

19

82.     Nonetheless, on November 8, 2023, the Company issued its Third Quarter earnings and in its financial results, without any reference to the known financial risk facing the Company and inaccurately reporting investments in cash and cash equivalents.  The November 8, 2023 8-K was signed by Defendant Schweller.

83.     The Company never issued an 8-K revealing the Company's true financial condition until November 15, 2023.

84.     Then in its November 15, 2023 8-K, the Company reported that it had intended to pay off Amped I, but "in preparing to access funds its investment accounts . . . the Company learned that certain Company funds were unexpectedly unavailable, rendering the Company unable to repay the Notes."  It then reports that pursuant to a Special Advisor Agreement, KORR Acquisitions was managing the investment and reinvestment of certain Company assets and "approximately $9.9 million of the Company asset under management" were not in the form of "cash, cash equivalents, marketable securities or similarly readily liquid assets" but instead, "were in fact invested in limited partnership interests of KORR Value, L.P." and "are not immediately able to be liquidated or readily accessible."  The Company further reported that absent sufficient liquidity to pay the principal and interest on the Notes, it could result in default under other of the Company's debt instruments and agreements that would "likely have a material adverse effect on the Company's liquidity, financial condition and results of operations, and may render the Company insolvent and unable to sustain its operations and continue as a going concern."

85.     As a result of the abdication of their duties to their former Chairman, the Defendants knew the Company would be unable to repay the debt owed to Amped I, which as result of the breaches from the outset carried default interest, penalties, fees, and liquidated damages.  They further would have understood that they owed a debt to Amed II given that the conversion of the

Convertible Notes was ineffective since it was conditioned on representations which were false at the time of the Exchange Agreement.

86.     Without access to its monies held in the IB Accounts, Defendants knew there would be cross-defaults on other instruments—all of which would render the Company unable to continue its operations.

87.     On November 19, 2023, the Company defaulted on the Non-Convertible Notes.

88.     As of February 29, 2024, the Company owed Amped I at least: (1) the principal amount of $25,847,423.00 in the aggregate; (2) accrued and unpaid interest (at standard 7.5% rate) through maturity totaling $93,841.42; (3) a 12.5% interest rate on the outstanding amounts due under the May Senior Non-Convertible Notes and December Senior Non-Convertible Notes (representing the difference between the standard 7.5% interest rate and the 20% interest rate that applies in the Event of Default) from at least May 19, 2021 and December 17, 2021, respectively, totaling $7,112,431.96; (4) interest at the default rate of 20% on due and unpaid principal amount totaling at least $1,450,327.62; (5) a 20% per annum late fee on overdue accrued but unpaid interest from the due date to the actual payment date totaling $1,731,320.20; (6) an Exit Fee totaling $1,938,556.70, (7) a liquidated damages fee of $30,000 per day for each day the Company has incurred Indebtedness in violation of the Notes totaling $163,350,000; and (8) other fees and expenses permitted under the Notes totaling $2,424,315.50.  In total, the Company owed Amped I $45,598,216.40 as of February 29, 2024, plus liquidated damages for a total of $203,948,216.42.

89.     As of February 29, 2024, the Company owed Amped II at least: (1) the principal amount of $12,498,889 in the aggregate; (2) a 17.75% interest rate on the outstanding Convertible Notes from at least July 1, 2022 (the day after the Exchange Agreement) totaling $3,746,889.20; and (3) a 20% per annum late fee on overdue accrued but unpaid interest from the due date to the

21

actual payment date, totaling $749,377.80. In total, the Company owed Amped II $16,995,156 as of February 29, 2024.

90.     In total, the amount owed Amped I and Amped II exceeded $220,000,000 on its secured debt, an amount stipulated to by the Company's subsidiary, PTGI.

91.     Following the default, between November 2023 and January 2024 Amped I and Amped II issued default notices and ultimately a notice of foreclosure whereby Amped I and Aped II would hold an auction, pursuant to the Uniform Commercial Code, to satisfy the Company's outstanding indebtedness. The Company reported the default notices on November 21, 2023 and December 6, 2023 respectively. The December 6, 2023 8-K further reported that the Company was ceasing certain operations to preserve liquidity. On January 25, 2024, in a form 8-K, the Company reported that it had received the foreclosure notice.

92.     After months of restructuring efforts, the Company and Amped I and Amped II entered into a Restructuring Support Agreement. On March 7, 2024, the Company filed a voluntary petition for bankruptcy under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware.

93.     Following the Company's bankruptcy, Amped I and Amped II received some, but not all, recovery on its secured claims. Specifically, as of May 3, 2024 when a Plan was confirmed by the Bankruptcy Court, Amped I and Amped II received 95% equity in the Company based on a stipulated value of secured debt of no less than $51 million.

94.     As a result of Defendants' misstatements and omissions, the Arena Shareholders were falsely induced to purchase and/or convert over 12 million shares of the Company stock, comprising 2.37 million Series C Convertible Preferred shares purchased in the December 2021 SPA, 9 million shares of Common Stock purchased in connection with the private market securities

transaction with Defendant Fox and KORR Value, and nearly 1.2 million Series D shares that were or would have been converted pursuant to the Exchange Agreement. As of the Effective Date of the Bankruptcy, all common and preferred stock was without any value. Therefore, the Arena Shareholders received no recovery.

**G.**     **The Defendants Were Aware that Orr Could Invest Funds Inappropriately**

95.     In November 2023, Orr produced to the Company a limited partnership agreement ("LPA") between KORR Value LP and the Company's predecessor GoIP Global, Inc. effective as of May 9, 2020. The LPA purports to give the general partner, KORR Acquisitions, all decision-making authority with no review from the limited partner and the power to "determine the criteria, timing and circumstances of the purchase, sale or distribution of the [investments] or proceeds or distributions thereon or in respect thereof at any time held or received by the Partnership." LPA § 2.2.1. A copy of the LPA is attached as Exhibit L.

96.     The LPA was never disclosed in any SEC filing prior to November 2023.

97.     The Company initiated an action in this Court against Orr, his wife, Korr Acquisitions Group, and Korr Value LP on January 8, 2024 captioned *Charge Enterprises, Inc. v. Kenneth Adam Orr et al.* pursuant to which the Company sought at least $15 million in damages (exclusive of interest, costs, and fees) based on claims of, among others, unjust enrichment, constructive trust, conversion and fraud in the inducement. A copy of the Company Complaint is attached as Exhibit M.

98.     The Company Complaint alleges that until November 2023, Charge's officers and directors, including Defendants, had never seen the LPA and they were unaware that the tens of millions of dollars of the Company's funds were ever invested in KORR Value LP, invested in anything other than cash or cash equivalents, or that the funds would not be immediately available

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 150 of 270

to repay Amped I and Amped II when the debt became due. The Company Complaint further alleges that the LPA is a forgery.

99.     Under the terms of the Informal Agreement with KORR Acquisitions and the 2022 Special Advisory Agreement there was no prohibition or restriction to Orr's wholly discretionary investment authority, no consultation or approval requirement with the Company, and no requirement that Orr adhere to any request or any alleged request as to how the funds were to be invested. There was nothing preventing Orr from investing the Company funds in a limited partnership or adhering to the requirements and covenants under the Notes. It was therefore critical that the Defendants actually "continuously monitor and review" the value of the investments to ensure liquidity as was represented in public filings.

100.     Further, Orr shared monthly statements regarding the investments with Defendants Fox, Schweller, and Denson, as well as the Company's entire accounting department. The other Defendants, as officers and directors, had access to these monthly statements informing them of the nature of the investments. Thus, at minimum, Defendants had an obligation to oversee their investments and ensure that their representations were accurate before warranting to Plaintiffs that its cash collateral was not and would not be encumbered or otherwise invested in anything other than cash or cash equivalents—promises that induced Plaintiffs to lend millions of dollars, convert notes into stock, and purchase additional Company shares.

101.     In short, whether Defendants did not know the Company was invested in KORR Value LP, had indebtedness, or was otherwise invested in other than cash and cash equivalents at the time of the Notes, Security Agreements, and Exchange Agreement, they should and could have known had Defendants acted with any regard for the truth of their statements instead of expending their loyalty to Orr at the expense of the Company and the Arena Shareholders.

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 151 of 270

H.     **The Defendants Refuse to Provide Arena with Information, and Uses Arena's Cash Collateral for its Own Benefit**

102.    On November 21, 2023, the Company filed an 8-K in which it announced its default on its repayment obligations to Arena, acknowledged the resultant Notices of Default, and noted the risk of insolvency.

103.    Yet while the Company publicly acknowledged it was in default of the non-Convertible Notes, Defendants refused to respond to Arena's repeated requests for information related to the investment agreements, KORR Value LP partnership agreement, or any other requests about the financial condition of the Company.

104.    This repeated stonewalling and denial of access to information continued for a month and violated Arena's contractual rights under Section 4.22 of the Security Purchase Agreement and statutory rights under Section 220(b) of the Delaware General Corporation Law to inspect the books and records.

105.    At the same time, and despite the mismanagement that resulted in material adverse effects on the Company's financial condition and a conversion of Arena's cash collateral, in its December 6, 2023 8-K, the Company announced that, on December 1, 2023, it entered into retention agreements with Defendant Denson, the CEO and COO, Defendant Schweller, the Company's CFO, and James Biehl, the Company's Chief Legal and Compliance Officer pursuant to which they were paid bonuses of $200,000, $150,000 and $175,000, respectively, 50% payable on December 15, 2023 and 50% payable on February 29, 2024.  A copy of the December 6, 2023 8-K is attached as Exhibit N together with copies of the retention agreements.

25

### FIRST CAUSE OF ACTION
**(Fraudulent Inducement or Misrepresentation– By the Arena Shareholders Against All Defendants)**

106.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

107.    Defendants engaged in fraud by knowingly inducing the Arena Shareholders to enter into the December 2021 SPA on the false basis that the Company was not in default under or in violation of any indenture, loan or credit agreement and that it was not in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any note.

108.    These representations, in the December 2021 SPA, were false and materially misleading because as Defendants knew, the Company had already violated and was in default under the Non-Convertible Notes because the Company was invested in a limited partnership that was not limited to cash or cash equivalents, as described above.

109.    Additionally, as Defendants knew but omitted to disclose, Defendants had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments—funds they knew were "critical" to the Company's liquidity and ability to continue as a going concern.  Without any oversight or monitoring, Orr improperly invested the Company funds in his own limited partnership and cross-collateralized the Company's funds with his other accounts, rendering them illiquid and unavailable.

110.    The Company's non-default and non-violation of any notes, loans, credit agreements, or other material obligations, were material terms of the December 2021 SPA and the Arena Shareholders justifiably and reasonably relied upon the representations in the December 2021 SPA when they purchased 2,370,370 shares of Series C Convertible Preferred Stock and

warrants to purchase up to 2,370,000 shares of the Company's common stock, and 9,000,000 shares of the Company's common stock from Defendant Fox and KORR Value.

111.    Had the Arena Shareholders known that the Company had already violated and was in default under the Convertible Notes the Arena Shareholders or that the Company had granted full authority and discretion to Orr without oversight, they would not have entered into the December 2021 SPA.

112.    Defendants, individually and in concert, directly or indirectly made or approved the false representations in the December 2021 SPA in order to induce the Arena Shareholders to purchase shares despite knowing or deliberately disregarding that the representations were false.

113.    Defendants, as high-level officers and directors of the Company were directly involved in drafting, producing, reviewing, and/or disseminating the false statements in the December 2021 SPA and/or approved or ratified such statements in furtherance of the fraud alleged herein.

114.    Defendants, as high-level officers and directors of the Company, had actual knowledge of the falsity of the material misrepresentations in the December 2021 SPA and intended to deceive the Arena Shareholders or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in those representations made by them or other Defendants to the Arena Shareholders.

115.    Defendants intentionally misled the Arena Shareholders in order to induce the Arena Shareholders to purchase the Company's stock and to conceal the Company's defaults and violations of the Non-Convertible Notes.

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 154 of 270

116.    The Arena Shareholders reasonably relied on Defendants' fraudulent statements and were induced to purchase 2,370,370 shares of Series C Convertible Preferred Stock, warrants to purchase up to 2,370,000 shares of the Company's common stock.

117.    As a result, Defendants are liable to the Arena Shareholders for damages of in an amount to be determined at trial, but no less than $6,666,666 (representing the cost basis of $6,666,666 price of the 2,370,370 shares purchased under the December 2021 SPA).

### SECOND CAUSE OF ACTION
**(Fraudulent Inducement or Misrepresentation – By Amped I Against All Defendants)**

118.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119.    Defendants engaged in fraud in the December 2021 Non-Convertible Notes by inducing Amped I to loan the Company $13.3 million on the false basis that the Company would not "make or suffer to exist any Investments using any proceeds from [Arena] or commitments therefor, or to become or remain a partner in any partnership or joint venture, except for (i) Investments in cash and cash equivalents…" Non-Convertible Notes, § 7(i).

120.    The representations in Section 7.1 of the December 2021 Non-Convertible Notes were false because, as Defendants knew, the Company was already invested in a limited partnership (namely, KORR Value LP) that was not limited to cash or cash equivalents and, given the Company's ongoing relationships with Orr and Defendants' total abdication of their responsibilities to Orr, would continue to use proceeds from Amped I and Amped II for such purposes moving forward.

121.    Additionally, as Defendants knew but omitted to disclose, Defendants had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments without oversight, allowing Orr to improperly invest in his own limited

partnership and cross-collateralize the Company's funds, which would cause the Company to default on its obligations to Amped I.

122.    Defendants' agreement to not invest in any limited partnership that was not limited to cash or cash equivalents was a material term of the December 2021 Non-Convertible Notes and Amped I justifiably and reasonably relied upon Defendants' agreement in loaning the Company $13.3 million.

123.    Had Amped I known that the Company was already invested and would continue to be invested in a limited partnership that was not limited to cash or cash equivalents or that the Company had relinquished such authority and discretion to Orr without proper controls or oversight, Amped I would not have entered into the December 2021 Non-Convertible Notes.

124.    Defendants, individually and in concert, directly or indirectly made and/or approved the false representations in the December 2021 Non-Convertible Notes in order to induce the Arena Shareholders to loan the Company millions of dollars despite knowing or deliberately disregarding that the representations were false and that they had abandoned their duties and given Orr unfettered authority over Company funds.

125.    Defendants, as high-level officers and directors of the Company were directly involved in drafting, producing, reviewing, and/or disseminating the false statements in the December 2021 Non-Convertible Notes and/or approved or ratified such statements in furtherance of the fraud alleged herein.

126.    Defendants, as high-level officers and directors of the Company, had actual knowledge of the falsity of the material misrepresentations in the December 2021 Non-Convertible Notes and intended to deceive the Amped I or, in the alternative, acted with reckless disregard for

29

the truth when they failed to disclose the true facts in those representations made by them or other Defendants to Amped I.

127.     Defendants intentionally misled Amped I in order to induce Amped I to loan the Company money and to conceal the Company's defaults and violations and Defendants' abdication of their duties as described herein.

128.     Amped I reasonably relied on Defendants' fraudulent statements and was induced to loan the Company $13,333,180.

129.     As a result, Defendants are liable to Amped I for damages in an amount to be determined at trial, but believed to be at least $13,333,180.

### THIRD CAUSE OF ACTION
**(Fraudulent Inducement or Misrepresentation – Amped II Against All Defendants)**

130.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131.     Defendants engaged in fraud in the Exchange Agreement by inducing Amped II to convert a total of $12,498,889 of the Convertible Notes into Preferred D shares on the basis of the representations and warranties in the Exchange Agreement, including that the Company was not in default under or in violation of any indenture, loan or credit agreement and that it was not in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any note.

132.     Specifically, Defendants falsely represented in the Exchange Agreement that (i) the Company was not in default or in violation of any "any indenture, loan or credit agreement or any other agreement or instrument to which it is party or by which it or any of its properties is bound"; (ii) the Company was not "in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any contract…loan or credit agreement,

note, lease, or other agreement or instrument..."; (iii) "[t]here is no fact known to the Company that would reasonably be expected to materially affect the Company that has not been expressly disclosed herein"; and (iv) "[a]ll of the disclosure furnished by or on behalf of the Company to the Investor in the Transaction Documents regarding, among other matters relating to the Company, its business and the transactions contemplated in the Transaction Documents, is true and correct in all material respects as of the date made and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading…"

133.   These representations were false and misleading because the Company was, in fact, in violation and default under loan agreements — namely, the Non-Convertible Notes and Convertible Notes — because, as Defendants knew, the Company was already invested in a limited partnership (namely, KORR Value LP) that was not limited to cash or cash equivalents and, given the Company's ongoing relationships with Orr and Defendants' total abdication of their responsibilities to Orr, would continue to use proceeds from Arena for such purposes moving forward.

134.   Additionally, as Defendants knew but omitted to disclose, Defendants had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds to the Company's detriment.

135.   Defendants' representations were material terms of the Exchange Agreement and Amped II justifiably and reasonably relied upon Defendants' representations in agreeing under the Exchange Agreement to convert its notes into Preferred D shares.

136.    Had Amped II known that the representations in the Exchange Agreement were false, it would not have entered into the Exchange Agreement or converted its notes into Preferred D shares.

137.    Defendants, individually and in concert, directly or indirectly made or approved the false representations in the Exchange Agreement in order to induce the Amped II to convert its shares despite knowing or deliberately disregarding that the representations were false.

138.    Defendants, as high-level officers and directors of the Company were directly involved in drafting, producing, reviewing, and/or disseminating the false statements in the Exchange Agreement and/or approved or ratified such statements in furtherance of the fraud alleged herein.

139.    Defendants, as high-level officers and directors of the Company, had actual knowledge of the falsity of the material misrepresentations in the Exchange Agreement and intended to deceive Amped II or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in those representations made by them or other Defendants to Amped II.

140.    Defendants intentionally misled Amped II in order to induce Amped II to convert its notes into equity and to conceal the Company's defaults and violations as described herein.

141.    Amped II reasonably relied on Defendants' fraudulent statements and omissions and, as a result, suffered damage including but not limited to the loss of $11,200,000 of Convertible Notes that were converted into worthless Series D stock by virtue of the Exchange Agreement.

142.    As a result, Defendants are liable to Amped II for damages in an amount to be determined at trial, but believed to be at least $12,498,889.

32

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation – All Plaintiffs Against All Defendants)

143.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

144.    Defendants were negligent when they made the misrepresentations and omissions in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement as specified above.

145.    Defendants, as high-level officers and directors of the Company were directly involved in drafting, producing, reviewing, and/or disseminating the false statements in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement and/or approved or ratified such statements in furtherance of the fraud alleged herein.

146.    The Arena Shareholders held the Company stock prior to December 2021.  As a result, Defendants, as officers and directors of the Company, owed fiduciary duties to the Arena Shareholders at all relevant times, including the duty of loyalty and duty of candor.  Defendants further knew that the funds invested with Orr were "critical to [the Company's] liquidity" and that absent access to such funds, the Company would default on its obligations to Amped I which would render the Company unable to continue as a going concern.  Defendants therefore owed a fiduciary duty to Amped I and Amped II as secured creditors.  Defendants therefore had a duty to ensure that the statements in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement were not false or misleading and Plaintiffs were entitled to rely on their fiduciaries' representations and complete, undivided loyalty.

147.    Defendants nevertheless misrepresented in the December 2021 SPA that the Company was not in default under or in violation of any indenture, loan or credit agreement and that it was not in violation or default in the performance or observation of any material obligation,

agreement, covenant or condition contained in any note when, in fact, the Company had already violated and was in default under the Non-Convertible Notes because the Company was invested in a limited partnership that was not limited to cash or cash equivalents. The statements in the December 2021 SPA were further misleading because Defendants failed to disclose that they had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds.

148. Defendants further misrepresented in the Non-Convertible Notes that the Company would not "make or suffer to exist any Investments using any proceeds from [Arena] or commitments therefor, or to become or remain a partner in any partnership or joint venture, except for (i) Investments in cash and cash equivalents." This representation was false because, in fact, the Company was already invested in a limited partnership not limited to cash or cash equivalents and, as Defendants knew, it would continue to use proceeds from Arena for such purposes moving forward. Additionally, Defendants failed to disclose that they had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds.

149. Defendants also misrepresented in the Exchange Agreement that (i) the Company was not in default or in violation of any "any indenture, loan or credit agreement or any other agreement or instrument to which it is party or by which it or any of its properties is bound"; (ii) the Company was not "in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any contract…loan or credit agreement, note, lease, or other agreement or instrument..."; (iii) "[t]here is no fact known to the Company

34

that would reasonably be expected to materially affect the Company that has not been expressly disclosed herein"; and (iv) "[a]ll of the disclosure furnished by or on behalf of the Company to the Investor in the Transaction Documents regarding, among other matters relating to the Company, its business and the transactions contemplated in the Transaction Documents, is true and correct in all material respects as of the date made and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading…"  These statements were false or misleading because the Company was in fact in violation and default under the Non-Convertible Notes and Convertible Notes and because Defendants failed to disclose that they had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds.

150.    Defendants, as high-level officers and directors of the Company were directly involved in drafting, producing, reviewing, disseminating, approving, and/or ratifying the misstatements in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement.

151.    Had Plaintiffs known that Defendants' statements were false or that Defendants had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments without oversight, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds, Plaintiffs would not have purchased the Company stock, loaned the Company money, or converted notes to the Company stock.

35

Case 24-10349-TMH   Doc 475   Filed 02/10/25   Page 162 of 270

152.     Defendants knew or should have known that Plaintiffs would rely on the representations in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement.

153.     Plaintiffs did reasonably rely on the representations in the December 2021 SPA, Non-Convertible Notes, and Exchange Agreement when they purchased nearly 2.4 million shares of Series C Convertible Preferred Stock, warrants to purchase nearly 2.4 million shares of the Company stock, and 9 million shares of common stock, loaned the Company over $13.3 million dollars, and converted nearly $12.5 million worth of Convertible Notes into the Company stock.

154.     Defendants misrepresented in its December 10, 2021 Amendment to Form S-1 Registration Statement that the Informal Agreement was an "at will" arrangement allowing KORR Acquisitions to invest in "marketable securities" limited to "20% of our assets, and of that, less than 5% in illiquid assets."   Defendants misrepresented the level of oversight over those investments stating that they had effective internal disclosure controls and procedures.   These misrepresented were repeated in multiple public disclosures.

155.     Defendants specifically reviewed and approved reporting that affirmed, in SEC filings and a press release as late as November 8, 2023, that as of September 30, 2023, the Company "held $57.2 million in cash, cash equivalents and marketable securities most of which is expected to be used for operations and debt service."   In the same press release it was announced that on November 8, 2023, the Company would host a webcast where Defendants Schweller and Denson would present on the Company's third quarter financial results.

156.     Amped I and Amped II reasonably relied on these disclosures made by the Company and approved by Defendants.   The information regarding the arrangement with KORR

36

Acquisitions and KORR Value LP and the nature of the Company's investments, including the lack of liquidity, was peculiarly within the knowledge of the Company, including Defendants.

157.    Defendants made these disclosures to its investors, in particular to Plaintiffs as the Company's largest and only secured creditor.  As a public company, the Company was required to make accurate disclosures to its investors, and yet, Defendants authorized statements that misrepresented this information.  Defendants knew or should have known that they were insolvent or on the brink of insolvency when they approved these disclosures and that Plaintiffs would rely on these disclosures.  Defendants knew or should have known that the funds that had not been returned by Orr were critical to the Company's liquidity and that without access to those funds, the Company would default on its obligations.

158.    As a result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages, including the price of the securities they were wrongly induced to purchase, the more than $13.3 million Plaintiffs loaned the Company, and the loss of the $11,200,000 of Convertible Notes that were converted into worthless Series D stock by virtue of the Exchange Agreement.

159.    Defendants are therefore liable to Plaintiffs in an amount to be established at trial, but believed to be at least $33,199,846.

### FIFTH CAUSE OF ACTION
**(Breach of Fiduciary Duty – The Arena Shareholders Against All Defendants)**

160.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.    As directors and officers of the Company, Defendants owed fiduciary duties to the Company's shareholders, including Plaintiffs.

162.    The Arena Shareholders held the Company stock prior to December 2021.  As a result, Defendants, as officers and directors of the Company, owed fiduciary duties to the Arena

37

Shareholders at all relevant times, including the duty of loyalty and duty of candor. Defendants therefore had a duty to ensure that the statements in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement were not false or misleading and Plaintiffs were entitled to rely on their fiduciaries' representations and complete, undivided loyalty.

163.   Defendants nevertheless breached their fiduciary duties by making the misrepresentations and omissions in the December 2021 SPA, Non-Convertible Notes, and Exchange Agreement.

164.   Specifically, in the December 2021 SPA Defendants misrepresented to Plaintiffs that the Company was not in default under or in violation of any indenture, loan or credit agreement and that it was not in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any note when, in fact, and as Defendants knew, the Company had already violated and was in default under the Non-Convertible Notes because the Company was invested in a limited partnership that was not limited to cash or cash equivalents. The statements in the December 2021 SPA were further misleading because Defendants failed to disclose that they had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership, leverage Company funds for his personal benefit, and cross-collateralize the Company's funds with accounts of his family and friends.

165.   Defendants further misrepresented in the Non-Convertible Notes that the Company would not "make or suffer to exist any Investments using any proceeds from [Arena] or commitments therefor, or to become or remain a partner in any partnership or joint venture, except for (i) Investments in cash and cash equivalents." This representation was false because, in fact and as Defendants knew, the Company was already invested in a limited partnership not limited

to cash or cash equivalents and, as Defendants knew, it would continue to use proceeds from Arena for such purposes moving forward. Additionally, Defendants failed to disclose that they had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds.

166. Defendants also misrepresented in the Exchange Agreement that (i) the Company was not in default or in violation of any "any indenture, loan or credit agreement or any other agreement or instrument to which it is party or by which it or any of its properties is bound"; (ii) the Company was not "in violation or default in the performance or observation of any material obligation, agreement, covenant or condition contained in any contract…loan or credit agreement, note, lease, or other agreement or instrument..."; (iii) "[t]here is no fact known to the Company that would reasonably be expected to materially affect the Company that has not been expressly disclosed herein"; and (iv) "[a]ll of the disclosure furnished by or on behalf of the Company to the Investor in the Transaction Documents regarding, among other matters relating to the Company, its business and the transactions contemplated in the Transaction Documents, is true and correct in all material respects as of the date made and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading…" These statements were false or misleading because, as Defendants knew, the Company was in violation and default under the Non-Convertible Notes and Convertible Notes and because Defendants failed to disclose that they had abandoned their duties and given Orr unfettered authority and discretion over the Company's funds and investments, allowing Orr to improperly invest in his own limited partnership and cross-collateralize the Company's funds.

167.    Defendants, as high-level officers and directors of the Company were directly involved in drafting, producing, reviewing, disseminating, approving, and/or ratifying the misstatements in the December 2021 SPA, the Non-Convertible Notes, and the Exchange Agreement.

168.    As a result of Defendants' breaches of their duties of candor and loyalty to Plaintiffs in favor of Orr and their desire to secure investments, Plaintiffs have suffered damages, including the price of the securities they were wrongly induced to purchase, the more than $13.3 million Plaintiffs loaned the Company, and the loss of the $12,498,889 of Convertible Notes that were converted into worthless Series D stock by virtue of the Exchange Agreement.

169.    Defendants are therefore liable to Plaintiffs in an amount to be established at trial, but believed to be at least $33,199,846.

## PRAYER FOR RELIEF

170.    WHEREFORE, Plaintiffs respectfully requests this Court enter judgment in its favor and order the following relief:

i.    On the first cause of action awarding compensatory damages in favor of the Arena Shareholders and against Defendants, jointly and severally, in an amount to be determined at trial but believed to be in the amount of at least $6,666,666, plus pre-and post-judgment interest thereon;

ii.    On the second cause of action awarding compensatory damages in favor of Amped I and against Defendants, jointly and severally, in an amount to be determined at trial but believed to be in the amount of at least $13,333,180, plus pre-and post-judgment interest thereon;

   iii. On the third cause of action awarding compensatory damages in favor of Amped II and against Defendants, jointly and severally, in an amount to be determined at trial but believed to be in the amount of at least $11,200,000, plus pre-and post-judgment interest thereon;

   iv. On the fourth cause of action awarding compensatory damages in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial but believed to be in the amount of at least $33,199,846, plus pre-and post-judgment interest thereon;

   v. On the fifth cause of action awarding compensatory damages in favor of the Arena Shareholders and against Defendants, jointly and severally, in an amount to be determined at trial but believed to be in the amount of at least $33,199,846, plus pre-and post-judgment interest thereon; and

   vi. Awarding any such further relief this Court deems just and proper.

This the 26th day of June, 2024

       By: *s/ Laura J. Garr*
         Laura J. Garr
         Susan L. Grace
         Sally Kagay
         Paula Kates

         WHITE & CASE LLP
         1221 Avenue of the Americas
         New York, New York 10020
         (212) 819-8849
         laura.garr@whitecase.com

         *Counsel for Plaintiffs*

41

DocuSign Envelope ID: 71E25-D9e-4573-8B62-958DF91F1FE5     Case 24-10349-TMH    Doc 475    Filed 02/10/25    Page 168 of 270

## **VERIFICATION**

STATE OF NEW YORK     )

                         : SS.:

COUNTY OF NEW YORK   )

Lawrence Cutler, being duly sworn, deposes and says:

       I am an authorized representative of the Plaintiffs in the instant action.  I have read the foregoing Complaint and its factual contents are true to my personal knowledge, except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

       I affirm this 25th day of June, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

DocuSigned by:

*Lawrence Cutler*

D6D05B3BF2A04FD...

By: Lawrence Cutler

**Exhibit 3**

**Charge Enterprises, Inc. Form 10-Q Filed November 8, 2025**

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2023**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from_____to_____**

**Commission file number: 333-253073**

# CHARGE ENTERPRISES, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 90-0471969 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 125 Park Avenue, 25th Floor New York, NY | 10017 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(212) 921-2100**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Ticker symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $.0001 per share | CRGE | Nasdaq Global Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☒ |
|---|---|---|---|

Non-accelerated filer ☐                Smaller reporting company ☒
                                       Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

As of October 31, 2023, a total of 215,039,868 shares of common stock, par value $0.0001 per share, were issued and outstanding.

Table of Contents

**CHARGE ENTERPRISES, INC.**
**TABLE OF CONTENTS**

**Part I – Financial Information**                                                                                           **Page**

Item 1 **Financial Statements**                                                                                              4

Item 2 **Management's Discussion and Analysis of Financial Condition and Results of Operations**                            37

Item 3 **Quantitative and Qualitative Disclosures About Market Risk**                                                        45

Item 4 **Controls and Procedures**                                                                                           46

**Part II – Other Information**

Item 1 **Legal Proceedings**                                                                                                 48

Item 1A **Risk Factors**                                                                                                     48

Item 2 **Unregistered Sales of Equity Securities, Use of Proceeds, and Issuer Purchases of Equity Securities**              50

Item 3 **Defaults Upon Senior Securities**                                                                                   50

Item 4 **Mine Safety Disclosures**                                                                                           50

Item 5 **Other Information**                                                                                                  50

Item 6 **Exhibits**                                                                                                           51

**Signatures**                                                                                                               53

2

Table of Contents

**Special Note Regarding Forward-Looking Statements**

*You should read this Quarterly Report on Form 10-Q, our Current Report on Form 8-K filed May 10, 2023 (our "May 10, 2023 Form 8-K") and our Annual Report on Form 10-K for the year ending December 31, 2022 (our "2022 Form 10-K") completely and with the understanding that our actual future results, levels of activity, performance and achievements may be different from what we expect and that these differences may be material. We qualify all of our forward-looking statements by these cautionary statements.*

*Certain statements contained in this Form 10-Q, which reflect our current views with respect to future events and financial performance, and any other statements of a future or forward-looking nature, constitute "forward-looking statements" for the purpose of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management's expectations, hopes, beliefs, intentions, or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "will," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. These statements relate to future events, our future operational or financial performance or future liquidity, and involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance, or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Factors that may cause actual results to differ materially from current expectations include, among other things, include the ability to achieve the expected benefits of the Greenspeed acquisition, including the risks that the Company's synergy estimates are inaccurate or that the Company faces higher than anticipated integration or other costs in connection with the acquisition, the business plans and strategies of Charge, Charge's ability to satisfy its debt payment obligations or extend the maturity or refinance outstanding debt at or prior to maturity, Charge's future business development, market acceptance of electric vehicles and continued auto maker investment in electric vehicles, the success of Charge's retail dealership initiative and the size, scope and success of the related initial installation projects, Charge's ability to generate profits and positive cash flow, changes in government regulations and government incentives, subsidies, or other favorable government policies, rising interest rates, macroeconomic and geopolitical conditions, and the ongoing automotive industry labor dispute and the impact on investments by our customers, as well as those listed under the section titled "Risk Factors". Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements.*

*Any forward-looking statement in this Form 10-Q reflects our current view with respect to future events and is subject to these and other risks, uncertainties and assumptions relating to our business, results of operations, industry, and future growth. Given these uncertainties, you should not place undue reliance on these forward-looking statements. No forward-looking statement is a guarantee of future performance. You should read this Form 10-Q in conjunction with our May 10, 2023 Form 8-K, our 2022 Form 10-K, and the documents that we reference herein and therein and have filed as exhibits hereto and thereto completely and with the understanding that our actual future results may be materially different from any future results expressed or implied by these forward-looking statements. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.*

*This Quarterly Report on Form 10-Q also contains or may contain estimates, projections and other information concerning our industry, our business, and the markets for our products, including data regarding the estimated size of those markets and their projected growth rates. We obtained the industry and market data in this report from our own research as well as from industry and general publications, surveys and studies conducted by third parties. This data involves a number of assumptions and limitations and contains projections and estimates of the future performance of the industries in which we operate that are subject to a high degree of uncertainty, including those discussed in "Risk Factors." We caution you not to give undue weight to such projections, assumptions, and estimates. Further, industry and general publications, studies and surveys generally state that they have been obtained from sources believed to be reliable, although they do not guarantee the accuracy or completeness of such information. While we believe that these publications, studies, and surveys are reliable, we have not independently verified the data contained in them. In addition, while we believe that the results and estimates from our internal research are reliable, such results and estimates have not been verified by any independent source.*

*In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this report, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely upon these statements as predictions of future*

*results. Our actual future results may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.*

3

Table of Contents

# PART I
# FINANCIAL INFORMATION

## Item 1. Financial Statements

**Charge Enterprises, Inc.**
**Consolidated Balance Sheets**
*(Unaudited)*

| *In thousands, except share and per share data* | | September 30, 2023 | | December 31, 2022 (As Adjusted) |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 51,359 | $ | 26,837 |
| Restricted cash | | 886 | | 886 |
| Accounts receivable net of allowances of $68 in 2023 and $322 in 2022 | | 55,768 | | 72,405 |
| Inventory | | 317 | | 111 |
| Deposits, prepaids and other current assets | | 3,430 | | 3,187 |
| Investments in marketable securities | | 5,868 | | 6,757 |
| Investments in non-marketable securities | | 279 | | 236 |
| Contract assets | | 8,128 | | 6,090 |
| Total current assets | | 126,035 | | 116,509 |
| | | | | |
| Property, plant and equipment, net | | 485 | | 732 |
| Finance lease right-of-use assets | | 888 | | 341 |
| Operating lease right-of-use assets | | 3,123 | | 4,028 |
| Non-current assets | | 248 | | 240 |
| Goodwill | | 25,906 | | 12,672 |
| Intangible assets, net | | 30,832 | | 33,932 |
| **Total Assets** | | 187,517 | | 168,454 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 73,105 | $ | 61,644 |
| Accrued liabilities | | 7,922 | | 11,121 |
| Contract liabilities | | 25,201 | | 13,741 |
| Derivative liability | | 2 | | 6,521 |
| Finance lease liabilities | | 242 | | 112 |
| Operating lease liabilities | | 1,183 | | 1,579 |
| Current portion of long-term debt | | 27,126 | | 29,180 |
| Total current liabilities | | 134,781 | | 123,898 |
| | | | | |
| Non-current liabilities | | | | |
| Finance lease liabilities, non-current | | 530 | | 146 |
| Operating lease liabilities, non-current | | 1,808 | | 2,199 |
| Contingent consideration liability | | 5,758 | | - |
| Net deferred tax liability | | 1,072 | | 1,410 |
| **Total Liabilities** | | 143,949 | | 127,653 |
| | | | | |
| **Mezzanine Equity** | | | | |
| Series C preferred stock (6,226,370 shares issued and outstanding at September 30, 2023, and December 31, 2022) | | 19,458 | | 16,572 |
| Total Mezzanine Equity | | 19,458 | | 16,572 |
| | | | | |
| Commitments, contingencies and concentration risk | | | | |
| | | | | |
| **Stockholders' Equity** | | | | |

| | | |
|---|---:|---:|
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized; | | |
|   Series D: 1,177,023 shares issued and outstanding at September 30, 2023, and December 31, 2022 | - | - |
|   Series E: 3,200,000 shares issued and outstanding at September 30, 2023, and 0 shares outstanding at December 31, 2022 | - | - |
| Common stock, $0.0001 par value; 750,000,000 shares authorized, 215,039,868 and 206,844,580 issued and outstanding at September 30, 2023 and December 31, 2022, respectively | 21 | 20 |
| Additional paid in capital | 208,564 | 179,723 |
| Accumulated deficit | (184,475) | (155,514) |
| **Total Stockholders' Equity** | 24,110 | 24,229 |
| **Total Liabilities and Stockholders' Equity** | $ 187,517 | $ 168,454 |

The accompanying notes are an integral part of these consolidated financial statements.

4

Table of Contents

**Charge Enterprises, Inc.**
**Consolidated Statement of Operations**
*(Unaudited)*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| *In thousands, except per share data* | **2023** | **2022 (As Adjusted)** | **2023** | **2022 (As Adjusted)** |
| **Revenues** | $ 132,277 | $ 185,857 | $ 473,412 | $ 529,876 |
| **Cost of sales** | 123,255 | 179,760 | 450,353 | 512,143 |
| **Gross profit** | 9,022 | 6,097 | 23,059 | 17,733 |
| | | | | |
| **Operating expenses** | | | | |
| General and administrative | 4,315 | 5,141 | 14,854 | 17,200 |
| Salaries and related benefits | 8,890 | 7,850 | 27,173 | 23,597 |
| Professional fees | 1,006 | 666 | 1,918 | 2,578 |
| Depreciation and amortization expense | 1,172 | 433 | 3,574 | 1,745 |
| Total operating expenses | 15,383 | 14,090 | 47,519 | 45,120 |
| | | | | |
| **(Loss) from operations** | (6,361) | (7,993) | (24,460) | (27,387) |
| | | | | |
| **Other income (expenses):** | | | | |
| Income (loss) from investments, net | 675 | (200) | 1,637 | (1,343) |
| Change in fair value of derivative liabilities | 57 | 28,669 | 1,713 | 28,669 |
| Interest expense | (1,489) | (1,015) | (4,515) | (9,939) |
| Loss on impairment | (56) | - | (114) | - |
| Other income (expense), net | 848 | (3,289) | 1,876 | (2,255) |
| Foreign exchange gain (loss) | 116 | 1 | (53) | (86) |
| Total other income (expenses), net | 151 | 24,166 | 544 | 15,046 |
| | | | | |
| Income (loss) before income taxes | (6,210) | 16,173 | (23,916) | (12,341) |
| | | | | |
| Income tax (expense) benefit | (741) | 8 | (1,093) | 1,336 |
| | | | | |
| **Net income (loss)** | $ (6,951) | $ 16,181 | $ (25,009) | $ (11,005) |
| Less: Deemed dividend | (2,885) | - | (2,885) | (36,697) |
| Less: Preferred dividends | (362) | (302) | (1,086) | (922) |
| Net income (loss) available to common stockholders | $ (10,198) | $ 15,879 | $ (28,980) | $ (48,624) |
| | | | | |
| Basic income (loss) per share available to common stockholders | $ (0.05) | $ 0.07 | $ (0.14) | $ (0.25) |
| Diluted income (loss) per share available to common stockholders | $ (0.05) | $ 0.06 | $ (0.14) | $ (0.25) |
| | | | | |
| Weighted average number of shares outstanding, basic | 214,273 | 206,225 | 211,423 | 196,126 |
| Weighted average number of shares outstanding, diluted | 214,273 | 231,388 | 211,423 | 196,126 |

The accompanying notes are an integral part of these consolidated financial statements.

5

Table of Contents

**Charge Enterprises, Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**
***(Unaudited)***

| In thousands | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2023** | **2022 (As Adjusted)** | **2023** | **2022 (As Adjusted)** |
| **Net income (loss)** | $ (6,951) | $ 16,181 | $ (25,009) | $ (11,005) |
| Other comprehensive income (loss), net of tax | | | | |
| Components of comprehensive income (loss) | - | - | - | - |
| Other comprehensive income (loss), net of tax | - | - | - | - |
| **Comprehensive income (loss)** | $ (6,951) | $ 16,181 | $ (25,009) | $ (11,005) |

The accompanying notes are an integral part of these consolidated financial statements.

6

Table of Contents

**Charge Enterprises, Inc.**
**Consolidated Statements of Stockholders' Equity**
*(Unaudited)*

| *In thousands, except share data* | Preferred Stock | | Common Stock | | Common Stock to be Issued | | Additional Paid-In Capital (As Adjusted) | Accumulated Other Comprehensive Income | Accumulated Deficit (As Adjusted) | Total (As Adjusted) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2021 (As Adjusted)** | 2,370,370 | $ - | 184,266,934 | $ 18 | 6,587,897 | $ 1 | $ 117,727 | $ (32) | $ (103,366) | $ 14,348 |
| Modified retrospective application of stock-based compensation accounting as of January 1, 2022 | - | - | - | - | - | - | (3,320) | - | 3,115 | (205) |
| Stock-based compensation expense | - | - | - | - | - | - | 10,744 | - | - | 10,744 |
| Declaration of preferred dividends | - | - | - | - | - | - | - | - | (267) | (267) |
| Series C preferred stock | 3,856,000 | - | - | - | - | - | 12,050 | - | - | 12,050 |
| Beneficial conversion feature arising from preferred stock | - | - | - | - | - | - | 2,651 | - | - | 2,651 |
| Deemed dividend in connection with Series C preferred stock | - | - | - | - | - | - | - | - | (3,856) | (3,856) |
| Common stock issued for acquisition | - | - | 5,201,863 | 1 | - | - | 17,530 | - | - | 17,531 |
| Conversion of debt into common stock | - | - | 319,950 | - | - | - | 80 | - | - | 80 |
| Net loss | - | - | - | - | - | - | - | - | (13,141) | (13,141) |
| **Balance, March 31, 2022 (As Adjusted)** | 6,226,370 | $ - | 189,788,747 | $ 19 | 6,587,897 | $ 1 | $ 157,462 | $ (32) | $ (117,515) | $ 39,935 |
| Stock-based compensation expense | - | - | - | - | - | - | 9,343 | - | - | 9,343 |
| Declaration of preferred dividends | - | - | - | - | - | - | - | - | (353) | (353) |
| Series D preferred stock | 1,177,023 | - | - | - | - | - | 12,499 | - | - | 12,499 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Common stock issued for private placement | - | - | 1,428,575 | - | - | - | 4,696 | - | - | 4,696 |
| Issuance of warrants for private placement | - | - | - | - | - | - | 5,304 | - | - | 5,304 |
| Issuance of shares committed in prior period | - | - | 1,862,146 | - | (1,862,146) | - | - | - | - | - |
| Settlement of holdback shares for acquisition | - | - | 4,725,748 | - | (4,725,748) | (1) | - | - | - | (1) |
| Exercise of warrants | - | - | 5,973,515 | 1 | - | - | 1,072 | - | - | 1,073 |
| Exercise of stock options | - | - | 10,000 | - | - | - | 20 | - | - | 20 |
| Vesting of restricted stock units | - | - | 138,327 | - | - | - | - | - | - | - |
| Conversion of Series B Preferred into common stock | - | - | 2,155,594 | - | - | - | 6,165 | - | - | 6,165 |
| Classification of Preferred C to Mezzanine Equity | (6,226,370) | - | - | - | - | - | (18,940) | - | 6,256 | (12,684) |
| Deemed dividend in connection with reclass of warrants to Derivative liability | - | - | - | - | - | - | (7,601) | - | (32,841) | (40,442) |
| Other | - | - | - | - | (3) | - | - | - | - | - |
| Net loss | - | - | - | - | - | - | - | - | (19,642) | (19,642) |
| Modified retrospective application of stock-based compensation accounting | - | - | - | - | - | - | (2,538) | - | 2,482 | (56) |
| **Balance, June 30, 2022 (As Adjusted)** | 1,177,023 | $ - | 206,082,652 | $ 20 | - | $ - | $ 167,482 | $ (32) | $ (161,613) | $ 5,857 |
| Stock-based compensation expense | - | - | - | - | - | - | 7,825 | - | - | 7,825 |
| Restricted stock units expense | - | - | - | - | - | - | 23 | - | - | 23 |
| Exercise of warrants | - | - | 137,803 | - | - | - | 50 | - | - | 50 |
| Exercise of stock options | - | - | 261,959 | - | - | - | 144 | - | - | 144 |
| Declaration of dividends | - | - | - | - | - | - | - | - | (302) | (302) |
| Other | - | - | - | - | - | - | - | - | (58) | (58) |
| Net income (loss) | - | - | - | - | - | - | - | 32 | 14,375 | 14,407 |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Modified retrospective application of stock-based compensation accounting | | - | | - | | - | | - | | - | | - | (1,981) | | - | 1,806 | | (175) |
| **Balance, September 30, 2022 (As Adjusted)** | 1,177,023 | $ | - | 206,482,414 | $ | 20 | | - | $ | - | $ | 173,543 | $ | - | (145,792) | $ | 27,771 |

The accompanying notes are an integral part of these consolidated financial statements.

7

Table of Contents

**Charge Enterprises, Inc.**
**Consolidated Statements of Stockholders' Equity**
*(Unaudited)*

| In thousands, except share data | Preferred Stock Shares | Amount | Common Stock Shares | Amount | Common Stock to be Issued Shares | Amount | Additional Paid-In Capital | Accumulated Other Comprehensive Income | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2022 (As Adjusted)** | 1,177,023 | $ - | 206,844,580 | $ 20 | - | $ - | $ 179,723 | $ - | $ (155,514) | $24,229 |
| Stock-based compensation expense | - | - | (444) | - | - | - | 5,902 | - | - | 5,902 |
| Declaration of preferred dividends | - | - | - | - | - | - | - | - | (362) | (362) |
| Exercise of warrants | 3,200,000 | - | 4,400,000 | 1 | - | - | 3,799 | - | - | 3,800 |
| Derivative liability impact to exercise of warrants | - | - | - | - | - | - | 4,806 | - | - | 4,806 |
| Exercise of stock options | - | - | 75,000 | - | - | - | 43 | - | - | 43 |
| Common stock issued for acquisition | - | - | 1,530,145 | - | - | - | 2,752 | - | - | 2,752 |
| Net loss | - | - | - | - | - | - | - | - | (9,212) | (9,212) |
| **Balance, March 31, 2023** | 4,377,023 | $ - | 212,849,281 | $ 21 | - | $ - | $ 197,025 | $ - | $ (165,088) | $31,958 |
| Stock-based compensation expense | - | - | 50,000 | - | - | - | 4,964 | - | - | 4,964 |
| Declaration of preferred dividends | - | - | - | - | - | - | - | - | (362) | (362) |
| Other | - | - | - | - | - | - | - | - | 19 | 19 |
| Net loss | - | - | - | - | - | - | - | - | (8,846) | (8,846) |
| **Balance, June 30, 2023** | 4,377,023 | $ - | 212,899,281 | $ 21 | - | $ - | $ 201,989 | $ - | $ (174,277) | $27,733 |
| Stock-based compensation expense | - | - | - | - | - | - | 4,583 | - | - | 4,583 |
| Restricted stock units vesting | - | - | 55,323 | - | - | - | (8) | - | - | (8) |
| Declaration of preferred dividends | - | - | - | - | - | - | - | - | (362) | (362) |
| Series C preferred deemed dividend | - | - | - | - | - | - | - | - | (2,885) | (2,885) |
| Common stock issued for acquisition | - | - | 2,085,264 | - | - | - | 2,000 | - | - | 2,000 |
| Net loss | - | - | - | - | - | - | - | - | (6,951) | (6,951) |
| **Balance, September 30, 2023** | 4,377,023 | $ - | 215,039,868 | $ 21 | - | $ - | $ 208,564 | $ - | $ (184,475) | $24,110 |

The accompanying notes are an integral part of these consolidated financial statements.

8

Table of Contents

**Charge Enterprises, Inc.**
**Consolidated Statement of Cash Flows**
*(Unaudited)*

|  | Nine Months Ended September 30, | |
|---|---|---|
| *In thousands* | 2023 | 2022 (As Adjusted) |
| **Cash flows from Operating Activities:** | | |
| Net loss | $ (25,009) | $ (11,005) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Amortization | 3,100 | 1,060 |
| Depreciation | 474 | 685 |
| Stock-based compensation | 15,449 | 20,514 |
| Change in fair value of derivative liabilities | (1,713) | (28,669) |
| Amortization of debt discount | 2,970 | 7,938 |
| Loss on foreign currency exchange | 53 | 86 |
| Loss on impairment | 114 | - |
| Net loss (gain) from investments | (1,637) | 1,343 |
| Other expense, net | (1,308) | 2,287 |
| Change in deferred income taxes | (316) | (1,338) |
| Changes in working capital requirements: | | |
| Accounts receivable | 17,934 | (1,900) |
| Inventory | (1) | (73) |
| Deposits, prepaids and other current assets | (1,007) | (1,761) |
| Other assets / liabilities | 195 | (43) |
| Contract assets | (1,294) | (3,041) |
| Accounts payable | 11,277 | 10,148 |
| Other current liabilities | 229 | (1,196) |
| Contract liabilities | 7,719 | 2,048 |
| Net cash provided by (used in) operating activities | 27,229 | (2,917) |
| **Cash flows from Investing Activities:** | | |
| Acquisition of property, plant and equipment | (143) | (205) |
| Sale of intellectual property | 1,308 | 179 |
| Purchase of marketable securities | (27,766) | (45,430) |
| Sale of marketable securities | 30,210 | 47,429 |
| Acquisition of ANS | - | (363) |
| Acquisition of EV Depot | 1 | (1,231) |
| Acquisition of Greenspeed | (5,289) | - |
| Cash acquired in acquisitions | 1,845 | 105 |
| Net cash provided by investing activities | 166 | 484 |
| **Cash flows from Financing Activities:** | | |
| Proceeds from sale of common stock | - | 10,000 |
| Proceeds from sale of Series C preferred stock | - | 10,845 |
| Proceeds from sale of Series E preferred stock | 1,600 | - |
| Proceeds from exercise of warrants | 2,200 | 1,122 |
| Proceeds from exercise of stock options | 41 | 164 |
| Draws from revolving line of credit | 4,717 | 18,802 |
| Payments on revolving line of credit | (9,741) | (18,548) |
| Tax withholding payments for vested stock-based compensation | (9) | (418) |
| Payment on financing lease | (252) | (78) |
| Payment of dividends on preferred stock | (1,086) | (818) |
| Redemption of Series B preferred stock | - | (685) |

| | | | | |
|---|---|---|---|---|
| Net cash (used in) provided by financing activities | | (2,530) | | 20,386 |
| | | | | |
| Effect of foreign exchange rate changes on cash, cash equivalents and restricted cash | | (343) | | 45 |
| | | | | |
| **Net Increase in Cash and Cash Equivalents** | | 24,522 | | 17,998 |
| **Cash, Cash Equivalents, and Restricted Cash, Beginning of Period** | | 27,723 | | 18,238 |
| **Cash, Cash Equivalents, and Restricted Cash, End of Period** | $ | 52,245 | $ | 36,236 |
| | | | | |
| Cash paid for interest expense | $ | 1,454 | $ | 2,138 |
| Cash paid for income taxes | $ | 1,538 | $ | 485 |
| Non-cash investing and financing activities: | | | | |
| Issuance of common stock for acquisition | $ | 2,000 | $ | 17,530 |

The accompanying notes are an integral part of these consolidated financial statements.

9

[Table of Contents](#)

**CHARGE ENTERPRISES, INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of operations**

Charge Enterprises, Inc. (the "Company"), (formerly known as "Transworld Holdings, Inc.", "GoIP Global, Inc." and "E Education Network, Inc.") was incorporated in Nevada in 2003. The Company was subsequently redomiciled in Delaware.

The Company is an electrical, broadband and electric vehicle ("EV") charging infrastructure company that provides clients with end-to-end project management services, from advising, designing, engineering, acquiring and installing equipment, to monitoring, servicing, and maintenance. The Company's vision is to be a leader in enabling the next wave of transportation and connectivity. By building, designing, and operating seamless infrastructure for charging EVs and high-speed broadband, the Company aims to create a future where transportation is safe, reliable, clean, efficient, and connected.

The Company has two operating segments which also represent the Company's reportable segments:

- Infrastructure, which has a primary focus on EV charging ("EVC"), broadband, including cell tower, small cell, and in-building applications, and electrical contracting services.
- Telecommunications, which provides connection of voice calls, Short Message Services ("SMS"), and data to global carriers.

**Note 2. Summary of significant accounting policies**

Basis of Presentation

The interim unaudited consolidated financial statements included herein have been prepared by the Company in accordance with: (i) generally accepted accounting principles in the United States ("U.S. GAAP") for interim financial information; and (ii) the instructions of the Securities and Exchange Commission (the "SEC") for Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by U.S. GAAP for annual financial statements. In the opinion of management, the consolidated financial statements reflect all adjustments considered necessary for a fair statement of the results of operations and financial position for the interim periods presented. All such adjustments are of a normal and recurring nature. The Company's results shown on an interim basis are not necessarily indicative of results for a full year.

This Form 10-Q should be read in conjunction with the current report on Form 8-K filed with the SEC on May 10, 2023 (the "May 10, 2023 Form 8-K") and the consolidated financial statements and related notes included in the Company's audited consolidated financial statements as of and for the year ended December 31, 2022, and filed with the SEC on March 15, 2023, as part of the Company's Annual Report on Form 10-K (the "2022 Annual Report"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted pursuant to such rules and regulations.

There have been no material changes from Note 2, Summary of significant accounting policies, as described in the notes to the Company's consolidated financial statements contained in the May 10, 2023 Form 8-K and the 2022 Annual Report, other than as noted below.

The Company is an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and the Company has and intends to continue to take advantage of certain exemptions from various reporting requirements.

10

Table of Contents

Principles of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation. The consolidated financial statements and related disclosures, presented in U.S. dollars, have been prepared in accordance with U.S. GAAP and pursuant to the rules and regulations of the SEC. The results and trends in these consolidated financial statements may not be representative for any future periods or the full year.

Revenue

Nature of Services

*Infrastructure*

The Company's Infrastructure segment revenues are derived from: (i) broadband and wireless; (ii) electrical contracting services; (iii) electric vehicle charging infrastructure; and (iv) fleet services.

Broadband and wireless, electrical contracting, and electric vehicle charging infrastructure primarily involve design, engineering and construction services. Types of services typically include providing: (i) end-to-end network design and implementation services for telecommunication and wireless carriers, cable companies and enterprise organizations; (ii) cell tower construction and modification services for national and regional wireless service providers, tower owners, and federal, state, and local government agencies; (iii) cellular distributed antenna systems ("DAS") and bi-directional antenna ("BDA") public safety systems from initial Radio Frequency ("RF") site assessment, through design, engineering, implementation, and testing; (iv) DAS maintenance and monitoring service, including an in-house 24 hour network operations center, utilizing Software-as-a-Service cloud-based software and customized maintenance program; (v) scalable and energy-efficient mission critical power systems to meet the demand of data equipment deployment for mission critical data centers; (vi) electrical and telecommunications construction and facilities services to commercial, industrial, and institutional facilities; and (vii) end-to-end solutions for safe, reliable, flexible and scalable charging ecosystems.

Projects can be performed under individual contracts or a statement of work under a master service agreement, which are generally multi-year agreements. The typical length of projects can vary and depends on size and complexity: broadband and wireless – two to three months; electrical contracting services – six months to three years; electric vehicle charging infrastructure – three to twelve months.

The types of services for fleet services primarily involve leasing and maintenance of real property to commercial and fleet operator customers in return for payment. Lease agreements include fixed payments and vary in length from 12 months to 3 years.

*Telecommunications*

The Company's Telecommunications segment revenues are derived from operating a global telecommunication network consisting of domestic switching and related peripheral equipment, carrier-grade routers, and switches for internet and circuit-based services. Types of services typically include providing: (i) routing of voice, data, and SMS to Carriers and Mobile Network Operators ("MNO") globally; and (ii) customers with internet-protocol-based and time-division multiplexing ("TDM") access for the transport of long-distance voice and data minutes.

The Company's Telecommunications segment operates an extensive network of direct routes and offers premium voice communication services for carrying a mix of business, residential and carrier long-distance traffic, data and transit traffic. Telecommunications has both a customer and vendor relationship with most parties. Telecommunications provides the customer routing services through the Telecommunications supplier routes on incoming calls and then Telecommunications purchases routing services from other vendor's supplier routes in order to complete the call.

11

Table of Contents

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those services. The Company applies the following five-step model in order to determine this amount: (i) identification of the promised services in the contract; (ii) determination of whether the promised services are performance obligations, including whether they are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when (or as) the Company satisfies each performance obligation. The Company's primary revenue stream is from services. The Company recognizes as revenues the amount of the transaction price for the performance obligation when the performance obligation is satisfied or as it is satisfied.

The Company recognizes revenue when it satisfies a performance obligation by transferring control over a product or service to a customer, in an amount that reflects the consideration it expects to be entitled to in exchange for those products or services. The Company evaluates when it is appropriate to recognize revenues based on the gross amount invoiced to the customer or the net amount retained by the Company if a third party is involved.

A contract liability for deferred revenue is recorded when consideration is received or is unconditionally due from a customer prior to transferring control of goods or services to the customer under the terms of a contract. Deferred revenue balances typically result from advance payments received from customers for contracts or from billings in excess of revenue recognized on services arrangements.

Contract assets represent when revenues are recognized in advance of invoice issuance. These assets are presented separately on the consolidated balance sheet and are converted to accounts receivable once the Company's right to the consideration becomes unconditional, which varies by contract but is generally based on achieving certain acceptance milestones. The Company recognizes the incremental costs of obtaining a contract as an expense when incurred if the amortization period of the asset would be one year or less.

*Infrastructure*

Broadband and wireless, electrical contracting services, and electric vehicle charging projects often require significant services to integrate complex activities and equipment into a single deliverable and are therefore generally accounted for as a single performance obligation, even when delivering multiple services that are capable of being distinct. Contract amendments and change orders, which are generally not distinct from the existing contract, are typically accounted for as a modification of the existing contract and performance obligation.

The Company recognizes revenues from these services over time using an input method, based on assessment of performance completed to date. The Company uses the percentage of completion method when it measures its progress towards completion of the performance obligation based on the ratio of costs incurred to date to total estimated costs at completion under the contract. The Company believes that this approach faithfully depicts the Company's performance toward complete satisfaction of the performance obligation as it accurately measures the transfer of control of the finished product to the customer.

Due to the nature of the Company's performance obligations, the estimation of total revenue and cost at completion is complex, subject to many variables and requires significant judgment. Management must make assumptions and estimates regarding labor productivity and availability, the complexity of the work to be performed, the cost and availability of materials, the performance of subcontracts, and the availability and timing of funding from the customer, among other variables. As a significant change in one or more of these estimates could affect the profitability of contracts, the Company updates contract-related estimates regularly through a review process in which management evaluates the progress and execution of each performance obligation and the estimated cost at completion. As part of this process, management reviews information including, but not limited to, any outstanding key contract matter, progress towards completion and the related program schedule and the related changes in estimates of revenues and costs. The Company recognizes adjustments in estimated profit on contracts on a cumulative catch-up basis. Therefore, the impact of the adjustment on profit recorded to date is recognized in the period the adjustment is identified. Revenue and profit in future periods of contract performance is recognized using the adjusted estimate. If at any time the estimate of contract profitability indicates an anticipated loss on the contract, the Company recognizes a provision for the entire loss in the period it is identified.

12

Table of Contents

The nature of the Company's contracts gives rise to several types of variable consideration, including claims and unpriced change orders. The Company includes variable consideration in the estimated transaction price when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur. The Company estimates the amount of variable consideration to be included in the transaction price, using the expected value or the most likely amount method, which is expected to better predict the amount. The Company's estimates of variable consideration and determination of whether to include estimated amounts in the transaction price are based largely on assessments of legal enforceability, performance, and all information that is reasonably available to the Company.

Fleet services include a single deliverable of leased parking spaces. The Company recognizes revenues from these services evenly over the life of the contracts.

*Telecommunications*

The amount of consideration the Company receives and revenue it recognizes is fixed based upon contractually agreed upon rates. The Company recognizes revenue at a point in time when the voice, data and SMS are routed, and the performance obligation is satisfied.

Revenue is earned based on the number of minutes during a call multiplied by the price per minute and is recorded upon completion of a call. Incomplete calls are not revenues earned by Telecommunications and may occur as a result of technical issues or because the customer's credit limit was exceeded and thus the customer routing of traffic was prevented. Telecommunications evaluates gross versus net revenue recognition for each of its contractual arrangements by assessing indicators of control to determine whether Telecommunications acts as a principal (i.e., gross recognition) or an agent (i.e., net recognition). Telecommunications has determined that it acts as a principal for all of its performance obligations as Telecommunications may accept or reject calls, determines the routing decision and routing vendor and has the risk of financial loss on revenues from customers and amounts owed to the vendors. Net revenue represents gross revenue, net of allowance for doubtful accounts receivable, service credits and service adjustments. Cost of sales includes network costs that consist of access, transport and termination costs. The majority of Telecommunications' cost of sales is variable, primarily based upon minutes of use, with transmission and termination costs being the most significant expense.

Refer to Note 4, Revenue, for additional information on the Company's revenue.

Cost of Sales

Cost of sales consists primarily of network telecommunication costs, contracted services, salaries and related employee benefits, including stock-based compensation, material and equipment costs, travel and other costs related to vehicles, training and lease expense.

Recent Accounting Pronouncements

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-13, *Credit Losses - Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). ASU 2016-13 requires entities to use a forward-looking approach based on current expected credit losses ("CECL") to estimate credit losses on certain types of financial instruments, including trade receivables. This may result in the earlier recognition of allowances for losses. The Company implemented ASU 2016-13 on January 1, 2023. The impact of adopting this new guidance was not material.

In October 2021, the FASB issued ASU No. 2021-08, *Business Combinations - Accounting for Contract Assets and Contract Liabilities from Contracts with Customers* ("ASU 2021-08"). ASU 2021-08 is designed to enhance comparability for both the recognition and measurement of acquired revenue contracts with customers at the date of and after a business combination. ASU 2021-08 was effective for the Company beginning January 1, 2023, under a prospective application. ASU 2021-08 requires the Company to measure contract assets and contract liabilities acquired in a business combination at the acquisition date in accordance with Accounting Standards Codification ("ASC") Topic 606 as if the Company had originated the contracts. The Company recorded contract assets and contract liabilities acquired in an acquisition in the current year at their respective acquisition date fair values as if it had originated the contracts. Refer to Note 6, Business combination, for additional information.

Table of Contents

In August 2020, the FASB issued ASU No. 2020-06, *Debt-Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging-Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06"). ASU 2020-06 will simplify the accounting for convertible instruments by reducing the number of accounting models for convertible debt instruments and convertible preferred stock. Limiting the accounting models will result in fewer embedded conversion features being separately recognized from the host contract as compared with current U.S. GAAP. Convertible instruments that continue to be subject to separation models are (1) those with embedded conversion features that are not clearly and closely related to the host contract, that meet the definition of a derivative, and that do not qualify for a scope exception from derivative accounting and (2) convertible debt instruments issued with substantial premiums for which the premiums are recorded as paid-in capital. ASU 2020-06 also amends the guidance for the derivatives scope exception for contracts in an entity's own equity to reduce form-over-substance-based accounting conclusions. ASU 2020-06 will be effective for the Company as of January 1, 2024. Early adoption is permitted. Management is currently evaluating the effect of the adoption of ASU 2020-06 on the consolidated financial statements, but currently does not believe ASU 2020-06 will have a significant impact on the Company's financial statements because it no longer has convertible debt outstanding. The Company will continue to monitor relevant accounting pronouncements.

<u>Reclassification</u>

Certain amounts included in the prior year financial statements and disclosures have been reclassified to conform to the current year presentation. These reclassifications did not have a material impact on the Company's previously reported financial statements.

*Change in Accounting Principle*

Effective January 1, 2023, the Company changed its accounting principle for recognizing stock-based compensation expense from the graded vesting attribution method, where an award is divided into vesting increments or tranches, to the straight-line attribution method of accounting. The Company believes the straight-line attribution method more accurately reflects how awards are earned over its employees' service periods. Also, it is the predominant method used in its industry, and therefore it better aligns the Company's recognition of stock-based compensation expense with its peers.

The retrospective application of the change in accounting principle had an effect on the consolidated balance sheets, consolidated statements of operations, consolidated statements of comprehensive income (loss) and consolidated statements of stockholders' equity. There was no net effect to the amounts reported for net cash provided by (used in) operating, investing or financing activities in the consolidated statements of cash flows for prior periods as a result of the change in accounting method. However, the net loss, change in deferred income taxes and stock-based compensation line items within net cash flows provided by operating activities each decreased as shown below to reflect the change in accounting method.

14

Table of Contents

The following tables present the comparative effect of the change in accounting principle and its effect on the Company's current and previously reported financial statements.

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2023 | September 30, 2022 | September 30, 2023 | September 30, 2022 |
| | (amounts, in thousands, except per share data) | | | |
| **Stock-based compensation** | | | | |
| Prior to revision | $ 3,339 | $ 7,848 | $ 8,890 | $ 28,353 |
| Revision | 1,244 | (1,981) | 6,559 | (7,839) |
| As revised | $ 4,583 | $ 5,867 | $ 15,449 | $ 20,514 |
| **Loss from operations** | | | | |
| Prior to revision | $ (5,117) | $ (9,974) | $ (17,901) | $ (35,226) |
| Revision | (1,244) | 1,981 | (6,559) | 7,839 |
| As revised | $ (6,361) | $ (7,993) | $ (24,460) | $ (27,387) |
| **Income tax benefit (expense)** | | | | |
| Prior to revision | $ (741) | $ 183 | $ (1,093) | $ 1,772 |
| Revision | - | (175) | - | (436) |
| As revised | $ (741) | $ 8 | $ (1,093) | $ 1,336 |
| **Net income (loss)** | | | | |
| Prior to revision | $ (5,707) | $ 14,375 | $ (18,450) | $ (18,408) |
| Revision | (1,244) | 1,806 | (6,559) | 7,403 |
| As revised | $ (6,951) | $ 16,181 | $ (25,009) | $ (11,005) |
| **Basic income (loss) per share available to common stockholders** | | | | |
| Prior to revision | $ (0.04) | $ 0.06 | $ (0.11) | $ (0.29) |
| Revision | $ (0.01) | $ 0.01 | $ (0.03) | $ 0.04 |
| As revised | $ (0.05) | $ 0.07 | $ (0.14) | $ (0.25) |
| **Diluted income (loss) per share available to common stockholders** | | | | |
| Prior to revision | $ (0.04) | $ 0.05 | $ (0.11) | $ (0.29) |
| Revision | $ (0.01) | $ 0.01 | $ (0.03) | $ 0.04 |
| As revised | $ (0.05) | $ 0.06 | $ (0.14) | $ (0.25) |

Table of Contents

The opening balances of accumulated deficit and additional paid in capital as of December 31, 2021, have been adjusted by $8.0 million and $9.1 million, respectively to reflect the cumulative effect of the change.

| | As of | |
|---|---|---|
| | September 30, 2023 | December 31, 2022 |
| | (amounts, in thousands) | |
| **Net deferred tax (liability) asset** | | |
| Prior to revision | $ (1,047) | $ (1,389) |
| Revision | (25) | (21) |
| As revised | $ (1,072) | $ (1,410) |
| **Additional paid in capital** | | |
| Prior to revision | $ 220,083 | $ 197,816 |
| Revision | (11,519) | (18,093) |
| As revised | $ 208,564 | $ 179,723 |
| **Accumulated deficit** | | |
| Prior to revision | $ (195,969) | $ (173,586) |
| Revision | 11,494 | 18,072 |
| As revised | $ (184,475) | $ (155,514) |
| **Total stockholders' equity** | | |
| Prior to revision | $ 24,135 | $ 24,250 |
| Revision | (25) | (21) |
| As revised | $ 24,110 | $ 24,229 |

*Stock-based compensation correction of immaterial error*

In 2023, the Company identified a misstatement related to its presentation of stock-based compensation in its consolidated statements of operations. Although determined to be immaterial, the Company elected to correct the immaterial misstatement and reclassified its stock-based compensation expense to the same financial statement line item as cash compensation paid to the same employees and nonemployees.

The reclassification reflects the change in accounting principle discussed above and had no incremental impact on the consolidated balance sheets, consolidated statements of comprehensive income (loss), consolidated statements of stockholders' equity, or consolidated statement of cash flows. There was no net effect to the amounts reported for (loss) from operations as a result of this reclassification. However, cost of sales, gross profit, stock-based compensation, general and administrative, salaries and related benefits, and total operating expenses each were adjusted as shown below to reflect the reclassification.

16

Table of Contents

The following tables present the effect of the reclassification on the Company's previously reported financial statements.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| | (amounts, in thousands) | | |
| **Cost of sales** | | | |
| Prior to revision | $ 669,620 | $ 465,503 | $ 83,554 |
| Revision | 2,503 | 1,771 | - |
| As revised | $ 672,123 | $ 467,274 | $ 83,554 |
| **Gross Profit** | | | |
| Prior to revision | $ 28,213 | $ 11,515 | $ 1,172 |
| Revision | (2,503) | (1,771) | - |
| As revised | $ 25,710 | $ 9,744 | $ 1,172 |
| **Stock-based compensation** | | | |
| Prior to revision | $ 26,499 | $ 21,801 | $ 2,005 |
| Revision | (26,499) | (21,801) | (2,005) |
| As revised | $ - | $ - | $ - |
| **General and administrative** | | | |
| Prior to revision | $ 14,392 | $ 7,995 | $ 2,020 |
| Revision | 9,117 | 11,011 | 121 |
| Other Reclassifications | (677) | - | - |
| As revised | $ 22,832 | $ 19,006 | $ 2,141 |
| **Salaries and related benefits** | | | |
| Prior to revision | $ 16,667 | $ 8,806 | $ 687 |
| Revision | 14,879 | 9,019 | 1,884 |
| Other Reclassifications | 657 | | |
| As revised | $ 32,203 | $ 17,825 | $ 2,571 |
| **Total operating expenses** | | | |
| Prior to revision | $ 67,225 | $ 40,977 | $ 5,922 |
| Revision | (2,503) | (1,771) | - |
| Other Reclassifications | (20) | | - |
| As revised | $ 64,702 | $ 39,206 | $ 5,922 |

17

Table of Contents

| | Three Months Ended | | | |
| | March 31, 2022 | June 30, 2022 | September 30, 2022 | December 31, 2022 |
| | (amounts, in thousands) | | | |
|---|---|---|---|---|
| **Cost of sales** | | | | |
| Prior to revision | $ 156,812 | $ 173,760 | $ 178,951 | $ 160,097 |
| Revision | 804 | 704 | 506 | 489 |
| Other Reclassifications | - | 303 | 303 | (606) |
| As revised | $ 157,616 | $ 174,767 | $ 179,760 | $ 159,980 |
| **Gross Profit** | | | | |
| Prior to revision | $ 6,166 | $ 7,281 | $ 6,906 | $ 7,860 |
| Revision | (804) | (704) | (506) | (489) |
| Other Reclassifications | - | (303) | (303) | 606 |
| As revised | $ 5,362 | $ 6,274 | $ 6,097 | $ 7,977 |
| **Stock-based compensation** | | | | |
| Prior to revision | $ 7,424 | $ 7,223 | $ 5,867 | $ 5,985 |
| Revision | (7,424) | (7,223) | (5,867) | (5,985) |
| As revised | $ - | $ - | $ - | $ - |
| **General and administrative** | | | | |
| Prior to revision | $ 2,742 | $ 3,908 | $ 3,516 | $ 4,226 |
| Revision | 2,865 | 2,704 | 1,775 | 1,773 |
| Other Reclassifications | - | (160) | (150) | (367) |
| As revised | $ 5,607 | $ 6,452 | $ 5,141 | $ 5,632 |
| **Salaries and related benefits** | | | | |
| Prior to revision | $ 4,193 | $ 4,127 | $ 4,417 | $ 3,930 |
| Revision | 3,755 | 3,815 | 3,586 | 3,723 |
| Other Reclassifications | - | (143) | (153) | 953 |
| As revised | $ 7,948 | $ 7,799 | $ 7,850 | $ 8,606 |
| **Total operating expenses** | | | | |
| Prior to revision | $ 15,632 | $ 17,209 | $ 14,899 | $ 19,485 |
| Revision | (804) | (704) | (506) | (489) |
| Other Reclassifications | - | (303) | (303) | 586 |
| As revised | $ 14,828 | $ 16,202 | $ 14,090 | $ 19,582 |

18

Table of Contents

|  | Three Months Ended |
|---|---|
|  | **March 31, 2023** |
|  | (amounts, in thousands) |
| **Cost of sales** |  |
| Prior to revision | $ 186,828 |
| Revision | 432 |
| As revised | $ 187,260 |
| **Gross Profit** |  |
| Prior to revision | $ 6,721 |
| Revision | (432) |
| As revised | $ 6,289 |
| **Stock-based compensation** |  |
| Prior to revision | $ 5,902 |
| Revision | (5,902) |
| As revised | $ - |
| **General and administrative** |  |
| Prior to revision | $ 3,345 |
| Revision | 1,760 |
| As revised | $ 5,105 |
| **Salaries and related benefits** |  |
| Prior to revision | $ 5,418 |
| Revision | 3,710 |
| As revised | $ 9,128 |
| **Total operating expenses** |  |
| Prior to revision | $ 16,341 |
| Revision | (432) |
| As revised | $ 15,909 |

19

Table of Contents

**Note 3. Fair value measurements**

<u>Recurring Fair Value Measurements</u>

The following table summarizes the Company's assets and liabilities measured at fair value on a recurring basis:

| (in thousands) | Level 1 | | Level 2 | | Level 3 | | Measured at Net Asset Value as a Practical Expedient | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **September 30, 2023** | | | | | | | | | | |
| Assets: | | | | | | | | | | |
| Marketable securities (Note 5) | $ | 4,280 | $ | - | $ | - | $ | 1,588 | $ | 5,868 |
| Liabilities: | | | | | | | | | | |
| Contingent consideration liability (Note 6) | $ | - | $ | - | $ | 5,758 | $ | - | $ | 5,758 |
| Derivative liabilities (Note 10) | $ | - | $ | 2 | $ | - | $ | - | $ | 2 |

The market value of the equity securities is determined using quoted prices in active markets. The market value of underlying investments in funds is determined using the net asset value ("NAV") provided by the administrator of the fund as a practical expedient. The NAV is determined by the fund's trustee based upon the fair value of the underlying assets owned by the fund, less liabilities, divided by outstanding units. In accordance with appropriate accounting guidance, these investments have not been classified in the fair value hierarchy. This class includes investments in a closed end interval fund that invests in publicly traded equity securities of U.S. and foreign companies. There are no unfunded commitments related to this investment. Investment redemptions are limited to 25% of the fund's outstanding shares but may be redeemed on a quarterly basis with 15 days' notice.

The Company had a contingent consideration liability of $3.5 million as of December 31, 2022, related to the Company's acquisition of EV Group Holdings LLC, and its settlement occurred in the first quarter of 2023. The contingency was based on the Company's average share price for the month ending December 31, 2022. As a result of the settlement of this contingent consideration liability, the Company issued 1,530,145 additional shares of common stock to the sellers. The contingent consideration liability was reflected in accrued liabilities on the consolidated balance sheet, and the remeasurement was reflected in other income (expense), net on the consolidated statement of operations as of and for the period ended December 31, 2022.

In connection with the Greenspeed Acquisition (as defined in Note 6), completed on August 1, 2023, the Company recorded a liability for contingent consideration payable based upon the achievement of certain annual performance benchmarks over 2 years. The fair value of the liability is estimated using discounted cash flows. The significant unobservable inputs (Level 3) used to estimate the fair value include the projected EBITDA values for the 2 year earn-out period (as defined in the purchase agreement), and the discount rate. The contingent consideration measured at fair value using unobservable inputs as of September 30, 2023 is $5.8 million and is included in contingent consideration liability within non-current liabilities on the consolidated balance sheets. Refer to Note 6, Business combination, for additional information.

<u>Nonrecurring Fair Value Measurements</u>

The Company also has investments in non-marketable securities, which are primarily equity securities in a non-public company that do not have readily determinable fair values. Such investments are initially recorded at cost and adjusted to fair value on a nonrecurring basis through earnings for observable price changes in orderly transactions for identical or similar transactions of the same company (Level 2 of U.S. GAAP fair value hierarchy). Historical adjustments have not been material. The carrying amount of these equity securities is $0.3 million and $0.2 million as of September 30, 2023, and December 31, 2022, respectively, and is included in non-marketable securities on the consolidated balance sheet. There was an immaterial increase in the non-marketable securities during the nine months ended September 30, 2023 and no change during the nine months ended September 30, 2022.

Table of Contents

**Note 4. Revenue**

Contract Balances

The following table provides information about receivables, contract assets and contract liabilities from contracts with customers. Accounts receivable in the table below excludes other receivables that are not generated from contracts with customers. These amounts are $0.1 million and $0.0 million as of September 30, 2023, and December 31, 2022, respectively.

| (in thousands) | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| Receivables included in "Accounts receivable net of allowances" | $ | 55,710 | $ | 72,405 |
| Contract assets | | 8,128 | | 6,090 |
| Contract liabilities | | 25,201 | | 13,741 |

The Company has remaining performance obligations of $139.2 million at September 30, 2023. This figure is inclusive of the Company's deferred revenue and backlog. The Company only includes projects within its backlog reporting if there is a signed contract, purchase order or other legally binding agreement. There can be no assurance that the Company's backlog will be earned as revenue in any particular period, if at all. Included within this figure is $25.2 million of deferred revenue that is classified within current liabilities on the consolidated balance sheets. The Company expects to earn the full amount of its deferred revenue within the next twelve months. The Company anticipates it will recognize approximately 25% of its remaining performance obligations within backlog as revenue in 2023, approximately 74% in 2024, and the remainder in 2025.

Changes in Contract Balances

The timing of revenue recognition, billings and cash collections results in accounts receivable, and customer advances and unearned revenue on the Company's consolidated balance sheets. At times, the Company receives advance payments or deposits from its customers before revenue is recognized, resulting in contract liabilities. The contract liabilities primarily relate to the advance consideration received from customers on certain contracts. For these contracts, revenue is recognized in a manner that is consistent with the satisfaction of the underlying performance obligations. The contract liabilities are reported on the consolidated balance sheets on a contract-by-contract basis at the end of each respective reporting period within the contract liabilities line item.

Significant changes in the balance of contract liabilities during the period are as follows:

| (in thousands) | | |
|---|---|---|
| Balance at December 31, 2022 | $ | 13,741 |
| Revenue recognized during the period that was included in the beginning balance | | (12,945) |
| Additions, net of revenue recognized during the period | | 24,405 |
| Balance at September 30, 2023 | $ | 25,201 |

21

Table of Contents

Disaggregation of Revenue

The following table presents the Company's revenues disaggregated by segment:

| (in thousands) | Three Months Ended September 30, | | | |
| | 2023 | | 2022 | |
| --- | --- | --- | --- | --- |
| Revenue: | | | | |
| Infrastructure | $ | 31,795 | $ | 26,753 |
| Telecommunications | | 100,482 | | 159,104 |
| Total | $ | 132,277 | $ | 185,857 |

| (in thousands) | Nine Months Ended September 30, | | | |
| | 2023 | | 2022 | |
| --- | --- | --- | --- | --- |
| Revenue: | | | | |
| Infrastructure | $ | 89,246 | $ | 71,804 |
| Telecommunications | | 384,166 | | 458,072 |
| Total | $ | 473,412 | $ | 529,876 |

**Note 5. Marketable securities and other investments**

The Company's marketable securities are stated at fair value. Any changes in the fair value of the Company's marketable securities are included within income (loss) from investments, net on the consolidated statement of operations.

Realized and unrealized gains and losses are determined on an average cost basis. The marketable securities are investments predominantly in shares of large publicly traded companies which are being invested until such time as the funds are needed for operations.

The fair value of these marketable securities is as follows:

| (in thousands) | September 30, 2023 | | December 31, 2022 | |
| --- | --- | --- | --- | --- |
| Brokerage Account | $ | 5,868 | $ | 6,757 |

Table of Contents

During the three months ended September 30, 2023, the Company recognized net gains of $0.7 million on marketable securities and other investments, which included $0.2 million of realized gains and $0.5 million of unrealized gains on marketable and non-marketable securities. During the nine months ended September 30, 2023, the Company recognized net gains of $1.6 million on marketable securities and other investments, which included $0.1 million of realized gains and $1.5 million of unrealized gains on marketable and non-marketable securities.

During the three months ended September 30, 2022, the Company recognized net losses of $0.2 million on marketable securities and other investments, which included $0.1 million of realized losses and $0.1 million of unrealized losses on marketable securities. During the nine months ended September 30, 2022, the Company recognized net losses of $1.3 million on marketable securities and other investments, which included $0.7 million of realized losses and $0.6 million of unrealized losses on marketable securities.

**Note 6. Business combination**

*Greenspeed Energy Solutions, LLC*

On August 1, 2023, the Company completed the acquisition of all of the issued and outstanding units of Greenspeed Energy Solutions, LLC ("Greenspeed") for up to $15.0 million, net of closing adjustments (the "Greenspeed Acquisition"). The consideration includes $6.0 million in cash consideration reduced for certain transaction expenses and working capital adjustments, $2.0 million in equity consideration at closing, and a performance-based earn-out over the next two years of up to $7.0 million. The Company recorded the performance-based earn-out as a contingent consideration liability at the acquisition date of approximately $5.8 million.

The following table summarizes the total consideration as well as the preliminary fair values of the net assets acquired, and liabilities assumed as of the acquisition date. The final determination of the fair value of certain assets and liabilities will be completed within the one year measurement period from the date of acquisition as required by ASC Topic 805, *Business Combinations*. As of September 30, 2023, the valuation studies necessary to determine the fair market value of the assets acquired and liabilities assumed are preliminary, including the validation of the underlying cash flows used to determine the fair values. Any potential adjustments could be material in relation to the preliminary values presented below.

| (in thousands) | | Preliminary Estimates |
|---|---|---|
| Cash | $ | 5,289 |
| Common stock | | 2,000 |
| Contingent consideration | | 5,758 |
| Total Consideration | $ | 13,047 |
| | | |
| **Fair values of identifiable net assets and liabilities:** | | |
| Assets: | | |
| Current assets | | |
| Cash | | 1,845 |
| Accounts receivable | | 1,315 |
| Deposits, prepaids and other current assets | | 9 |
| Inventory | | 205 |
| Contract assets | | 744 |
| Total current assets | | 4,118 |
| | | |
| Property, plant and equipment | | 212 |
| Operating lease right-of-use assets | | 259 |
| Goodwill | | 13,234 |
| Total assets | | 17,823 |
| Liabilities: | | |
| Current liabilities | | |
| Accounts payable | | 542 |
| Accrued liabilities | | 77 |
| Contract liabilities | | 3,741 |
| Operating lease liabilities | | 54 |
| Finance lease liabilities | | 50 |

| | |
|---|---:|
| Total current liabilities | 4,464 |
| **Non-current liabilities** | |
| Operating lease liabilities, non-current | 214 |
| Finance lease liabilities, non-current | 98 |
| Total liabilities | 4,776 |
| Total fair value of identifiable net assets and liabilities | $ 13,047 |

Management believes that the Greenspeed Acquisition provides the Company with an opportunity to benefit from technical knowledge, and expected synergies from combining operations. The goodwill is not deductible for income tax purposes.

The inclusion of the Greenspeed Acquisition in the Company's consolidated financial statements is not deemed material with respect to the requirement to provide pro-forma results of operations. As such, pro-forma information is not presented.

**Note 7. Goodwill and intangible assets**

Goodwill is not amortized for book purposes, however, it may be amortized for tax purposes. The Company accounts for its acquired customer relationships, backlogs, non-compete agreements, favorable leases and brand assets as definite-lived intangible assets. Goodwill is reviewed at least annually for impairment. At the time of each review, if the fair value of a reporting unit is less than its respective carrying value, then a charge is recorded to the results of operations.

The following table presents goodwill by reportable segment:

| (in thousands) | Infrastructure | Telecommunications | Consolidated Total |
|---|---:|---:|---:|
| Goodwill, net, as of December 31, 2022 | $ 11,900 | $ 772 | $ 12,672 |
| Acquisition (See Note 6) | $ 13,234 | $ - | $ 13,234 |
| Goodwill, net, as of September 30, 2023 | $ 25,134 | $ 772 | $ 25,906 |

The Company's goodwill is tested for impairment on an annual basis and more often if indications of impairment exist. The Company conducts its annual impairment analyses as of October 1 each year. There were no indicators of impairment during the three-month and nine-month period ended September 30, 2023.

The Company performs a review of its intangible assets for impairment when evidence exists that the carrying value of an asset may not be recoverable. There were no events or changes in circumstances which indicated the Company's intangible assets may not be recoverable. Accordingly, no impairment assessments were conducted on its intangible assets during the three-month and nine-month period ended September 30, 2023.

The following table presents intangible assets:

| | September 30, 2023 | | | December 31, 2022 | | |
|---|---:|---:|---:|---:|---:|---:|
| (in thousands) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Customer relationships | $ 30,849 | $ (4,031) | $ 26,818 | $ 30,849 | $ (2,489) | $ 28,360 |
| Backlog | 3,322 | (1,938) | 1,384 | 3,322 | (1,107) | 2,215 |
| Non-compete agreements | 3,729 | (1,594) | 2,135 | 3,729 | (895) | 2,834 |
| Off-market favorable leases | 955 | (955) | - | 955 | (955) | - |
| Brand | 560 | (65) | 495 | 560 | (37) | 523 |
| Total | $ 39,415 | $ (8,583) | $ 30,832 | $ 39,415 | $ (5,483) | $ 33,932 |

23

Table of Contents

**Note 8. Related party transactions**

On August 31, 2023, the Company entered into a separation and consulting agreement with Andrew Fox, the Company's former Chief Executive Officer and a current member of the Company's Board of Directors. The agreement provides for the continued vesting of stock options previously granted to Mr. Fox and extends the exercise period for those options through October 11, 2025. Pursuant to this agreement, Mr. Fox will serve as a strategic advisor to the Board of Directors for a one-year initial term with compensation of approximately $0.5 million.

On August 11, 2023, the Company entered into a Securities Purchase Agreement with KORR Value, L.P. (the "August 2023 SPA"), pursuant to which, beginning on October 15, 2023 and through March 31, 2024, the Company has the right, but not the obligation, to sell, and to require the purchaser to purchase, up to $5.0 million of common stock, at a purchase price of $1.00 per share. The Company will be obligated to issue warrants to purchase 1,000,000 shares of common stock on the date the Company first elects to require the purchaser to purchase shares pursuant to the August 2023 SPA. Such warrants would have a two-year term and an exercise price of $1.50 per share. Kenneth Orr, a beneficial owner of more than 5% of the Company's common stock and the former Chairman of the Company, has sole voting and dispositive power over the shares held by KORR Value, L.P.

Greenspeed obtains lighting materials and equipment for certain projects from a related party, Greenwave Partners, LLC ("Greenwave"). Greenwave has established relationships with lighting suppliers as a wholesaler and is able to obtain lighting materials and equipment on more economical terms than Greenspeed.  Cost savings are passed on to Greenspeed. During the nine months ended September 30, 2023, the total amount invoiced from Greenwave to Greenspeed was approximately $0.2 million. Paul Williams is the President and CEO of Greenspeed and also is a member of Greenwave.

In 2022, the Company entered into a special advisor agreement with KORR Acquisitions Group, Inc., an entity controlled by Kenneth Orr, and a stockholder of the Company. The agreement included an upfront payment of $0.5 million and currently includes a monthly advisory fee of $25,000.

**Note 9. Debt**

Debt was comprised of the following as of the periods indicated:

| (in thousands) | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Line of Credit | | |
| ANS Line of Credit | $           - | $      5,024 |
| Total Line of Credit | - | 5,024 |
| Notes Payable | | |
| Issued on May 19, 2021 | 11,860 | 11,860 |
| Issued on December 17, 2021 | 15,926 | 15,926 |
| Total Face Value of Notes Payable | 27,786 | 27,786 |
| Less: Unamortized Discount | (660) | (3,630) |
| Net Carrying Value of Notes Payable | 27,126 | 24,156 |
| **Total debt before deferred financing costs** | 27,126 | 29,180 |
| Current amount of Notes Payable | 27,126 | 24,156 |
| Current amount of Line of Credit | - | 5,024 |
| **Total current portion of long-term debt** | 27,126 | 29,180 |
| **Total long-term debt, net of current portion** | $           - | $           - |

*Convertible notes payable*

*May 2020 Financing*

On May 8, 2020, the Company entered into a securities purchase agreement with certain institutional investors (collectively, the "May 2020 Investors") pursuant to which the Company issued convertible notes in an aggregate principal amount of $3.0 million for an aggregate purchase price of $2.7 million (the "May 2020 Convertible Notes"). In connection with the issuance of the May 2020 Convertible Notes, the Company issued to the May 2020 Investors warrants to purchase an aggregate of 7,600,000 shares of common stock (collectively, the "Warrants") and 7.5 shares of series G convertible preferred stock (the "Series G preferred stock").

The May 2020 Convertible Notes' maturity date of May 8, 2021, was subsequently extended to  May 8, 2023. The May 2020 Convertible Notes accrued interest at a rate of 8% per annum, subject to increase to 20% per annum upon and during the occurrence of an event of default. Interest was payable in cash on a quarterly basis beginning on December 31, 2020.

*November 2020 Financing*

On November 3, 2020, the Company entered into a securities purchase agreement with funds affiliated with Arena Investors LP (the "November 2020 Investors") pursuant to which it issued convertible notes in an aggregate principal amount of $3.9 million for an aggregate purchase price of $3.5 million (the "November 2020 Convertible Notes"). In connection with the issuance of the November 2020 Convertible Notes, the Company issued to the November 2020 Investors 903,226 shares of common stock. The November 2020 Convertible Notes were convertible at any time, at the holder's option, into shares of the Company's common stock at a conversion price of $0.25 per share. The November 2020 Convertible Notes' maturity was extended from November 3, 2023, to  November 3, 2024. The November 2020 Convertible Notes accrued interest at a rate of 8% per annum.

Table of Contents

*May 2021 Financing*

On May 19, 2021, the Company entered into a securities purchase agreement with funds affiliated with Arena Investors LP (the "May 2021 Investors") pursuant to which it issued convertible notes in an aggregate principal amount of $5.6 million for an aggregate purchase price of $5.0 million (collectively, the "May 2021 Convertible Notes" and together with the May 2020 Convertible Notes and the November 2020 Convertible Notes, the "Convertible Notes"). In connection with the issuance of the May 2021 Convertible Notes, the Company issued to the May 2021 Investors warrants to acquire 1,870,000 shares of common stock. The May 2021 Convertible Notes were convertible at any time, at the holder's option, into shares of the Company's common stock at a conversion price of $3.00 per share. The May 2021 Convertible Notes were due to mature on  May 19, 2024. The May 2021 Convertible Notes accrued interest at a rate of 8% per annum.

*Conversion of Convertible Notes to Preferred Stock*

In the second quarter of 2022, the Convertible Notes were exchanged for 1,177,023 shares of Series D preferred stock ("Series D preferred stock"). As a result of this exchange, the Company has no Convertible Notes Payable outstanding at September 30, 2023, and December 31, 2022. Refer to Note 13, Stockholders' equity, for additional information.

The Company has accounted for all Convertible Notes Payable as a financing transaction, wherein the net proceeds that were received were allocated to the financial instrument issued. Prior to making the accounting allocation, the Company evaluated the Convertible Notes under ASC 815, *Derivatives and Hedging*, which generally requires the analysis of embedded terms and features that have characteristics of derivatives to be evaluated for bifurcation and separate accounting in instances where their economic risks and characteristics are not clearly and closely related to the risks of the host contract. None of the terms and features embedded in the notes required bifurcation and liability classification.

The Company analyzed the detachable warrants under ASC 480 and ASC 815. The warrants did not fall under the guidance of ASC 480. After analyzing the warrants under ASC 815, it was determined that the warrants met all of the requirements for equity classification under guidance of ASC 815-40-25-1 through 6.

*Line of credit*

Nextridge Inc. ("Nextridge") and its operating subsidiary Advance Network Services, LLC. ("ANS") have a revolving $8.0 million line of credit (the "ANS Line of Credit") available with a bank, collateralized by all the assets of Nextridge and ANS. Interest is payable monthly at the Wall Street Journal prime rate (8.50% and 7.50% at September 30, 2023, and December 31, 2022, respectively). As of September 30, 2023, and December 31, 2022, the Company had outstanding balances of $0 and $5.0 million, respectively, on this ANS Line of Credit.

25

Table of Contents

On October 25, 2022, Nextridge and ANS renewed the ANS Line of Credit increasing the availability from $4.0 million to $8.0 million. Borrowings under the ANS Line of Credit will bear interest at a floating rate at the Wall Street Journal prime rate with a floor of 5%. Advances under the line of credit are limited to 70% and 50% of Nextridge and ANS' eligible accounts receivable and work in progress, respectively. At each fiscal year end, Nextridge and ANS must maintain a minimum debt service coverage ratio of 1.2:1 and maximum debt/tangible net worth ratio of 3:1. The outstanding balance on the ANS Line of Credit is payable upon demand by the bank. In addition to the security interest in the assets of Nextridge and ANS, the line of credit is guaranteed by the Company and Charge Infrastructure Holdings, Inc., the parent of Nextridge and ANS and a subsidiary of the Company. At December 31, 2022, the Company was in compliance with the aforementioned covenants. The ANS Line of Credit has a termination date of October 31, 2024.

On November 18, 2022, Nextridge and ANS renewed a $750,000 equipment and vehicle line of credit available with a bank. Interest is payable monthly at the Wall Street Journal prime rate. On December 1, 2023, the line will convert to a term loan with the then five-year Federal Home Loan Bank rate + 2.5% and have a five-year term with a five-year amortization. There are no financial commitments or covenants on the line of credit. As of September 30, 2023, and December 31, 2022, the Company had no outstanding balance on this line of credit.

B W Electrical Services, LLC. ("BW") had a revolving $3.0 million line of credit (the "BW Line of Credit") available with a bank, collateralized by all the assets of BW. Interest was payable monthly at the Wall Street Journal prime rate (8.50% and 7.50% at September 30, 2023, and December 31, 2022, respectively). Effective July 26, 2023, BW renewed the facility with substantially the same terms and an expiration of August 1, 2024.

Advances under the BW Line of Credit are limited to 75% of BW's eligible accounts receivable. At all times during the loan term BW is required to maintain a minimum increase in the net retained earnings of $0.2 million tested annually and maintain a maximum seller funded debt to EBIDA of 2.0x tested semi-annually on a trailing twelve-month basis beginning with the period ended June 30, 2022. In addition to the security interest in the assets of BW, the BW Line of Credit is guaranteed by the Company and Charge Infrastructure Holdings, Inc., the parent of BW and a subsidiary of the Company. As of September 30, 2023, and December 31, 2022, the Company had no outstanding balance on the BW Line of Credit. At September 30, 2023, and December 31, 2022, the Company was in compliance with the aforementioned covenants.

*Notes payable*

On May 19, 2021, the Company entered into a securities purchase agreement with funds affiliated with Arena Investors LP (the "May 2021 Investors") pursuant to which it issued notes payable in an aggregate face value (includes 7.5% premium and 10% original issue discount) of $11.8 million for an aggregate purchase price of $10.0 million (the "May 2021 Notes"). The May 2021 Notes have a coupon of 8% and an 18-month term, subject to increase to 20% per annum upon and during the occurrence of an event of default. The May 2021 Notes' original maturity date of November 19, 2022, was extended to November 19, 2023.

On December 17, 2021, the Company entered into a securities purchase agreement with funds affiliated with Arena Investors LP (the "December 2021 Investors") pursuant to which it issued a note payable in an aggregated face value of $15.9 million for an aggregate purchase price of $13.3 million (collectively, the "December 2021 Notes" and together with the May 2021 Notes, the "Notes"). The December 2021 Notes have a coupon of 7.5% and a 23-month term, subject to increase to 20% per annum upon and during the occurrence of an event of default. The December 2021 Notes mature on November 19, 2023.

The securities purchase agreements entered into in May 2021 and December 2021 include certain affirmative and negative covenants, including, but not limited to, participation rights in future debt and equity offerings, restrictions on future variable rate transactions and limitations on the Company's ability to incur indebtedness other than Permitted Indebtedness (as defined in the respective agreements) while liabilities to the investors remain outstanding. The securities purchase agreement entered into in December 2021 Notes also contain a most-favored nations provision, such that, if the Company subsequently issues securities having more favorable terms ("Other Securities"), the purchasers may exchange their securities for Other Securities.

*Interest Expense*

The components of interest expense are as follows:

| (in thousands) | Three Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Interest expense | $ (499) | $ (520) |
| Amortization of debt discount | (990) | (495) |

| Total net interest expense | $ | (1,489) | $ | (1,015) |

Table of Contents

| | | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (in thousands) | | 2023 | | 2022 |
| Interest expense | $ | (1,545) | $ | (2,001) |
| Amortization of debt discount | | (2,970) | | (7,938) |
| Total net interest expense | $ | (4,515) | $ | (9,939) |

**Note 10. Derivative liabilities**

The Company does not use financial derivative instruments to manage risk. In June 2022, the Company exchanged the outstanding convertible debt for Series D preferred stock ("Series D preferred stock"). Concurrently, the warrants that were granted along with the original convertible debt were amended to provide, at the holders' choice, the option to exercise for a to-be-issued class of preferred stock, which are convertible into the same number of shares of common stock as would have been issued upon exercise of such warrants under the original terms. This amendment caused the instruments to be treated as a derivative liability beginning on June 30, 2022. The warrants were reclassified from equity to a derivative liability and measured at fair value using a Black Scholes model (Level 2 of U.S. GAAP fair value hierarchy), which included inputs for exercise price, stock price, term to expiration, volatility, and interest rate. The impact was a derivative liability of approximately $40.4 million and a deemed dividend of approximately $32.8 million. This derivative liability is revalued on a recurring basis with changes in the fair value of the derivative recorded through the consolidated statement of operations.

In the first quarter of 2023, the Arena Investors (defined below) exercised 7.6 million warrants issued in May 2020 (the "May 2020 Warrants") into: (i) 4.4 million shares of common stock; and (ii) 3.2 million shares of Series E preferred stock ("Series E preferred stock"). In connection with this exercise, the Company revalued the exercised warrants immediately before the exercise and recorded a gain of $0.9 million with an offsetting reduction to the outstanding derivative liability. The Company revalued the remaining warrants as of March 31, 2023, June 30, 2023, and September 30, 2023, and recorded a gain of $0.5 million, $0.3 million, and $0.1 million, respectively, with an offsetting reduction to the outstanding derivative liability. These gains on the remeasurement of the warrants are included in the Change in fair value of derivative liabilities line item on the consolidated statement of operations. Refer to Note 13, Stockholders' equity, and Note 14, Stock-based compensation, for additional information.

The following tables summarize the effects on the Company's gain (loss) associated with changes in the fair values of the derivative financial instruments by type of financing reflected on the change in fair value of derivative liabilities line on the consolidated statement of operations:

| | | | Three Months Ended September 30, | |
|---|---|---|---|---|
| (in thousands) | | 2023 | | 2022 |
| Derivative liability beginning balance | $ | 59 | $ | 40,443 |
| Change in fair value of derivative liabilities | | (57) | | (28,669) |
| Derivative liability ending balance | $ | 2 | $ | 11,774 |

| | | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (in thousands) | | 2023 | | 2022 |
| Derivative liability beginning balance | $ | 6,521 | $ | - |
| Reclassification of derivative | | - | | 40,443 |
| Change in fair value of derivative liabilities | | (1,713) | | (28,669) |
| Warrant exercise | | (4,806) | | - |
| Derivative liability ending balance | $ | 2 | $ | 11,774 |

Table of Contents

**Note 11. Leases**

*Lease Revenue*

The Company leases commercial properties under agreements that are classified as operating leases. The Company's commercial property leases generally include minimum rents and do not include recoveries for property taxes and common area maintenance.

The Company's rental revenues are earned from its operating subsidiary EVDepot, LLC ("EV Depot") operations and are a component of Infrastructure revenues disclosed in Note 4, Revenue. The following table summarizes the fixed components of rental revenue for the nine and three months ended September 30, 2022, and 2022:

| (in thousands) | Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | **2023** | | **2022** | |
| Revenue: | | | | |
| Fixed component | $ | 844 | $ | 1,139 |
| Variable component | | - | | - |
| Total | $ | 844 | $ | 1,139 |

| (in thousands) | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | **2023** | | **2022** | |
| Revenue: | | | | |
| Fixed component | $ | 2,577 | $ | 3,549 |
| Variable component | | - | | - |
| Total | $ | 2,577 | $ | 3,549 |

**Note 12. Reportable segments**

The Company has two reportable operating segments - Infrastructure, and Telecommunications. The Company also has a Non-operating corporate segment. All inter-segment revenues are eliminated.

Refer to Note 4, Revenue, for additional information on the Company's revenue by segment. Summary information with respect to the Company's income (loss) from operations is as follows:

| (in thousands) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2023** | | **2022 (As Adjusted)** | | **2023** | | **2022 (As Adjusted)** | |
| Income (loss) from operations: | | | | | | | | |
| Infrastructure | $ | 658 | $ | (1,152) | $ | (2,207) | $ | (4,294) |
| Telecommunications | | 108 | | 181 | | (29) | | 806 |
| Non-operating corporate | | (7,127) | | (7,022) | | (22,224) | | (23,899) |
| Total | $ | (6,361) | $ | (7,993) | $ | (24,460) | $ | (27,387) |

28

Table of Contents

A reconciliation of the Company's consolidated segment loss from operations to consolidated loss from operations before income taxes and net loss is as follows:

| (in thousands) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 (As Adjusted) | 2023 | 2022 (As Adjusted) |
| Loss from operations | $ (6,361) | $ (7,993) | $ (24,460) | $ (27,387) |
| Income (loss) from investments, net | 675 | (200) | 1,637 | (1,343) |
| Change in fair value of derivative liabilities | 57 | 28,669 | 1,713 | 28,669 |
| Interest expense | (1,489) | (1,015) | (4,515) | (9,939) |
| Loss on impairment | (56) | - | (114) | - |
| Other income (expense), net | 848 | (3,289) | 1,876 | (2,255) |
| Foreign exchange gain (loss) | 116 | 1 | (53) | (86) |
| Total other expenses | 151 | 24,166 | 544 | 15,046 |
| Income (loss) before income taxes | (6,210) | 16,173 | (23,916) | (12,341) |
| Income tax (expense) benefit | (741) | 8 | (1,093) | 1,336 |
| Net income (loss) | $ (6,951) | $ 16,181 | $ (25,009) | $ (11,005) |

Summary information with respect to the Company's operating segments is as follows:

| (in thousands) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Depreciation and amortization: | | | | |
| Infrastructure | $ 1,166 | $ 391 | $ 3,539 | $ 1,618 |
| Telecommunications | 6 | 42 | 35 | 127 |
| Total | $ 1,172 | $ 433 | $ 3,574 | $ 1,745 |

| (in thousands) | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Capital expenditures: | | |
| Infrastructure | $ 143 | $ 205 |
| Telecommunications | - | - |
| Total | $ 143 | $ 205 |

| (in thousands) | September 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| Investments: | | |
| Infrastructure | $ 1,595 | $ 1,389 |
| Telecommunications | - | - |
| Non-operating corporate | 4,552 | 5,604 |
| Total | $ 6,147 | $ 6,993 |

| (in thousands) | September 30, 2023 | December 31, 2022 (As Adjusted) |
| --- | --- | --- |
| Assets: | | |
| Infrastructure | $ 114,628 | $ 102,248 |
| Telecommunications | 54,880 | 42,046 |
| Non-operating corporate | 18,009 | 24,160 |
| Total | $ 187,517 | $ 168,454 |

Table of Contents

**Note 13. Stockholders' equity**

The Company has evaluated each series of preferred stock for proper classification under ASC 480, *Distinguishing Liabilities from Equity*, and ASC 815, *Derivatives and Hedging*. ASC 480 generally requires liability classification for financial instruments that are certain to be redeemed, as they represent obligations to purchase shares of stock or represent obligations to issue a variable number of common shares. Series C preferred stock ("Series C preferred stock") is classified as a liability within mezzanine equity on the consolidated balance sheet as of September 30, 2023, and December 31, 2022.

The Company has 20,000,000 shares of preferred stock authorized with a par value of $0.0001.

***Permanent Equity***

*Preferred Stock*

Series D: On June 30, 2022, the Company entered into an exchange agreement with funds affiliated with Arena Investors LP ("Arena Investors") pursuant to which the Company issued 1,177,023 shares of Series D preferred stock. The Series D preferred stock was issued in exchange for the Convertible Notes. The total principal of the Convertible Notes was $12.5 million. The remaining unamortized discount as of June 30, 2022, of $4.3 million was fully amortized during the period ended June 30, 2022, and included in interest expense on the consolidated statement of operations. As of September 30, 2023, and December 31, 2022, there were 1,177,023 shares of Series D preferred stock issued and outstanding.

The Series D preferred stock has the following designations:

- Convertible at the option of the holder into common stock at $0.4248 per share
- The Series D liquidation preference is equal to $10.6191 per share
- The holders are entitled to receive cumulative quarterly dividends at a fixed annual rate of 2.25% of the liquidation preference, or $0.23893 per share
- The liquidation preference is senior in liquidation rights to holders of common stock.
- No voting rights

In addition to the exchange of the Convertible Notes, the related 11.8 million outstanding warrants to purchase common stock were amended to allow the holder to exercise for a to-be-issued class of the Company's preferred stock, convertible into the same number of shares of common stock as would have been issued upon exercise of such warrants under the original terms. This amendment caused the instruments to be treated as a derivative liability beginning on June 30, 2022. The transition to derivative accounting created a derivative liability of $40.4 million and a related deemed dividend of $32.8 million. Changes in the fair value of the derivative liability are marked to market through the consolidated statement of operations in the respective period.

Series E: In connection with the Series D preferred stock discussed above, the Company entered into an agreement with the Arena Investors pursuant to which the holder of the 11.8 million outstanding warrants to purchase common stock was allowed to exercise for shares of a to-be-issued class of preferred stock. Pursuant to this provision, on March 14, 2023, the Arena Investors exercised the warrants issued in May 2020 (the "May 2020 Warrants") into: (i) 4.4 million shares of common stock; and (ii) 3.2 million shares of Series E preferred stock.

The Series E preferred stock has the following designations:

- Convertible at the option of the holder at $0.50 per share of common stock
- The liquidation preference is senior in liquidation rights to holders of common stock.
- No dividends
- No voting rights

*Common Stock*

On April 20, 2022, the Company entered into a securities purchase agreement with an affiliate of Island Capital Group, LLC pursuant to which the Company issued 1,428,575 shares of Charge's common stock and three-year warrants to purchase up to 2,000,000 shares of Charge's common stock at $8.50 per share for an aggregate purchase price of $10.0 million. The purchase price was allocated between common stock and warrants and is reported within common stock and additional paid-in capital on the consolidated balance sheet. Pursuant to the purchase agreement, until February 2025, the purchaser has the right to participate, up to

25% in any issuance by the Company of indebtedness, common stock or common stock equivalents for cash other than exempt issuances, as defined in the agreement.

30

Table of Contents

On December 8, 2020, the Company entered into a Private Placement Agreement for the purchase of up to an aggregate $2.5 million of Charge's common stock at $0.25 per share. In connection with this agreement, the Company issued 8.7 million shares for an aggregate purchase price of $2.2 million. The shares were issued on January 15, 2021.

**Mezzanine Equity**

*Preferred Stock*

<u>Series C:</u> On December 17, 2021, the Company entered into a securities purchase agreement with funds affiliated with Arena Investors LP pursuant to which the Company issued 2,370,370 shares of Series C preferred stock at an aggregate face value of $7.4 million for an aggregate purchase price of $6.7 million. In connection with the issuance of the Series C preferred stock, the Company also issued warrants to purchase 2,370,370 shares of the Company's common stock. The Company has valued and recorded the beneficial conversion feature of the Series C preferred stock and the warrants resulting in a deemed dividend at the time of issuance.

On February 25, 2022, the Company entered into a securities purchase agreement with an affiliate of Island Capital Group LLC pursuant to which it issued 3,856,000 shares of Series C preferred stock at an aggregate face value of $12.1 million for an aggregate purchase price of $10.8 million. The Company has valued and recorded the beneficial conversion feature of the Series C preferred stock resulting in a deemed dividend at the time of issuance. As of September 30, 2023, and December 31, 2022, there were 6,226,370 shares of Series C preferred stock issued and outstanding.

The Series C preferred stock has the following designations:

- Convertible at the option of the holder at a conversion price of $3.125 per share
- The holders are entitled to receive cumulative dividends at 6% per annum, payable monthly
- In the event of reorganization, this class of preferred will not be affected by any such capital reorganization
- The Series C liquidation preference is equal to the stated value, plus any accrued and unpaid dividends
- Change of control provision whereby the Series C preferred shareholders would receive their stated value before all other shareholders
- No voting rights
- The liquidation preference is senior in liquidation rights to holders of common stock.
- Redemption features:

  o If the closing price on any particular date exceeds 200% of the effective conversion price, the Company may force the conversion of preferred stock with 10 days written notice;
  o At any time after the original issue date, the Company has the option to redeem some or all the outstanding preferred stock for cash within 10 days written notice; and
  o On the third anniversary of the issue date, the holder may request redemption, at the Company's option of cash or common stock, at the conversion price equal to the three-year redemption amount (a) 100% of the aggregate stated value then outstanding, (b) accrued but unpaid dividend, (c) additional cash consideration in order for the Purchasers to achieve a 20% internal rate of return, and (d) all liquidated damages and other amounts due in respect of the preferred stock.

The Series C preferred stock provides that the Company shall redeem the preferred stock for cash or common stock at the Company's option and, therefore, is not considered mandatorily redeemable. However, due to the change in control provision, the Series C preferred stock has liquidation preference and is deemed a liability and presented within mezzanine equity on the consolidated balance sheet as of September 30, 2023, and December 31, 2022.

During the third quarter of 2023, the Company determined there were facts and circumstances outside the holders' control which may prevent the Series C preferred stock from becoming redeemable by the holders. The Series C is classified as mezzanine equity due to the presence of the right of the holders to redeem outside of the Company's control. The holders' redemption is scheduled to occur on the third anniversary of the issue date and would occur based solely on the passage of time. However, due to changes in the underlying facts and circumstances, the Company concluded that it is not probable that the Series C preferred stock will become redeemable by the holders. The Company has the right to optionally redeem the Series C preferred stock prior to the third anniversary of the issue date. Therefore, the Company subsequently remeasured its Series C preferred stock to its maximum redemption amount at the balance sheet date. This subsequent remeasurement increased the carrying value of the Series C preferred stock to the face value of $19.5 million.

Table of Contents

*Warrants*

Warrant activity is summarized as follows:

| | Number of Warrants (in thousands) | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|---|
| Warrants outstanding at January 1, 2022 | 24,085 | $ | 1.74 | 3.0 |
| Issued | 2,000 | | 8.50 | 2.8 |
| Exercised | (8,183) | | (1.59) | N/A |
| Expired | - | | - | N/A |
| Warrants outstanding at December 31, 2022 | 17,902 | $ | 2.56 | 1.8 |
| Warrants exercisable at December 31, 2022 | 17,902 | $ | 2.56 | 1.8 |
| Issued | - | | - | |
| Exercised | (7,600) | | 0.50 | N/A |
| Expired | - | | - | N/A |
| Warrants outstanding at September 30, 2023 | 10,302 | $ | 4.08 | 2.1 |
| Warrants exercisable at September 30, 2023 | 10,302 | $ | 4.08 | 2.1 |

## Note 14. Stock-based compensation

*2020 Omnibus Equity Incentive Plan*

On January 11, 2021, the Company's Board of Directors and a majority of its stockholders adopted the 2020 Omnibus Equity Incentive Plan (the "2020 Plan"), as amended and restated as of May 7, 2021, and on December 23, 2021, with 75.0 million shares available for issuance. Under the 2020 Plan, the Company may grant stock options, restricted stock, dividend equivalents, restricted stock units, stock appreciation rights, and other stock or cash-based awards to individuals who are employees, officers, non-employee directors or consultants of the Company. The vesting periods range from one to four years. As of September 30, 2023, approximately 35.8 million shares remain available for issuance under the 2020 Plan.

*Non-Qualified Stock Option Agreement*

On November 1, 2020, Transworld Holdings, Inc. granted 10.5 million non-qualified stock options to the spouse of the Interim Chief Executive Officer and current member of the Company's Board of Directors for service in facilitating and completing the acquisition of PTGi International Carrier Services, Inc. ("PTGi"). The stock options have an exercise price of $0.55, vest over a period of three years from the grant date and have a contractual term of 10 years. The grant date fair value of these stock options using the Black Scholes Model ("BSM") valuation was $0.51 per share. These non-qualified stock options are separate from the 2020 Plan.

Table of Contents

**Stock options**

Stock option activity is summarized as follows:

| | Number of Shares (in thousands) | Weighted Average Exercise Price | | Intrinsic Value (in thousands) | | Weighted Average Remaining Contractual Term (in years) |
|---|---|---|---|---|---|---|
| Options outstanding at December 31, 2022 | 49,576 | $ | 2.07 | | - | - |
| Options granted | 7,480 | | 1.04 | | - | - |
| Options exercised | (75) | | 0.55 | | - | - |
| Options cancelled | (8,553) | | 2.85 | | - | - |
| Options outstanding at September 30, 2023 | 48,428 | $ | 1.77 | $ | 122 | 4.79 |
| Options exercisable at September 30, 2023 | 26,943 | $ | 1.60 | $ | 92 | 3.97 |
| Vested and expected to vest at September 30, 2023 | 48,428 | $ | 1.77 | $ | 122 | 4.79 |

The weighted-average grant date fair value of all options granted during the three and nine months ended September 30, 2023, was $0.53 and $0.62, respectively. The total intrinsic value of stock options exercised during the three and nine months ended September 30, 2023, was $0.0 million and $0.1 million, respectively. The total intrinsic value of stock options exercised during the three and nine months ended September 30, 2022, was $0.7 million. At September 30, 2023 there was $22.9 million of unrecognized stock-based compensation cost related to unvested stock options that is expected to be recognized over a weighted-average period of 1.5 years.

The Company uses the following assumptions in its BSM valuation for stock options granted:

| | Nine Months Ended September 30, |
|---|---|
| Weighted risk-free interest rate [1] | 3.5% |
| Weighted-average volatility [2] | 59% |
| Weighted expected dividend yield [3] | -% |
| Weighted expected term (in years) [4] | 5.7 |

1. Risk-free interest rate - Determined based on the U.S. Treasury yield in effect at the time of the grant for zero-coupon U.S. Treasury notes with remaining terms similar to the expected term of the options.

2. Expected volatility - Determined based on a blend of the Company's historic stock price volatility and the historic volatility of a peer group of publicly traded companies.

3. Expected dividend yield - Determined to be zero as the Company has not and does not currently plan to issue dividends.

4. Expected term - Determined using the "simplified method" for estimating the expected option life, which is the midpoint of the weighted-average vesting period and contractual term of the option.

**Restricted stock units**

Restricted stock unit ("RSU") activity is summarized as follows:

| | Number of Shares (in thousands) | Weighted Average Grant Date Fair Value | |
|---|---|---|---|
| RSUs outstanding at December 31, 2022 | 405 | $ | 2.26 |
| RSUs granted | 40 | | 0.92 |
| RSUs released | (76) | | 2.27 |
| RSUs forfeited | (100) | | 2.22 |
| RSUs outstanding at September 30, 2023 | 269 | $ | 2.07 |
| Weighted average remaining recognition period in years | 2.9 | | |
| Unamortized stock-based compensation expense | $ | 540 | |

33

Table of Contents

***Stock-based compensation expense***

The following tables present the Company's stock-based compensation expense, which is related primarily to options and is a non-cash expense, in the consolidated statements of operations:

| | | Three Months Ended September 30, | |
| --- | --- | --- | --- |
| *(in thousands)* | **2023** | | **2022 (As Adjusted)** |
| Cost of sales | $ 228 | $ | 506 |
| General and administrative | 845 | | 1,775 |
| Salaries and related benefits | 3,510 | | 3,586 |
| Total stock-based compensation | 4,583 | | 5,867 |
| Income tax benefit [1] | 425 | | - |
| After-tax stock-based compensation expense | $ 4,158 | $ | 5,867 |

| | | Nine Months Ended September 30, | |
| --- | --- | --- | --- |
| *(in thousands)* | **2023** | | **2022 (As Adjusted)** |
| Cost of sales | $ 961 | $ | 2,014 |
| General and administrative | 3,956 | | 7,344 |
| Salaries and related benefits | 10,532 | | 11,156 |
| Total stock-based compensation | 15,449 | | 20,514 |
| Income tax benefit [1] | 574 | | 1,735 |
| After-tax stock-based compensation expense | $ 14,875 | $ | 18,779 |

(1) Amounts exclude impact from any stock-based compensation expense subject to Section 162(m) of the Internal Revenue Code, which is nondeductible for income tax purposes.

**Note 15. Commitments, contingencies and concentration risk**

**Contingencies**

During the normal course of business, the Company may be exposed to litigation. When the Company becomes aware of potential litigation, it evaluates the merits of the case in accordance with ASC 450, *Contingencies*. Litigation and contingency accruals are based on the Company's assessment, including advice of legal counsel, regarding the expected outcome of litigation or other dispute resolution proceedings. If the Company determines that an unfavorable outcome is probable and can be reasonably assessed, it establishes the necessary accruals. As of September 30, 2023, and December 31, 2022, the Company is not aware of any contingent liabilities that should be reflected in the consolidated financial statements.

**Other Commitments**

**Indemnities**

The Company generally indemnifies its customers for the services it provides under its contracts, as well as other specified liabilities, which may subject the Company to indemnity claims, liabilities and related litigation. As of September 30, 2023, and December 31, 2022, the Company was not aware of any material asserted or unasserted claims in connection with these indemnity obligations.

Table of Contents

**Performance and Payment Bonds**

Many customers, particularly in connection with new construction within Infrastructure, require the Company to post performance and payment bonds issued by a financial institution known as a surety. If the Company fails to perform under the terms of a contract or to pay subcontractors and vendors who provided goods or services under a contract, the customer may demand that the surety make payments or provide services under the bond. The Company must reimburse the surety for any expenses or outlays it incurs. To date, the Company is not aware of any losses to their sureties in connection with bonds the sureties have posted on their behalf, and do not expect such losses to be incurred in the foreseeable future. Generally, 10% of bonding needs are held in cash on the balance sheet.

**Concentration of Credit Risk**

The Company maintains accounts with financial institutions. All cash in checking accounts is fully insured by the FDIC up to a $250,000 limit. At times, cash balances may exceed the maximum coverage provided by the FDIC on insured depositor accounts. The Company believes it mitigates its risk by depositing its cash and cash equivalents with major financial institutions.

**Major Customer Concentration**

There was one customer whose individual accounts receivable represented 10% or more of the Company's total balance as of September 30, 2023. The Company had three customers whose accounts receivable individually represented 10% or more of the Company's total balance as of December 31, 2022. In aggregate these customers accounted for approximately 46% of the Company's total accounts receivable as of December 31, 2022.

The Company has two customers whose revenue individually represented 10% or more of the Company's total revenue and whose revenue accounted for approximately 35% of the Company's total revenue for the three months ended September 30, 2023. The Company has one customer whose revenue represented 10% or more of the Company's total revenue, which accounted for 14% of the Company's total revenue for the nine months ended September 30, 2023. The Company had two customers whose revenue individually represented 10% or more of the Company's total revenue and, in aggregate, accounted for approximately 32% and 29% of the Company's total revenue for the three and nine months ended September 30, 2022, respectively.

**Labor Concentration**

One of our operating subsidiaries within Infrastructure sources direct labor from local unions, which have collective bargaining agreements expiring at various times over the next four years. Although the Company's past experience has been favorable with respect to resolving conflicting demands with these unions, it is possible that contract negotiations are unsuccessful which could impact the renewal of the collective bargaining agreements and availability of personnel.

**Note 16. Income taxes**

The following table includes the Company's income (loss) before income tax provision benefit (expense), income tax provision (benefit) and effective benefit tax rate for the periods indicated:

| | Three Months Ended September 30, | |
| --- | --- | --- |
| | **2023** | **2022 (As Adjusted)** |
| Income (loss) before income taxes | $ (6,210) | $ 16,173 |
| Income tax benefit (expense) | (741) | 8 |
| Effective tax rate | (11.9)% | (0.0)% |

Table of Contents

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | **2023** | **2022 (As Adjusted)** |
| Income (loss) before income taxes | $ (23,916) | $ (12,341) |
| Income tax benefit (expense) | (1,093) | 1,336 |
| Effective tax rate | (4.6)% | 10.8% |

For the three and nine months ended September 30, 2023, and 2022, the Company utilized the discrete effective tax rate method. This discrete method treats the year-to-date period as if it was the annual period and calculates the income tax expense or benefit on a discrete basis. Currently, the Company believes the use of the discrete method represents the best estimate of its annual effective tax rate. The Company's effective tax rate differed from the statutory rate primarily due to the valuation allowance on deferred tax assets, as well as the Company's permanent book-tax differences from stock-based compensation and state income taxes net of federal benefit.

**Note 17. Net income (loss) per share**

Basic income (loss) per share available to common stockholders is calculated using the weighted average number of common shares outstanding during the applicable period. Diluted net income (loss) per share available to common stockholders is calculated using the weighted average number of common shares outstanding plus the number of dilutive potential common shares outstanding during the applicable period. Dilutive potential common shares consist of the incremental common shares (i) issuable upon the vesting of outstanding restricted stock units and the exercise of outstanding stock options using the treasury stock method, (ii) contingently issuable assuming that the end of the reporting period is the end of the contingency period, and (iii) issuable for non-participating preferred stock using the if-converted method. Our warrants and some of our preferred stock are considered participating securities pursuant to the two-class method. Dilutive potential common shares are excluded from the calculation of diluted net income (loss) per share available to common stockholders if their effect is antidilutive.

The following potential common shares were excluded from the calculation of diluted net income (loss) per share available to common stockholders because their effect would have been antidilutive:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2023** | **2022** | **2023** | **2022** |
| Restricted stock units | 325 | - | 368 | 154 |
| Contingently issuable shares | - | - | 493 | 1,685 |
| Warrants | 10,303 | - | 12,725 | 16,878 |
| Stock options | 51,755 | 25,122 | 51,478 | 48,906 |
| Preferred stock | 38,852 | - | 37,856 | 16,951 |
| Convertible notes payable | - | - | - | 33,250 |
| Total | 101,235 | 25,122 | 102,920 | 117,824 |

**Note 18. Subsequent Events**

Events occurring after September 30, 2023, and through the date that these consolidated financial statements were issued, were evaluated to ensure that any subsequent events that met the criteria for recognition have been included.

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our current report on Form 8-K filed on May 10, 2023 (the "May 10, 2023 Form 8-K") and our audited financial statements and related notes included in our Annual Report on Form 10-K for the year ending December 31, 2022, filed on March 15, 2023 (our "2022 Form 10-K"). This discussion and other parts of this report contain forward-looking statements that involve risks and uncertainties, such as statements of our plans, objectives, expectations and intentions. Our actual results could differ materially from those discussed in these forward-looking statements.*

*Throughout this Quarterly Report on Form 10-Q, the terms "Charge," "we," "our," or "us" refer to Charge Enterprises, Inc. and its subsidiaries on a consolidated basis, unless stated or the context implies otherwise. The use of the term the "Company," "partner," or "partnering" in this report does not mean or imply a formal legal partnership and is not meant in any way to alter the terms of Charge's relationship with any third parties.*

**Overview**

Charge Enterprises, Inc. (the "Company" or "Charge") is an electrical, broadband and electric vehicle ("EV") charging infrastructure company that provides clients with end-to-end project management services, from advising, designing, engineering, acquiring and installing equipment, to monitoring, servicing, and maintenance. Our vision is to be a leader in enabling the next wave of transportation and connectivity. By building, designing, and operating seamless infrastructure for charging EVs and high-speed broadband, we aim to create a future where transportation is safe, reliable, clean, efficient, and connected.

The Company has two operating segments which also represent the Company's reportable segments:

- Infrastructure, which has a primary focus on EV charging ("EVC"), broadband, including cell tower, small cell, and in-building applications, and electrical contracting services.
- Telecommunications, which provides connection of voice calls, Short Message Services ("SMS"), and data to global carriers.

**Infrastructure**

Infrastructure's focus is to implement end-to-end solutions for customers that are custom designed to enhance connectivity, productivity, reduce the cost of operations, and improve the efficiency of commercial operations for our customers and their consumers. Our Infrastructure segment comprises several different offerings: Broadband & Wireless, Electrical Contracting Services, Electric Vehicle Charging and Fleet Services.

**Telecommunications**

Telecommunications provides routing of voice, data, and SMS to Carriers and Mobile Network Operators ("MNO") globally and operates through our wholly owned subsidiary PTGi International Carrier Services, Inc. ("PTGi"). Our Telecommunications business has contractual relationships with service providers in over 45 countries primarily within Asia, Europe, the Middle East, Africa, and North and South America. We provide customers with internet-protocol-based and time-division multiplexing ("TDM") access for the transport of long-distance voice and data minutes.

We operate a global telecommunications network consisting of domestic switching and related peripheral equipment, carrier-grade routers, and switches for internet and circuit-based services. To ensure high-quality communications services, our network employs digital switching and fiber optic technologies, incorporates the use of voice-over-internet protocols and SS7/C7 signaling, and is supported by comprehensive network monitoring and technical support services.

Table of Contents

**Comparability to Past Periods**

During the first quarter of 2023, we elected to change our method for recognizing stock-based compensation expense from the graded vesting attribution method to the straight-line attribution method. This change resulted in the recognition of a cumulative benefit to stock-based compensation expense of approximately $18.1 million ($18.0 million, net of tax). Of this amount, approximately $0.3 million ($0.2 million, net of tax) was attributable to 2020, approximately $8.8 million ($7.8 million, net of tax) was attributable to 2021, and approximately $8.9 million ($10.0 million, net of tax) was attributable to 2022. The Company believes the straight-line attribution method is the predominant method used in its industry, more accurately reflects how awards are earned over its employees' service periods, and better aligns the Company's recognition of stock-based compensation expense with its peers. The effects of the change in accounting principle have been retrospectively applied to all periods presented in Management's Discussion and Analysis of Financial Condition and Results of Operations. Refer to "Change in Accounting Principle" in Part I, Item 1, Note 2 – "Summary of significant accounting policies" for additional information.

In 2023, we identified a misstatement related to our presentation of stock-based compensation in our consolidated statements of operations. Although determined to be immaterial, we elected to correct the immaterial misstatement and reclassified our stock-based compensation expense to the same financial statement line item as cash compensation paid to the same employees and non-employees. The reclassification, which was effective subsequent to the change in accounting principle discussed above, resulted in the elimination of the stock-based compensation financial statement line item and a corresponding increase in expense reported in the historical cost of sales, general and administrative, and salaries and related benefits financial statement line items. Refer to "Stock-based compensation reclassification" in Part I, Item 1, Note 2 – "Summary of significant accounting policies" for additional information.

**Consolidated Results of Operations**

*Comparison of the Reported results for three and nine months ended September 30, 2023, and 2022*

| (in thousands) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 (As Adjusted) | Increase (Decrease) | % Increase (Decrease) | 2023 | 2022 (As Adjusted) | Increase (Decrease) | % Increase (Decrease) |
| Revenues | $ 132,277 | $ 185,857 | $ (53,580) | (29)% | $ 473,412 | $ 529,876 | $ (56,464) | (11)% |
| Cost of sales | 123,255 | 179,760 | (56,505) | (31)% | 450,353 | 512,143 | (61,790) | (12)% |
| Gross profit | 9,022 | 6,097 | 2,925 | 48% | 23,059 | 17,733 | 5,326 | 30% |
| General and administrative | 4,315 | 5,141 | (826) | (16)% | 14,854 | 17,200 | (2,346) | (14)% |
| Salaries and related benefits | 8,890 | 7,850 | 1,040 | 13% | 27,173 | 23,597 | 3,576 | 15% |
| Professional fees | 1,006 | 666 | 340 | 51% | 1,918 | 2,578 | (660) | (26)% |
| Depreciation and amortization expense | 1,172 | 433 | 739 | 171% | 3,574 | 1,745 | 1,829 | 105% |
| Income (loss) from operations | (6,361) | (7,993) | 1,632 | 20% | (24,460) | (27,387) | 2,927 | 11% |
| Other income (expenses) | 151 | 24,166 | (24,015) | (99)% | 544 | 15,046 | (14,502) | (96)% |
| Income tax (expense) benefit | (741) | 8 | (749) | (9,363)% | (1,093) | 1,336 | (2,429) | (182)% |
| Net income (loss) | $ (6,951) | $ 16,181 | $ (23,132) | (143)% | $ (25,009) | $ (11,005) | $ (14,004) | (127)% |

Table of Contents

Revenues

Revenues for the three-month period decreased $53.6 million to $132.3 million, compared with 2022. Revenues for the nine-month period decreased $56.5 million to $473.4 million, compared with 2022. The 29% decrease in revenue for the three months ended September 30, 2023 and 11% decrease in revenue for the nine months ended September 30, 2023 was driven by a decrease in wholesale traffic volumes within Telecommunications offset by increases in the revenues of electrical contracting services and EV charging installations within Infrastructure.

Cost of sales

Costs of sales decreased $56.5 million to $123.3 million for the three-month period and decreased $61.8 million to $450.4 million for the nine-month period, compared with 2022. The decrease in cost of sales in both periods was associated with the decrease in customer revenue. Overall gross margin percentage increased in both periods versus the prior year driven by the mix of revenue between businesses and the mix of projects in Infrastructure.

General and administrative

General and administrative expenses decreased $0.8 million to $4.3 million for the three-month period and decreased $2.3 million to $14.9 million for the nine-month period, compared to 2022. The decrease in both periods was driven primarily by a decrease in stock compensation expense of $0.9 million and $3.4 million in the three and nine-month periods, respectively, partially offset by higher insurance expense in the three-month period and higher insurance and other public company costs in the nine-month period.

Salaries and benefits

Salaries and benefits increased $1.0 million to $8.9 million for the three-month period and increased $3.6 million to $27.2 million for the nine-month period, compared to 2022. The increase was principally attributable to investments in personnel in the Infrastructure and Corporate segments to support our Company's growth partially offset by a decrease in stock compensation of $0.1 million in the three month period and $0.6 million in the nine month periods.

Professional fees

Professional fees increased $0.3 million to $1.0 million for the three-month period and decreased $0.7 million for the nine-month period, compared to 2022. The increase in the three-month period was primarily related to approximately $0.5 million in non-recurring legal fees and the decrease in the nine month period was primarily related to higher legal and accounting fees in the prior year related to acquisitions and our uplist to Nasdaq in the first and second quarter of 2022.

Depreciation and amortization expense

Depreciation and amortization expense increased $0.7 million to $1.2 million for the three-month period and increased $1.8 million for the nine-month period, compared to 2022. The increase was driven by amortization of intangible assets associated with the acquisitions of ANS, BW, and EV Depot.

Other income (expense)

Other income (expense) decreased by $24.0 million to $0.2 million for the three-month period and decreased $14.5 million to $0.5 million for the nine-month period compared to 2022.

The decrease in the three month period was driven primarily by a decrease in the gain related to the change in the fair value of derivative liabilities of $28.6 million and an increase in debt amortization costs of $0.5 million, partially offset by higher investment income of $0.9 million, a gain on the sale of intellectual property of $0.5 million in the current period and a decrease in the loss on contingent liability of $3.4 million compared to the prior year.

The decrease in the nine month period was driven primarily by a decrease in the gain related to the change in the fair value of derivative liabilities of $27.0 million, partially offset by a decrease in amortization of debt discount of $5.0 million and interest expense of $0.5 million as a result of the redemption of convertible stock in 2022, increase in investment income of $3.0 million, a decrease in the loss on contingent liability of $2.7 million compared to the prior year and a gain on the sale of intellectual property of $1.1 million in the current period.

Income tax benefit

The Company incurred income tax expense in the three and nine months ended September 30, 2023, compared to an income tax benefit in the three and nine months ended September 30, 2002, primarily due to an increase of the valuation allowance on deferred tax assets in the current quarter. The Company placed a full valuation allowance on its deferred tax assets in the fourth quarter of 2022.

**Segment Results of Operations**

*Infrastructure*

*Comparison of the reported results for three and nine months ended September 30, 2023, and 2022*

| (in thousands) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 (As Adjusted) | Increase (Decrease) | % Increase (Decrease) | 2023 | 2022 (As Adjusted) | Increase (Decrease) | % Increase (Decrease) |
| Revenues | $ 31,795 | $ 26,753 | $ 5,042 | 19% | $ 89,246 | $ 71,804 | $ 17,442 | 24% |
| Cost of sales | 23,600 | 21,607 | 1,993 | 9% | 68,619 | 57,538 | 11,081 | 19% |
| Gross profit | 8,195 | 5,146 | 3,049 | 59% | 20,627 | 14,266 | 6,361 | 45% |
| General and administrative | 1,485 | 1,369 | 116 | 8% | 4,418 | 4,115 | 303 | 7% |
| Salaries and related benefits | 4,867 | 4,468 | 399 | 9% | 14,750 | 12,615 | 2,135 | 17% |
| Professional fees | 19 | 70 | (51) | (73)% | 127 | 212 | (85) | (40)% |
| Depreciation and amortization expense | 1,166 | 391 | 775 | 198% | 3,539 | 1,618 | 1,921 | 119% |
| Income (loss) from operations | 658 | (1,152) | 1,810 | 157% | (2,207) | (4,294) | 2,087 | 49% |
| Other income (expenses) | (146) | (92) | (54) | (59)% | 29 | (906) | 935 | 103% |
| Income tax (expense) benefit | (741) | (91) | (650) | (714)% | (1,093) | 14 | (1,107) | (7,907)% |
| Net income (loss) | $ (229) | $ (1,335) | $ 1,106 | 83% | $ (3,271) | $ (5,186) | $ 1,915 | 37% |

Revenues

Revenues increased $5.0 million to $31.8 million for the three-month period and increased $17.4 million to $89.2 million for the nine-month period, compared with 2022. The increase in the three and nine-month periods was driven by growth related to electrical contracting services and higher revenues in our EV charging infrastructure business, both organically and through the recent acquisition of Greenspeed, which was partially offset by lower revenue within broadband and wireless as a result of lower spending by wireless broadband companies.

39

Table of Contents

<u>Cost of sales</u>

Costs of sales increased $2.0 million to $23.6 million for the three-month period and increased $11.1 million to $68.6 million for the nine-month period, compared with 2022, driven by the increase in revenues. Gross margin percentage increased in both periods, compared with 2022, driven by the mix of revenue between businesses and the mix of projects within the businesses, primarily in our electrical contracting services business.

<u>General and administrative</u>

General and administrative expenses increased $0.1 million to $1.5 million for the three-month period and increased $0.3 million to $4.4 million for the nine-month period, compared to 2022. The change in both periods was driven primarily by investments made in the EV charging infrastructure business partially offset by lower stock compensation expense.

<u>Salaries and related benefits</u>

Salaries and benefits increased $0.4 million to $4.9 million for the three-month period and increased $2.1 million to $14.8 million for the nine-month period, compared to 2022. The increase in both periods was driven by higher headcount across all Infrastructure businesses to support growth, offset by lower stock compensation expense.

<u>Professional fees</u>

Professional fees in both the three-month and nine-month periods were consistent with 2022.

<u>Depreciation and amortization expense</u>

Depreciation and amortization expense increased $0.8 million to $1.2 million for the three-month period and increased $1.9 million to $3.5 million for the nine-month period, compared to 2022. The increase in both periods was driven by amortization of intangible assets associated with the acquisitions of ANS, BW, and EV Depot.

<u>Other income (expense)</u>

Other income (expense) for the three-month period decreased by $0.1 million from an expense of $0.1 million in 2022. Other income (expense) for the nine-month period increased by $0.9 million from an expense of $0.9 million in 2022.

For the three-month and nine-month periods, the expense was driven primarily by an investment loss.

<u>Income tax benefit</u>

The Company incurred income tax expense for the three months ended September 30, 2023 and September 30, 2022. For the nine months ended September 30, 2023 the Company had an income tax expense, primarily due to an increase of the valuation allowance on deferred tax assets. The Company placed a full valuation allowance on its deferred tax assets in the fourth quarter of 2022.

Table of Contents

***Telecommunications***

***Comparison of the reported results for three and nine months ended September 30, 2023, and 2022***

| (in thousands) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | **2023** | **2022 (As Adjusted)** | **Increase (Decrease)** | **% Increase (Decrease)** | **2023** | **2022 (As Adjusted)** | **Increase (Decrease)** | **% Increase (Decrease)** |
|---|---|---|---|---|---|---|---|---|
| Revenues | $100,482 | $ 159,104 | $ (58,622) | (37)% | $384,166 | $ 458,072 | $ (73,906) | (16)% |
| Cost of sales | 99,655 | 158,153 | (58,498) | (37)% | 381,734 | 454,605 | (72,871) | (16)% |
| Gross profit | 827 | 951 | (124) | (13)% | 2,432 | 3,467 | (1,035) | (30)% |
| General and administrative | 507 | 514 | (7) | (1)% | 1,670 | 1,677 | (7) | (0)% |
| Salaries and related benefits | 198 | 187 | 11 | 6% | 723 | 794 | (71) | (9)% |
| Professional fees | 8 | 27 | (19) | (70)% | 33 | 63 | (30) | (48)% |
| Depreciation and amortization expense | 6 | 42 | (36) | (86)% | 35 | 127 | (92) | (72)% |
| Income (loss) from operations | 108 | 181 | (73) | (40)% | (29) | 806 | (835) | (104)% |
| Other income (expenses) | 808 | (4) | 812 | 20,300% | 1,433 | 69 | 1,364 | 1,977% |
| Income tax (expense) benefit | - | (255) | 255 | 100% | - | (3) | 3 | 100% |
| Net income (loss) | $ 916 | $ (78) | $ 994 | 1,274% | $ 1,404 | $ 872 | $ 532 | 61% |

Revenues

Revenues decreased $58.6 million to $100.5 million for the three-month period and decreased $73.9 million to $384.2 million for the nine-month period, compared with 2022. The decrease in both periods was due to an overall decrease in wholesale traffic volumes compared to 2022 driven by lower voice demand. The rapid development of new technologies, services, and products has eliminated many of the traditional distinctions among wireless, cable, internet, local, and long-distance communication services. The Company continues to expect downward pressure on revenues over time due to the pace of technology development, emergence of new products, and intense competition.

Cost of sales

Cost of sales decreased $58.5 million to $99.7 million for the three-month period and decreased $72.9 million to $381.7 million for the nine-month period, compared to 2022, driven by the decrease in customer revenue. Gross margin percentage in this business increased in the three-month period and decreased in the nine-month period year over year due to customer mix.

General and administrative

General and administrative expense in both the three and nine-month periods was consistent with 2022.

Salaries and related benefits

Salaries and benefits for the three and nine month period were consistent with 2022.

Professional fees

Professional fees in both the three and nine-month periods were consistent with 2022.

41

Table of Contents

Depreciation and amortization expense

Depreciation and amortization expense decreased $0.1 million for the nine-month period, compared to 2022. The decrease was driven by assets reaching their full depreciation in prior periods.

Other income (expense)

Other income (expense) increased by $0.8 million to $0.8 million other income for the three-month period and increased $1.4 million to $1.4 million other income for the nine-month period, compared to 2022.

For the three-month period, the income in 2023 was driven by a gain on the sale of intellectual property of $0.5 million, interest income of $0.2 million and a gain on Foreign Exchange ("FX") of $0.1 million.

For the nine-month period, the income in 2023 was driven by a gain on the sale of intellectual property of $1.3 million, interest income of $0.2 million partially offset by a loss on FX of $0.1 million. The income in 2022 was driven primarily by a gain on the sale of intellectual property of $0.2 million offset by an FX loss of $0.1 million.

Income tax benefit

The Company did not incur income tax expense in the three and nine months ended September 30, 2023, compared to an income tax expense for the three months ended September 30, 2022, primarily due to an increase of the valuation allowance on deferred tax assets. The Company placed a full valuation allowance on its deferred tax assets in the fourth quarter of 2022.

***Non-operating Corporate Segment***

***Comparison of the reported results for three and nine months ended September 30, 2023, and 2022***

| | **Three Months Ended September 30,** | | | | **Nine Months Ended September 30,** | | | |
|---|---|---|---|---|---|---|---|---|
| *(in thousands)* | **2023** | **2022 (As Adjusted)** | **Increase (Decrease)** | **% Increase (Decrease)** | **2023** | **2022 (As Adjusted)** | **Increase (Decrease)** | **% Increase (Decrease)** |
| Revenues | $    - | $    - | $    - | - | $    - | $    - | $    - | - |
| Cost of sales | - | - | - | - | - | - | - | - |
| Gross profit | - | - | - | - | - | - | - | - |
| General and administrative | 2,323 | 3,258 | (935) | (29)% | 8,766 | 11,408 | (2,642) | (23)% |
| Salaries and related benefits | 3,825 | 3,195 | 630 | 20% | 11,700 | 10,188 | 1,512 | 15% |
| Professional fees | 979 | 569 | 410 | 72% | 1,758 | 2,303 | (545) | (24)% |
| Income (loss) from operations | (7,127) | (7,022) | (105) | (1)% | (22,224) | (23,899) | 1,675 | 7% |
| Other income (expenses) | (511) | 24,262 | (24,773) | (102)% | (918) | 15,883 | (16,801) | (106)% |
| Income tax (expense) benefit | - | 354 | (354) | (100)% | - | 1,325 | (1,325) | (100)% |
| Net income (loss) | $ (7,638) | $ 17,594 | $ (25,232) | (143)% | $(23,142) | $ (6,691) | $ (16,451) | (246)% |

General and administrative

General and administrative expenses decreased $0.9 million to $2.3 million for the three-month period and decreased $2.6 million to $8.8 million for the nine-month period, compared to 2022. The decrease was driven primarily by a decrease in stock compensation expense of $0.9 million and $2.6 million in the three and nine-month periods, respectively.

Salaries and related benefits

Salaries and benefits increased $0.6 million to $3.8 million for the three-month period and increased $1.5 million to $11.7 million for the nine-month period, compared to 2022. The increase in both periods was driven by investments in personnel to support the Company's growth.

Professional fees

Professional fees increased $0.4 million to $1.0 million for the three-month period and decreased $0.6 million to $1.8 million for the nine-month period, compared to 2022. The increase in the three-month period was primarily related to approximately $0.5 million in non-recurring legal fees and the nine-month decrease was primarily related to higher legal and accounting fees in the prior year related to acquisitions and our uplist to Nasdaq in the first and second quarter of 2022.

Other income (expense)

Other income (expense) for the three-month period decreased by $24.8 million from an income of $24.3 million in 2022 to an expense of $0.5 million in 2023. Other income (expense) for the nine-month period decreased by $16.8 million from an income of $15.9 million in 2022 to an expense of $0.9 million in 2023.

For the three-month period, the expense in 2023 was driven primarily by debt amortization costs of $1.0 million and interest expense of $0.5 million, offset by a gain in investment income of $0.8 million and a gain in fair value of derivative liabilities of $0.1 million. The income in 2022 was driven primarily by a gain on change in the fair value of derivative liabilities of $28.7 million partially offset by a loss on contingent liabilities of $3.4 million, debt amortization costs of $0.5 million and interest expense of $0.5 million.

For the nine-month period, the expense in 2023 was driven primarily by debt amortization costs of $3.0 million and interest expense of $1.5 million, offset by a gain in fair value of derivative liabilities of $1.7 million and an investment gain of $1.4 million and insurance revenue of $0.3 million. The income in 2022 was driven primarily by a change in the fair value of derivative liabilities of $28.7 million partially offset by debt amortization costs of $7.9 million, a loss on contingent liability of $2.7 million, interest expense of $2.0 million, and an investment loss of $0.4 million.

Income tax benefit

The Company did not incur income tax expense in the three and nine months ended September 30, 2023, compared to an income tax benefit for the three and nine months ended September 30, 2022, primarily due to an increase of the valuation allowance on deferred tax assets in the current quarter. The Company placed a full valuation allowance on its deferred tax assets in the fourth quarter of 2022.

**Liquidity and Capital Resources**

Our primary sources of liquidity are operating cash flows and private placement of equity and debt. In order to finance acquisitions, throughout 2020 and 2021, we issued preferred shares, convertible and non-convertible promissory notes. During 2022, all convertible notes, in the amount of $12.5 million, were either exchanged for Series D preferred stock or sold to an unrelated third party and converted to common stock. As a result, we no longer have any convertible notes payable outstanding at September 30, 2023, and December 31, 2022. Outstanding non-convertible notes issued on May 19, 2021 (the "May 2021 Notes") and December 17, 2021 (the "December 2021 Notes" and, together, the "Notes") in the aggregate amount of $27.8 million will mature on November 19, 2023. We plan to pay the full amount due on or before the maturity date.

On August 11, 2023, we entered into a Securities Purchase Agreement with KORR Value, L.P. (the "August 2023 SPA"), pursuant to which, beginning on October 15, 2023 and through March 31, 2024, the Company has the right, but not the obligation, to sell to the purchaser, and to require the purchaser to purchase, up to $5.0 million of common stock, at a purchase price of $1.00 per share. Kenneth Orr, a beneficial owner of more than 5% of the Company's common stock and the former Chairman of the Company, has sole voting and dispositive power over the shares held by KORR Value, L.P. To date, we have not exercised our right and have not sold any shares pursuant to the August 2023 SPA.

We assess our liquidity in terms of our ability to generate cash to fund our short-term and long-term cash requirements. We believe that our business will continue to generate cash flows from operating activities, and these cash flows, together with our existing cash and cash equivalents, and our ability to draw on current credit facilities, provide us with sufficient resources to meet our current operating liquidity, debt service requirements and capital requirements for operations over the next 12 months. From time to time, we invest excess liquidity in money market funds or other interest-bearing accounts. When such investments are made, we do not believe that we have any material exposure with respect to these assets. In the event that our plans change, or our cash requirements are greater than we anticipate, we may need to access the capital markets to finance our future cash requirements. However, there can be no assurance that such financing will be available to us should we need it or, if available, that the terms will be satisfactory to us and not dilutive to existing shareholders.

Table of Contents

*Funding*

On February 25, 2022, we entered into a securities purchase agreement with Island Capital Group Charge Me LLC (the "February 2022 Investors") pursuant to which we issued Series C preferred shares in an aggregate face value of $12.1 million and aggregate purchase price of $10.8 million ("Series C preferred stock"). We valued and recorded the beneficial conversion feature of the Series C preferred stock resulting in a deemed dividend at the time of issuance. At September 30, 2023, and December 31, 2022, we have 6,226,370 shares of Series C preferred stock issued and outstanding.

On December 17, 2021, we entered into a securities purchase agreement with funds affiliated with Arena Investors LP (the "December 2021 Investors") pursuant to which we issued a note payable in an aggregate face value of $15.9 million for an aggregate purchase price of $13.3 million (the "December 17, 2021 Notes"). The December 17, 2021 Notes have a coupon of 7.5% per annum and a maturity date of November 19, 2023. On December 17, 2021, we issued 2,370,370 shares of Series C Preferred ("Series C preferred stock") to Arena Investors LP as part of the securities purchase agreement at an aggregate purchase price of $6.7 million. In connection with the issuance of the Series C preferred stock, we also issued warrants to purchase 2,370,370 shares of our common stock at a price of $4.00 per share.

On May 19, 2021, we entered a securities purchase agreement with funds affiliated with Arena Investors LP (the "May 2021 Investors") pursuant to which we issued: (i) convertible notes in an aggregate principal amount of $5.6 million for an aggregate purchase price of $5.0 million that are convertible at any time, at the holder's option, into shares of our common stock at a conversion price of $4.00 per share and mature on May 19, 2024 (the "May 19, 2021 Convertible Notes"); and (ii) non-convertible notes payable in an aggregate face value of $11.9 million for an aggregate purchase price of $10.0 million (the "May 19, 2021 Notes"). The May 19, 2021 Notes includes a 7.5% premium and 10% original issue discount, a coupon of 8.0% per annum and were originally set to mature on November 19, 2022. The maturity date was subsequently extended to November 19, 2023. In connection with this extension, we issued to the May 2021 Investors warrants to acquire 1,870,000 shares of common stock at a price of $4.00 per share.

On November 3, 2020, we entered into a securities purchase agreement with funds affiliated with Arena Investors LP (the "November 2020 Investors") pursuant to which we issued convertible notes in an aggregate principal amount of $3.9 million for an aggregate purchase price of $3.5 million (the "November 2020 Convertible Notes). In connection with the issuance of the November 2020 Convertible Notes, we issued to the November 2020 Investors 903,226 shares of common stock. The November 2020 Convertible Notes were convertible at any time, at the holder's option, into shares of our common stock at a conversion price of $0.25 per share.

On May 8, 2020, we entered into a securities purchase agreement with certain institutional investors (collectively, the "May 2020 Investors") pursuant to which we issued convertible notes in an aggregate principal amount of $3.0 million for an aggregate purchase price of $2.7 million (the "May 2020 Convertible Notes"). In connection with the issuance of the May 2020 Convertible Notes, we issued to the May 2020 Investors warrants to purchase an aggregate of 7,600,000 shares of common stock (collectively, the "Warrants") and 7.5 shares of series G convertible preferred stock (the "Series G preferred stock"). The May 2020 Convertible Notes' maturity date of May 8, 2021 was extended to May 8, 2023, unless earlier converted. The May 2020 Convertible Notes accrue interest at a rate of 8% per annum, subject to increase to 20% per annum upon and during the occurrence of an event of default. Interest was payable in cash on a quarterly basis beginning on December 31, 2020. The May 2020 Convertible Notes were convertible at any time, at the holder's option.

During the year ended December 31, 2022, we entered into a non-cash exchange agreement with funds affiliated with the November 2020 Investors and the May 2020 Investors pursuant to which we issued 1,177,023 shares of Series D preferred stock ("Series D preferred stock") in exchange for the November 2020 Convertible Notes, the May 2020 Convertible Notes, and the May 2021 Convertible Notes, totaling $12.5 million. At September 30, 2023, and December 31, 2022, we no longer have any convertible notes outstanding.

43

Table of Contents

In connection with the Series D preferred stock, we entered into an agreement with the Arena Investors pursuant to which the holder of the 11.8 million outstanding warrants to purchase common stock was allowed to exercise for shares of a to-be-issued class of preferred stock. Pursuant to this provision on March 14, 2023, the Arena Investors exercised the warrants issued May 2020 (the "May 2020 Warrants") into: (i) 4.4 million shares of common stock; and (ii) 3.2 million shares of Series E preferred stock ("Series E preferred stock"). The proceeds from the issuance of the Series E preferred stock were $1.6 million and the proceeds from the exercise of warrants was $2.2 million.

Our subsidiary ANS has an $8.0 million line of credit (the "ANS Line of Credit"), which we and our subsidiary Charge Infrastructure Holdings, Inc. guarantee. Interest on the ANS Line of Credit is payable monthly at the Wall Street Journal prime rate. During the nine months ended September 30, 2023, we borrowed $4.7 million under the ANS Line of Credit and made payments against the ANS Line of Credit of $9.7 million. As a result of this activity, we have no amounts outstanding under the ANS Line of Credit at September 30, 2023. The ANS Line of Credit has a termination date of October 31, 2024.

On November 18, 2022, our subsidiaries Nextridge and ANS renewed a $750,000 equipment and vehicle line of credit available with a bank. Interest is payable monthly at the Wall Street Journal prime rate. On December 1, 2023, the line will convert to a term loan with the then five-year Federal Home Loan Bank rate + 2.5% and have a five-year term with a five-year amortization. There are no financial commitments or covenants on the line of credit. As of September 30, 2023, and December 31, 2022, we have no amounts outstanding under this line of credit.

Our subsidiary BW had a $3.0 million line of credit (the "BW Line of Credit"), which we and our subsidiary Charge Infrastructure Holdings, Inc. guaranteed. Interest on the BW Line of Credit was payable monthly at the Wall Street Journal prime rate. During the nine months ended September 30, 2023, we did not borrow under the BW Line of Credit. We had no amounts outstanding under the BW Line of Credit at September 30, 2023. Effective July 26, 2023, BW renewed the facility with substantially the same terms and an expiration of August 1, 2024.

*Liquidity*

As of September 30, 2023, we had $27.8 million aggregate principal amount outstanding under the May 2021 Notes and the December 2021 Notes. As of September 30, 2023, we have no amounts outstanding under the ANS Line of Credit or the BW Line of Credit. As of September 30, 2023, total liquidity was $68.3 million, which was comprised of $51.4 million in cash and cash equivalents, $5.9 million of marketable securities, $8.0 million available under the ANS Line of Credit, and $3.0 million available under the BW Line of Credit. We may also use our capital resources to repurchase shares of our common stock, to pay dividends to our stockholders, and to make acquisitions.

On August 1, 2023, the Company completed the acquisition of Greenspeed for up to $15.0 million, net of closing adjustments, which includes $6.0 million in cash consideration reduced for certain transaction expenses and working capital adjustments, $2.0 million in equity consideration at closing, and a performance-based earn out over the next two years of up to $7.0 million. We recorded the performance based earn-out as a contingent consideration liability of approximately $5.8 million on the acquisition date.

As discussed above, we have $5.0 million of additional liquidity available to us through March 2024 pursuant to the August 2023 SPA.

*Cash Requirements*

As discussed above, based on our current and available future liquidity, we expect to have sufficient resources to meet our current operating liquidity and capital requirements for the next 12 months, including after accounting for the repayment of the $27.8 million that comes due and payable under the Notes on November 19, 2023. We are also exploring opportunities to enter into new debt and / or equity facilities with an alternative financing source to refinance the Notes. Although we expect to have sufficient resources to meet our near-term needs, in the event that our plans change, or our cash requirements are greater than we anticipate, we may need to access the capital markets or obtain other sources of debt funding to finance future cash requirements. However, there can be no assurance that such financing will be available to us should we need it or, if available, that the terms will be satisfactory to us and not dilutive to existing stockholders.

Moreover, certain holders of the Notes advised us, during our June 2023 discussions with them related to refinancing or repaying the Notes, that in their view, certain provisions of the securities purchase agreements pursuant to which they purchased the Notes and other of the Company's securities, prohibit the Company from refinancing the Notes and from incurring additional indebtedness following repayment of the Notes without their consent. Additionally, during further discussions, the holders have raised issues relating to the Company's guarantees of its subsidiaries' indebtedness, which, in their view, could constitute a breach of the

securities purchase agreements and defaults under the Notes and result in the application of default interest rates (20%) and other monetary penalties. We disagree with these positions and believe we have valid defenses, and we intend to take appropriate action to preserve the Company's rights. We are attempting to resolve these disagreements amicably through ongoing discussions, but an inability to resolve these disputes would likely increase the costs of refinancing or repayment or hinder our ability to refinance or amend the Notes or otherwise obtain new debt financing to fund our longer-term operations and acquisition strategy. Moreover, an inability to reach resolution could also lead to litigation with the holders of the Notes, whether brought by us or against us. Any such litigation could be expensive, time-consuming, and distracting and no assurance can be provided that the outcome would be satisfactory. See Risk Factors - "*We are subject to significant restrictive covenants and other provisions under the agreements governing our indebtedness, preferred stock and warrants.*" and "*We may be party to legal proceedings that could have a material adverse effect on the Company's liquidity, financial position, and results of operations, as well as its reputation.*" in Part II, Item 1A of this report.

Our longer-term liquidity needs (i.e., more than 12 months from the date of this filing) include cash necessary to support our business growth, to pay our debt service costs, which will vary based on the amount of principal outstanding and the interest rate on such amounts, and to continue to pay annual dividends on our issued and outstanding Series C and Series D preferred stock of approximately $1.5 million. Additionally, pursuant to the Greenspeed acquisition agreement, we may be required to pay up to $3.5 million in earn out payments in each of the next two years if certain EBITDA targets are met by the Greenspeed business.

*Cash Flows*

The following table summarizes our cash flow activity, as reported within the consolidated statements of cash flows, followed by a discussion of the major drivers impacting operating, investing, and financing cash flows:

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| *(in thousands)* | | 2023 | | 2022 |
| Total cash provided by (used in): | | | | |
| Operating activities | $ | 27,229 | $ | (2,917) |
| Investing activities | | 166 | | 484 |
| Financing activities | | (2,530) | | 20,386 |
| Effect of foreign currency exchange rates on cash and cash equivalents | | (343) | | 45 |
| Net increase in cash and cash equivalents | $ | 24,522 | $ | 17,998 |

44

Table of Contents

Cash Flows from Operating Activities

Cash flows provided by operating activities were $27.2 million for the nine months ended September 30, 2023. Cash flows used in operating activities were $2.9 million for the nine months ended September 30, 2022. The increase in cash flows provided by operating activities was primarily due to the increase of cash provided by net working capital in 2023 of $35.1 million, compared with $4.2 million cash provided by net working capital in 2022. This increase was partially offset by a decrease in net income adjusted for non-cash items of $0.7 million. We anticipate the acquisition of Greenspeed to be accretive to our cash flows from operations in the first full year of ownership.

Cash Flows from Investing Activities

Cash flows provided by investing activities were $0.2 million for the nine months ended September 30, 2023. Cash flows provided by investing activities were $0.5 million for the nine months ended September 30, 2022. The decrease in cash flows provided by investing activities is primarily due to: (i) a decrease in cash proceeds from the sale of marketable securities of $17.2 million; and (ii) an increase in cash outflows for acquisitions of $3.7 million. These decreases in cash flows provided by investing activities were partially offset by: (i) a decrease in purchases of marketable securities of $17.7 million; (ii) an increase in cash acquired in acquisitions of $1.7 million; and (iii) an increase in proceeds from sales of intellectual property of $1.1 million.

Cash Flows from Financing Activities

Cash flows used in financing activities were $2.5 million for the nine months ended September 30, 2023. Cash flows provided by financing activities were $20.4 million for the nine months ended September 30, 2022. The cash flows provided by financing activities decreased primarily due to: (i) a reduction in proceeds from borrowing under revolving lines of credit of $14.1 million; (ii) a reduction in proceeds from the sale of common stock of $10.0 million; and (iii) a net reduction in proceeds from the issuance of preferred stock of $9.2 million. These reductions in cash flows provided by financing activities were partially offset by: (i) a decrease in payments against revolving lines of credit of $8.8 million; and (ii) an increase in proceeds from the exercise of warrants of $1.1 million.

**Off-Balance Sheet Arrangements**

As of September 30, 2023, the Company did not have any off-balance sheet arrangements.

**Critical Accounting Estimates**

The preparation of financial statements and related disclosures in conformity with U.S. GAAP requires us to make judgments, assumptions, and estimates that affect the amounts reported in the consolidated financial statements and accompanying notes. "Note 2, Summary of significant accounting policies" to the Consolidated Financial Statements in our 2022 Form 10-K describes the significant accounting policies and methods used in the preparation of the consolidated financial statements. Our critical accounting estimates, identified in Management's Discussion and Analysis of Financial Condition and Results of Operations in Part II, Item 7 of our 2022 Form 10-K, are stock-based compensation, revenue recognition, leases, goodwill, and income taxes. Such accounting policies and estimates require significant judgments and assumptions to be used in the preparation of the consolidated financial statements, and actual results could differ materially from the amounts reported.

**Recent Accounting Pronouncements**

See Part I, Item 1, "Note 2, Summary of significant accounting policies" for a detailed description of recent accounting pronouncements.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risk from fluctuations in interest rates and foreign currency exchange rates.

*Interest Rate Risk*

The Federal Reserve Board has been increasing interest rates, and it is anticipated that rate increases may continue throughout 2023. We are exposed to market risk from changes in interest rates on our variable-rate indebtedness (the ANS Line of Credit and BW Line of Credit). As of September 30, 2023, and December 31, 2022, we had $0.0 million and $5.0 million outstanding under the ANS Line of Credit, respectively, which bears interest at the Wall Street Journal prime rate ("Prime Rate"). As of September 30,

2023, and December 31, 2022, we did not have any outstanding balances on our BW Line of Credit, which bears interest at the Prime Rate.

45

Table of Contents

As of September 30, 2023, if our borrowing rates were to change by 1%: (i) interest expense on our ANS Line of Credit would increase or decrease, as applicable, by $0.1 million on an annual basis, assuming our entire $8.0 million balance under the ANS Line of Credit was outstanding; and (ii) interest expense on our BW Line of Credit would increase or decrease, as applicable, by $0.1 million on an annual basis, assuming our entire $3.0 million balance under the BW Line of Credit was outstanding.

As of September 30, 2023, and December 31, 2022, we also had $27.8 million aggregate principal amount of fixed-rate senior notes payable (the "Notes Payable") outstanding, which bear interest at a weighted average interest rate of 7.7%. Since our Notes Payable bear interest at fixed rates and are carried at amortized cost, fluctuations in interest rates do not have any impact on our consolidated financial statements. However, the fair value of the Notes Payable will fluctuate with movements in market interest rates, increasing in periods of declining interest rates and declining in periods of increasing interest rates. The Notes Payable are not subject to interest rate risk, but we may be subject to changes in interest rates if and when we refinance this debt at maturity or otherwise.

At this time, we have not entered into, but in the future we may enter into, derivatives or other financial instruments in an attempt to hedge our interest rate risk.

*Foreign Currency Risk*

In our Telecommunications business, we perform services in foreign countries, which have foreign currency risks related to our revenue and operating expenses denominated in currencies other than the U.S. dollar, primarily the Euro. Accordingly, changes in exchange rates, and in particular a weakening of the U.S. dollar, have negatively affected, and may continue to negatively affect, our revenue and other operating results as expressed in U.S. dollars.

We enter into transactions that are not denominated in their functional currency. We have experienced and will continue to experience fluctuations in our net income as a result of transaction gains or losses related to revaluing monetary asset and liability balances that are denominated in currencies other than the functional currency of the entities in which they are recorded. At this time, we have not entered into, but in the future, we may enter into, derivatives or other financial instruments in an attempt to hedge our foreign currency exchange risk. It is difficult to predict the effect hedging activities would have on our results of operations. A foreign currency exchange net loss of $0.0 million, and a foreign currency exchange net loss of $0.1 million were recognized during the three months ended September 30, 2023, and 2022, respectively. Foreign currency exchange net losses of $0.2 million and $0.1 million were recognized during the nine months ended September 30, 2023, and 2022, respectively. If the Euro had weakened or strengthened by 10% compared to the U.S. dollar, our foreign currency exchange losses for the three months ended September 30, 2023, would have an immaterial impact on the consolidated financial statements. Revenue from foreign currency represents approximately 3% of total revenue.

Translation gains or losses, which are recorded in other comprehensive income or loss, result from translation of the assets and liabilities of our foreign subsidiaries into US dollars. Foreign currency exchange net losses of $0.0 million were recognized during the three and nine months ended September 30, 2023, and 2022. If the Euro had weakened or strengthened by 10% compared to the U.S. dollar, our foreign currency exchange losses for the three months ended September 30, 2023 would not have increased or decreased materially.

This sensitivity analysis has inherent limitations. While our largest exposure is to the Euro, the analysis disregards the possibility that rates of multiple foreign currencies will not always move in the same direction relative to the value of the U.S. dollar.

### Item 4. Controls And Procedures Evaluation of Disclosure Controls and Procedures

Our disclosure controls and procedures are designed to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

Table of Contents

Our management, with the participation and supervision of our Chief Executive Officer and our Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of such date, our disclosure controls and procedures were, in design and operation, effective at a reasonable assurance level.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(e) and 15d-15(e) of the Exchange Act that occurred during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Controls**

Our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving their objectives as specified above. Management does not expect, however, that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all errors and fraud. Any control system, no matter how well designed and operated, is based upon certain assumptions and can provide only reasonable, not absolute, assurance that its objectives will be met. Further, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the Company have been detected.

47

Table of Contents

Part II

OTHER INFORMATION

## Item 1. Legal Proceedings

From time to time, we may be involved in litigation incidental to the conduct of our business. We are currently not a party to any legal proceedings that we believe would have a material effect on our business, financial position, results of operations or cash flows.

## Item 1A. Risk Factors

In addition to the other information set forth in this report, you should carefully consider the risks that could materially affect our business, financial condition or results of operations. The following is an update to the Company's risk factors and should be read in conjunction with the risk factors previously disclosed under the caption "Risk Factors" in Part I, Item 1A of our 2022 Form 10-K.

***We are subject to significant restrictive covenants and other provisions under the agreements governing our indebtedness, preferred stock and warrants.***

The securities purchase agreements related to our outstanding Notes and the agreements governing our indebtedness contain various negative covenants that restrict our ability to, among other things:

- Incur additional indebtedness and guarantee indebtedness;
- Pay dividends or make other distributions, or repurchase or redeem capital stock;
- Prepay, redeem or repurchase debt or equity;
- Issue certain preferred stock;
- Make loans and investments;
- Sell, lease or otherwise dispose of assets;
- Acquire any assets or business;
- Incur liens;
- Enter into any transactions with affiliates;
- Issue common stock or common stock equivalents involving a variable rate transaction; and
- Consolidate, merge or sell all or substantially all of our assets

As discussed in Part I, Item 1. Note 9, Debt, we are also subject to certain affirmative covenants under the ANS and BW Lines of Credit, which, among other things, require us and our operating subsidiaries to maintain a specified debt service and debt to net worth or earnings ratios. Our ability to meet these financial ratios may be affected by events beyond our control and, as a result, there can be no assurance that we will be able to meet these ratios. Effective July 26, 2023, BW renewed the facility with substantially the same terms and an expiration of August 1, 2024.

Until February 25, 2025, the holders of our Series C preferred stock, our Series D preferred stock, and our warrants issued in April 2022 have the right to participate in future financings that involve the issuance of indebtedness, common stock or common stock equivalents. Such participation rights may restrict our ability to secure such financing unless the holders of such securities waive their right to participate or the party providing the financing accept the participation of the holders of the Series C preferred stock, the Series D preferred stock and the April 2022 warrants.

The securities purchase agreements entered into in December 2021 also contain a most-favored nations provision, such that if future issuances of securities by the Company are deemed to be on more beneficial terms (the "Other Securities") to those provided for in the December 2021 transactions, the December 2021 investors may exchange their securities for Other Securities, which could result in increased dilution to our stockholders or reduced proceeds to the Company from existing securities.

Violation of these covenants would allow the counterparties to exercise their remedies under the respective agreement. In particular, violation of these covenants could constitute a default that would increase applicable interest rates payable by the Company, result in the obligation to pay other penalty fees or permit the relevant creditors to require the immediate repayment of the borrowings thereunder, which could result in a default under other debt instruments and agreements that contain cross-default provisions, including the Notes and ANS and BW lines of credit. A default under any of the agreements governing our indebtedness could materially adversely affect our financial condition and results of operations. We may seek waivers from compliance with these covenants and restrictive provisions to pursue our business strategy, which may not be granted on commercial terms or at all. As a result, we may be:

- Limited in how we conduct our business;
- Unable to raise additional debt or equity financing to operate during general economic or business downturns; or
- Unable to compete effectively or to take advantage of new business opportunities.

These restrictions could have a material adverse effect on liquidity and our ability to grow in accordance with our strategy and on the value of our equity securities.

48

Table of Contents

***We may be unable to regain and maintain compliance with The Nasdaq Global Market continued listing requirements, which could cause our common stock to be delisted from The Nasdaq Global Market. This could result in the lack of a market for our common stock, cause a decrease in the value of an investment in Charge, and adversely affect our business, financial condition, and results of operations.***

Our common stock is currently listed on The Nasdaq Global Market. To maintain the listing of our common stock on The Nasdaq Global Market, we are required to meet certain listing requirements, including, among others, a minimum closing bid price of $1.00 per share.

On August 22, 2023, we received notice from The Nasdaq Global Market that the closing bid price for Charge's common stock had been below $1.00 per share for the previous 30 consecutive business days, and that we are therefore not in compliance with the minimum bid price requirement for continued inclusion on The Nasdaq Global Market under Nasdaq Listing Rule 5450(a)(1) ("Rule 5450(a)(1)"). The Nasdaq Global Market's notice has no immediate effect on the listing or trading of our common stock on The Nasdaq Global Market.

The notice indicates that we will have 180 calendar days, until February 19, 2024, to regain compliance with this requirement. Charge can regain compliance with the $1.00 minimum bid listing requirement if the closing bid price of our common stock is at least $1.00 per share for a minimum of ten (10) consecutive business days during the 180-day compliance period.

If Charge does not regain compliance during the initial compliance period, we may be eligible for an additional 180-day period to regain compliance. To qualify, we would be required to meet the continued listing requirement for market value of our publicly held shares and all other Nasdaq initial listing standards, with the exception of the minimum bid price requirement under Rule 5450(a)(1), and we would need to provide written notice to Nasdaq of our intention to cure the deficiency during the second compliance period. If it appears to Nasdaq that we will not be able to cure the deficiency, or if we are otherwise not eligible, we expect that Nasdaq will notify us that our common stock will be subject to delisting. We will have the right to appeal a determination to delist our common stock, and our common stock will remain listed on The Nasdaq Global Market until the completion of the appeal process.

A delisting of our common stock could negatively impact us by, among other things, reducing the liquidity and market price of our common stock and reducing the number of investors willing to hold or acquire shares, which would further restrict our ability to obtain equity financing. A suspension or delisting could also adversely affect our reputation, our relationships with our business partners and suppliers, which would have a material, adverse impact on our business, operating results and financial condition. In addition, a suspension or delisting would impair our ability to raise additional capital through equity or debt financing as well as our ability to attract and retain employees by means of equity compensation.

Since the date of the Nasdaq notice, our common stock has continued to trade below $1.00 per share.  As of the date hereof, we had not regained compliance with Rule 5450(a)(1).

49

Table of Contents

***We may be party to legal proceedings that could have a material adverse effect on the Company's liquidity, financial position, and results of operations, as well as its reputation.***

The Company has limited experience in litigation and other legal proceedings, but any lawsuit brought against us or any legal proceeding that we may bring to enforce our rights could result in substantial costs, divert the time and attention of our management, result in counterclaims (whether meritorious or as a litigation tactic), result in substantial monetary judgments or settlement costs and harm our reputation, any of which could seriously harm our business.

In addition, in the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. Any lawsuit brought against us by one or more of our stockholders, could result in substantial costs to defend the lawsuit, divert the time and attention of our management, result in substantial monetary judgments or settlement costs and harm our reputation, any of which could seriously harm our business.

Further, as we continue to seek to expand, raise capital, grow our business and acquire new businesses, we have entered into, and expect to enter into in the future, agreements and instruments, such as the agreements related to our outstanding indebtedness, preferred stock and warrants, and various unit purchase agreements related to our business acquisitions, which are subject to interpretation and the potential for dispute. If we have disagreements with counterparties to our agreements or with holders of our outstanding securities and are unable to resolve any disagreements that may arise, such disagreements may result in lawsuits, other legal proceedings and/or protracted negotiations, including those whereby we seek to enforce our rights. For example, certain holders of the Notes advised us, during our June 2023 discussions with them related to refinancing or repaying the Notes, that in their view, certain provisions of the securities purchase agreements pursuant to which they purchased the Notes and other of the Company's securities, prohibit the Company from refinancing the Notes and from incurring additional indebtedness following repayment of the Notes without their consent. Additionally, during further discussions, the holders have raised issues relating to the Company's guarantees of its subsidiaries' indebtedness, which, in their view, could constitute a breach of the securities purchase agreements and defaults under the Notes and result in the application of default interest rates (20%) and other monetary penalties. We disagree with these positions, and believe we have valid defenses, and we intend to take appropriate action to preserve the Company's rights. We are attempting to resolve these disagreements amicably through ongoing discussions, but an inability to resolve these disputes would likely increase the costs of refinancing or repayment or hinder our ability to refinance or amend the Notes or otherwise obtain new debt financing to fund our longer-term operations and acquisition strategy. Moreover, an inability to reach resolution may lead to litigation with the holders of the Notes, whether brought by us or against us. Any such litigation could be expensive, time-consuming, and distracting and no assurance can be provided that the outcome would be satisfactory. If we do reach agreement with the holders of the Notes, any agreements or amendments we execute are likely to impose additional conditions or costs that impact our liquidity and the flexibility of our operations or create the possibility of dilution to our other equity holders.

Even if successful, litigation, other legal proceedings or protracted negotiations could be expensive and time consuming and could divert management's attention from managing our business and could result in significant adverse judgments or costs of settlement, amendments to agreements or adjustments to instruments, any of which may have a material adverse effect on our liquidity, financial position, business, reputation or prospects.

### Item 2. Unregistered Sales of Equity Securities, Use of Proceeds and Issuer Purchases of Equity Securities

### Market Information

Our common stock has been listed on the Nasdaq Global Market since April 12, 2022. Our common stock was quoted on the Pink Open Market from January 27, 2021, to April 11, 2022. Our common stock is currently quoted under the trading symbol "CRGE".

### Recent Sales of Unregistered Securities; Use of Proceeds from Registered Offerings

We did not sell any of our equity securities during the three months ended September 30, 2023, that were not registered under the Securities Act and were not previously reported on a Current Report on Form 8-K filed by us.

### Item 3. Defaults Upon Senior Securities

None.

### Item 4. Mine Safety Disclosures

Not applicable.

**Item 5. Other Information**

On November 3, 2023, the Company entered into employment agreements with Ms. Leah Schweller, the Chief Financial Officer, and Mr. James Biehl, the Chief Legal and Compliance Officer, and Corporate Secretary, and on November 6, 2023, the Company entered into an employment agreement with Mr. Craig Denson, the Interim Chief Executive Officer and Chief Operating Officer.

Mr. Denson's employment agreement dated November 6, 2023 (the "Denson Letter Agreement"), but effective August 29, 2023, provides for an annual salary of $400,000. He will also be eligible to earn an annual cash incentive award under the Company's bonus program, cash incentive plan (once established), or any successor plan. For fiscal year 2023, 50% of Mr. Denson's annual incentive award shall be determined by the Board's Compensation Committee in its discretion, and 50% shall be determined based on his satisfaction of certain objectives that shall be established by the Compensation Committee. Mr. Denson's target annual incentive award for fiscal year 2023 shall be 100% of his base salary. Effective September 1, 2023, and for each full or partial quarter Mr. Denson serves as the Interim Chief Executive Officer, he shall be entitled to receive a cash bonus of $25,000 payable in the next payroll period immediately following such fiscal quarter; such bonus shall be prorated only from September 1, 2023 to September 30, 2023. Mr. Denson is also entitled to a retention bonus consisting of (i) an option to purchase Company's common stock with a value equal to $200,000 based on a Black Scholes calculation, with an exercise price equal to the fair market value of the common stock on the grant date, a term of 10 years and the following vesting schedule: (a) 1/3 on March 1, 2024, (b) 1/3 three months following the effective date of appointment of the successor CEO, and (c) 1/3 on the first anniversary of the effective date of the appointment of the successor CEO; and (ii) cash bonus payable as follows: $133,000 on each of the first and second vesting date, and $134,000 on the third vesting date.

The Denson Letter Agreement provides that he will be entitled to the following severance benefits in the event of termination by the Company without "cause" or by Mr. Denson for "good reason" (as those terms are defined in the Denson Letter Agreement): (i)(a) his base salary as in effect at the time of such termination to the extent such amount has accrued through the termination date and remains unpaid, (b) any fully earned and declared but unpaid annual incentive award as of the termination date, and (c) any unpaid unreimbursed expenses as of the termination date (collectively, (i)(a) through (i)(c), the "Accrued Obligations"); and (ii) in return for a timely executed and delivered release, (a) an amount equal to 12 months of his base salary, which shall be payable in the same amounts and at the same intervals as if the employment period had not ended, (b) if the termination date occurs more than 6 months after the beginning of the fiscal year, a prorated annual incentive award in respect of the fiscal year in which the termination date occurs, (c) any time-based vesting equity awards granted to him under the Company's Equity Incentive Plan that would have vested in the 24-month period following the termination date shall immediately become vested upon his termination date, (d) extension of the exercise period with respect to all stock options held by Mr. Denson until the earlier of the date that is 2 years after the termination date, or the original expiration date of the stock options, and (e) if he timely elects continued coverage pursuant COBRA, payment of his share of the premium cost for the earlier of 12-month period following the termination date or the date which he is no longer eligible for COBRA.

Should Mr. Denson be terminated within 3 months prior, upon or within 12 months of a Change of Control (as defined in the Denson Letter Agreement), Mr. Denson would be entitled to (i) the Accrued Obligations, and (ii) in return for a timely executed and delivered release, (a) an amount equal to two times of his annual base salary, which will be payable (y) if the termination date is within three months prior to the consummation of a change in control, in the same amounts and at the same intervals as if the employment period had not ended, or (z) if the termination date is within 12 months following the consummation of a change in control, in a single lump sum cash payment within 2 and a half months following the termination date; (b) an amount equal to one and a half times the target incentive award for the applicable fiscal year, which will be payable (y) if the termination date is within three months prior to the consummation of a change in control, in the same manner and at the same time that the Company pays other Company executive incentive awards under the incentive plan after the termination date, or (z) if the termination date is within 12 months following the consummation of a change in control, in the same manner in a single lump sum cash payment within 2 and a half months following the termination date, (c) immediate vesting of the portion of all his time-based equity awards under the Company's Equity Incentive Plan, (d) the extension of the post-termination exercise period with respect to all stock options held by Mr. Denson until the earlier of the date that is 2 years after the termination date or the original expiration date of the stock options; and (e) if he timely elects continued coverage, payment of his share of the premium cost of COBRA for the earlier of 18-month period following the termination date, or the date which he is no longer eligible for COBRA.

Ms. Schweller's employment agreement, dated November 3, 2023 (the "Schweller Letter Agreement"), provides for an annual salary of $300,000. She will also be eligible to earn an annual cash incentive award under the Company's bonus program, cash incentive plan (once established), or any successor plan. For fiscal year 2023, 50% of Ms. Schweller's annual incentive award shall be determined by the Board's Compensation Committee in its discretion, and 50% shall be determined based on her satisfaction of certain objectives that shall be established by the Compensation Committee. Ms. Schweller's target annual incentive award for fiscal year 2023 shall be 100% of her base salary. The Schweller Letter Agreement provides that she will be entitled to the following severance benefits in the event of termination by the Company without "cause" or by Ms. Schweller for "good reason" (as those terms are defined in the Schweller Letter Agreement): (i)(a) her base salary as in effect at the time of such termination to

the extent such amount has accrued through the termination date and remains unpaid, (b) any fully earned and declared but unpaid annual incentive award as of the termination date, and (c) any unpaid unreimbursed expenses as of the termination date (collectively, (i)(a) through (i)(c), the "Accrued Obligations"); and (ii) in return for a timely executed and delivered release, (a) an amount equal to 12 months of her base salary, which shall be payable in the same amounts and at the same intervals as if the employment period had not ended, (b) if the termination date occurs more than 6 months after the beginning of the fiscal year, a prorated annual incentive award in respect of the fiscal year in which the termination date occurs, (c) any time-based vesting equity awards granted to her under the Company's Equity Incentive Plan that would have vested in the 24-month period following the termination date shall immediately become vested upon her termination date, (d) extension of the exercise period with respect to all stock options held by Ms. Schweller until the earlier of the date that is 2 years after the termination date, or the original expiration date of the stock options, and (e) if she timely elects continued coverage pursuant COBRA, payment of her share of the premium cost for the earlier of 12-month period following the termination date or the date which she is no longer eligible for COBRA.

Should Ms. Schweller terminated within 3 months prior, upon or within 12 months of a Change of Control (as defined in the Schweller Letter Agreement), Ms. Schweller would be entitled to (i) the Accrued Obligations, and (ii) in return for a timely executed and delivered release, (a) an amount equal to one and a half times of her annual base salary, which will be payable (y) if the termination date is within three months prior to the consummation of a change in control, in the same amounts and at the same intervals as if the employment period had not ended, or (z) if the termination date is within 12 months following the consummation of a change in control, in a single lump sum cash payment within 2 and a half months following the termination date; (b) an amount equal to one and a half times the target incentive award for the applicable fiscal year, which will be payable (y) if the termination date is within three months prior to the consummation of a change in control, in the same manner and at the same time that the Company pays other Company executive incentive awards under the incentive plan after the termination date, or (z) if the termination date is within 12 months following the consummation of a change in control, in the same manner in a single lump sum cash payment within 2 and a half months following the termination date, (c) immediate vesting of the portion of all her time-based equity awards under the Company's Equity Incentive Plan, (d) the extension of the post-termination exercise period with respect to all stock options held by Ms. Schweller until the earlier of the date that is 2 years after the termination date or the original expiration date of the stock options; and (e) if she timely elects continued coverage, payment of her share of the premium cost of COBRA for the earlier of 18-month period following the termination date, or the date which she is no longer eligible for COBRA.

Mr. Biehl's employment agreement, dated November 3, 2023 (the "Biehl Letter Agreement"), provides for an annual salary of $350,000. He will also be eligible to earn an annual cash incentive award under the Company's bonus program, cash incentive plan (once established), or any successor plan. For fiscal year 2023, 50% of Mr. Biehl's annual incentive award shall be determined by the Board's Compensation Committee in its discretion, and 50% shall be determined based on his satisfaction of certain objectives that shall be established by the Compensation Committee. Mr. Biehl's target annual incentive award for fiscal year 2023 shall be 100% of his base salary. The Biehl Letter Agreement provides that he will be entitled to the following severance benefits in the event of termination by the Company without "cause" or by Mr. Biehl for "good reason" (as those terms are defined in the Biehl Letter Agreement): (i)(a) his base salary as in effect at the time of such termination to the extent such amount has accrued through the termination date and remains unpaid, (b) any fully earned and declared but unpaid annual incentive award as of the termination date, and (c) any unpaid unreimbursed expenses as of the termination date (collectively, (i)(a) through (i)(c), the "Accrued Obligations"); and (ii) in return for a timely executed and delivered release, (a) an amount equal to 12 months of his base salary, which shall be payable in the same amounts and at the same intervals as if employment period had not ended, (b) if the termination date occurs more than 6 months after the beginning of the fiscal year, a prorated annual incentive award in respect of the fiscal year in which the termination date occurs, (c) any time-based vesting equity awards granted to him under the Company's Equity Incentive Plan that would have vested in the 24-month period following the termination date shall immediately become vested upon his termination date, (d) extension of the exercise period with respect to all stock options held by Mr. Biehl until the earlier of the date that is 2 years after the termination date, or the original expiration date of the stock options, and (e) if he timely elects continued coverage pursuant COBRA, payment of his share of the premium cost for the earlier of 12-month period following the termination date or the date which he is no longer eligible for COBRA.

Should Mr. Biehl be terminated within 3 months prior, upon or within 12 months of a Change of Control (as defined in the Biehl Letter Agreement), Mr. Biehl would be entitled to (i) the Accrued Obligations, and (ii) in return for a timely executed and delivered release, (a) an amount equal to one and a half times of his annual base salary, which will be payable (y) if the termination date is within three months prior to the consummation of a change in control, in the same amounts and at the same intervals as if the employment period had not ended, or (z) if the termination date is within 12 months following the consummation of a change in control, in a single lump sum cash payment within 2 and a half months following the termination date; (b) an amount equal to one and a half times the target incentive award for the applicable fiscal year, which will be payable (y) if the termination date is within three months prior to the consummation of a change in control, in the same manner and at the same time that the Company pays other Company executive incentive awards under the incentive plan after the termination date, or (z) if the termination date is within 12 months following the consummation of a change in control, in the same manner in a single lump sum cash payment within 2 and a half months following the termination date, (c) immediate vesting of the portion of all his time-based equity awards under the Company's Equity Incentive Plan, (d) the extension of the post-termination exercise period with respect to all stock options held by Mr. Biehl until the earlier of the date that is 2 years after the termination date or the original expiration date of the

stock options; and (e) if he timely elects continued coverage, payment of his share of the premium cost of COBRA for the earlier of 18-month period following the termination date, or the date which he is no longer eligible for COBRA.

50

Table of Contents

**Item 6. Exhibits**

| Exhibit Number | Description |
| --- | --- |
| 3.1 # | Certificate of Incorporation of GoIP Global, Inc., dated October 1, 2020 (Incorporated by reference to Exhibit 3.1 to our Form S-1 as filed on February 12, 2021) |
| 3.2 # | Certificate of Designations of the Series A Preferred Stock, dated October 6, 2020 (Incorporated by reference to Exhibit 3.2 to our Form S-1 as filed on February 12, 2021) |
| 3.3 # | Certificate of Amendment to the Certificate of Incorporation, dated December 11, 2020 (Incorporated by reference to Exhibit 3.3 to our Form S-1 as filed on February 12, 2021) |
| 3.4 # | Certificate of Amendment to the Certificate of Incorporation, dated January 26, 2021 (Incorporated by reference to Exhibit 3.4 to our Form S-1 as filed on February 12, 2021) |
| 3.5 # | Amendment to Certificate of Designations of the Series A Preferred Stock, dated March 29, 2021 (Incorporated by reference to Exhibit 3.5 to our Form S-1/A as filed on June 11, 2021) |
| 3.6 # | Certificate of Designations of the Series B Preferred Stock, dated May 20, 2021 (Incorporated by reference to Exhibit 3.7 to our Form S-1/A as filed on June 11, 2021) |
| 3.7 # | Certificate of Designations of the Series C Preferred Stock, dated December 17, 2021 (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on December 23, 2021) |
| 3.8 # | Certificate of Amendment of Certificate of Incorporation, dated December 29, 2021 (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on January 4, 2022) |
| 3.9 # | Amended and Restated Certificate of Designations of the Series C Preferred Stock, filed on February 25, 2022 (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on March 3, 2022) |
| 3.10 # | Certificate of Amendment to the Certificate of Incorporation, dated September 27, 2022. (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on September 28, 2022) |
| 3.11 # | Certificate of Designation of Preferences, Rights and Limitations of Series D Convertible Preferred Stock filed on June 30, 2022 (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on July 7, 2022). |
| 3.12 # | Amended and Restated Bylaws, effective January 26, 2023. (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on January 27, 2023) |
| 3.13 # | Certificate of Designation of Preferences, Rights and Limitations of Series E Preferred Stock filed on March 27, 2023 (Incorporated by reference to Exhibit 3.1 to our Form 8-K as filed on March 31, 2023) |
| 10.1** | Employment Agreement, dated November 3, 2023, between Charge Enterprises, Inc. and Leah Schweller. (Filed herewith) |
| 10.2** | Employment Agreement, dated November 3, 2023, between Charge Enterprises, Inc. and James Biehl. (Filed herewith) |
| 10.3** | Employment Agreement, dated November 6, 2023, between Charge Enterprises, Inc. and Craig Denson. (Filed herewith) |
| 10.4# | Separation and Consulting Agreement, dated August 28, 2023, by and between Charge Enterprises, Inc. and Andrew Fox (Incorporated by reference to Exhibit 10.1 to our Form 8-K as filed on August 29, 2023. |
| 31.1 ** | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d- 14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 ** | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 *** | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 *** | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

Table of Contents

| | |
|---|---|
| 101.INS ** | Inline XBRL Instance Document. |
| 101.SCH ** | Inline XBRL Taxonomy Extension Schema. |
| 101.CAL ** | Inline XBRL Taxonomy Extension Calculation Linkbase. |
| 101.LAB ** | Inline XBRL Taxonomy Extension Label Linkbase |
| 101.PRE ** | Inline XBRL Taxonomy Presentation Linkbase. |
| 101.DEF ** | Inline XBRL Taxonomy Definition Linkbase Document. |
| 104 ** | Cover Page Interactive Data File (formatted as Inline XBRL with applicable taxonomy extension information contained in Exhibits 101) |

** Filed herewith.

*** Furnished herewith.

# Incorporated by reference

52

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CHARGE ENTERPRISES, INC.**

Date: November 8, 2023

| | |
|---|---|
| By: | /s/ Craig Denson |
| Name | Craig Denson |
| Title: | Interim Chief Executive Officer |
| | (Principal Executive Officer) |

| | |
|---|---|
| By: | /s/ Leah Schweller |
| Name | Leah Schweller |
| | Chief Financial Officer |
| Title: | (Principal Financial Officer and Principal |
| | Accounting Officer) |

53

## Exhibit 4

**Charge Enterprises, Inc. Form 8-K Filed November 19, 2023**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported)**: **November 15, 2023**

# CHARGE ENTERPRISES, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 001-41354 | 90-0471969 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission file number) | (I.R.S. Employer Identification No.) |

| 125 Park Avenue, 25th Floor New York, NY | 10017 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(212)921-2100**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 | CRGE | Nasdaq Global Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter):

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

**2.04: Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement**

*Notice of Default – Guarantee of Indebtedness*

As disclosed in our Quarterly Report on Form 10-Q filed on November 8, 2023, Charge Enterprises, Inc. (sometimes referred to herein as "*Company*", "*we*," "*us*," "*our*", "*Charge*" or similar terms) has been involved in disputes with the holders of its notes payable dated May 19, 2021 and December 17, 2021 (collectively, the "Notes"). These disagreements relate to, among other things, the position taken by the holders of the Notes that certain provisions of the securities purchase agreements pursuant to which they purchased the Notes and other of the Company's securities prohibit the Company from refinancing the Notes and from incurring additional indebtedness following repayment of the Notes without their consent, as well as the holders' view that the Company's guarantees of its subsidiaries' indebtedness could constitute a breach of the securities purchase agreements pursuant to which the holders purchased the Notes and an event of default under the Notes.

On November 15, 2023,  the Company received a letter (the "Default Letter") from Arena Investors, LP ("Arena") on behalf of the holders of the Notes alleging that the Company's guarantee of the obligations of its wholly-owned subsidiaries, Nextridge, Inc. and ANS Advanced Network Services, Inc. under a Loan Agreement with Pioneer Bank entered on October 21, 2022 (the "ANS Facility") was in violation of certain restrictions on the incurrence or guarantee of indebtedness found in the Securities Purchase Agreements by and between the Company and Arena, dated November 3, 2020, May 19, 2021, and December 17, 2021 (collectively, the "Purchase Agreements"). The Default Letter further alleges that this guarantee, which was incurred over a year ago and disclosed in our Form 8-K, filed on October 27, 2022, constitutes an event of default under the Notes. As of the date of this Report, there are currently no amounts outstanding under the ANS Facility.

The Default Letter claims that an additional $3,345,297.87 in interest (reflecting the difference in the default interest rate of 20% and the interest rate of 7.5% per annum commencing from October 25, 2022 on an aggregate principal amount of $25,847,409.00) and additional legal fees, expenses and other costs of at least $692,216.15 are immediately due and payable. The Default Letter also seeks a 20% per annum late fee on any overdue accrued and unpaid interest pursuant to Section 2(c) of the Notes.  The Default Letter further claims that each purchaser in respect of each relevant Purchase Agreement is owed $11,550,000 as partial liquidated damages. Notwithstanding that the Purchase Agreements provide for liquidated damages of $30,000 per issuance or incurrence of indebtedness, Arena has calculated such partial liquidated damages as $30,000 per day since the date the Company entered into the guarantee.  The Company disagrees with the positions taken by Arena in the Default Letter, including the existence of any default and the calculation of the amount of liquidated damages, and believes it has valid defenses to the matters raised in the Default Letter.

As discussed below, the Company did not pay the principal and accrued interest on the Notes on the stated maturity date. Based on the non-payment upon maturity, the Company is in default of its obligations under the Notes and expects to receive an additional notice of default from Arena. As of the date of this Current Report on Form 8-K, except for the Default Letter, Arena has taken no action to enforce its rights under the terms of the Purchase Agreements or Notes. We have no assurance Arena will not seek to enforce its rights in the future. Before the receipt of the Default Letter, the Company had been attempting to resolve its disagreements with Arena regarding the Notes.

Based on Arena's actions over the past several months, including its position that refinancing the Notes and that incurring additional indebtedness following repayment of the Notes is not permitted without their consent, which has prevented us from refinancing the Notes, the Company believes it has multiple potential legal claims against Arena for substantial damages. In fact, the Company received several non-binding term sheets from potential lenders on favorable terms that would have paid off the Notes, and Arena's interpretation of the loan documents interfered with the ability to secure such financing. The Company is exploring its options and plans to take appropriate actions to preserve and enforce its rights and to pursue available legal remedies.  The Company cannot give any assurance that it will be able to reach an amicable resolution on a timely basis, on favorable terms, or at all. Moreover, an inability to reach resolution may lead to litigation, whether brought by the Company or against the Company. Any such litigation could be expensive, time-consuming, and distracting and no assurance can be provided that the outcome would be satisfactory.

*Non-Payment of Note Principal*

As noted above, the stated maturity date of the Notes was November 19, 2023. Despite the ongoing disagreements with the noteholders regarding provisions of the Purchase Agreements that purport to prohibit the Company from refinancing the Notes or incurring additional indebtedness following repayment of the Notes without the holders' consent and the disagreement related to potential defaults discussed above, it was the Company's intention to repay the principal and accrued interest (without taking into account any alleged default interest or fees) on the Notes at or prior to maturity. However, while preparing to access funds in its investment accounts and liquidate marketable securities for the Notes repayment, the Company learned that certain Company funds were unexpectedly unavailable, rendering the Company unable to repay the Notes.

Pursuant to a Special Advisor Agreement with Korr Acquisitions Group, Inc. ("KORR"), KORR provided certain investment advisory services and managed the investment and reinvestment of certain assets of the Company. Based upon information provided by KORR, the Company had believed that approximately $9.9 million of Company assets under management were in the form of cash, cash equivalents, marketable securities or similar readily liquid assets. However, when seeking to liquidate these assets, the Company learned that these investment assets were, in fact, invested in limited partnership interests of KORR Value, L.P., a limited partnership controlled by KORR, as general partner pursuant to a Limited Partnership Agreement dated May 9, 2020, and are not immediately able to be liquidated or readily accessible. In addition, the Company has reason to believe these limited partnership interests may be in a loss position, such that the Company may only be able to recover a portion of these assets, if any at all. The Company continues to investigate and gather information on these matters.

Additionally, as previously disclosed, on August 11, 2023, the Company entered into a Securities Purchase Agreement (the "August 2023 SPA") with KORR Value, L.P. (the "KORR Fund"), pursuant to which, beginning on October 15, 2023 and through March 31, 2024, the Company has the right, but not the obligation, to sell to the purchaser, and to require the purchaser to purchase, up to $5.0 million of common stock (the "KORR Shares"), at a purchase price of $1.00 per share. Kenneth Orr, a beneficial owner of more than 5% of the Company's common stock and the former Chairman of the Company, has sole voting and dispositive power over the shares held by KORR Fund. On November 15, 2023, we delivered a notice to the KORR Fund exercising our rights under the August 2023 SPA to require the purchase of five million shares of our common stock no later than the third business day following delivery of the notice, which was November 20, 2023. The KORR Fund provided the Company with notice that it did not believe that the Company satisfied the necessary conditions to require the KORR Fund to purchase the KORR Shares, and therefore, did not deliver the purchase price for the KORR Shares on such date. The Company disagrees that it did not satisfy the necessary conditions to require the KORR Fund to purchase the KORR Shares and is exploring all options and remedies with respect to the KORR Fund's failure to deliver the purchase price for such shares.

\*        \*        \*

If the Company continues not to have sufficient liquidity to pay the principal and interest on the Notes, or the Company is unable to resolve the alleged defaults under the Purchase Agreements and Notes, these circumstances could result in a default under other of the Company's debt instruments and agreements that contain cross-default provisions, including the ANS Facility and the Business Loan Agreement dated June 19, 2007 by and between B W Electrical Services LLC and Provident Bank, as amended (the "BW Facility"). Although there are currently no amounts outstanding under the ANS Facility or the BW Facility, any of the foregoing would likely have a material adverse effect on the Company's liquidity, financial condition and results of operations, and may render the Company insolvent and unable to sustain its operations and continue as a going concern.

Management has engaged Piper Sandler & Co. to assist the Company in addressing its debt and liquidity positions.  The Company intends to consider all strategic alternatives including restructuring or refinancing our debt, seeking additional debt or equity capital, reducing or delaying our business activities and strategic initiatives, or selling assets, other strategic transactions and/or other measures. No assurance can be provided that the Company will be able to refinance, restructure or repay our indebtedness or to continue as a going concern.

**SIGNATURES**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this Form 8-K to be signed on its behalf by the undersigned duly authorized.

Dated: November 21, 2023

CHARGE ENTERPRISES, INC.

By: /s/ Leah Schweller
     Leah Schweller
     Chief Financial Officer

4

**<u>Exhibit 5</u>**

**April 4, 2024 Correspondence**

**From:** David Pinches <david@charge.enterprises>
**Sent:** Thursday, April 4, 2024 12:59 PM
**To:** Craig Denson <craig@charge.enterprises>; Andrew Fox <a@l2n.com>; Jim Biehl <jbiehl@charge.enterprises>
**Cc:** Roger Marion Esq. <rmarion@rogermarion.com>
**Subject:** Re: Withholding my emails

I am in the process of copying data to ensure that nothing is lost accidentally. As soon as that is finished, I will be able to provide access as requested.

It should be by end of day tomorrow.

Cheers,
David

---

**From:** Craig Denson <craig@charge.enterprises>
**Sent:** Thursday, April 4, 2024 10:09 AM
**To:** Andrew Fox <a@l2n.com>; Jim Biehl <jbiehl@charge.enterprises>; David Pinches <david@charge.enterprises>
**Cc:** Roger Marion Esq. <rmarion@rogermarion.com>
**Subject:** Re: Withholding my emails

@David Pinches both Jim and I provided approval a while back - please advise ASAP so Andrew can gain access

**Craig Denson**

**CONFIDENTIALITY NOTICE**
This email is solely for the use of the intended recipient(s) and may contain information and attachments that are confidential, privileged or otherwise sensitive in nature.   Please do not disseminate this email or any of its attachments without the permission of the sender.  If this email has been received in error, please do not read, copy, use, forward or disclose the email or any of its attachments to others.  Instead, immediately notify the sender by replying to this email and then delete it from your system.  Transmission of this email is not to be construed as a waiver of any rights of confidentiality or applicable privilege.

**NO BINDING AGREEMENT**
This email does not constitute an agreement to conduct transactions by electronic means and does not create any legally binding contract or enforceable obligation in the absence of a fully signed written contract.

---

**From:** andrew fox <a@l2n.com>
**Sent:** Thursday, April 4, 2024 10:00 AM
**To:** Craig Denson <craig@charge.enterprises>; Jim Biehl <jbiehl@charge.enterprises>
**Cc:** Roger Marion Esq. <rmarion@rogermarion.com>
**Subject:** Withholding my emails

I have been requesting now for over two weeks access to my old emails to prepare for litigation, and I still have not been given access to it. I'm not exactly sure what the rationale is but I would like resolved ASAP before I have to actually file a legal motion to get it done.
I suggested a very simple solution and it would have already been done.

Pls advise when this will be completed. Thank you

**Exhibit 6A**

**Correspondence dated January 10, 2025 through January 22, 2025, between Counsel for Charge Enterprises, Inc. and Counsel for Andrew Fox**

## Sutherland, Gabe

| | |
|---|---|
| **From:** | Garr, Laura |
| **Sent:** | Wednesday, January 22, 2025 6:03 PM |
| **To:** | Roger K. Marion, Esq. |
| **Cc:** | jhh@stevenslee.com; robert.lapowsky@stevenslee.com; Denman, Harrison; Smith, Trudy; Ryan L. O'Neill; David M. Stewart |
| **Subject:** | RE: [EXT] Re: Re: Demand for the Immediate Return of Company Property |
| **Attachments:** | CGRE - Letter to Fox [01.22.2025].pdf; CGRE - Letter to Fox - Email Enclosure.pdf |

Roger,

As a final attempt, please see attached.

Best,
Laura

**Laura Garr** | Partner
**T** +1 212 819 8849    **M** +1 917 968 0236    **E** laura.garr@whitecase.com
White & Case LLP | 1221 Avenue of the Americas | New York, NY 10020-1095

---

**From:** Roger K. Marion, Esq. <rmarion@rogermarion.com>
**Sent:** Tuesday, January 21, 2025 5:05 PM
**To:** Garr, Laura <laura.garr@whitecase.com>
**Cc:** jhh@stevenslee.com; robert.lapowsky@stevenslee.com; Denman, Harrison <harrison.denman@whitecase.com>; Smith, Trudy <trudy.smith@whitecase.com>; Ryan L. O'Neill <Ryan.ONeill@stevenslee.com>; David M. Stewart <David.Stewart@stevenslee.com>
**Subject:** [EXT] Re: Re: Demand for the Immediate Return of Company Property

Laura,

Please find a response to your January 1 letter attached.

- Roger

Roger K. Marion, Esq.

Marion & Allen, P.C.
488 Madison Avenue, Suite 1120
New York, New York 10022
201.264.6622 - 212.658.0350


New Jersey Office:
190 Moore Street, Suite 204
Hackensack, New Jersey 07601

_____

This message from Roger K. Marion, Esq. contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. If you are not the named recipient(s), or otherwise authorized to receive this communication for the named

recipient(s), please advise sender's office immediately that you received this in error and then delete all pages and attachments of this email.   IRS CIRCULAR 230 DISCLOSURE: No tax advice of any kind is included in, or should be derived from, the above email.  Thank you.

On Tue, Jan 14, 2025 at 5:11 PM Garr, Laura <laura.garr@whitecase.com> wrote:

Roger,

Please see attached.  In light of this new information, please let me know if you would like to have a call.

Best,

Laura

**Laura Garr** | Partner

**T**  +1 212 819 8849    **M**  +1 917 968 0236    **E**  laura.garr@whitecase.com

White & Case LLP  |  1221 Avenue of the Americas  |  New York, NY 10020-1095

**From:** Roger K. Marion, Esq. <rmarion@rogermarion.com>
**Sent:** Monday, January 13, 2025 9:22 AM
**To:** Garr, Laura <laura.garr@whitecase.com>
**Cc:** jhh@stevenslee.com; robert.lapowsky@stevenslee.com; Denman, Harrison <harrison.denman@whitecase.com>; Smith, Trudy <trudy.smith@whitecase.com>; Ryan L. O'Neill <Ryan.ONeill@stevenslee.com>; David M. Stewart <David.Stewart@stevenslee.com>
**Subject:** [EXT] Re: Demand for the Immediate Return of Company Property

Laura,

I believe you have been misinformed.  Please find correspondence in response to your January 10, 2025 email below attached hereto.

Best,

- Roger

Roger K. Marion, Esq.

Marion & Allen, P.C.
488 Madison Avenue, Suite 1120
New York, New York 10022
201.264.6622 - 212.658.0350

New Jersey Office:
190 Moore Street, Suite 204
Hackensack, New Jersey 07601

_____

This message from Roger K. Marion, Esq. contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. If you are not the named recipient(s), or otherwise authorized to receive this communication for the named recipient(s), please advise sender's office immediately that you received this in error and then delete all pages and attachments of this email.  IRS CIRCULAR 230 DISCLOSURE: No tax advice of any kind is included in, or should be derived from, the above email.  Thank you.

On Fri, Jan 10, 2025 at 2:38 PM Garr, Laura <laura.garr@whitecase.com> wrote:

Dear Counsel,

It has been brought to our attention that Mr. Andrew Fox recently contacted Charge Enterprises, Inc. ("Charge" or "Company") seeking information associated with his former charge.us and/or charge.enterprises accounts.  Specifically, he requested that Charge provide him with certain company files from the time of his employment with the Company and further indicated that he has been maintaining and utilizing Company Property notwithstanding the fact that his employment at Charge has long since ceased.  Under Section 3(c) of his Consulting Agreement, all files are Company Property. Mr. Fox was required to  return such property upon the termination of the Consulting Agreement.

That Mr. Fox not only failed to return or destroy the Company Property but seems to be improperly utilizing Company Property, including Confidential Information, is a clear breach of the Consulting Agreement, among other violations of law.

Mr. Fox must **immediately** return all Company Property in his possession and destroy and copies he has made. We reserve all rights.

Please advise (i) what documents remain in Mr. Fox's possession (ii) return all Company Property to White & Case no later than **Monday, January 13, 2025, at 2:00 p.m. (ET)**, and (iii) confirm that Mr. Fox has destroyed any copies of Company Property in his possession, custody or control.

We appreciate your prompt attention to this important matter.

Thank you,

Laura

**Laura Garr**  |  Partner

**T**  +1 212 819 8849    **M** +1 917 968 0236    **E** laura.garr@whitecase.com

White & Case LLP  |  1221 Avenue of the Americas  |  New York, NY 10020-1095

**WHITE & CASE**

========================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

========================================================================

========================================================================
This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

================================================================================

**Exhibit 6B**

**Letter dated January 13, 2025, from Counsel for Andrew Fox to Counsel for Charge Enterprises, Inc.**

**MARION & ALLEN, P.C.**    488 Madison Avenue, Suite 1120, New York, New York 10022
BY: ROGER K. MARION, ESQ.

rmarion@rogermarion.com

Telephone: (212) 658-0350
Mobile: (201) 264-6622

January 13, 2025

<u>VIA EMAIL</u>

Laura Garr, Esq.
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095

Re:    <u>Demand for Property  Andrew Fox</u>

Dear Ms. Garr:

As you know, we represent Andrew Fox.  I write to you in response to your email on Friday afternoon, January 10, 2025, making allegations regarding Mr. Fox.

We have made an initial inquiry regarding your allegations, and believe that you have not been presented with the correct facts.

Pursuant to his Consulting Agreement, when Andrew Fox left his position as an employee of Charge, it appears that he fully complied with his Consulting Agreement and left with Charge all of Charge's property.  He did not breach his Agreement; there is nothing nefarious here.

Later, Charge gave Andrew a new user name and password so he could continue to see his old emails on a read-only basis, approved by the CEO and General Counsel of Charge.  In fact, please recall that the Consulting Agreement retained Mr. Fox as a director, so continued availability of information was necessary. This was entirely consensual access.  Per your email, when the permissive access was discontinued recently, Mr. Fox called Charge to inquire why that had occurred – again, this is not consistent with concealment, is not an effort to improperly utilize Company Property, and was not a breach of his Consulting Agreement.

We do not believe that Mr. Fox is in possession of Charge company property.

If you want to discuss remedying breaches of the Consulting Agreement, perhaps you should offer to pay Mr. Fox what he is owed under that Agreement.

Further, Mr. Fox has lost access to his personal photographs and other non-Charge related personal documents in his Charge files, and we should also discuss the return of those to him.

Very truly,

Roger K. Marion, Esq.

## **Exhibit 6C**

**Letter dated January 14, 2025, from Counsel for Charge Enterprises, Inc. to Counsel for Andrew Fox**

**WHITE & CASE**

January 14, 2025

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

whitecase.com

**VIA E-MAIL**

Roger K. Marion, Esq.
Marion & Allen, P.C.
488 Madison Avenue, Suite 1120
New York, New York 10022
rmarion@rogermarion.com

**Re: In re Charge Enterprises, Inc. - Case No. 24-10349**

Dear Mr. Marion,

We write as follow up to our January 10, 2025 email and in response to your January 13, 2025 reply (the "Reply Letter"). We appreciate your effort in making an initial inquiry into this matter. However, your Reply Letter contains several important inaccuracies and does not provide adequate reassurance as to Charge's Company Property and Confidential Information.

First of all, Mr. Fox resigned from his role as chairman of the board of directors and Chief Executive Officer of Charge in August 2023, and his access to the Company Property was terminated around that time. He also ceased acting as Consultant for Charge by the time Charge initiated Chapter 11 bankruptcy on March 7, 2024, and his Consulting Agreement was officially terminated on the Effective Date of the Plan, which was May 3, 2024. Therefore, contrary to your assertion in the Reply Letter that his "continued availability" to Company information was "necessary," there is no legitimate basis for him to be seeking or accessing Company Property after his roles at the Company ceased. Indeed, retaining Company Property, including Confidential Information, after the Company requested the return of the Company Property at his resignation (and following the termination of the Consulting Agreement) is strictly prohibited.

Second, you contend that without access to the Company files, Mr. Fox has lost access to personal photos and personal documents. Mr. Fox requested access to Charge's email files in September 2023, following his resignation, so that he could retrieve his personal items. He was briefly granted such access for that sole purpose. Specifically, on September 14, 2023 Jim Biehl stated to Mr. Fox: "you will have access to your google email account through the weekend. Just to confirm, please do not download, forward or delete any information other than personal matters." He was granted the access for those limited days and then his access was again rightly terminated. Therefore, it is puzzling that he is now suggesting he does not have his personal files. Nonetheless, to the extent there are personal photos he simply failed to retrieve when permitted to do so, we can certainly discuss how best to return them.

Third, and most alarmingly, since our last correspondence it has come to our attention that in April

Mr. Marion
January 14, 2025

2024, when Mr. Fox had no legitimate need for or right to Company Property, Mr. Fox demanded a mirror copy of all of Company files, including Confidential Information, from the time of his employment.  He made this request to Mr. Craig Denson, Ms. Leah Schweller, and Mr. Biehl, at a time when all parties knew that Charge would imminently be emerging from the ongoing Chapter 11 bankruptcy proceeding under a Proposed Plan by which Arena would become equity owner of the Company, the specific officers and directors from whom he was seeking Company Property would be terminated, and Arena would be bringing suit against Charge's former officers and directors, likely including Mr. Fox, Ms. Schweller, Mr. Denson, and Mr. Biehl, among others.   It was also at the exact time that Mr. Fox was asserting claims against Charge in the Bankruptcy. Far from being sought for use in his role as Director or any other permissible purpose as you suggest, he explicitly stated that he sought the Company Property for litigation purposes.  In other words, bypassing any formal discovery process and the protections thereunder, Mr. Fox wrongly sought and gained access to Charge Property, including Confidential Information, from his co-defendants right before they were terminated and Arena (the Plaintiff) took ownership of Charge.  Most disturbing is that you, Mr. Marion, were included on this wildly improper demand knowing it was for use in litigations against Charge and Arena and yet you failed to include Charge's or Arena's counsel though both parties were represented and such representations were well known to you and your client.  It is also rather shocking, given your involvement in this, the number misstatements that exist in your Reply Letter.

Relatedly, you are entirely wrong that his January contact with Charge was for some permissible purpose or that Mr. Fox called Charge in January 2025 simply "to inquire why" his access to Company files—access that never should have been granted—was discontinued.  Rather, he brazenly contacted Charge last week demanding *additional* Company Property to which is not entitled for use in the ongoing litigations.  His access was discontinued only *after* that outreach when the Company informed White & Case about the demand and White & Case first learned that Mr. Fox wrongly had access to Company Property, including Confidential Information.

In short, with your knowledge, Mr. Fox used the soon to be terminated co-defendants to wrongly obtain Company Property that Mr. Fox, as a former employee, is prohibited from having for use in his litigations.  Last week he reached out directly to Charge again urgently demanding even more "for litigation."  I hope it goes without saying that we strongly disagree with your claim in the Reply Letter that Mr. Fox's outreach to Charge was "not an effort to improperly utilize Company Property" and not a breach of the Consultation Agreement.  To be clear, there could be no "necessary" or permissible basis for accessing and maintaining such files after his employment ended.  But Mr. Fox, with your knowledge, made no secret that his intention was to obtain Company Property for use in ongoing lawsuits between him, Charge, and Arena, thereby skirting the applicable federal and state laws governing the timing, manner, and protections afforded in the discovery process.

Finally, your statement that "we do not believe he is in possession of Charge company property" is insufficient.  Please immediately represent or alternatively send a sworn statement from Mr. Fox that Mr. Fox (i) does not have in his possession, custody, or control any Company Property, including Confidential Information, (ii) never disseminated any Company Property, including Confidential Information, to any entity or individual, and (ii) never downloaded, saved, copied, or

WHITE & CASE

Mr. Marion
January 14, 2025

otherwise retained any Charge Property, including Confidential Information.  We will await your prompt response and expect to hear from you by no later than **Thursday, January 16, 2024**. We reserve all rights and remedies, including in the ongoing bankruptcy proceeding and New York action.

Sincerely,

**Laura J. Garr**

**T** +212-819-8849
**E** lgarr@whitecase.com

3

**Exhibit 6D**

**Letter dated January 21, 2025, from Counsel for Andrew Fox to Counsel for Charge Enterprises, Inc.**

**MARION & ALLEN, P.C.**   **488 Madison Avenue, Suite 1120, New York, New York 10022**

BY: ROGER K. MARION, ESQ.

rmarion@rogermarion.com

Telephone: (212) 658-0350
Mobile: (201) 264-6622

January 21, 2025

<u>VIA EMAIL</u>

Laura Garr, Esq.
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095

> Re:   <u>Demand for Property  Andrew Fox</u>

Dear Ms. Garr:

    I am responding to your January 14, 2025 letter. Your ad hominem attacks are completely unworthy of an experienced attorney.

    You now demand that I represent that Mr. Fox "never disseminated any Company Property, including Confidential Information, to any entity or individual"?  During his tenure at Charge I am certain he did each of these things in his due capacity.  However, that does not mean that he retained anything now.  Your other demands are similar, and I disagree with your allegations.  You have my prior representation.

    Very truly,

Roger K. Marion, Esq.

**Exhibit 6E**

**Letter dated January 22, 2025, from Counsel for Charge Enterprises, Inc. to Counsel for Andrew Fox**

**WHITE & CASE**

January 22, 2025

**VIA E-MAIL**

Roger K. Marion, Esq.
Marion & Allen, P.C.
488 Madison Avenue, Suite 1120
New York, New York 10022
rmarion@rogermarion.com

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

whitecase.com

**Re: In re Charge Enterprises, Inc. - Case No. 24-10349**

Dear Mr. Marion,

We write to confirm receipt of your January 21, 2025 letter, which purports to be in response to our prior requests from January 10, 2025, and January 14, 2025, that Mr. Fox immediately (a) return all Company Property that he wrongly obtained and retained and (b) provide a sworn statement or counsel representation that Mr. Fox (i) does not have in his possession, custody, or control any Company Property, including Confidential Information, (ii) never disseminated any Company Property, including Confidential Information, to any entity or individual, and (iii) never downloaded, saved, copied, or otherwise retained any Charge Property, including Confidential Information.

As Mr. Fox has long since ceased his employment with Charge, there should not be any basis to deny this request. Indeed, it is mandated under his employment agreement and separation and consulting agreement. Nonetheless, our January 14, 2025 letter laid out, in detail, the facts behind how Mr. Fox obtained the Company Property for litigation purposes around April 4, 2024, *after* he ceased acting in his role at Charge and over six months after his access to such information had been cut off. Despite request by email on January 14 additional "time to investigate [Arena's] claims," your January 21 letter fails to address *any* of the claims raised therein. It also does not provide the sworn statements or representations that we have been requesting since January 10, 2025. Instead, you merely respond that during his tenure at Charge you are certain he disseminated Company Property in his due capacity. Obviously, downloading, retaining, or dissemination Company Property while he was employed by and acting on behalf of Charge is not what is being asked. But for the avoidance of doubt, we are demanding a sworn response or attorney representation that Mr. Fox (a) does not currently have in his possession, custody, or control any Company Property, and (b) since April 4, 2024 (i) has not downloaded, saved, or copied any Company Property and (ii) has not distributed any Company Property to *any* third party, including without limitation, his co-defendants, their counsel, or his counsel. Please provide such statement or representation no later than **Friday, January 24, 2025** or advise immediately whether you can not do so. If the latter, please advise whether you intend to return or destroy all copies in his possession and provide us with the names of individuals or entities to whom Mr. Fox distributed Company Property.

WHITE & CASE

Lastly, our letter did not contain "ad hominen attacks . . . unworthy of an experienced attorney." Rather, it detailed substantiated facts, pulled directly from correspondence between Mr. Fox and individuals at Charge, including correspondence which you were on.  Enclosed with this letter please find, as one example, the April 4, 2024 email in which Mr. Fox is following up on his requests to access his "old emails to prepare for litigation [with Charge and Arena]" from his co-defendants right before their termination.  You were copied on this email.  Charge's counsel and Arena's counsel, both actively representing the entities at that time, were not.

We reserve all rights.


Sincerely,



**Laura J. Garr**

**T** +212-819-8849
**E** lgarr@whitecase.com

2

**Exhibit 7**

**Email Access Information for the Period August 29, 2024 through January 25, 2025**

| Date | User | Event | Description | Login type | Challenge type | Login failure type | Is suspicious | Is second factor | IP address | Affected user | Email forwarding address | Sensitive action name | Login time | Domain |
|------|------|-------|-------------|------------|----------------|--------------------|---------------|------------------|------------|---------------|--------------------------|-----------------------|------------|--------|
| 2025-01-25T11:49:35-05:00 | a@charge.us | Login failure | a@charge.us failed to login | Reauth | Password | Unknown | FALSE | FALSE | 2600:1017:b830:ffd4:3d2b:433c:f31a:7979 | | | | | charge.us |
| 2025-01-25T11:49:35-05:00 | a@charge.us | Sensitive action blocked | a@charge.us was blocked from the action: Allowing an app access to Google data. Their session was risky and identity couldn't be verified. | Reauth | Password | Unknown | TRUE | FALSE | 2600:1017:b830:ffd4:3d2b:433c:f31a:7979 | | | Allowing an app access to Google data | | charge.us |
| 2025-01-13T14:19:16-05:00 | david@charge.us | Logout | David Pinches logged out | Google password | | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2025-01-13T14:08:28-05:00 | david@charge.us | Login success | David Pinches logged in | Reauth | None | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2025-01-13T14:08:18-05:00 | david@charge.us | Login success | David Pinches logged in | Google password | Password, IDV preregistered phone | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2025-01-13T14:08:18-05:00 | david@charge.us | Login verification | David Pinches was presented with login verification | Google password | IDV preregistered phone | Unknown | FALSE | TRUE | 71.57.214.79 | | | | | charge.us |
| 2025-01-09T14:56:45-05:00 | david@charge.us | Login success | David Pinches logged in | Reauth | Password | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2025-01-09T12:19:24-05:00 | david@charge.us | Login success | David Pinches logged in | Reauth | None | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2025-01-09T12:19:09-05:00 | david@charge.us | Login success | David Pinches logged in | Google password | Password, IDV preregistered phone | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2025-01-09T12:19:09-05:00 | david@charge.us | Login verification | David Pinches was presented with login verification | Google password | IDV preregistered phone | Unknown | FALSE | TRUE | 71.57.214.79 | | | | | charge.us |
| 2025-01-08T23:30:55-05:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Google password | Password | Unknown | FALSE | FALSE | 136.28.63.43 | | | | | backup.charge.us |
| 2024-12-07T22:54:28-05:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Google password | Password | Unknown | FALSE | FALSE | 136.28.63.43 | | | | | backup.charge.us |
| 2024-11-21T11:29:53-05:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Google password | Password | Unknown | FALSE | FALSE | 207.237.78.233 | | | | | backup.charge.us |
| 2024-10-22T10:59:00-04:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Reauth | Password | Unknown | FALSE | FALSE | 207.237.78.233 | | | | | backup.charge.us |
| 2024-10-17T12:16:14-04:00 | david@charge.us | Login success | David Pinches logged in | Reauth | None | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2024-10-17T12:16:01-04:00 | david@charge.us | Login success | David Pinches logged in | Google password | Password, IDV preregistered phone | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2024-10-17T12:16:01-04:00 | david@charge.us | Login verification | David Pinches was presented with login verification | Google password | IDV preregistered phone | Unknown | FALSE | TRUE | 71.57.214.79 | | | | | charge.us |
| 2024-10-12T19:33:03-04:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Google password | Password | Unknown | FALSE | FALSE | 207.237.78.233 | | | | | backup.charge.us |
| 2024-09-25T09:48:48-04:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Google password | Password | Unknown | FALSE | FALSE | 207.237.78.233 | | | | | backup.charge.us |
| 2024-09-18T13:53:56-04:00 | david@charge.us | Logout | David Pinches logged out | Google password | | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2024-09-18T13:51:31-04:00 | david@charge.us | Login success | David Pinches logged in | Reauth | None | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2024-09-18T13:51:17-04:00 | david@charge.us | Login success | David Pinches logged in | Google password | Password, IDV preregistered phone | Unknown | FALSE | FALSE | 71.57.214.79 | | | | | charge.us |
| 2024-09-18T13:51:17-04:00 | david@charge.us | Login verification | David Pinches was presented with login verification | Google password | IDV preregistered phone | Unknown | FALSE | TRUE | 71.57.214.79 | | | | | charge.us |
| 2024-08-29T20:20:38-04:00 | af@backup.charge.us | Login success | af@backup.charge.us logged in | Google password | Password | Unknown | FALSE | FALSE | 70.107.181.206 | | | | | backup.charge.us |